4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 2 0 2001

Michael N. Milby
Clerk of Court

CAMERON COUNTY, TEXAS, et al.,
         Plaintiffs,

              v.                              C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
              Defendants.
_____/

DEFENDANTS' MOTION
TO DISMISS, OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

Defendants hereby move, pursuant to Rules 12(b)(1) and (6), Fed. R. Civ. P., to dismiss

this case for lack of jurisdiction and failure to state a claim upon which relief can be granted.

Alternatively, defendants move for summary judgment pursuant to Rule 56, Fed. R. Civ. P.

Respectfully submitted,

STUART E. SCHIFFER
Acting Assistant Attorney General
GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
ANDREA COHEN
Attorneys, Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CAMERON COUNTY, TEXAS, et al.,
          Plaintiffs,

        v.                       C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
          Defendants.
_____/

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS, OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

                    STUART E. SCHIFFER
                    Acting Assistant Attorney General

                    GREGORY A. SERRES
                    United States Attorney

                    THOMAS MILLET
                    Attorney in Charge
                    D.C. Bar No. 294405
                    ANDREA COHEN
                    Attorneys, Civil Division
                    Department of Justice
                    901 E St., NW
                    Washington, D.C. 20530
                    Tel:(202) 514-3313
                    Fax:(202) 616-8202

                    Attorneys for Defendants.

# Table of Contents

Page

Table of Authorities                                                      i

Statement of the Nature and Stage of the Proceeding                      1

Statement of the Issues to be Ruled upon by the Court                    1

Summary of the Argument                                                  1

Statement of Facts                                                       2

Argument

    I. Plaintiffs' Claims Are Not Justiciable                        8

        A. Plaintiffs' Claims Are Not Ripe                       8

        B. Plaintiffs Lack Standing                             10

        C. Plaintiffs' Challenge to the Revocation
          of the Delegation Rule Is Moot                       12

    II. Plaintiffs Have No Claim for
    Relief on the Merits                                             12

        A. The Delegation Revocation is Procedural
          and Not Subject to Notice and Comment                13

        B. Plaintiffs' Statutory Claim Has No Merit             14

        C. Plaintiffs Have Failed to Allege
          an Equal Protection Violation                        22

Conclusion                                                               24

Table of Authorities

Page(s)

Cases

American Water Works Association v. EPA, 40 F.3d 1266 (D.C. Cir. 1994)     18

Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252 (1977)     23

Bennett v. Spear, 520 U.S. 154 (1997)     10

Bolling v. Sharpe, 347 U.S. 497 (1954)     23

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
  467 U.S. 837 (1984)     19,20

Church of Scientology of California v. United States, 506 U.S. 9 (1992)     12

City of Houston, Texas v. Dept. of Housing
and Urban Development, 24 F.3d 1421 (D.C. Cir. 1994)     11

City of Los Angeles, et al. v. Evans, et al., C.A. No. 01-1671
(C.D. Cal.) (filed Apr. 25, 2001)     passim

Dayton Board of Education v. Brinkman, 433 U.S. 406 (1977)     23

Dept. of Commerce v. United States House of
Representatives, 525 U.S. 316 (1999)     4,20,21

In the Matter of D H, 556 S.W. 2d 628 (Ct. of Civ. App., Waco 1977)     11

Karcher v. Dagget, 462 U.S. 725 (1983)     21

Kirkpatrick v. Preisler, 394 U.S. 526 (1969)     21

Lewis v. United States, 523 U.S. 155 (1998)     19

Lonsdale v. United States, 919 F.d 1440 (10th Cir. 1990)     13

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)     10

McClelland v. Gronwaldt, 155 F. 3d 507 (5th Cir. 1998)     12

CHzPDF - www.foxlio.com

Nolan v. United States, 44 Fed. Cl. 49 (1999)                                        14

O'Brien v. Skinner, 414 U.S. 524 (1970)                                              24

Office of Personnel Management v. Richmond, 496 U.S. 414 (1990)                      11

Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998)                        9

Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539 (5th Cir. 2001)                    10

Regional Rail Reorganization Act Cases, 419 U.S. 102 (1974)                          9

Regions Hospital v. Shalala, 522 U.S. 448  (1998)                                    19,20

Saratoga Savings and Loan Association v. Federal Home Loan Bank
of San Francisco, 724 F. Supp. 683 (N.D. Cal. 1989)                                  14

Schlesinger v. Ballard, 419 U.S. 498 (1975)                                          23

Shipp v. McMahon, 234 F.3d 907 (5th Cir. 2000)                                       23

State of Wisconsin v. City of New York, 517 U.S. 1 (1996)                            passim

Texas v. United States, 523 U.S. 296 (1998)                                          9

United States v. Goodman, 605 F.2d 870 (5th Cir. 1979)                               13

United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113 (1849)                      19

United States v. Hoyland, 960 F.2d 94 (9th Cir. 1992)                                13

United States v. Mead Corp., 121 S.Ct. 2164 (2001)                                   20

United States v. Saunders, 951 F.2d 1065 (9th Cir. 1991)                             13

United States Nat. Bank of Ore. v. Independent Ins. Agents
of America, Inc., 508 U.S. 439 (1993)                                                19

United Transportation Union v. Foster, 205 F. 3d 851 (5th Cir. 2000)                 9

U.S. Railroad Retirement Board v. Fritz, 449 U.S. 166 (1980)                         24

Washington v. Davis, 426 U.S. 229 (1976)                                             23

Watt v. Western Nuclear, Inc., 462 U.S. 36 (1983)     19

Wayte v. U.S., 470 U.S. 598 (1985)     23

Williamson v. Lee Optical, 348 U.S. 483 (1955)     23

Young v. Klutznick, 497 F. Supp. 1318 (E.D. Mich. 1980),
rev'd, 652 F.2d 617 (6th Cir. 1981)     17

Statutes and Regulations

5 U.S.C. § 553     13,14

13 U.S.C. § 141     passim

13 U.S.C. § 221     20

13 U.S.C. § 195     passim

15 C.F.R. § 101     4,1413

65 Fed. Reg. 59713 (Oct. 6, 2000)     4

66 Fed. Reg. 11231 (February 23, 2001)     4,5

P.L 105-119, § 209(j), 111 Stat. 2480, 2483     4,20

Miscellaneous

Accuracy and Coverage Evaluation, Statement on the Feasibility
of Using Statistical Methods to Improve the Accuracy of Census 2000     15

Bureau of the Census, Updated Summary: Census 2000
Operational Plan  (Feb. 23, 1999)     4

Decision of Secretary of Commerce to Release the Tabulations
of Population Reported to States and Localities Pursuant to
13 U.S.C. § 141(c), 66 Fed. Reg. 14520 (March 13, 2001)     8

Dept. of Commerce, 200 Years of U.S. Census Taking: 1790-1990 (1988)     17

Freedman, Pisani & Purves, Statistics 381 (3rd ed. 1998)     15

CItdPDF - www.fasiso.com

GAO, <u>Decennial Census: Overview of Historical Issues,</u>  (1998)          17

Memo from J. Gregory Robinson, Chief, Population Analysis
& Evaluation Staff to Howard Hogan, Chief, Decennial Statistics
Studies Division, March 12, 2001                                             6

Recommendation on Adjustment of Census Counts, March 1, 2001                 5

Report of the Executive Steering Committee for Accuracy
and Coverage Evaluation Policy, March 1, 2001                          <u>passim</u>

## Statement of the Nature and Stage of the Proceeding

Plaintiffs challenge the decision of the Secretary of Commerce not to release data for Census 2000 which have been statistically adjusted through sampling. Defendants file this motion in response to the complaint. No other proceedings have occurred.

## Statement of the Issues to be Ruled upon by the Court

1. Whether, as the Census Bureau continues to study the accuracy of the adjusted data for possible modification and release at a later date, plaintiffs' claims are ripe.

2. Whether plaintiffs have standing to bring their claims, when their claimed harm is a loss of federal and state funds and where they have not claimed that their relative population shares would increase such that they would be eligible for additional funding.

3. Whether plaintiffs' challenge to the revocation of the delegation of authority to decide the adjustment issue to the Census Bureau Director is moot because both the current Acting Director and the Secretary agree that the adjusted data are unreliable and should not be released.

4. Whether defendants violated 13 U.S.C. § 195 by withholding adjusted data determined to be unreliable.

5. Whether the equal protection standard requires release of the adjusted data.

## Summary of the Argument

The case is not justiciable. Defendants were required by 13 U.S.C. § 141 to release census data for redistricting and did so, while indicating that they would continue to review the data for possible modification and future release if serious inconsistencies in the data could be resolved. Because adjusted data which could be used for the funding purposes plaintiffs seek may be released in the future, their claims are not ripe. Plaintiffs also lack standing because they have not claimed that they would increase population share such that they could claim a larger portion of federal or

state funding. Their challenge to the revocation of the rule delegating the adjustment decision to the Director is moot because the current Acting Director's recommendation against the use of adjusted data is in agreement with the Secretary's decision.

Plaintiffs' claims on the merits also fail. The delegation rule is procedural, not substantive, and its revocation did not require notice and comment. The decision not to release the adjusted data is well within the Secretary's authority under 13 U.S.C. § 195 to use sampling "if he considers it feasible...." Indeed, a nearly identical effort by a group of jurisdictions and persons from California, Texas, and elsewhere to limit the Secretary's authority under § 195 was recently and squarely rejected in City of Los Angeles v. Evans, CV 01-1671 (C.D. Cal. Apr. 26, 2001), and the same analysis applies to this action. Finally, plaintiffs equal protection claim is facially deficient because they have failed to allege intentional discrimination.

### Statement of Facts

The decennial census has, historically, contained an undercount of the population. Moreover, the undercount has not been evenly distributed. Rather, in the past, it has affected different demographic groups and geographic areas differently, with certain racial and ethnic groups having higher undercount rates. Because of this "differential undercount," areas with large portions of demographic groups have contended that they are under-represented in legislative apportionment and revenue-sharing programs which include demographic data in their distribution formulae. See generally State of Wisconsin v. City of New York, 517 U.S. 1, 6-8 (1996).

Since the 1980 census, the Census Bureau has studied the efficacy of using statistical sampling to "adjust" the results of the headcounts using a "capture-recapture" methodology. The decennial census, an effort to conduct a complete enumeration of the population, represents the

2

capture. After conclusion of the enumeration, a second intensive sample survey, the recapture, is conducted of the population of designated census blocks around the country. The results of the census enumerations are compared on a block-by-block basis with the results of the survey. Persons found in both the census and the survey are deemed correctly enumerated. Those who could not be matched in both the survey and the census are deemed either erroneous enumerations (overcounts) or omissions (undercounts) from the census. State of Wisconsin, supra at 8-10. Each person in the sample is placed into a designated demographic group, called a post-stratum, identified by the following factors: race, ethnicity, age, sex, housing tenure, mail return rate and metropolitan status/census enumeration method. By comparing data from the survey blocks to the census, an estimate of the undercount or overcount for each post-stratum is derived. These coverage correction factors are then applied to the census through mathematical formulae to synthetically adjust the results. See Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000, p. 12 (Exh 10).[1]

The Commerce Department considered and rejected adjustment for both the 1980 and 1990 Censuses for a variety of reasons pertaining to the accuracy of the results. State of Wisconsin, supra. Nevertheless, to address the persistent differential undercount, the Census Bureau embarked on a two-fold plan to increase the accuracy of Census 2000. First, the Bureau undertook numerous efforts to improve the accuracy of the actual enumeration process, including improved address files

---

[1] For example, one post-stratum in Census 2000 was comprised of non-Hispanic black males, aged 18-29, in non-owner housing, in mailout/mailback areas of metropolitan areas with 500,000 or more population in tracts with a low mail return rate in the census. If the Census Bureau determined that this post-stratum had been undercounted, it would compute a coverage correction factor that could be used to add individuals in the post-stratum to selected blocks. Exh. 10 at 10.

compiled with the assistance of the Postal Service, increased public outreach and marketing through

commercial advertising, and increased use of improved technology.[2]  Second, the Bureau planned

and executed another sample survey, the Accuracy and Coverage Evaluation ("A.C.E."), the results

of which could be reviewed for purposes of a later adjustment.[3]

On October 6, 2000, the Commerce Department published a final rule, 15 C.F.R. § 101,

which delegated to the Director of the Census Bureau the Secretary's authority to decide whether to

adjust Census 2000.  The regulation established a group of senior Census Bureau employees (the

Executive Steering Committee for Accuracy and Coverage Evaluation Policy, or "ESCAP") to

review the A.C.E. results and make recommendations to the Director.  It also provided that, should

the Bureau staff recommend adjustment but the Director elected to the contrary, the adjusted data

would nevertheless be publicly released.  See 65 Fed. Reg. 59713 (Oct. 6, 2000).[4]

On February 16, 2001, the Secretary amended and revoked this rule in part.  66 Fed. Reg.

11231 (February 23, 2001).  The Secretary noted that § 101.1 delegated to the Director the

Secretary's authority for the adjustment decision.  The Secretary further noted that the Director is

ordinarily appointed by the President and confirmed by the Senate, that the Director's position was

vacant (although an Acting Director was, and still is, in place), and that it was unlikely that a

---

[2]  See Bureau of the Census, Updated Summary: Census 2000 Operational Plan at 2-5 (Feb. 23, 1999) (Exh. 1).

[3]  The original plans to employ sampling as a component of the data used to apportion the House of Representatives was challenged in Dept. of Commerce v. United States House of Representatives, 525 U.S. 316 (1999), in which the Supreme Court held that 13 U.S.C. § 195 precluded the use of sampling to apportion the House.

[4]  Congress had previously mandated that the unadjusted data be disclosed in the event that adjusted data were deemed to be released as Census 2000.  P.L 105-119, § 209(j), 111 Stat. 2480, 2483.

Director could be confirmed before the time to make a decision arrives. The Secretary therefore stated that, consistent with Congress' delegation to him of plenary authority over the decennial census, 13 U.S.C. § 141, and the intent of the original rule to have the decision made by an official who is publicly accountable, the prior delegation was revoked and the adjustment decision would be made by the Secretary with advice from the Acting Director and the ESCAP. The Secretary also revoked § 101.2 which had mandated the automatic release of adjusted data, reserving the point for further study. 66 Fed. Reg. 11232:

Early data released by the Census Bureau indicate that the traditional headcount was extremely successful in reducing the undercount rate. Those data indicate a net national undercount rate of 1.18%, compared to 1.61% in 1990. The undercount rate for Hispanics dropped dramatically, from 4.99% in 1990 to 2.85% in 2000, and that for African-Americans fell from 4.57% in 1990 to 2.17% in 2000.[5]

On March 1, 2001, the Acting Director of the Census Bureau and the ESCAP unanimously recommended that the Secretary not release the adjusted data as the official Census 2000 redistricting data.[6] They noted significant inconsistencies in the data which precluded the conclusion that an adjustment would improve overall accuracy of Census 2000. Most important were inconsistencies between the adjusted data and Demographic Analysis ("DA") estimates. DA provides a measure of the population at the national level, through an analysis of data on births, deaths, immigration, emigration, and Medicare enrollments. DA estimates have traditionally been regarded as highly

---

[5] See Exh. 4, pp. 5-6.

[6] Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy, March 1, 2001, (Exh. 4) ("Report"); Recommendation on Adjustment of Census Counts, March 1, 2001, (Exh. 5) ("Recommendation").

accurate at the national level. "DA has long provided the standard against which the accuracy of both censuses and coverage measurement surveys are measured." Report, p. 15.

Contrary to experience or expectation, the initial DA figures indicated that the unadjusted Census 2000 contained a net overcount of the population by 1.8 million persons, id., while the A.C.E. estimated a net undercount in the enumeration of 3.3 million, id. at 3, a total difference of 5.1 million. This difference is significant. The total difference between the DA and A.C.E. , as a percentage of the population, could be as high as 1.9%. Report at 18. In contrast, the difference in 1990, where adjustment was also rejected, was .23%, an eightfold difference.[7]

The ESCAP concluded that this inconsistency was very serious and likely the result of 1) overcounts in the enumeration (meaning an A.C.E.-based upward adjustment would be wrong), 2) underestimates in population estimates in DA over the last decade (meaning that DA is wrong), or 3) undetected errors in the 1990 coverage measurement survey, enumeration or DA. Id. at 15. Because of these differences, "[t]he Census Bureau has determined that it must further investigate this inconsistency, and the possibility of a methodological error, before it can recommend that adjustment would improve accuracy." Id.

The ESCAP found two other possible sources of error which led it to question the accuracy of the A.C.E.-- synthetic error and balancing error. As discussed above, the A.C.E. placed every person contained in the sample within one post-stratum. The A.C.E. estimated a coverage correction factor for each post-stratum and then applied that factor within that post-stratum to the census at the

---

[7]     Table 6, Memo from J. Gregory Robinson, Chief, Population Analysis & Evaluation Staff to Howard Hogan, Chief, Decennial Statistics Studies Division, March 12, 2001 (Exh. 6).

CVisPDF - www.Yextia.com

local level, in a process called synthetic estimation. A key assumption underlying synthetic estimation is that the net census undercount rate is relatively uniform within post-strata. Synthetic estimation is designed to remove the effects of systematic errors, so that when small entities are aggregated, systematic and differential errors in the census can be corrected. The synthetic estimates will not correct random counting errors that occur at any geographic level. The ESCAP was concerned that there might be significant rates of synthetic error because it was not included as a component in comparing the accuracy of the adjusted and unadjusted census. Although local geographic variation in the census undercount rates will affect the accuracy of both the adjusted and unadjusted census figures, the ESCAP took a conservative view in allowing the possibility that local census geographic heterogeneity might decrease the relative accuracy of the unadjusted figures. Report, p. 22-24.

The ESCAP also noted concerns with balancing error. The A.C.E. consists of two surveys, a P sample, which tries to identify persons omitted from the enumeration, and an E sample, which tries to identify those erroneously enumerated in the census. Id. Both samples are taken from selected sample blocks and are matched against the census results for those blocks to determine erroneous enumerations or gross omissions in the census. When a record cannot be matched within the sample, surrounding blocks can be examined to see if a match can be found. "Balancing error occurs when the search area for the P-sample matching does not agree with the search area for E-sample erroneous enumerations." Report, p. 25. The ESCAP noted that the level of balancing error for the A.C.E. results "added to the concerns that adjustment could not be shown to improve accuracy at this time." Id.

On March 6, 2001, the Secretary accepted the recommendations of the ESCAP and the

7

Acting Director and provided his rationale in a decision memorandum the following day.   On the

basis of the unanimous recommendations, the Secretary ordered that the unadjusted data be released

to the states for their use in redistricting.[8]  Meanwhile, the Census Bureau is continuing to study the

data from the census and the A.C.E. and will recommend to the Secretary later this year whether it

considers adjusted data to be more accurate for other uses, such as federal funding.  Report at 6.

Argument

I. <u>Plaintiffs' Claims Are Not Justiciable</u>

Plaintiffs' claims here are not justiciable for three reasons.  First, while defendants

released unadjusted census data for redistricting purposes under 13 U.S.C. § 141, the Census

Bureau continues to study the data to determine whether the  concerns noted above can be

resolved and adjusted data made available in the future for other purposes, such as funding

programs.  Accordingly, plaintiffs' claims are not ripe.  Second, because no plaintiff has alleged

that adjusted data would cause it to gain in population share such that that plaintiff could

legitimately claim a loss of funding from the failure to release adjusted data, no plaintiff has

standing.  Third, plaintiffs' challenge to the revocation of the delegation rule is moot because the

ultimate decision on release of the adjusted data would be unaffected even if plaintiffs were to

prevail.

A. <u>Plaintiffs' Claims Are Not Ripe</u>

Plaintiffs' sole claimed injury is the potential future loss of funding from grant programs

containing population as an element in their funding formulae.  No plaintiff points to a specific

---

[8] Decision of Secretary of Commerce to Release the Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. § 141(c) ("Decision"), 66 Fed. Reg. 14520 (March 13, 2001) (Exh. 7).

8

funding program with such a formula. Rather, each plaintiff makes either a general claim that it will

lose an unspecified amount of funds or calculates its current federal funding on a per capita basis and

assumes that the resulting rate will apply to any person added by adjustment throughout the next

decade. The Secretary's decision to release only unadjusted data applied to his responsibility, under

13 U.S.C. § 141(c), to produce "population counts for State and local redistricting purposes,"

Decision at 1, and he expressly released the unadjusted data "pursuant to Section 141(c) of the

Census Act as the Census Bureau's official redistricting data." Id. at 3. Further, the ESCAP clearly

indicated its intent to study the adjusted data to resolve the concerns identified in its recommendation

and to permit a furhter recommendation regarding use of the adjusted data for federal funding..

Because plaintiffs' claims go to funding, not redistricting, and because the Bureau's continued

research may result in the release of adjustment-based data, plaintiffs' claims are not ripe.

"[R]ipeness is peculiarly a question of timing...." Regional Rail Reorganization Act Cases,

419 U.S. 102, 140 (1974). As an aspect of Article III's limits on judicial power, "[r]ipeness separates

those matters that are premature because the injury is speculative and may never occur from those

that are appropriate for judicial review." United Transportation Union v. Foster, 205 F. 3d 851, 857

(5th Cir. 2000). A claim is unripe when it depends on events which may not happen. Texas v.

United States, 523 U.S. 296, 300 (1998). In such cases, the Supreme Court has looked to three

factors in assessing whether to permit judicial review:

> (1) whether delayed review would cause hardship to the plaintiffs; (2) whether
> judicial intervention would inappropriately interfere with further administrative
> action; and (3) whether the courts would benefit from further factual development of
> the issues presented.

Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

CVAPDF - www.fasou.com

In this case, while defendants determined that they would not release adjusted data for redistricting under § 141(c), the Census Bureau has made plain its intent to continue to study the matter and, potentially, to release adjustment-based data at a later time. Thus, the ESCAP stated that, even with its March 1 recommendation, further study would follow:

> The ESCAP makes this recommendation in light of the information now available. Additional evaluations, research, and analysis may allow the Census Bureau to resolve the noted concerns. The Census Bureau will continue to investigate these issues and will make the results of this research available, as is consistent with the Bureau's long-standing policy of openness.

Report at 3. The Census Bureau may very well conclude that adjustment-based data are, indeed, more accurate than those based on the enumeration, raising the possibility that plaintiffs' claimed future losses will not materialize.

Here, no plaintiff alleges the loss of any funding immediately. Rather, they complain about potential losses over the course of the next decade. See, e.g., Complaint, ¶ 4 (Cameron County fears loss of $75.9 million "over the next decade...."). Absent an allegation that any plaintiff will suffer a concrete loss before the Census Bureau's deliberations are completed, no plaintiff has presented a ripe claim.

### B. Plaintiffs Lack Standing

To obtain federal jurisdiction, a plaintiff must allege and demonstrate standing. Standing requires a plaintiff to demonstrate a concrete injury in fact which was caused by the defendants and which is capable of judicial redress. Bennett v. Spear, 520 U.S. 154, 162 (1997); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Proctor & Gamble Co. v. Amway Corp., 242 F.3d 539, 560 (5th Cir. 2001). Plaintiffs' complaint fails this test and must therefore be dismissed.

Plaintiffs claim that they would receive additional federal and state funds if defendants

release the adjusted data, assuming that their population totals will rise. This assumption is too simplistic to support their claimed injuries, as both federal and state funding levels are generally limited to the total amounts appropriated by the legislative branch. Office of Personnel Management v. Richmond, 496 U.S. 414, 424 (1990); City of Houston, Texas v. Dept. of Housing and Urban Development, 24 F.3d 1421, 1426 (D.C. Cir. 1994); Texas Const., Art. VIII, § 6; In the Matter of D H, 556 S.W. 2d 628 (Ct. of Civ. App., Waco 1977). Given that government funding programs are generally "fixed pies," plaintiffs can only lay claim to increased funding from such fixed appropriations if their respective population shares increase over those of competing jurisdictions, regardless of their actual population totals.[9]   Because it is the relative population share, and not absolute population, which generally controls the amount of any jurisdiction's funding, merely claiming that they will increase population is not sufficient to demonstrate injury. Rather, each plaintiff jurisdiction must show that its relative population share would increase to demonstrate a concrete injury here.

Additionally, the complaint fails to satisfy the causation or redressibility elements of standing. The complaint does not allege that defendants are responsible for any funding allocation decisions which affect plaintiffs. Rather, those decisions will be made by federal and state officials not before this Court. Moreover, in light of the serious inconsistencies identified by the Census Bureau with the accuracy of the adjusted data, it is sheer conjecture to assume that such third party officials would nevertheless use the adjusted data in allocating public funds over the next decade.

---

[9]   Indeed, the allegations of the complaint demonstrate this point. Plaintiff City of Harlingen claims a population undercount of 868 persons, or 1.5% of its population, while plaintiff City of Combs alleges an undercount of 1366 people, or 34.9% of its population, a much larger proportionate effect.

Thus, both the causation and redressibility components of standing are lacking.

## C. Plaintiffs' Challenge to the Revocation
of the Delegation Rule Is Moot

A federal court may only exercise jurisdiction over a live case. Where there is no relief available to address a plaintiff's claimed harm, that plaintiff's claim is moot and must be dismissed. Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992); McClelland v. Gronwaldt, 155 F. 3d 507, 514 (5th Cir. 1998). Here, plaintiffs' challenge to the revocation of the prior rule delegating the authority to decide the adjustment question to the Director is moot because the relief sought would not address plaintiffs' claimed harms. Even if the Court were to undo the revocation of the delegation, the ultimate outcome here would be unchanged. The Acting Director, who would then regain the authority for the adjustment decision, "concur[s] with and approve[s] the Committee's recommendation that unadjusted census data be released as the Census Bureau's official redistricting data." Recommendation at 1. Thus, invalidating the revocation would not affect the ultimate decision and plaintiffs' revocation claim is moot.

## II. Plaintiffs Have No Claim for
Relief on the Merits

Plaintiffs' claims on the merits fare no better. Their challenge to the revocation of the delegation rule must fail, as that action falls within well-recognized exceptions to the APA's notice and comment requirements. Their statutory claim under § 195 is contrary to that section's language and history, as well as logic. A virtually identical claim was recently rejected in Los Angeles for precisely those reasons and, we submit, this Court should be guided by the same rationale. Finally, plaintiffs' equal protection claim must be dismissed for failure to allege intentional discrimination.

## A. The Delegation Revocation is Procedural
## and Not Subject to Notice and Comment

In Count I of their Complaint, plaintiffs allege that the revocation of the delegation to the

Director of the authority to decide the adjustment issue violated the notice and comment

requirements of the APA. The revocation falls squarely into two exceptions to the APA's general

requirement for notice and comment when an agency engages in rulemaking. Section 553(a)(2) of

Title 5 provides that all of the rulemaking requirements of § 553 "appl[y] . . . except to the extent

that there is involved – a matter relating to agency management or personnel . . . ." Similarly,

Section 553(b)(A) provides that the specific notice and comment requirements of § 553 do not apply

"to . . . rules of agency organization, procedure or practice." An internal delegation of administrative

authority, such as the one in former 15 C.F.R. § 101.1(a) vesting authority in the Director of the

Census, plainly involves an agency "management or personnel" decision **and** is a "rule[] of agency

organization [and] practice." For the same reasons, the new rule's revocation of the delegation also

falls within those exceptions. Accordingly, the new rule was appropriately promulgated without

notice and comment rulemaking procedures. See, e.g., United States v. Goodman, 605 F.2d 870,

887-88 (5th Cir. 1979) (internal delegation of authority did not adversely affect public and need not

be published); United States v. Hoyland, 960 F.2d 94 (9th Cir. 1992) (delegation of authority valid

where not published); United States v. Saunders, 951 F.2d 1065, 1068 (9th Cir. 1991) (delegations

from Secretary to Commissioner of IRS have "no legal impact on, or significance for, the general

public," and therefore "simply effect[] a shifting of responsibility wholly internal to the Treasury

Department); Lonsdale v. United States, 919 F.2d 1440, 1446 (10th Cir. 1990) ("APA does not

require publication of [rules] which internally delegate authority to enforce the Internal Revenue

13

laws"); Saratoga Savings and Loan Association v. Federal Home Loan Bank of San Francisco, 724 F. Supp. 683, 687 (N.D. Cal. 1989) (rules delegating authority from Federal Home Loan Bank Board to regional Federal Home Loan Bank exempt from notice and comment under 5 U.S.C. § 553(a)(2) and (b)(A).[10]

The delegation revocation addresses the identity of the officials within the Commerce Department who will review, recommend, and ultimately make the adjustment decision, and, thus, it is a quintessential "management" and "agency procedure" rule. Indeed, in promulgating the original rule, the Secretary expressly reserved the authority to alter or revoke it:

> Nothing in this section diminishes the authority of the Secretary of Commerce to revoke or amend this delegation of authority or relieves the Secretary of Commerce of responsibility for any decision made by the Director of the Census pursuant to this delegation.

To require the Secretary to employ notice and comment procedures in repealing or amending § 101.1 plainly would "diminish[]" his authority to set the management processes of his Department, since the APA expressly provides that he may do so without engaging in those rulemaking procedures. The new rule revoking the prior delegation of decisionmaking authority to the Director is a classic procedural rule which is exempted from notice and comment requirements under 5 U.S.C. §§ 553(a)(2) and 553(b)(A).

### B. Plaintiffs' Statutory Claim Has No Merit

Plaintiffs allege that defendants violated § 195 by favoring the unadjusted data unless the adjusted figures were shown to be more accurate "to a certainty and beyond doubt...." Complaint,

---

[10]   Cf. Nolan v. United States, 44 Fed. Cl. 49, 57 n.5 (1999) (Secretary of Transportation's internal memorandum delegating authority to a subordinate without notice and comment may supersede the regulation reserving that authority to the Secretary until the next annual issuance of that reservation in the Code of Federal Regulations).

¶ 53.  Plaintiffs apparently contend that § 195, which provides that "the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as sampling in carrying out the provisions of this title," means that sampling must be used if those procedures can be operationally completed and adjusted data produced, without regard to the quality of the resulting adjusted data.  Complaint, ¶ 56.  Plaintiffs' claims misperceive the Census Bureau's analysis and the meaning of § 195.

Contrary to plaintiffs' allegations, the ESCAP did not require the adjusted data to be proven superior to a certainty or beyond a reasonable doubt.[11]  Rather, the Census Bureau followed the criteria previously announced by former Director Prewitt, when he authorized the conduct of the A.C.E. in June, 2000: 1) operational success in conducting the A.C.E., 2) consistency of the A.C.E. results with historic patterns of undercount and independent demographic analysis, and 3) a review of A.C.E. quality measures.  Report at 1; Accuracy and Coverage Evaluation, Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000 at 32 (Exh. 10). While the ESCAP concluded that the first of these criteria had been met, it found that there simply was too much uncertainty in the data to determine whether the last two criteria were satisfied.  In particular, the dramatic variance between the adjusted estimates and the DA estimates (which have long been viewed as the preferred estimate of national population) as well as the possibility of unaccounted for synthetic and balancing error, led the ESCAP to its recommendation against the adjusted data.  Further, though the ESCAP noted that it could compare the two data sets through its mathematical measures of accuracy, called loss functions, and that those results generally favored

---

[11]   Indeed, by definition, statistics based on sampling can never express certainty, only probability.  Freedman, Pisani & Purves, Statistics 381 (3rd ed. 1998).

15

adjustment, the uncertainty surrounding the adjusted data made the results of the loss functions unreliable.

Plaintiffs, in their Complaint, appear to confuse the ESCAP's ability to perform calculations meant to measure the relative accuracy of the adjusted and unadjusted data with the ESCAP's more fundamental concerns over the quality of the adjusted data used in those calculations. The ESCAP was careful to separate the two in explaining its recommendation. Thus, after noting that the loss functions generally rendered results favoring the accuracy of the adjusted data, the Committee stated:

> However, the ESCAP notes its concern regarding the unexplained differences between DA and the A.C.E. estimates, which may be indicative of an unmeasured problem in Census 2000 or in the A.C.E. The potential for a reversal of these findings is strong enough to preclude a conclusion at this time that adjustment would improve accuracy. When considering the additional concerns [synthetic and balancing error] described below and taking into account the inconsistencies with DA, the Committee was not prepared to recommend at this time that adjustment would improve accuracy.

Report at 22. The ESCAP did not hold adjustment to a standard of statistical certainty. Rather, it simply found too much uncertainty surrounding the accuracy of the adjusted data to conclude that the results which favored adjustment were reliable. Thus, the ESCAP's analysis was not the result of any presumption in favor of the unadjusted data, but instead stemmed from serious uncertainty with the accuracy of the adjusted data.

In addition to misunderstanding the nature of the ESCAP analysis and the Secretary's decision to follow its recommendation, plaintiffs misperceive the requirements of § 195. In alleging that defendants were required to release adjusted data under § 195, though the quality of those data was deemed by the Bureau to be too uncertain to use, plaintiffs apparently believe that the term "feasible," as used in § 195, means only that sampling can be operationally accomplished without

16

regard to accuracy.  See Complaint, ¶ 56.  Such an interpretation is contrary to § 195's language, its

history, its administrative interpretation, its recent judicial construction, and, perhaps most

importantly, common sense.

There is no textual basis for plaintiffs' assumption that § 195 requires the Secretary to adjust

the data to incorporate the results of the sampling.  Section 195, by its plain terms, focuses upon the

Secretary's decision whether to "authorize" the use of sampling in carrying out the provisions of the

Census Act.  The statute requires that the Secretary authorize the performance of statistical sampling

when such sampling is "feasible."  Section 195 does not, however, require that the Secretary accept

the results of the sampling as the official data.  As the court in City of Los Angeles noted, § 195 does

not "indicate that the Secretary must adjust the final census when making the adjustment decision."

Exh. 16 at 18.  Indeed, "§ 195 was adopted in 1957 and amended in 1976, before serious

consideration was given to adjusting the decennial census.  Thus, § 195 was originally drafted to

authorize the Secretary to use sampling in accumulating supplementary demographic data," rather

than to require the Secretary to adopt adjusted census data.  Id.[12]

Consistent with § 195, the Secretary, through the Census Bureau, "preliminarily

---

[12] Use of a coverage measurement survey to adjust a decennial census was not seriously
considered until the 1980 census.  See, e.g., Young v. Klutznick, 497 F. Supp. 1318 (E.D. Mich.
1980), rev'd, 652 F.2d 617 (6th Cir. 1981).    Thus, § 195's genesis strongly suggests that its
purpose was to authorize the "long form," where a sample of the population receives a detailed
questionnaire on a wealth of topics, while the remainder receives the more familiar "short form."
See Hearing on H.R. 7912 before House Committee on Post Office and Civil Service, 85th
Cong., 1st Sess. at 7-8 (1957)  (letter from Commerce Secretary Sinclair Weeks, noting that the
proposed § 195 would authorize long form-type sampling).  Prior to the 1940 census, every
household received the same form, often quite detailed.  Indeed, the 1890 census form contained
a potential 13,161 questions.  GAO, Decennial Census: Overview of Historical Issues, p. 20
(1998).  Widespread use of long form sampling began in 1940, Dept. of Commerce, 200 Years of
U.S. Census Taking: 1790-1990, 5 (1988), and, as noted above, was expressly approved by
Congress in 1957 with the passage of § 195's predecessor.

determin[ed]" that it was feasible to do sampling, defining "feasible" as being made up of two components: operational feasibility (the ability to conduct the A.C.E.) and technical feasibility (the determination that the A.C.E. satisfied the expectation that it would improve the accuracy of the census).  Exh 10 at 13-14.  Acknowledging the prospective nature of the technical feasibility determination, the Director stated that  the "Census Bureau would not, however, release corrected redistricting data until it has brought its technical judgment to bear in assessing the available data to verify that its expectations have been met."  Id. at 51.  Not surprisingly, under a factual scenario almost identical to the case at hand, the Supreme Court upheld the Secretary's post-census decision not to adjust the data for the 1990 Census.  Wisconsin, 517 U.S. at 19 (noting that no party had even suggested that Congress had constrained the Secretary's discretion not to adjust the census).  As the Supreme Court explained, "the Secretary's decision not to adjust need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census."  Id. at 19-20 (noting also that Congress delegated broad authority to the Secretary under § 141).

The Secretary clearly has the discretion to do more than simply decide if sampling operations are possible and can judge the quality of sampling-based data after the successful completion of sampling operations.  On its face, § 195 authorizes the Secretary to use sampling "*if he considers it feasible,*" clearly denoting that the Secretary is to make a judgment concerning the use of sampling.  Further, the term "feasible" must itself be interpreted in light of the Census Act's overall purposes, see American Water Works Association v. EPA, 40 F.3d 1266, 1270-71 (D.C. Cir. 1994) (approving agency interpretation that "feasible" means "capable of being accomplished in a manner **consistent with the Act**") (emphasis added), and that, viewed in such a light, the term must be read to include

18

an "accuracy," as well as an operational feasibility, component.  Indeed, such a view is mandated by standard canons of statutory construction that require courts to read a provision consistently with its object and policy.  Regions Hospital v. Shalala, 522 U.S. 448, 460 n.5 (1998) (citing United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 455 (1993), and United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122 (1849)).

Any other interpretation of § 195 would lead to absurd results.  Under plaintiffs' view, once the Secretary determined that conducting the A.C.E. was operationally feasible, he would be required to adopt its results no matter how absurd such results might be, how little confidence statisticians had in their accuracy, and even if all other indications were that the sampling results varied wildly from the true figures the census was seeking.  Such a literal interpretation of the term "feasible," "is not a sensible interpretation . . . since a literal reading . . . would dramatically separate the statute from its intended purpose."  Lewis v. United States, 523 U.S. 155, 160 (1998).  See also Watt v. Western Nuclear, Inc., 462 U.S. 36, 56 (1983).

Thus, neither the language nor the history of § 195 supports plaintiffs' position.  Further, defendants' administrative construction of that section is strong evidence that plaintiffs' interpretation cannot be accepted.  Such administrative interpretations are entitled to substantial judicial deference:

> "[W]hen we examine the Secretary's rule interpreting a statute, we ask first whether 'the intent of Congress is clear' as to 'the precise question at issue.'  Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984).  If, by 'employing traditional tools of statutory construction,' id., at 843, n. 9, we determine that Congress' intent is clear, 'that is the end of the matter,' id., at 842.  But 'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'  Id., at 843.  If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer 'the court would have reached if the question initially had arisen in a judicial proceeding.'  Id., at 843, n. 11."

19

Regions Hospital v. Shalala, 522 U.S. 448, 457 (1998).

Indeed, deference in light of statutory ambiguity is particularly appropriate here, where the Census Act as a whole vests broad discretion in the Secretary to conduct the Census, including determining its form and content. United States v. Mead Corp., 121 S.Ct. 2164, 2171 (2001) (Chevron deference applies where Congress expected agency to speak with authority and "a reviewing court has no business rejecting" the agency's interpretation). Through the Census Act, Congress has delegated its broad authority over the census to the Secretary, Wisconsin v. City of New York, 517 U.S. 1, 15 (1996), and 13 U.S.C. § 141(a) gives discretion to the Secretary to take "a decennial census of [the] population . . . in such form and content as he may determine." The Supreme Court has recently reiterated its view of the Secretary's wide discretion in Department of Commerce v. United States House of Representatives, 525 U.S. 316 (1999), noting that, even after the 1976 amendments to § 195, "the Secretary retained substantial authority to determine the manner in which the decennial census is conducted." 525 U.S. at 341.

Of course, the Secretary's discretion is not entirely unfettered, but both the Constitution and the statute embody a preference for a measure of accuracy determined by the Secretary that far outweighs any presumed preference for a particular methodology. Section 141(a) makes clear that it is the "census," or "count," that is the primary purpose of the Census Act, and Congress has reiterated the importance of accuracy as recently as 1997, when it issued findings that "it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States." P.L. 105-119, title II, § 209(a)(6)-(7), 111 Stat. 2480

20

(November 26, 1997), codified at 13 U.S.C. § 141 note.[13]

Courts have also explicitly recognized the importance of accuracy in determining "official" census figures, see Kirkpatrick v. Preisler, 394 U.S. 526 (1969); Karcher v. Dagget, 462 U.S. 725, 738 (1983), and the Supreme Court found that the Secretary's role in determining what factors are relevant in determining accuracy is paramount. Wisconsin v. City of New York, 517 U.S. at 20-21.

Here, defendants have interpreted § 195's "feasibility" standard to include the discretion to evaluate the accuracy of sampling-based census results. This interpretation is in keeping with the purpose of the Census Act, its language, and its history. Indeed, any other result would defy common sense.[14]

The precise argument advanced by plaintiffs was recently rejected in City of Los Angeles, et al. v. Evans, et al., C.A. No. 01-1671 (C.D. Cal.) (filed Apr. 25, 2001) (Exh.16). In rejecting a claim virtually identical to this one, the court found that a reading of "feasible" in § 195 that required the use of adjusted data whenever sampling was operationally feasible, without regard to the data's reliability, simply made no sense:

> If "feasible" means nothing more than operational feasibility – i.e., physical possibility – then the statute, literally read, strips the Secretary of all ability to consider the accuracy of an adjusted census figure, even if all evidence indicates that

---

[13] Several provisions of the Census Act even impose criminal liability for the provision to a Census official of "any suggestion, advice, information or assistance. . . with the intent or purpose of causing an inaccurate enumeration of the population" See, e.g., 13 U.S.C. § 221.

[14] It would also attribute a bizarre intent to Congress. Indeed, under plaintiffs' interpretation of § 195, the same section which they contend requires the release of adjusted data of undetermined quality also prohibits the use of adjusted data for reapportioning the House of Representatives. Department of Commerce v. United States House of Representatives, 525 U.S. 316 (1999). It is hard to imagine why Congress would deem sampling methods improper for apportionment, but turn around and mandate their production for other uses of the census, particularly where so much uncertainty surrounds the data.

21

the adjustment process developed flawed data. Under such circumstances, the strict reading offered by Plaintiffs would require release of a population count that was universally regarded as grossly inaccurate. Reading the statute in this way defeats the purpose of the Census Act in general and the specific purpose behind Congress's encouragement of the use of statistical sampling methods.

Mem. Op. at 17. Rejecting this view, and applying appropriate Chevron deference, the court found that defendants' decision not to release adjusted data was rationally based upon the the demonstrated inconsistency between DA and the A.C.E., as well as the other potential sources of error identified in the ESCAP Report. The court expressly declined to import "legally derived standards of proof, such as 'beyond a reasonable doubt,' 'clear and convincing evidence' or 'preponderance of the evidence,'" id at 24, to make the adjustment decision, as plaintiffs here seek to do. Rather, the court found that the Bureau had properly looked to "the sort of evidence that would give professionals in the field pause before recommending substitution of adjusted data for unadjusted data.." Id.

C. Plaintiffs Have Failed to Allege
an Equal Protection Violation

Finally, plaintiffs' equal protection claim must be dismissed under well-settled constitutional principles.[15] The crux of plaintiffs' claim is that the Secretary's decision not to adjust the census results using the ACE methodology resulted in a differential undercount of the population, and that the undercount had a disparate impact in undercounting Hispanics. But even if plaintiffs could prove these allegations, it is axiomatic that plaintiffs cannot make out a race or ethnicity-based equal

---

[15] It is far from clear that plaintiffs have standing to raise equal protection claims involving alleged discrimination against people of Hispanic origin. Plaintiffs are cities and counties of Texas and two public officials suing in their official capacities who do not allege that they are members of a constitutionally protected class. Because, as a prudential matter, courts generally disfavor permitting plaintiffs to invoke the constitutional rights of third parties, these governmental plaintiffs should not be permitted to press an ethnicity-based equal protection claim themselves.

22

CSVPDF - www.fesisx.com

protection claim on the basis of disparate impact alone.   Washington v. Davis, 426 U.S. 229, 239

(1976); Shipp v. McMahon, 234 F.3d 907 (5th Cir. 2000).[16]  To make out an equal protection claim,

plaintiffs would have to allege intentional discrimination on the part of defendants, see, e.g., Dayton

Board of Education v. Brinkman, 433 U.S. 406 (1977);  Arlington Heights v. Metropolitan Housing

Dev. Corp., 429 U.S. 252 (1977), or show that the policy in question made an ethnicity-based

classification on its face, see Wayte v. U.S., 470 U.S. 598, 610 (1985).  In their complaint, however,

plaintiffs claim only that the decision's effect had a disparate impact on Hispanics, see Complaint,

¶ 58-60.  Plaintiffs allege that the motivation for the Secretary's adjustment decision was an

inaccurate understanding of what § 195 required, see Complaint, ¶ 57, and not an intent to

invidiously discriminate against a protected class.  In the absence of any allegation – or any shred

of evidence – of an intent on the part of defendants to discriminate, any ethnicity-based equal

protection challenge must be dismissed.[17]

Of course, plaintiffs do not fare any better under the "rational basis" equal protection analysis

---

[16] Unlike the fourteenth amendment, which applies only to the States, the fifth amendment has no independent equal protection clause. However, the Supreme Court has held that the fifth amendment's due process clause "prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.' " Schlesinger v. Ballard, 419 U.S. 498, 500 n.3 (1975), quoting Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

[17] Indeed, to the contrary, published documents set out a host of race-neutral reasons for Secretary Evans' decision not to adjust, and the government's extraordinary efforts to enumerate minority residents also belie any inference that Census officials pursued a deliberate policy of undercounting minority residents. Among other measures, the Census Bureau engaged in targeted advertising directed at raising mail response among historically undercounted populations  and special advertising messages and campaigns targeted at hard-to-enumerate populations (including undocumented immigrants,) ESCAP report at 11 (Exhibit 19)   In many respects, these efforts were fruitful, as the net "undercount" rate as estimated by the ACE for the "Hispanic Origin" population was 2.85%, substantially less than the 4.99% undercount rate estimated by the 1990 adjusted census figures.

that is applied when a court is asked to review a government action or rule that does not implicate

a protected class or a fundamental right. See, e.g., U.S. Railroad Retirement Board v. Fritz, 449 U.S.

166 (1980); Williamson v. Lee Optical, 348 U.S. 483 (1955). Defendant's decision to release

unadjusted figures has already been upheld by one court, see Los Angeles et al. v. Evans, and the

reasoning behind the decision easily withstands the appropriate rational basis review.[18]

Conclusion

For the foregoing reasons, plaintiffs' complaint should be dismissed or, alternatively,

judgment entered for defendants.

Respectfully submitted,

STUART E. SCHIFFER
Acting Assistant Attorney General

GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
ANDREA COHEN
Attorneys, Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202
Attorneys for Defendants.

---

[18] Nor is plaintiffs' reliance on O'Brien v. Skinner, 414 U.S. 524, 530 (1970) of any assistance to them here. In that case, a fractured Court struck down the application of a state statute that denied certain incarcerated individuals – who were, under state law, qualified voters – an opportunity to vote. Because plaintiffs do not claim that the census results would deprive any individual person or class the right to the franchise, O'Brien is entirely inapposite.

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CAMERON COUNTY, TEXAS, et al.,
    Plaintiffs,

v.

                          C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
           Defendants.
_____/

## ORDER

This matter having come before the Court on Defendants' motion to dismiss or for

summary judgment, and the opposition thereto, and the Court having found that this case is not

justiciable because plaintiffs' claim for release of adjusted census data is not ripe,  plaintiffs lack

standing for such a claim, and plaintiffs' challenge to the revocation of the delegation rule is

moot, and having further found that plaintiffs' statutory and constitutional claims lack merit, it is,

this ____ day of _____, 2001, hereby

ORDERED that plaintiffs' complaint be, and hereby is, dismissed.

_____
UNITED STATES DISTRICT JUDGE

<u>Certificate of Service</u>

I hereby certify that Defendants' Motion to Dismiss, or in the Alternative, for Summary

Judgment, and accompanying memorandum and appendix were served this 19th day of July,

2001, by placing it in Federal Express, overnight delivery to:


Rolando L. Rios
115 E. Travis
Suite 1024
San Antonio, TX 78205


THOMAS MILLET

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CAMERON COUNTY, TEXAS, et al.,
Plaintiffs,

v.                                      C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
Defendants.
_____/

APPENDIX TO MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION
TO DISMISS, OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

STUART E. SCHIFFER
Acting Assistant Attorney General

GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
ANDREA COHEN
Attorneys, Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202

Attorneys for Defendants.

# TABLE OF CONTENTS

TAB   DOCUMENT

1.   Bureau of the Census Updated Summary: Census 2000 Operational Plan; Excerpt: (Full Document at www.census.gov/dmd/www./pdf/InfoMem.pdf)

2.   15 C.F.R. §101 66 Fed. Reg. 59713 (Oct. 6, 2000)

3.   66 Fed. Reg. 11231 (Feb. 23, 2001)

4.   Report of Executive Sheering Committee for Accuracy and Coverage Evaluation Policy, March 1, 2001

5.   Recommendation on Adjustment of Census Courts, March 1, 2001

6.   Table 6, Memo from J. Gregory Robinson, Chief Population Analysis and Evaluation Staff to Howard Hogan, Chief, Decennial Statistics Studies Division, March 12, 2001 (Full document at www.census.gov/dmd/www/pdf/Fr4.pdf

7.   Decision of Secretary of Commerce to Release Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. § 141(c) 66 Fed. Reg. 14520 (Mar. 13, 2001)

8.   Nolan vs. United States, 44 Fed. Cl. 49 (1999)

9.   Freedman, D., Pisani, R. and Purves, R. Statistics (1998)

10.   Accuracy and Coverage Evaluation, Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000; Excerpt (Full document at www.census.gov/Press-Release/www/feasibility.pdf

11.   Hearing on H.R. 7912 before House Committee on Post Office and Civil Service, 85th Cong., 1st Sess. (1957)

12.   General Accounting Office Decennial Census: Overview of Historical Issues (1998) (Excerpt)

13.   Dept. of Commerce, 200 Years of U.S. Census Taking: 1790-1990 (1998) (Excerpt)

14.   71 Stat. 481, 484 (1957)

15.   90 Stat. 2459, 2464 (1976)

16.   City of Los Angeles vs. Evans, C.A. 01-1671 (C.D. Cal.)

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 36 of 155

# UPDATED SUMMARY: CENSUS 2000 OPERATIONAL PLAN

Census 2000 will occur next year to determine how many people reside in the United States, precisely where they reside, and their demographic characteristics. Census 2000 is the nation's largest and most complex mobilization, and will include numerous critical phases, such as preparing address lists, mailing questionnaires, performing quality checks and tabulating census results.

The data gathered by Census 2000 will serve several critical purposes for American government and society. The data are used to apportion the U.S. House of Representatives among the states, draw legislative districts within each state, allocate nearly $200 billion in annual Federal funding, and provide the baseline demographic statistics for planning, implementing and evaluating the provision of Federal, state and local services and private business decisions.

In January, consistent with the Congressional mandate that the Census Bureau plan two separate census tracks, the Census Bureau issued two operational plans for conducting Census 2000. The first track "Census 2000 Operational Plan" is a revised version of the Census Bureau's original plan using statistical sampling methodology for all purposes. The second track "Census 2000 Operational Plan: Using Traditional Census-Taking Methods" is the Census Bureau's plan for conducting the decennial census without using statistical sampling for purposes of apportionment.

After the Bureau completed those plans, important developments occurred. First, the Census Bureau completed more thorough evaluations of the Census 2000 Dress Rehearsals conducted in 1998 in Sacramento, CA, Menominee County, WI, and the 11 counties of and around Columbia SC. In addition, on January 25, 1999, the U.S. Supreme Court ruled that a 1976 amendment to the Census Act bars the use of statistical sampling to correct the decennial data used to apportion seats in the U.S. House of Representatives among the states. However, the Court opinion also acknowledged that the 1976 amendment requires the use of statistical sampling for non-apportionment purposes, if it is feasible to do so.

The Census Bureau is preparing a plan designed to ensure the most accurate decennial census legally possible. The Census Bureau is continuing to refine this plan to be consistent with the decision of the Supreme Court, as well as the lessons from the Dress Rehearsals. In developing this plan, the Census Bureau has determined that it is feasible to conduct and complete the statistical procedures necessary to provide corrected data for all purposes other than apportionment within the legally mandated schedule. The Bureau also believes that such corrected data will be substantially more accurate than the raw data.

CSXPDF - www.fasino.com

Case 1:01-cv-00082    Document 4    Filed in TXSD on 07/20/2001    Page 37 of 155

This plan includes data collection from 100 percent of households and housing units. In addition, the plan includes an extensive statistical operation to measure and correct overall and differential coverage of U.S. residents in Census 2000. This operation consists of a scientific sample of approximately 300,000 housing units, and will use regional groupings to generate corrected counts.

The Census Bureau will carry out the plan in accordance with a detailed Master Activity Schedule that catalogues the start and finish dates for the multitude of separate but interrelated activities entailed in Census 2000. The Bureau is completing development of this Master Activity Schedule. The major elements of the plan and schedule are outlined below.

## A.    *Marketing Program*

Census 2000 will include, for the first time, an integrated communications effort to increase awareness of the Decennial census and boost response rates. Because the Census Bureau will need to reach 100 percent of housing units, the marketing program has been expanded to achieve this goal. There are three phases to the marketing program: (1) Prior to Census Day, build awareness of the Census and how it will benefit communities; (2) During the mailout/mailback period, motivate people to return their questionnaire promptly; and (3) During the enumerator follow-up period, encourage cooperation with census enumerators.

The comprehensive marketing program includes five major activities:

- *Partnerships:* Form partnerships between the Census Bureau and other federal agencies, state, local and tribal governments, and community-based organizations and businesses, to draw on the unique knowledge, experience and expertise of these partners. The Census Bureau has already hired over 300 partnership specialists to manage these relationships and plans to hire more, and has already signed over 10,000 partnership agreements with local, city, and state governments, businesses, and community organizations.

- *Paid Advertising:* Conduct the first-ever paid advertising campaign, including a national media campaign aimed at increasing mail response, targeted advertising directed at raising mail response among historically undercounted populations, and special advertising messages and campaigns targeted to hard-to-enumerate populations. Advertising will also focus on encouraging cooperation during the non-response follow-up procedures.

CHAPDF - www.hsoia.com

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 38 of 155

- *Special Methods to Encourage Mail Response:* In addition to the questionnaire, households will receive a letter alerting people to the coming census questionnaire and a reminder postcard urging their response. In addition, all Census mailings, including the questionnaires, envelopes, motivational slogans and logos, are being designed to support and reinforce the marketing plan.

- *Media Public Relations:* Media specialists will be assigned to the regional census centers to cultivate local press contacts and respond to local media inquiries.

- *Promotion and Special Events:* A variety of special events, including parades, athletic events and public service television documentaries will be cosponsored by state, local and tribal governments and by community organizations and businesses to motivate people to respond.

## B.    The Census Questionnaires

In Census 2000, the questionnaire mailout/mailback system will be the primary means of census-taking. Because results of the Dress Rehearsal indicated that the use of a second mailing could contribute serious inaccuracies to the census count, Census will only mail one questionnaire per household. Cities, towns, and suburban areas with city-style addresses (house number and street name), and rural areas where city-style addresses are used for mail delivery will comprise the mailout/mailback areas. In areas where the addresses are predominantly non city-style, census enumerators will deliver addressed questionnaires for respondents to mail back. Every housing unit in the country will receive either the "short" form, or the "long" form.

- The Census **short form** will be delivered to approximately 83 percent of all housing units. It will allow the respondent to provide complete information for six household members and to list up to 6 additional household members (with follow-up to obtain information on these members). The Census 2000 form will ask for information on only seven subjects (name, sex, age, relationship, Hispanic origin, and race for each household member, as well as whether the home is owned or rented).

- The Census **long form** will be delivered to a sample - approximately 17 percent - of all housing units. It will also allow respondents to list up to 12 household members. This form will include the short form questions, as well as a number of additional questions on the social, economic, financial, and physical characteristics for up to 6 household members (with follow-up for other members when needed). The Bureau will use a variable rate sampling plan to collect the

CNsPDF - www.fxsite.com

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 39 of 155

> long form data. This will allow for more efficient allocation of the sample and will maintain the accuracy and reliability of census data at small geographic levels, while reducing respondent burden.

The questionnaires collect data the nation needs to meet the statutory data requirements of the federal agencies and to administer state, local, and tribal government programs. The process began with an evaluation of the questions used in 1990. All federal agencies were asked to identify programs required by law to use census data. Non-federal requirements were obtained by a survey directed to a broad spectrum of data users, such as state, local, and tribal governments; ethnic and community organizations, the business sector; academic researchers and librarians; religious groups; and the public. Two extensive tests were conducted in 1996 to evaluate the proposed questions, and the Bureau conducted a wide range of focus groups and cognitive research. On March 31, 1997, as required by law, the Bureau submitted to the Congress the list of subjects planned for inclusion in the short and long forms, and on March 30, 1998 submitted to the Congress the actual questions.

In addition to carefully formulating the questions, the Bureau has made a number of other improvements to the forms to increase the mail response in Census 2000, and to improve the accuracy of the information collected:

- *Respondent-friendly format*: The Bureau worked with private sector designers to design forms that are easier to understand, explain why the question is being asked, and are simple to complete and mail back. Graphic icons, color contrasts, navigational aids, better grouping of questions, and more accessible instructions, are some of the improvements over the forms used in 1990.

- *Multiple mail contacts*: The Bureau's research has shown that multiple mail contacts with respondents will increase the response rate. In Census 2000 respondents will receive an advance letter alerting them that the form is coming, and a later post card reminding them to mail the questionnaire if they have not done so.

- *Questionnaires in other languages*: Forms will be mailed in five other languages (Chinese, Korean, Spanish, Tagalog, and Vietnamese) to households who request them in response to the advance letter. In addition, questionnaire assistance booklets will be available in over 30 languages.

- *Special forms:* Special forms will be used to increase the participation of people who might otherwise go uncounted in Census 2000. For example, there will be a special short form used in the Be Counted program, for people who did not

CSXPDF - www.texlis.com

Case 1:01-cv-00082    Document 4    Filed in TXSD on 07/20/2001    Page 40 of 155

receive a form in the mail or believe they were not included in a mailback questionnaire. There will also be special forms used to count people in living situations that require special operations, such as dormitories, nursing homes, and military bases.

## C.    *Address List Development*

In order to mail out questionnaires and control the collection and tabulation of Census 2000 data, the Census Bureau will identify all living quarters in the country and locate them with respect to the geographic areas for which census data are reported.  The Bureau will accomplish this by creating a Master Address File (MAF) that identifies all living quarters and locates those addresses in its geographic database called TIGER (Topologically Integrated Geographic Encoding and Referencing). The building and maintenance of the MAF and TIGER involve partnerships with other federal agencies, state, local, and tribal governments, and regional and metropolitan planning agencies.  The Bureau will create and maintain the MAF through a series of operations that are determined by whether the area involved consists predominantly of city-style addresses or non city-style addresses.

The MAF for **city-style addresses** is created by combining addresses from the Census Bureau's 1990 Census Address Control File with addresses in the U.S. Postal Service (USPS) Delivery Sequence File.  Each address is then located in the TIGER database.  If an address cannot be located, the location is researched and resolved through an office or field operation or through assistance from local partners.  For Census 2000, two additional operations will be implemented to improve the quality of the MAF for city-style addresses:

- *100 percent block canvass*:  The first is a 100 percent block canvass to ensure consistently good address coverage in the MAF and to ensure correct geographic locations for all addresses.  Census enumerators will canvass every road and street in areas of city-style addresses looking for every place where people live or could live, and compare the address of each living quarters with the addresses on the Census 2000 address list.  As block canvassing is completed, the Bureau will data-capture the address updates in a keying operation and will enter the updated map information into the TIGER database. The MAF will be updated with the results of the block canvassing in time to use the updated address information for delivery of questionnaires.

- *Postal Check*:  The Bureau will also add  a Postal Check in which USPS letter carriers will be asked to validate the addresses in the MAF, identifying and adding addresses that are missing.  This postal validation to be conducted close to Census

    Day will help ensure that new construction and previously missed units are added to the MAF.  The Bureau is planning an additional procedure that will provide an update of

CMzPDF - www.texiss.com

## DEPARTMENT OF TRANSPORTATION

**Federal Aviation Administration**

**14 CFR Part 187**

**[Docket No. FAA–00–7018; Amendment No. 187–11]**

**RIN 2120–AG17**

**Fees for FAA Services for Certain Flights; Extension of Comment Period**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Interim final rule; extension of comment period.

**SUMMARY:** On June 6, 2000, the FAA published an Interim Final Rule (IFR) establishing fees for FAA air traffic and related services for certain aircraft that transit U.S.-controlled airspace but neither take off from, nor land in, the United States and invited comments for a 120-day period. The IFR went into effect on August 1, 2000, and the comment period was originally scheduled to close on October 4, 2000. However, the FAA is extending the comment period to October 27, 2000, to ensure that affected entities( mostly foreign) have sufficient time to comment on the contents of the docket.

**DATES:** Comments must be received on or before October 27, 2000.

**ADDRESSES:** Address your comments to the Docket Management System (DMS), U.S. Department of Transportation, Room Plaza Level 401, 400 Seventh Street, SW., Washington, DC 20590–0001. You must identify the docket number "FAA–00–7018" at the beginning of your comments, and you should submit two copies of your comments.

You may also submit comments through the Internet to http:// dms.dot.gov.

You may review the public docket containing comments to this interim rule in person in the Dockets Office between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The Dockets Office is on the plaza level of the NASSIF Building at the Department of Transportation at the above address. Also, you may review public dockets on the Internet at http:/ /dms.dot.gov.

**FOR FURTHER INFORMATION CONTACT:** Randall Fiertz, Office of Performance Management, (APF–1), Federal Aviation Administration, 800 Independence Avenue, SW., Washington, 20591; telephone (202) 267–7140; fax (202) 493–4191.

**SUPPLEMENTARY INFORMATION:**

**Comments Invited**

Interested persons are invited to comment on the interim rule submitting such written data, views, or arguments as they may desire. Comments relating to the environmental, energy, federalism, or economic impact that might result from adopting the interim rule are also invited. Substantive comments should be accompanied by cost estimates. Comments must identify the regulatory docket or notice number and be submitted in duplicate to the Rules Docket address specified above.

All comments received, as well as a report summarizing each substantive public contact with FAA personnel on this interim rule will be filed in the docket. The docket is available for public inspection before and after the comment closing date.

The Administrator will consider all comments received on or before the closing date. Late-filed comments will be considered to the extent practicable. The Interim Final Rule, as well as the Final Rule, may be changed in light of the comments received.

Commenters wishing the FAA to acknowledge receipt of their comments must include a pre-addressed, stamped postcard on which the following statement is made: "Comments to Docket No. FAA–00–7018." The postcard will be date-stamped and mailed to the commenter.

**Availability of Interim Final Rule**

You can get an electronic copy using the Internet by taking the following steps:

(1) Go to the search function of the Department of Transportation's electronic Docket Management System (DMS) web page (http://dms.dot.gov/ search).

(2) On the search page type in the last four digits of the Docket number shown at the beginning of this notice. Click on "search."

(3) On the next page, which contains the Docket summary information for the Docket you selected, click on the document number for the item you wish to view.

You can also get an electronic copy using the Internet through FAA's web page at http://www.faa.gov/avr/arm/ nprm/nprm.htm or the **Federal Register's** web page at http:// www.access.gpo.gov/su_docs/aces/ aces140.html.

You can also get a copy by submitting a request to the Federal Aviation Administration, Office of Rulemaking, ARM–1, 800 Independence Avenue, SW., Washington, DC 20591, or by calling (202) 267–9680. Make sure to

identify the docket number of this rulemaking.

**Extension of Comment Period**

On June 6, 2000, the FAA published Amendment No. 187–11, Fees for FAA Services for Certain Flights (65 FR 36002). The FAA requested that comments to that document be submitted on or before October 4, 2000. The FAA has received and reviewed approximately 70 comments. In response to the extreme significance and international implications of this IFR, as expressed in the comments, FAA is extending the comment period to give affected entities (mostly foreign) additional time to comment on the contents of the docket. Also, the first billing under this rule has recently occurred and entities that may not have commented to date may desire to comment. This action provides the opportunity.

The FAA determines that extending the comment period is in the public interest and that good cause exists for taking this action. Accordingly, the comment period for Amendment No. 187–11 is extended until October 27, 2000. If possible, any comments received after this date will be considered by the FAA prior to any further action in this rulemaking.

Issued in Washington, DC, September 29, 2000.

**Donna McLean,**

*Assistant Administrator for Financial Services.*

[FR Doc. 00–25633 Filed 10–3–00; 2:42 pm]

**BILLING CODE 4910–13–M**

## DEPARTMENT OF COMMERCE

**Bureau of the Census**

**15 CFR Part 101**

**[Docket No.: 000609172–0268–02]**

**RIN 0607–AA33**

**Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. 141(c) and Availability of Other Population Information**

**AGENCY:** Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** The Department of Commerce is issuing a final rule setting forth how the Bureau of the Census will carry out its responsibilities to report tabulations of population to States and localities pursuant to 13 U.S.C. 141(c) and in making available certain other population information.

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 42 of 155

**DATES:** This rule is effective November 6, 2000.

**FOR FURTHER INFORMATION CONTACT:** John H. Thompson, (301) 457–3946.

**SUPPLEMENTARY INFORMATION:** Through the Census Act, which is codified in title 13 of the United States Code, Congress has delegated to the Secretary of Commerce its broad constitutional authority over the decennial census (see U.S. Constitution Art. I, Sec. 2, Cl.3). On June 13, the Commerce Department issued a proposed rule that would set forth how the Bureau of the Census will carry out its responsibilities to report tabulations of population to States and localities pursuant to the Census Act. *See* 65 FR 38370 (June 20, 2000). The proposed rule would establish a process for the release of data to the States and codify the process by which a committee of senior career officials of the Census Bureau would advise the Director of the Census. In addition, the proposed rule contained a delegation of authority from the Secretary to the Director of the Census to make a determination regarding the methodology to be used in calculating the tabulations of population to be reported to States and localities pursuant to 13 U.S.C. 141(c). While the background and basis for the entire proposal were included in the June 20 publication and are not repeated here, this delegation of authority to the Director, in particular, was included in the proposed rule because the decision turns entirely on operational and methodological implementation within the scientific expertise of the Bureau of the Census, and it is important to avoid even the appearance that considerations other than those relating to statistical science are being taken into account.

## Comments and Responses

*Comments in Support of the Proposed Rule*

The Department received 17 letters in support of the proposed rule. There were a total of 243 signatories to these letters. Comments included one letter signed by four Directors of the Census Bureau; five letters with six signatories from statistical, social science, and survey research organizations; three letters with six signatories from universities or university-based research institutions; two letters signed by 69 Members of Congress; three letters with 15 signatories from national associations and organizations; two letters with two signatories from state or local government officials; and one letter with 141 signatories from a public interest organization.

## Comment

Common to the letters in support of the proposed rule were the following two comments: (1) The decision on the use of statistically corrected redistricting and other non-apportionment data from Census 2000 is a technical/scientific decision that should be made by the Director of the Census upon the recommendation of his or her professional staff, and (2) the rule ensures that other, irrelevant considerations, especially those that are political in nature, do not affect the decision-making process. A number of comments stated agreement with the intent to ensure that politics do not dictate what should be a scientific decision. Others said the proposed rule sets forth a fair and unbiased procedure for making a vital decision on the release of statistically corrected redistricting and other non-apportionment data. Others viewed the release of the recommendation of the Executive Steering Committee for Accuracy and Coverage Evaluation (A.C.E.) Policy (ESCAP) to the public at the same time that it is delivered to the Director as helpful in ensuring that the proposed decision-making process is an open and transparent one.

## Response

The Department notes the support for the proposal stated in these comments.

*Comments in Opposition to the Proposed Rule*

The Department received seven letters in opposition to the proposed rule. There were a total of 12 signatories to these letters. Two of these letters were signed by university officials; one letter was signed by six Members of Congress; two letters with two signatories from state government officials; one letter with one signatory from a non-profit legal organization; and one letter from a private individual.

## Comment

Several of those commenting viewed the contents of the "Accuracy and Coverage Evaluation—Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000," 65 FR 38373–38398 (hereinafter, the Feasibility Statement), as evidence that the Census Bureau pre-judged the superior accuracy of the sampling-based counts.

## Response

We regret this concern. To date, no decision has been reached. The Census Bureau has stated that it expects the statistically corrected data to be more accurate for non-apportionment uses of

the data, including redistricting and for this reason it is implementing the Accuracy and Coverage Evaluation (A.C.E.) (see the Feasibility Statement). However, the Census Bureau will not determine whether it is appropriate to release statistically corrected redistricting data until it has brought its technical judgment to bear in assessing the available data to verify that its expectations have been met. The Census Bureau will consider operational data to validate the successful conduct of the A.C.E., assess whether the A.C.E. measurements of undercount are consistent with historical patterns of undercount and independent Demographic Analysis benchmarks, and review measures of quality. If the Census Bureau determines that incorporating the results of the survey would not improve the accuracy of the initial census counts, then the data without statistical correction would be released to meet the requirements of Pub.L. 94–171.

## Comment

Several letters raised technical concerns regarding the use of statistical methods to correct the census and challenged the arguments set forth in the Feasibility Statement.

## Response

These concerns or issues are beyond the scope of the rulemaking and will not be addressed specifically. However, as part of the evaluation process described in the proposed rule, these and other technical issues will be considered. Also, this fall, at a public meeting with outside statistical experts and other interested parties, the Census Bureau will provide additional information regarding the detailed analyses it plans to conduct as part of its decision-making process.

## Comment

Two letters questioned the expertise of the National Academy of Sciences (NAS) panels that have been convened over this decade to review the planning and conduct of Census 2000. One questioned the expertise of the Secretary of Commerce's and the Census Bureau's advisory committees in their work relating to Census 2000.

## Response

The NAS panels and the various advisory committees are composed of professionals with excellent credentials to review and provide advice on the planning and conduct of the decennial census. In particular, the NAS panel members are carefully selected from among the country's leading experts in

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 43 of 155

a wide variety of research fields, including statistical and survey methodology. The NAS has a long and distinguished history of advising the federal government on scientific and technical matters. With regard to the selection of advisory committee members, both the Secretary of Commerce and the Census Bureau went to great lengths to ensure that the committees possess well-documented expertise in a wide range of areas relating to the conduct of the decennial census, including, but not limited to, statistical and survey methodology.

## Comment

Several letters indicated that the Census Bureau professional staff have a vested interest in the acceptance and use of the statistically derived counts. One stated that past Census Bureau judgments on adjustment issues lead one to question the agency's ability to reach the correct decision. In addition, one letter stated that the lack of review or input from independent scientific experts biases the decision making process.

## Response

The senior professional officials who serve on the Executive Steering Committee for A.C.E. Policy (ESCAP) are distinguished, objective, career civil servants whose only interest is in producing the most reliable and accurate census data possible. Many of these individuals have been recognized by leading statistical organizations for their significant contributions in the areas of survey methodology and statistics in general. Based on their years of experience and expertise, these officials are best suited to bring their professional judgment and integrity to bear in reviewing all the available data and directing a comprehensive, scientifically-defensible analysis in making a recommendation on their findings to the Director regarding the use of the statistically corrected census data. The ESCAP's recommendation will be released publicly, at the same time that it is delivered to the Director, to demonstrate the thoroughness and integrity of the process for all interested parties.

## Comment

One comment acknowledged that the Census Bureau committed itself to achieving an open and transparent planning and decision process, however, the writer considered Census Bureau reports and documentation, including the A.C.E. documentation, on statistical adjustment to be difficult to access because they were not catalogued to facilitate external access.

## Response

The Census 2000 A.C.E. methodology has been pre-specified and documentation regarding the methodology has been disseminated through a variety of forums including the Census Bureau's website, public meetings, two public workshops sponsored by the National Academy of Sciences (October 6, 1999, and February 2–3, 2000), and at a May 19, 2000, hearing before the House Subcommittee on the Census. The Census Bureau will continue to make documentation relating to Census 2000 publicly available and available upon request.

## Comment

One comment questioned whether the Secretary's proposed delegation of authority to the Director of the Census for making certain determinations concerning the census amounted to a divestiture of obligations vested in the Secretary by the Congress. The comment expressed three key concerns: (1) That the delegation of authority is, in fact, a "divestiture" of authority because the Secretary is seeking to escape responsibility for the decision of the Census Director by stating that the Secretary will not review or reverse that decision, (2) that by issuing a regulation that allegedly divests the Secretary of his statutory responsibility, the Secretary is attempting to supersede the statutory scheme passed by the Congress, and (3) that if "the Commerce Secretary believes he cannot, or should not, be responsible for the final release of adjusted numbers, then he should ask that Congress remove the Census Bureau entirely from the Commerce Department and make it a separate agency."

## Response

The Department of Commerce considers Section 4 of Title 13, United States Code to clearly provide the Secretary authority to issue the proposed rule and to include in that proposal the delegation of authority at issue. That section provides that:

The Secretary shall perform the functions and duties imposed upon him by this title, *may issue such rules and regulations as he deems necessary* to carry out such functions and duties, and *may delegate the performance of such functions and duties* and the authority to issue such rules and regulations to such officers and employees of the Department of Commerce as he may designate. (Emphasis added.)

This statutory language provides the Secretary with broad authority to take the steps he deems appropriate to carry out his responsibilities under the law, and that language does not establish limitations on the Secretary's ability to delegate the performance of his functions and duties under the Census Act. As such, the Secretary may delegate the authority to determine the methodology to be used in calculating the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c).

The delegation of authority contained in the Department's proposed rule is not an unlawful divestiture of the Secretary's statutory responsibility or authority because the delegation, if adopted in a final rule, would not be irrevocable. Thus, the current or any future Secretary of Commerce could revoke that delegation by issuing another final rule doing so. It is unassailable that a rule revoking the delegation would be effective, if it satisfied the requirements of the Administrative Procedure Act and other applicable legal standards. Further, the fact that the rule seeks to authorize the Director of the Census to make a determination under the Census Act, and states that the Director's decision would not be subject to review or reconsideration by the Secretary, does not mean the Secretary would escape responsibility for that determination. By establishing this delegation of authority by regulation, the Secretary is merely creating a transparent process for allowing a scientific determination to be made by scientists. However, the decision is being made on behalf of the Secretary. Inherent in the delegation of authority is the notion that the Secretary is responsible for the determination made by the head of the scientific bureau in which the particular knowledge and experience for making that determination lies. Nevertheless, in order to erase any doubt that the delegation of authority is not a divestiture of obligations or responsibility by the Secretary, text has been added to 15 CFR 101.1(a) that explicitly states that nothing in the rule diminishes the authority of the Secretary of Commerce to revoke this delegation of authority or relieves the Secretary of Commerce of responsibility for any decision made by the Director of the Census pursuant to this delegation, and that this rule shall remain in effect unless or until amended or revoked by the Secretary of Commerce.

## Comment

One letter provided the Memorandum of Law in a case currently proceeding in the U.S. District Court for the District of Columbia (*Commonwealth of Virginia* v. *United States of America,* Case No.

Case 1:01-cv-00082 Document 4 Filed in TXSD on 07/20/2001 Page 44 of 155

1:00CV00751) stating that the memorandum demonstrates the rulemaking provides no real opportunity to provide meaningful comments.

Response

The Department considers the notice and comment associated with this rulemaking to be an appropriate venue for meaningful comment. With respect to the Memorandum of Law, the Department is not party to the case and, therefore, does not believe it appropriate to make any statement on the arguments presented.

**Administrative Law Requirements**

*Executive Order 12866*

This final rule has been determined to be not significant under section 3(f) of Executive Order 12866.

*Paperwork Reduction Act*

This final rule contains no new information collection requests subject to the Paperwork Reduction Act.

*Regulatory Flexibility Act*

The Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that the proposed rule, if adopted, would not have a significant economic impact on a substantial number of small entities. No comments were received regarding this certification. Thus, the factual basis for the certification has not changed. As such, a final regulatory flexibility analysis is not required, and none has been prepared.

*Unfunded Mandate Reform Act of 1995*

This rule contains no Federal mandates, as that term is defined in the Unfunded Mandates Reform Act, on State, local and tribal governments or the private sector.

*Executive Order 12630*

This rule does not contain policies that have takings implications.

**List of Subjects in 15 CFR Part 101**

Administrative practice and procedure, Census data.

Dated: September 28, 2000.

**Norman Y. Mineta,**

*Secretary of Commerce.*

For the reasons set out in the preamble, 15 CFR Part 101 is added to read as follows:

**PART 101—RELEASE OF DECENNIAL CENSUS POPULATION INFORMATION**

101.1 Report of tabulations of population to states and localities pursuant to 13 U.S.C. 141(c).
101.2 Availability of other population information.

**Authority:** 5 U.S.C. 301; 13 U.S.C. 4, 141, 195; 15 U.S.C. 1512.

**PART 101—RELEASE OF DECENNIAL CENSUS POPULATION INFORMATION**

**§ 101.1 Report of tabulations of population to states and localities pursuant to 13 U.S.C. 141(c).**

(a)(1) The Director of the Census shall make the final determination regarding the methodology to be used in calculating the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c). The determination of the Director will be published in the **Federal Register**.

(2) All relevant authority of the Secretary of Commerce under 13 U.S.C. 141(c) and other applicable provisions of title 13 of the U.S. Code with respect to the decision to be made pursuant to paragraph (a)(1) of this section is hereby conferred upon the Director of the Census.

(3) The Director of the Census shall not make the determination specified in paragraph (a)(1) of this section until after he or she receives the recommendation of the Executive Steering Committee for A.C.E. Policy (ESCAP) in accordance with paragraph (b)(1) of this section.

(4) The determination of the Director of the Census shall not be subject to review, reconsideration, or reversal by the Secretary of Commerce.

(5) Nothing in this section diminishes the authority of the Secretary of Commerce to revoke or amend this delegation of authority or relieves the Secretary of Commerce of responsibility for any decision made by the Director of the Census pursuant to this delegation. This section shall remain in effect unless or until amended or revoked by the Secretary of Commerce.

(b)(1) The Executive Steering Committee for A.C.E. Policy shall prepare a written report to the Director of the Census recommending the methodology to be used in making the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c).

(2) The report of the Executive Steering Committee for A.C.E. Policy described in paragraph (b)(1) of this section shall be released to the public at the same time it is delivered to the Director of the Census. This release to the public shall include, but is not limited to, posting of the report on the Bureau of the Census website and publication of the report in the **Federal Register**.

(3) The "Executive Steering Committee for A.C.E. Policy" (ESCAP) is composed of the following employees of the Bureau of the Census:

(i) Deputy Director and Chief Operating Officer;

(ii) Principal Associate Director and Chief Financial Officer;

(iii) Principal Associate Director for Programs;

(iv) Associate Director for Decennial Census (Chair);

(v) Assistant Director for Decennial Census;

(vi) Associate Director for Demographic Programs;

(vii) Associate Director for Methodology and Standards;

(viii) Chief; Planning, Research, and Evaluation Division;

(ix) Chief; Decennial Management Division;

(x) Chief; Decennial Statistical Studies Division;

(xi) Chief; Population Division; and

(xii) Senior Mathematical Statistician.

**§ 101.2 Availability of Other Population Information.**

(a) When the Director of the Census determines pursuant to § 101.1(a)(1) of this part to use methodologies including the statistical method known as "sampling" to produce the tabulations of population to report to States and localities pursuant to 13 U.S.C. 141(c), data prepared without the use of such statistical method shall be made available to the public in accordance with the standards set forth in section 209(j) of Public Law 105–119, 111 Stat. 2440, simultaneously with the issuance of the report to States.

(b) When the Director of the Census determines pursuant to § 101.1(a)(1) of this part to produce tabulations of population without the use of methodologies including the statistical method known as sampling, for reporting to States and localities pursuant to 13 U.S.C. 141(c) notwithstanding a recommendation by the Executive Steering Committee for A.C.E. Policy to use sampling, data prepared with the use of such statistical method shall be made available to the public in accordance with the standards set forth in section 209(j) of Public Law 105–119, 111 Stat. 2440, for the release of data prepared without the use of such statistical method, simultaneously with the issuance of the report to States.

[FR Doc. 00–25501 Filed 10–5–00; 8:45 am]

**BILLING CODE 3510-07-U**

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 45 of 155

effective date of this final rule, to reflect the name change.

**EFFECTIVE DATE:** 0901 UTC, May 17, 2001.

**FOR FURTHER INFORMATION CONTACT:** Ken McElroy, Airspace and Rules Division, ATA–400, Office of Air Traffic Airspace Management, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591; telephone: (202) 267–8783.

**SUPPLEMENTARY INFORMATION:**

**The Rule**

This action amends 14 CFR part 71 (part 71) by changing the legal descriptions of three Federal airways that have "Douglas VOR/DME" included as part of their route structure. Currently, the Douglas VOR/DME and the Converse County, WY Airport share the same location identifier. The fact that the VOR/DME and the airport are not collocated has led to confusion among users. To eliminate this confusion, the Douglas VOR/DME will be renamed the "Hipsher VOR/DME," and all the airways with "Douglas VOR/ DME" included in their legal descriptions will be amended to reflect the name change. The name change of the VOR/DME will coincide with the effective date of this rulemaking action.

Since this action merely involves editorial changes in the legal description of three Federal airways, and does not involve a change in the dimensions or operating requirements of that airspace, notice and public procedure under 5 U.S.C. 553(b) are unnecessary.

The FAA has determined that this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this regulation: (1) Is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a Regulatory Evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this rule will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

Domestic VOR Federal airways are published in paragraph 6010(a) of FAA Order 7400.9H, dated September 1, 2000, and effective September 16, 2000, which is incorporated by reference in 14 CFR 71.1. The airways listed in this document would be published subsequently in the order.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**Adoption of the Amendment**

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, CLASS B, CLASS C, CLASS D, AND CLASS E, AIRSPACE AREAS; AIRWAYS; ROUTES; AND REPORTING POINTS**

1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1   [Amended]**

2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9H, Airspace Designations and Reporting Points, dated September 1, 2000, and effective September 16, 2000, is amended as follows:

*Paragraph 6010(a)—Domestic VOR Federal Airways*

\*     \*     \*     \*     \*

**V–247 [Revised]**

From Scottsbluff, NE, 75 MSL, INT Scottsbluff 307° and Hipsher, WY, 109° radials, 75 MSL, Hipsher; 90 miles 75 MSL, Crazy Woman, WY; INT Crazy Woman 347° and Sheridan, WY, 137° radials; Sheridan; INT Sheridan 327° and Billings, MT, 116° radials; Billings; INT Billings 301° and Helena, MT, 089° radials; to Helena.

\*     \*     \*     \*     \*

**V–254 [Revised]**

From Hipsher, WY, via Gillette, WY, via Miles City, MT; to Glasgow, MT.

\*     \*     \*     \*     \*

**V–547 [Revised]**

From Cheyenne, WY; INT Cheyenne 002° and Hipsher 152° radials; Hipsher, WY; to Casper, WY.

\*     \*     \*     \*     \*

Issued in Washington, DC, on February 15, 2001.

**Reginald C. Matthews,**

*Manager, Airspace and Rules Division.*

[FR Doc. 01–4542 Filed 2–22–01; 8:45 am]

**BILLING CODE 4910–13–U**

**DEPARTMENT OF COMMERCE**

**Bureau of the Census**

**15 CFR Part 101**

[Docket No.: 000609172–1040–03]

**RIN 0607–AA33**

**Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. 141(c) and Availability of Other Population Information; Revocation of Delegation of Authority**

**AGENCY:** Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** The Secretary of Commerce is issuing a final rule to revoke a delegation of authority to the Director of the Census. By that delegation the Secretary authorized the Director of the Census to make a determination regarding the methodology to be used in calculating the tabulations of population to be reported to States and localities pursuant to 13 U.S.C. 141(c). This final rule will require that this determination be made by the Secretary, and establishes an open and fair decision-making process.

**DATES:** This rule is effective February 23, 2001.

**FOR FURTHER INFORMATION CONTACT:** Alden F. Abbott, Acting General Counsel, U.S. Department of Commerce, (202) 482–1328.

**SUPPLEMENTARY INFORMATION:** Through the Census Act, which is codified in title 13 of the United States Code, Congress has delegated to the Secretary of Commerce its broad constitutional authority over the decennial census (see U.S. Constitution Art. I, Sec. 2, Cl.3). On October 6, 2000, the Commerce Department issued a final rule that set forth how the Bureau of the Census will carry out its responsibilities to report tabulations of population to States and localities pursuant to 13 U.S.C. 141(c). *See* 65 FR 59712 (October 6, 2000). That rule established a process for the release of data to the States and codified the process by which a committee of senior career officials of the Census Bureau would advise the Director of the Census. In addition, that rule contained a delegation of authority from the Secretary to the Director of the Census to make a determination regarding the methodology to be used in calculating the tabulations of population to be reported to States and localities pursuant to 13 U.S.C. 141(c).

The October 6, 2000, final rule delegated the methodological determination to the Census Director. Reflecting the character of its

Case 1:01-cv-00082 Document 4 Filed in TXSD on 07/20/2001 Page 46 of 155

responsibilities, the position of Census Director is held by a person who is appointed by the President and confirmed by the Senate. At the present time, the Deputy Director, a career civil servant, is serving as Acting Director. It is unlikely that a new Director will be nominated by the President and confirmed by the Senate prior to the time that this decision must be made. Consistent with Congress' delegation of authority specifically to the Secretary to make the decision regarding the tabulations contemplated by 13 U.S.C. 141(c), and in recognition of the accountability properly expected of the person making the methodological decisions underlying those tabulations, the Secretary has determined that, in the current circumstances, he is the appropriate official to make the final determinations concerning the tabulations of populations to be reported pursuant to 13 U.S.C. 141(c). The Secretary will continue to seek the advice of the statistical experts at the Census Bureau to inform his decision. The Secretary, in his discretion, might also seek the advice of other individuals with knowledge of this issue.

The October 6, 2000, rule further established a process for the release of data to the States to meet the requirements of 13 U.S.C. 141(c). The process in the regulation envisioned two scenarios. First, where the decision was made to use sampling to produce the tabulations of population to report to States and localities after a recommendation by the Census Bureau committee to do so, the October 6, 2000, rule incorporated the requirement of section 209(j) of Public Law 105–119 to also release simultaneously data prepared without the use of such statistical method. Second, the October 6, 2000, rule adopted a new requirement (not mandated by section 209(j)) that, if the decision was made to produce tabulations of population without the use of statistical adjustment notwithstanding a recommendation by the Census Bureau committee to do so, data prepared with the use of such method would be made available to the public simultaneously with the release of data prepared without the use of statistical adjustment. Not discussed in the October 6, 2000, rule was the release of data when the Census Bureau committee recommended statistical adjustment not be used and that recommendation was adopted. Because the Department can not rule out situations in which the release of data produced by statistical adjustment might be inappropriate (for instance the release of statistics with material error),

the Secretary has decided to remove this section of the regulation for further study.

## Administrative Law Requirements

### Executive Order 12866

This final rule has been determined to be not significant under section 3(f) of Executive Order 12866.

### Administrative Procedure Act

Pursuant to authority at 5 U.S.C. 553(b)(A), this rule of agency organization, procedure and practice is not subject to the requirement to provide prior notice and an opportunity for public comment. This rule of agency organization, procedure and practice is not a substantive rule subject to the requirement, in 5 U.S.C. 553(d), for a 30-day delay in effective date.

### Paperwork Reduction Act

This final rule contains no new information collection requests subject to the Paperwork Reduction Act.

### Regulatory Flexibility Act

Because this rule is not subject to the requirement to provide prior notice and an opportunity for public comment under 5 U.S.C. 553, or any other law, it is not subject to the analytical requirements of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*

### Unfunded Mandate Reform Act of 1995

This rule contains no Federal mandates, as that term is defined in the Unfunded Mandates Reform Act, on State, local and tribal governments or the private sector.

### Executive Order 12630

This rule does not contain policies that have takings implications.

## List of Subjects in 15 CFR Part 101

Administrative practice and procedure, Census data.

**Donald L. Evans,**
*Secretary of Commerce.*

For the reasons set out in the preamble, 15 CFR part 101 is amended as follows:

## PART 101—RELEASE OF DECENNIAL CENSUS POPULATION INFORMATION

1. The authority citation for part 101 continues to read as follows:

**Authority:** 5 U.S.C. 301; 13 U.S.C. 4, 141, 195; 15 U.S.C. 1512.

2. Section 101.1 is revised to read as follows:

## § 101.1 Report of tabulations of population to States and localities pursuant to 13 U.S.C. 141(c).

(a)(1) The Secretary of Commerce shall make the final determination regarding the methodology to be used in calculating the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c). The determination of the Secretary will be published in the **Federal Register**.

(2) The Secretary shall not make the determination specified in paragraph (a)(1) of this section until after he or she receives the recommendation of the Director of the Census, together with the report of the Executive Steering Committee for A.C.E. Policy, in accordance with paragraph (b)(1) of this section.

(b)(1) The Executive Steering Committee for A.C.E. Policy shall prepare a written report to the Director of the Census analyzing the methodologies that may be used in making the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c), and the factors relevant to the possible choices of methodology. The Director of the Census will forward the Executive Steering Committee for A.C.E. Policy report and his or her recommendation on methodology, if any, to the Secretary of Commerce.

(2) The recommendation of the Director of the Census, together with report of the Executive Steering Committee for A.C.E. Policy described in paragraph (b)(1) of this section, shall be released to the public at the same time it is delivered to the Secretary. This release to the public shall include, but is not limited to, posting of the report on the Bureau of the Census website and publication of the report in the **Federal Register**.

(3) The Executive Steering Committee for A.C.E. Policy is composed of the following employees of the Bureau of the Census:

(i) Deputy Director and Chief Operating Officer;

(ii) Principal Associate Director and Chief Financial Officer;

(iii) Principal Associate Director for Programs;

(iv) Associate Director for Decennial Census (Chair);

(v) Assistant Director for Decennial Census;

(vi) Associate Director for Demographic Programs;

(vii) Associate Director for Methodology and Standards;

(viii) Chief, Planning, Research, and Evaluation Division;

(ix) Chief, Decennial Management Division;

(x) Chief; Decennial Statistical Studies Division;

(xi) Chief; Population Division; and

(xii) Senior Mathematical Statistician.

§ 101.2 [Removed]

3. Section 101.2 is removed.

[FR Doc. 01–4438 Filed 2–22–01; 8:45 am]

BILLING CODE 3510–07–U

## DEPARTMENT OF TRANSPORTATION

### Coast Guard

### 33 CFR Part 117

[CGD07–01–014]

### Drawbridge Operation Regulations; Siesta Key Bridge (SR 758), Sarasota, FL

**AGENCY:** Coast Guard, DOT.

**ACTION:** Notice of temporary deviation from regulations.

**SUMMARY:** The Commander, Seventh Coast Guard District, has approved a temporary deviation from the regulations governing the operation of the Siesta Key Bridge (SR 758) across the Gulf Intracoastal Waterway, mile 71.6, Sarasota County, Sarasota, Florida. This deviation allows the drawbridge owner or operator to only open one leaf of the drawbridge, from 8 a.m. until 5 p.m., on March 5, 2001 and March 6, 2001. This temporary deviation is required to allow the bridge owner to safely complete maintenance on the bridge.

**DATES:** This deviation is effective from 8 a.m. on March 5, 2001 until 5 p.m. on March 6, 2001.

**FOR FURTHER INFORMATION CONTACT:** Mr. Barry Dragon, Chief, Operations Section, Seventh Coast Guard District, Bridge Section at (305) 415–6743.

**SUPPLEMENTARY INFORMATION:** The Siesta Key Bridge across the Gulf Intracoastal Waterway at Sarasota County, Sarasota, is a double leaf bridge with a vertical clearance of 21 feet above mean high water (MHW) measured at the fenders in the closed position with a horizontal clearance of 90 feet. On January 24, 2001, the Florida Department of Transportation, the drawbridge owner, requested a deviation from the current operating regulations in 33 CFR 117.287(b–1). These regulations require the draw to open on signal, except from 11 a.m. to 6 p.m. daily, the draw need only open on the hour, 20 minutes past the hour, and 40 minutes past the hour. This temporary deviation was requested to allow necessary maintenance to the

drawbridge in a critical time sensitive manner.

The District Commander has granted a temporary deviation from the operating requirements listed in 33 CFR 117.287(b–1) for the purpose of maintenance on the drawbridge. Under this deviation, the Siesta Key Bridge need only open one leaf from 8 a.m. until 5 p.m., March 5, 2001 and March 6, 2001.

Dated: February 14, 2001.

**Greg E. Shapley,**

*Chief, Bridge Administration, Seventh Coast Guard District.*

[FR Doc. 01–4548 Filed 2–22–01; 8:45 am]

BILLING CODE 4910–15–P

## DEPARTMENT OF TRANSPORTATION

### Coast Guard

### 33 CFR Part 117

[CGD07–01–013]

### Drawbridge Operation Regulations; Cortez Bridge (SR 684), Cortez, FL

**AGENCY:** Coast Guard, DOT.

**ACTION:** Notice of temporary deviation from regulations.

**SUMMARY:** The Commander, Seventh Coast Guard District, has approved a temporary deviation from the regulations governing the operation of the Cortez Bridge across the Gulf Intracoastal Waterway, mile 87.4, Sarasota, Cortez, Florida. This deviation allows the drawbridge owner or operator to only open one leaf of the drawbridge, from 8 a.m. until 5 p.m., on March 12, 2001 and March 13, 2001. This temporary deviation is required to allow the bridge owner to safely complete maintenance on the bridge.

**DATES:** This deviation is effective from 8 a.m. on March 12, 2001 until 5 p.m. on March 13, 2001.

**FOR FURTHER INFORMATION CONTACT:** Mr. Barry Dragon, Chief, Operations Section, Seventh Coast Guard District, Bridge Section at (305) 415–6743.

**SUPPLEMENTARY INFORMATION:** The Cortez Bridge across the Gulf Intracoastal Waterway at Sarasota County, Cortez, FL is a double leaf bridge with a vertical clearance of 25.5 feet above mean high water (MHW) measured at the fenders in the closed position with a horizontal clearance of 90 feet. On January 24, 2001, the Florida Department of Transportation, the drawbridge owner, requested a deviation from the current operating regulations in 33 CFR 117.287(d)(1). Those regulations require the draw to

open on signal, except from 7 a.m. to 6 p.m., the draw need only open on the hour, twenty minutes past the hour, and forty minutes past the hour. This temporary deviation was requested to allow necessary maintenance to the drawbridge in a critical time sensitive manner.

The District Commander has granted a temporary deviation from the operating requirements listed in 33 CFR 117.287(d)(1) for the purpose of maintenance on the drawbridge. Under this deviation, the Cortez Bridge need only open one leaf from 8 a.m. until 5 p.m. on March 12, 2001 and March 13, 2001.

Dated: February 14, 2001.

**Greg E. Shapley,**

*Chief, Bridge Administration, Seventh Coast Guard District.*

[FR Doc. 01–4547 Filed 2–22–01; 8:45 am]

BILLING CODE 4910–15–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 63

[AD–FRL–6768–2]

RIN 2060–AH47

### National Emission Standards for Hazardous Air Pollutant Emissions: Group IV Polymers and Resins

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; amendment.

**SUMMARY:** The EPA is issuing this final rule amendment to indefinitely stay the current compliance date of February 27, 2001, for the provisions pertaining to process contact cooling towers (PCCT) for existing affected sources producing poly (ethylene terephthalate) (PET) using the continuous terephthalic acid (TPA) high viscosity multiple end finisher process. On August 29, 2000, the EPA issued a direct final rule (65 FR 52319) and a parallel proposal (65 FR 52392) to stay the compliance date indefinitely because the EPA is in the process of responding to a request to reconsider relevant portions of the rule which may result in changes to the emission limitation applying to PCCT in this subcategory.

On September 20, 2000, the EPA received an adverse comment on the direct final rule for an indefinite stay of compliance. Therefore, the EPA withdrew the direct final rule (65 FR 64161; October 26, 2000). After considering the comments received, the EPA is promulgating the indefinite stay of compliance through this amendment.

# Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy

**Recommendation Concerning
the Methodology to be Used in
Producing the Tabulations of Population
Reported to States and Localities
Pursuant to 13 U.S.C. 141(c)**

**March 1, 2001**

ClibPDF - www.fastio.com

# Recommendation

The Executive Steering Committee for A.C.E. Policy (ESCAP) is unable to conclude, based on the information available at this time, that the adjusted Census 2000 data are more accurate for redistricting. Accordingly, ESCAP recommends that the unadjusted census data be released as the Census Bureau's official redistricting data.

The Census Bureau publicly set forth the criteria it would use to evaluate the success of the Accuracy and Coverage Evaluation (A.C.E.), stating that the adjustment decision would be based on: (1) a consideration of operational data to validate the successful conduct of the A.C.E.; (2) whether the A.C.E. measures of undercount were consistent with historical patterns of undercount and independent demographic analysis benchmarks; and (3) a review of quality measures.

The ESCAP spent many weeks examining voluminous evidence, and has debated at great length whether adjustment based on the A.C.E. would improve Census 2000 data for use in redistricting. As described in the following Report, the Committee considered a wide variety of evidence relating to the accuracy of Census 2000 and the A.C.E. After careful consideration of the data, the Committee has concluded that there is considerable evidence to support the use of adjusted data, and that Census 2000 and A.C.E. operations were well designed and conducted. However, demographic analysis comparisons, and possible issues related to synthetic and balancing error, preclude a determination at this time that the adjusted data are more accurate.

As described in detail in the Report, demographic analysis indicates fundamental differences with the A.C.E. In particular, demographic analysis estimates are significantly lower than the A.C.E. estimates for important population groups. The Committee investigated this inconsistency extensively, but in the time available could not adequately explain the result.

The inconsistency between the A.C.E. and the demographic analysis estimates is most likely the result of one or more of the following three scenarios:

1.   The estimates from the 1990 census coverage measurement survey (the Post-Enumeration Survey), the 1990 demographic analysis estimates, and the 1990 census were far below the Nation's true population on April 1, 1990. This scenario means that the 1990 census undercounted the population by a significantly greater amount and degree than previously believed, but that Census 2000 included portions of this previously un-enumerated population.

2.   Demographic analysis techniques to project population growth between 1990 and 2000 do not capture the full measure of the Nation's growth.

3.   Census 2000, as corrected by the A.C.E., overestimates the Nation's population.

The inconsistency between the demographic analysis estimates and the A.C.E. estimates raises the possibility of an as-yet undiscovered problem in the A.C.E. or census methodology, scenario 3, above. The Census Bureau must further investigate this inconsistency, and the possibility of a methodological error, before it can recommend that adjustment would improve accuracy. Similarly, concerns with synthetic and balancing error must be more fully investigated and addressed.

The ESCAP's recommendation to use the unadjusted data was a difficult one. The Committee conducted a number of analyses directed at understanding the inconsistency with demographic analysis and the synthetic and balancing error issues, but could not find a complete explanation in the time available. The Committee believes it likely that further research may establish that adjustment based on the A.C.E. would result in improved accuracy. However, the uncertainty due to these concerns is too large at this time to allow for a recommendation to adjust. The Committee believes that further research will verify that Census 2000 improved on the coverage levels of past censuses, but that the unadjusted census totals will still reflect a net national undercount. The Committee further believes the evidence will confirm that the differential undercount (the lower than average coverage of minorities, renters, and children) was reduced, but not eliminated, in Census 2000.

The ESCAP finds that both the census and the A.C.E. were efficient and effective operations that produced high quality data. The Committee is proud of the Census Bureau's design work on both the census and the A.C.E. and believes that both produced measurably better results. The high quality of the census has made the adjustment decision more difficult than in 1990. The closeness of the A.C.E. and the census heightens the concern that an undiscovered problem with Census 2000 or the A.C.E. will result in a decrease in accuracy from adjustment. Today's recommendation is, however, in no way a reflection of weaknesses in data quality or in the quality of staff work.

The ESCAP makes this recommendation in light of the information now available. Additional evaluations, research, and analysis may allow the Census Bureau to resolve the noted concerns. The Census Bureau will continue to investigate these issues and will make the results of this research available, as is consistent with the Bureau's long-standing policy of openness.

# Executive Summary

**The ESCAP cannot recommend adjustment at this time.** The Executive Steering Committee for Accuracy and Coverage Evaluation (A.C.E.) Policy (ESCAP) is required by regulation to prepare a written report analyzing the methodologies and factors involved in the adjustment decision. The Acting Director of the Census Bureau asked the ESCAP to include a recommendation in its Report. The ESCAP spent many weeks examining voluminous evidence, and has debated at great length whether adjustment would improve Census 2000 data for use in redistricting. After having evaluated a wide variety of evidence relating to the accuracy of Census 2000, and developed an extensive record of its deliberations, the ESCAP is unable to conclude, based on the information available at this time, that the adjusted Census 2000 data are more accurate for redistricting.

While the majority of the evidence indicates both the continued existence of a differential undercount of the population and the superior accuracy of the adjusted numbers, the ESCAP has concerns. There is a significant inconsistency between the A.C.E. estimates and demographic analysis estimates. Additionally, possible synthetic and balancing errors may affect the accuracy of the adjusted numbers. Until these concerns are more fully investigated and addressed, the ESCAP cannot recommend using adjustment. Accordingly, ESCAP has recommended that unadjusted census data be released as the Census Bureau's official redistricting data.

**The ESCAP makes this recommendation in light of the information now available.** Additional evaluations, research, and analysis may alleviate these concerns and support the evidence that indicates the superior accuracy of the adjusted data. Accordingly, the Census Bureau intends to continue its research into these concerns.

**The Census Bureau relied on three prespecified decision criteria.** The ESCAP based its adjustment recommendation on: (1) a consideration of operational data to validate the successful conduct of the A.C.E.; (2) whether the A.C.E. measures of undercount were consistent with historical patterns of undercount and independent demographic analysis benchmarks; and (3) a review of quality measures. These criteria were specified in advance in the Census Bureau's June, 2000 "Accuracy and Coverage Evaluation: Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000."

**Both Census 2000 and the A.C.E. were of high quality.** The ESCAP's recommendation against adjustment in no way suggests serious concern about the quality of the census or the A.C.E. operations, as the ESCAP believes that both Census 2000 and the A.C.E. were efficient and effective operations that produced high quality data. All major programs in the census were completed on schedule and within budget, and design improvements in both Census 2000 and the A.C.E. produced measurably better results. An innovative advertising and partnership program

i

CPDF - www.fasko.com

encouraged public participation, and adequate staffing and pay contributed to improved data quality. The ESCAP concludes that the unadjusted census data are of high quality.

The A.C.E. was also a design and operational success. The A.C.E. included a variety of design improvements that resulted in better data quality, including enhanced computer processing and bettering matching. The Census 2000 adjusted data have lower variances and comparable or improved missing data rates compared to the 1990 adjusted data. The Census Bureau followed the A.C.E.'s prespecified design except for two specific instances that are easily explained by good and normal statistical practice. Both of these changes should be considered enhancements. The ESCAP has concluded that both Census 2000 and the A.C.E. were effective and efficient operations.

Demographic analysis estimates were inconsistent with the adjusted data. The demographic analysis estimates indicate fundamental differences with the results of the A.C.E. In particular, the demographic analysis estimates are significantly lower than both Census 2000 and the A.C.E. estimates for important population groups. The Committee investigated this inconsistency extensively, but in the time available could not adequately explain it. The inconsistency between the A.C.E. and the demographic analysis estimates is most likely the result of one or more of the following three scenarios:

1.  The estimates from the 1990 census coverage measurement survey (the Post-Enumeration Survey), the 1990 demographic analysis estimates, and the 1990 census were far below the Nation's true population on April 1, 1990. This scenario means that the 1990 census undercounted the population by a significantly greater amount and degree than previously believed, but that Census 2000 included portions of this previously un-enumerated population.

2.  Demographic analysis techniques to project population growth between 1990 and 2000 do not capture the full measure of the Nation's growth.

3.  Census 2000, as corrected by the A.C.E., overestimates the Nation's population.

The inconsistency between the demographic analysis estimates and the A.C.E. estimates raises the possibility of an as-yet undiscovered problem in the A.C.E. or census methodology, scenario 3, above. The Census Bureau must further investigate this inconsistency, and the possibility of a methodological error, before it can recommend that adjustment would improve accuracy.

Quality measures indicate the adjusted data are more accurate overall, but concerns were identified. The ESCAP directed the preparation of several total error models and loss function analyses to evaluate whether the adjusted data are more accurate than the unadjusted data. The Committee examined the loss functions for evidence of a clearly measurable improvement under a variety of scenarios and found the following:

ii

1.  Under what the Committee considered reasonable assumptions, state, congressional district, and county level analyses showed a marked improvement for adjustment.

2.  However, some less likely scenarios indicated that the unadjusted census was more accurate at all geographic levels.

3.  The analysis of accuracy for counties with populations below 100,000 people indicated that the unadjusted census was more accurate.

The ESCAP believes that under reasonable scenarios, and absent the concerns noted above, adjustment would result in more accurate data at the state, congressional district, and county levels. Even though smaller counties would have been less accurate, the analysis indicated an overall improvement in accuracy from adjustment. However, the concerns noted above are all potentially indicative of undetected problems. The ESCAP is unable to conclude at this time that the adjusted data are superior because further research on these concerns could reverse the finding of the adjusted data's superior accuracy.

The ESCAP assessed other factors that might affect accuracy. The ESCAP examined the issues of synthetic and balancing error and concluded that the potential for these errors cannot be ignored, particularly when considered in conjunction with the inconsistency with demographic analysis. Finally, the ESCAP reviewed the treatment of late census additions and whole person imputations, because the number of these cases significantly increased from 1990, concluding that these cases did not raise serious new concerns.

Additional issues were considered. The ESCAP reiterated that the Census Bureau does not consider block-level accuracy to be an important criterion with which to evaluate either Census 2000 or the A.C.E., and explained that had adjusted data files been released, adjustments for overcounts would not have resulted in the removal of any records from Census 2000 files.

# Table of Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **Census and A.C.E. Results in Brief** . . . . . . . . . . . . . . . . . . . . . . 2

    **ESCAP Procedure and Process** . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Findings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    **Conduct of Key Operations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        **Census Quality Indicators** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            **Address List Development** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            **Questionnaire Return - Census 2000 Mail Return Rates** . . . . . . . . 11

            **Nonresponse Follow-up** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            **Housing Unit Unduplication Program** . . . . . . . . . . . . . . . . . . . . . 12

            **Data Processing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        **A.C.E. Quality Indicators** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    **Historical Measures of Census Coverage-
Comparison with Demographic Analysis** . . . . . . . . . . . . . . . 15

    **Measures of Census and A.C.E. Quality** . . . . . . . . . . . . . . . . 18

        **Total Error Model** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iv

CMxPDF - www.fastio.com

## <u>Table of Contents</u> (continued)

**Loss Function Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

## Other Factors That May Affect Accuracy . . . . . . . . . . . . . . . **22**

**Synthetic Error** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

**Balancing Error** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**Late Adds and Whole Person Imputations** . . . . . . . . . . . . . **25**

**Misclassification Error** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

# Additional Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**Block Level Accuracy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**Adjustments for Overcounts** . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

# Attachments

v

# Introduction

This report fulfills the responsibility of the Executive Steering Committee for Accuracy and Coverage Evaluation (A.C.E.) Policy ("the ESCAP" or "the Committee") to prepare a "written report to the Director of the Census analyzing the methodologies that may be used in making the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c), and the factors relevant to the possible choices of methodology."[1] As is required by regulation, the Director of the Census will forward this report and his recommendation regarding adjustment to the Secretary of Commerce. This report is also being released to the public at the same time that it is being forwarded to the Secretary of Commerce.[2] The Secretary of Commerce will make the final determination about whether to adjust the data that will be released pursuant to P.L. 94-171.

The Census Bureau released in June 2000 the report "Accuracy and Coverage Evaluation: Statement on the Feasibility of Using Statistical Methods to Improve the Accuracy of Census 2000," (the Feasibility Document). The Feasibility Document stated that "the Census Bureau will make the determination to use the A.C.E. to correct Census 2000 after evaluating (1) the conduct of key operations, (2) the consistency of the A.C.E. to historical measures of undercount, and (3) measures of quality."[3] This report will, accordingly, evaluate the conduct of key operations, compare the Accuracy and Coverage Evaluation Survey (A.C.E.) estimates to historic measures of the undercount, and evaluate the quality of both the A.C.E. and the census.

---

[1]The phrase "the methodologies that may be used in making the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c)" refers to the decision about whether the Census Bureau should release adjusted or unadjusted data for the states to use in redistricting. Rather than repeating this cumbersome legal phrase, this document will often refer simply to "the adjustment decision."

[2]In addition to the requirement to make this report public, the Census Bureau firmly believes that full disclosure and a vigorous and informed debate will improve both the Census Bureau's internal processes and the public's understanding of statistical adjustment. Accordingly, the Bureau is also making available on its Internet site the documentation supporting the ESCAP report. This additional documentation includes the analytical reports outlined publicly to the National Academy of Sciences Panel to Review the 2000 Census in October, 2000, along with underlying data, analysis, and supporting documentation. An index to the supporting documentation is attached.

[3]Feasibility Document, p. 33.

# Census and A.C.E. Results in Brief

As the Census Bureau has stated publicly, Census 2000 was an operational success, meeting or exceeding goals. This success may be attributed to a number of improvements, including the following:

- a multi-faceted marketing and partnership program that encouraged householders to complete and mail back their census forms,

- the ability to hire and retain enough highly skilled temporary staff throughout the course of the census, permitting timely completion of operations,

- the timely completion of nonresponse follow-up, which provided sufficient time and resources to conduct other operations designed to improve coverage, and

- the use of digital imaging and optical character recognition technology for the first time to recognize handwritten answers in addition to marks on the form, a vast improvement that allowed the Census Bureau to process the data faster and permitted multiple response options.

The A.C.E. was also an operational success that met or exceeded goals. The A.C.E. was completed on time and generally produced data equal or superior in quality to prior coverage measurement surveys.

The A.C.E. supports the conclusion that the quality of the initial census was generally good, finding that Census 2000 reduced both net and differential undercoverage from 1990 census levels. The A.C.E. estimates that the net national undercount was reduced from the 1990 rate of 1.61 percent to 1.18 percent in 2000.[4] This reduction is substantial and reflects high census quality. The A.C.E. further found that not only was the net undercount reduced, but there was a reduction in the differential undercount. According to the 1990 Post-Enumeration Survey, minorities, renters, and children were differentially undercounted in the 1990 census, and other methods indicate a differential undercoverage of minorities in earlier censuses. While these groups still have higher undercount rates than the population as a whole, the differential has dropped considerably.

The A.C.E. did not judge Census 2000 quality to be perfect, however. The A.C.E. indicated that while differential coverage was reduced, it was not eliminated, and that Census 2000 continued

---

[4]These figures compare the 1990 and 2000 undercount rates as measured by coverage measurement surveys. The coverage measurement survey conducted in connection with the 1990 census was called the Post-Enumeration Survey (PES). As will be discussed below, Demographic Analysis presents an alternative measure of census coverage.

longstanding patterns of differential coverage, with minority groups, renters, and children all exhibiting lower coverage rates.[5]

Coverage measurement surveys such as the A.C.E. are not the only method available to estimate census coverage; the Census Bureau also uses demographic analysis (DA) to assess net and differential population coverage. DA uses records and estimates of births, deaths, legal immigration, and Medicare enrollments, and estimates of emigration and net undocumented immigration to estimate the national population, separately from the census. The Census Bureau has long relied on DA as an important independent benchmark for validation of the accuracy of both the census and coverage measurement surveys such as the A.C.E. Initial DA results, however, presented a major inconsistency with the A.C.E. results – instead of confirming a net undercount, DA estimates that Census 2000 overcounted the national population by 1.8 million individuals. Even an alternative DA that assumed a doubling of net undocumented immigration during the 1990's (compared with the initial DA) showed a small net undercount of 0.9 million, substantially below the net undercount of 3.3 million shown by the A.C.E. These inconsistencies and DA in general will be discussed in more detail later in this report. The DA and A.C.E. estimates did agree, however, that Census 2000 perpetuated the historical phenomenon of the differential undercount.

---

[5]The percent net undercount for owners was 0.44 percent compared to 2.75 percent for renters, and the non-Hispanic White undercount rate of 0.67 percent was lower than the rates for non-Hispanic Blacks (2.17 percent) and Hispanics (2.85 percent).

The following table sets forth the A.C.E.'s results in summary fashion:

### Table 1a: Percent Net Undercount for Major Groups: 2000 A.C.E.

| Estimation Grouping | Net Undercount (percent) | Standard Error (percent) |
|---|---|---|
| Total population in Households ............................. | 1.18 | 0.13 |
| **RACE AND HISPANIC ORIGIN** | | |
| American Indian and Alaska Native (on reservation) ............ | 4.74 | 1.20 |
| American Indian and Alaska Native (off reservation) ............ | 3.28 | 1.33 |
| Hispanic Origin (of any race) ............................... | 2.85 | 0.38 |
| Black or African American (not Hispanic) ..................... | 2.17 | 0.35 |
| Native Hawaiian and Other Pacific Islander (not Hispanic) ....... | 4.60 | 2.77 |
| Asian (not Hispanic) ...................................... | 0.96 | 0.64 |
| White or Some Other Race (not Hispanic) ..................... | 0.67 | 0.14 |
| **AGE AND SEX** | | |
| Under 18 years ........................................... | 1.54 | 0.19 |
| 18 to 29 years | | |
|     Male .................................................. | 3.77 | 0.32 |
|     Female ................................................ | 2.23 | 0.29 |
| 30 to 49 years | | |
|     Male .................................................. | 1.86 | 0.19 |
|     Female ................................................ | 0.96 | 0.17 |
| 50 years and over | | |
|     Male .................................................. | -0.25 | 0.18 |
|     Female ................................................ | -0.79 | 0.17 |
| **HOUSING TENURE** | | |
| In owner-occupied housing units ............................. | 0.44 | 0.14 |
| In nonowner-occupied units ................................. | 2.75 | 0.26 |

**NOTES:**

- The race and Hispanic categories shown on this table represent estimation groupings used in developing estimates based on the A.C.E. Survey and do not conform with race and Hispanic categories that will appear in the redistricting (P.L. 94-171) files and other Census 2000 data products. In developing the estimation groupings used to evaluate the coverage of Census 2000, the principal consideration was to combine people who were expected to have the same probability of being counted in Census 2000. Consequently, the race and Hispanic origin groupings used to create the A.C.E. estimates of coverage are exceedingly complex. For a complete description of the estimation groups, see DSSD Memorandum Q-37, which will be provided on request.

- In general, American Indians and Alaska Natives (AIAN) are included in that category, regardless of whether they marked another race or are Hispanic. A few exceptions apply, especially for those who do not live on a reservation, on trust lands, or in an AIAN statistical area.

- Similarly, Native Hawaiians and Other Pacific Islanders (NHPI) generally are included in that category, unless they lived outside of Hawaii and marked more than one race or marked Hispanic.

- Hispanics are mostly in that category, unless they marked AIAN and lived on a reservation, on trust lands, or in an AIAN statistical area, or marked NHPI and lived in Hawaii.

- People who marked Black or African American are generally in that category unless they fell in the categories described above; similarly those who marked Asian are generally in that category, unless they fell in the categories described above.

- The final category includes most people who marked only White or only Some Other Race or marked three or more races but did not fall into the categories described above.

- The data in this table contain sampling and non-sampling error; a minus sign denotes a net overcount.

Page 4 of 28

CSMPDF - www.csc-texisi.com

The following table presents the results from the 1990 Census Post-Enumeration Survey:

### Table 1b: Percent Net Undercount for Major Groups: 1990 PES

| Estimation Grouping | Net Undercount (percent) | Standard Error (percent) |
|---|---|---|
| Total Population 1/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.61 | 0.20 |
| **RACE AND HISPANIC ORIGIN** | | |
| White or Some Other Race (not Hispanic) 2/ . . . . . . . . . . . . . . . . . . | 0.68 | 0.22 |
| Black or African American . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.57 | 0.55 |
| Hispanic Origin 3/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4.99 | 0.82 |
| Asian and Pacific Islander . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.36 | 1.39 |
| American Indian and Alaska Native (on reservation) . . . . . . . . . . . . | 12.22 | 5.29 |
| **AGE AND SEX** | | |
| Under 18 years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.18 | 0.29 |
| 18 to 29 years | | |
| Male . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.30 | 0.54 |
| Female . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.83 | 0.47 |
| 30 to 49 years | | |
| Male . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.89 | 0.32 |
| Female . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.88 | 0.25 |
| 50 years and over | | |
| Male . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | -0.59 | 0.34 |
| Female . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | -1.24 | 0.29 |
| **HOUSING TENURE** | | |
| In owner-occupied housing units . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.04 | 0.21 |
| In nonowner-occupied housing units . . . . . . . . . . . . . . . . . . . . . . . . . | 4.51 | 0.43 |

**NOTES:**

- The data in this table contain sampling and non-sampling error.

- The race and Hispanic categories shown on this table represent selected population groupings used in conducting the PES and do not conform exactly with race and Hispanic tabulations that were released from the 1990 census.

1/ Includes household population and some Group Quarters; excludes institutions, military group quarters.

2/ Includes American Indians off reservations.

3/ Excludes Blacks or African Americans, Asian and Pacific Islanders, and American Indians on reservations.

The following table summarizes DA's estimates for Census 2000:

### Table 2: Demographic Analysis Estimates of Percent Net Undercount by Race, Sex and Age: 2000

| Category | DEMOGRAPHIC ANALYSIS 2000 | | |
|---|---|---|---|
| | Average | Model 1 | Model 2 |
| **BLACK MALE** | | | |
| Total | 5.10 | 6.94 | 3.26 |
| 0-17 | 1.47 | 4.86 | -1.92 |
| 18-29 | 6.45 | 8.02 | 4.88 |
| 30-49 | 9.18 | 10.11 | 8.25 |
| 50+ | 3.29 | 4.08 | 2.49 |
| **BLACK FEMALE** | | | |
| Total | 0.63 | 2.52 | -1.27 |
| 0-17 | 1.92 | 5.39 | -1.56 |
| 18-29 | 0.12 | 1.93 | -1.70 |
| 30-49 | 0.98 | 2.06 | -0.10 |
| 50+ | -1.31 | -0.45 | -2.16 |
| **NONBLACK MALE** | | | |
| Total | -0.93 | -1.21 | -0.65 |
| 0-17 | -0.90 | -1.56 | -0.23 |
| 18-29 | -4.17 | -4.45 | -3.89 |
| 30-49 | 0.10 | -0.04 | 0.24 |
| 50+ | -0.16 | -0.24 | -0.08 |
| **NONBLACK FEMALE** | | | |
| Total | -1.44 | -1.74 | -1.14 |
| 0-17 | -0.32 | -1.01 | 0.38 |
| 18-29 | -3.66 | -4.00 | -3.32 |
| 30-49 | -1.21 | -1.38 | -1.04 |
| 50+ | -1.45 | -1.54 | -1.35 |

(a minus sign denotes a net overcount)

**NOTE:**

Model 1 uses 2000 census tabulations for Blacks that include people who reported "Black" and no other race. Model 2 uses 2000 census tabulations for Blacks that include people who reported Black, whether or not they reported other races. People who reported only "Some other race" are reassigned to a specific race category (to be consistent with 1990 DA estimates and the historical demographic data series).

Page 6 of 28

CutePDF - www.tasisx.com

# ESCAP Procedure and Process

After the Supreme Court ruled in January, 1999 that the Census Act barred the use of statistical sampling for reapportioning the House of Representatives,[6] the Census Bureau redesigned its plan for the census to assure that sampling was not used to arrive at the apportionment counts, and to provide for the possible use of sampling for all other purposes. This action was in accordance with the advice of the (then) General Counsel of the Department of Commerce that "Section 195 of the Census Act requires the Census Bureau, if feasible, to produce statistically corrected numbers from the decennial census for all non-apportionment purposes."[7]

The Associate Director for Decennial Census originally chartered the ESCAP on November 26, 1999 and charged the Committee to "advise the Director in determining policy for the A.C.E. and the integration of the A.C.E. results into the census for all purposes except Congressional reapportionment." Thereafter, on October 6, 2000, the Department of Commerce delegated to the Director of the Census Bureau the final determination "regarding the methodology to be used in calculating the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c)." This regulation further required the ESCAP to "prepare a written report to the Director of the Census Bureau recommending the methodology to be used in making the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141 (c)."[8] The initial regulation was revised on February 14, 2001 to provide that the Secretary of Commerce would make the final adjustment decision for the redistricting data, but only after receiving the recommendation, if any, of the Director of the Census Bureau, together with the ESCAP's report.[9] Accordingly, this document constitutes the official report of the ESCAP to the Director analyzing the adjustment methodologies and setting forth the relevant factors in the adjustment decision. The Acting Director of the Census Bureau asked the ESCAP to include a recommendation in the Report. This Report is limited to an analysis of whether adjustment would produce improved data for legislative redistricting.

---

[6] Dept. of Commerce v. House of Representatives, 119 S.Ct. 765 (1999).

[7] Memorandum to the Secretary and the Director of the Census from Andrew J. Pincus, General Counsel, dated June 12, 2000 and entitled "Legal Obligation to Produce Statistically-Corrected Non-Apportionment Census Numbers."

[8] 65 Federal Register 59713, "Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. 141(c) and Availability of Other Population Information," October 6, 2000.

[9] 66 Federal Register 11231, "Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. 141(c); Revocation of Delegation of Authority," February 23, 2001.

The ESCAP held its first meeting on December 8, 1999 and met regularly until the date of this Report, meeting over 45 times, sometimes with more than one meeting per day. The analysis set forth in this document is supported by extensive staff work and many analytic reports on various aspects of the census and the A.C.E. The documents in these "B-series" reports represent diligent and thorough statistical, demographic, and analytic work conducted over many months of intensive effort. These more detailed reports are summarized in Report B-1, "Data and Analysis to Inform the ESCAP Report," from which this Report draws heavily.[10]

The ESCAP's membership was originally set forth in its charter and repeated in the regulations. There are twelve members on the ESCAP, with the Director functioning in an *ex officio* role. The Committee solicited needed assistance from the Associate Director for Field Operations, recognizing his unique contribution to the Committee's awareness of field operations and procedures. He contributed valuable input to the deliberative process and was, in effect, a member of ESCAP. The ESCAP represents a body of senior career Census Bureau professionals, with advanced degrees in relevant technical fields and/or decades of experience in the Federal statistical system. All are highly competent to evaluate the relative merits of the A.C.E. data versus the census data and are recognized for their extensive contributions to the professional community.

The Committee proceeded through four distinct but overlapping stages. The Chair arranged that minutes be prepared for all sessions, except for the final sessions which were private deliberations. The early sessions were educational, designed to make the Committee members aware of the details of the upcoming operations and to explain possible adjustment issues. The second phase was devoted to the presentation of evidence. As data from the census and the A.C.E. became available, knowledgeable individuals in the Census Bureau made presentations to the Committee. The Committee reviewed data from all relevant census and A.C.E. operations, sometimes asking staff to provide additional and new information. The third phase was the deliberation phase. Unlike the first two phases, the deliberations were closed to all but Committee members and individuals invited for a specific purpose: individuals with specialized knowledge who could respond to specific inquiries from the Committee members. The final and briefest stage was the review stage, where Committee members circulated and commented on the draft report.

During the education and evidence presentation phases, the Chair generally arranged presentations on major issues, issues that he identified on his own initiative or on the suggestion of Committee members. During the evidence presentation stage, authors of the analysis reports known as "the B-series" presented their data and conclusions to the Committee. The deliberation and review phases were less structured with various members raising topics for discussion and asking for evidence. No formal vote was held; this Report reflects a consensus of the ESCAP.

---

[10]A list of these reports is attached to this Report.

This report and the analysis preceding it were prepared in light of the statutory April 1, 2001 deadline.[11] The Census Bureau clearly would have preferred to have additional time to analyze the data before it, and may well have reached a different recommendation had it had more time; however, the ESCAP believes that it has analyzed the available data sufficiently to make the findings contained in this report. This report is based on the best data available at the time. More data will be produced in the months and years to come that could affect the matters discussed in this report. As in past censuses, the Census Bureau will prepare a large number of detailed evaluations of both the census and the A.C.E. These evaluations will not be available for months, or in some cases, years, after the Census Bureau is required by law to provide redistricting data to the states. These final evaluations, as distinguished from the analysis reports that informed the ESCAP Committee, will be accomplished without the pressure of a legal deadline, will be based on additional information, and may, in some instances, reach conclusions different from those in the analysis reports.[12]

# Findings

The ESCAP has evaluated the conduct of key operations in both the census and the A.C.E., the consistency of the A.C.E. to historical measures of undercount, and measures of both census and A.C.E. accuracy. Accordingly, this section will evaluate:

• The conduct of key operations (Census Quality Indicators, A.C.E. Quality Indicators),

• Historical measures of census coverage – comparison with Demographic Analysis ,

• Measures of census and A.C.E. accuracy (Total Error Models and Loss Function Analysis), and

• Other factors that may affect accuracy.

## Conduct of Key Operations

### Census Quality Indicators

The ESCAP concludes that the unadjusted census was well designed and executed and that the results are of a high quality. There had been considerable concern about potential operational problems, given that the Census Bureau finalized its plans for Census 2000 very late in the census cycle in response to the Supreme Court ruling in January, 1999. However, Census

---

[11]The Census Act requires that redistricting data be "completed, reported, and transmitted to each respective State within one year after the decennial census date." 13 U.S.C. § 141(c).

[12]A list of the planned Census 2000 final evaluations can be found at Attachment 3.

Page 9 of 28

2000 was an operational success; all major programs were completed on schedule and within design parameters. Although there were some local problems and minor operational shortcomings, census operations were implemented in a controlled manner and within design expectations.

The ESCAP reviewed the results of the initial census to determine whether improved census operations could be expected to yield high quality results. The ESCAP heard presentations on the results of each major census operation and evaluated the extent to which these operations were under control. The discussion in this document is not meant to be a complete evaluation of census operations, but rather focuses on information relevant to the level and pattern of census omissions or erroneous inclusions, because this information is directly relevant to understanding and assessing the results of the A.C.E.

While several major improvements were introduced for Census 2000, including improved marketing, better questionnaire design, more ways to respond, higher pay rates, and improved processing,[13] the basic design of Census 2000 was similar to the design of the last two censuses. Address lists were prepared from a variety of sources. Questionnaires were delivered to each address on the list. Questionnaires were principally delivered by the U.S. Postal Service. In areas with rural-style addresses, census workers delivered the questionnaires. Households were asked to return the questionnaires by mail. Those addresses that did not return a questionnaire by mail were followed up by census workers in the nonresponse follow-up (NRFU) operation. NRFU was followed by a coverage improvement follow-up operation. Each major operation had its own quality control procedures.

The following is a brief discussion of the quality indicators associated with some of the major Census 2000 operations.

Address List Development

A foundation of the decennial census process is the list of housing units representing every known residence in the country. The address list is dynamic, with updates occurring at a number of phases throughout the census. One important measure of its quality is the time at which housing units were added. It is preferable for the address list to be largely complete before the majority of census operations begin, as this would indicate that the building of the address list had been successful, by using operations such as address listing and block canvassing, and local government input in the Local Update of Census Addresses (LUCA) program. The data confirm that the address list was largely complete early in the process, as census enumerators found few new addresses in the field. The address list was nearly 97 percent complete (overall and in each region of the nation) before the census forms were mailed out or delivered. The two fastest growing regions, the South and the West, not surprisingly, had slightly lower percentages of housing unit coverage before the census and higher rates of added housing units during

---

[13]For more detail see "Census 2000 Operational Plan – December, 2000."

questionnaire delivery. (See B-2, "Quality Indicators of Census 2000 and the Accuracy and Coverage Evaluation.")

Questionnaire Return – Census 2000 Mail Return Rates

One of the most important quality indicators for the census is the mail return rate, the proportion of occupied housing units that mailed back their questionnaires. A high mail return rate is crucial to the success of the census – operationally, budgetarily, and also in terms of data quality; data from mailback questionnaires tend to be more complete and of higher quality than the data from forms completed by enumerators.

Public cooperation is critical for the success of any census. The Census Bureau had projected that the mail return rate would be lower in Census 2000 than in 1990 and had accordingly developed an enhanced marketing and partnership program designed to increase awareness of the decennial census and public cooperation. The marketing program was designed around a first-ever paid advertising campaign, including a national media campaign aimed at increasing mail response, targeted advertising directed at raising mail response among historically undercounted populations, and special advertising messages and campaigns targeted to hard-to-enumerate populations. In the partnership program, the Census Bureau worked nationwide with state and local partners to encourage all individuals to respond to the census. Additionally, the Census Bureau worked with states and local jurisdictions to encourage residents of the jurisdictions to raise their mail response rates over their 1990 levels.

The success of the advertising campaign and the partnership program is reflected in the final Census 2000 national mail return rate of 72 percent. In 1990, this figure was 74 percent, but the mailback universe was different in Census 2000, including the addition of approximately five million (mostly rural) housing units to the universe in 2000. These units were enumerated differently in 1990 and the two figures are, thus, not wholly comparable. It is fair to say that the level of public cooperation in Census 2000 roughly equaled that of 1990, despite projections of lower cooperation.

Nonresponse Follow-up

The nonresponse follow-up (NRFU) operation involved field follow up of about 42 million housing units that did not return a census form within the specified time after Census Day. For most LCO's, NRFU was completed as scheduled in a 9-week period between April 27 and June 26. This performance is a significant improvement over 1990 when NRFU was generally conducted over a 14-week period from April 26 through July 30. The Census Bureau believes, based on past research, that NRFU interviews conducted closer to Census Day are likely to be of higher quality. Thanks in large part to adequate funding provided by the Congress, pay rates and levels of staffing in 2000 were far higher than in the past two censuses. We believe that this increased funding and the ability to hire adequate staff contributed to an improvement in NRFU quality, and thus improved Census 2000 data in general.

The Census Bureau identified local NRFU problems at a few Local Census Offices (LCOs), including the LCO in Hialeah, Florida. The Census Bureau responded to the localized problems in the Hialeah office by re-enumerating certain areas that were believed to have faulty data and does not believe that net coverage in the Hialeah or any other LCO was substantially affected by these local problems. The limited local imperfections do not detract from the conclusion that NRFU as a whole was successful. The local problems experienced were similar to problems encountered in previous censuses, and should be expected in any non-recurring operation of this magnitude.

Housing Unit Unduplication Program

The Census Bureau became concerned that the address list might contain a significant number of duplicate addresses, or duplicated persons living in duplicated addresses. The Census Bureau responded to this problem by designing and conducting the Housing Unit Unduplication Program. This program was a special operation designed and instituted to reduce the level of housing unit duplication. While this program was not prespecified, the Census Bureau believed that failure to address this potential problem could have seriously impaired the accuracy of the apportionment numbers. Using the results of an address matching operation and a person matching operation, 2,411,743 addresses were identified as potential duplicates and the person and housing records associated with these addresses temporarily removed from the census file. Based on more detailed analysis, 1,392,686 addresses of these were permanently removed from the address list and 1,019,057 addresses were re-instated and included in the census results. Although this operation certainly made mistakes of both exclusion and inclusion, the operation was necessary and resulted in improved census accuracy.

Data Processing

The large number of address sources used to compile the address list, along with an increased number of response opportunities, increased the chance of duplicate returns. Census 2000 included several data processing steps designed to handle multiple census returns for a single housing unit. More than 90 percent of Census 2000 housing units had only one census return. For households returning two or more forms, the Census Bureau conducted a computer operation to identify and remove duplicated responses. Imputation is discussed later in this Report.

## A.C.E. Quality Indicators

The A.C.E. is based on an independent coverage measurement survey, meaning that it collects information in operations separate from the census to allow comparison with the initial census enumeration. The goal is to determine what proportion of the people living in the A.C.E. sample blocks were correctly included in the census, what proportion were erroneously included in the census, and what proportion were not included in the census, so that corrected data can be prepared.

The Census Bureau selected a stratified random sample of blocks to include in the A.C.E. and created an independent list of housing units in those blocks. Enumerators conducted initial A.C.E. interviews at the housing units on this independent list. Households with discrepant information between the A.C.E. and the census received a follow-up interview to find the correct answer or "true" situation. This process led to a determination for each individual regarding whether the A.C.E. response or the census response was correct. Missing data for households and/or individuals was supplied using prespecified procedures, including imputation.[14] The individuals in the A.C.E. sample were then categorized by age, sex, tenure (owner or renter) and other predefined variables into groupings called post-strata, and coverage correction factors (CCFs) were calculated for each post-stratum. The methodology used to create the coverage correction factors is called Dual System Estimation or DSE. The coverage correction factors measure the extent to which the total of people in each post-stratum is over- or undercounted in the initial census. These factors can be used to correct the initial census data and to produce tabulated results.

The Census Bureau incorporated a variety of improvements into the 2000 A.C.E. compared with the 1990 PES:

- In order to reduce variance (sampling error), the Bureau doubled the size of the sample from the 1990 PES.

- The design included enhancements to the matching process, such as a more fully automated matching system with built-in edits and quality checks, centralization of matching in one site, and a change in the treatment of movers.

- Computer processing was improved in a number of ways, such as adoption of software validation and verification procedures, standardized nomenclature, and improved documentation for technical issues.

- Enhancements to minimize missing data were added to the design, including allowance of an additional two weeks for attempts to revisit any nonresponding households.

The ESCAP spent many hours reviewing the elements of A.C.E. quality and has concluded that these enhancements succeeded in their goal of improving the A.C.E., and that the operational quality of the A.C.E. was good.

The quality of the A.C.E. operations is particularly evident from the fact that the A.C.E. was completed on schedule without any major difficulties. That operations of the massive size of both the initial census and the A.C.E. could be finished on time and under budget is testimony to thoughtful design and careful implementation. Listing, interviewing, matching, and follow up

---

[14]B-7 "Missing Data Results" contains a description of the three types of missing data in the A.C.E. and the processes used to correct for them.

were all conducted as designed and in a controlled manner. A.C.E. interview response rates met or exceeded expectations. The Quality Assurance operations were carried out as planned and assured that the A.C.E. was in control, resulting in few outliers.[15] Computer programs were thoroughly tested and improved from 1990. This evidence indicates that the A.C.E. was a clear operational success.[16]

A.C.E. prespecified procedures were followed except in two specific instances.[17] Both of these instances were actually enhancements to the A.C.E. design permitted by earlier than anticipated availability of data; both are consistent with good statistical practice and both improved the accuracy of the A.C.E. results.

Briefly, the first change was a modification of A.C.E. collapsing rules to permit the inclusion of variance as a criterion to collapse data cells. The second enhancement to the prespecified rules deals with imputation cell estimation, the process by which resident status, match status, or enumeration status is imputed for unresolved cases. Imputation cell estimation was modified because the results of the A.C.E. follow-up forms became available during the missing data estimation process. The changes were discussed with the ESCAP and documented.

The ESCAP was pleased with the reduction in sampling variance from 1990 levels. The A.C.E. was designed so that the coefficients of variation (CV) would be lower than in 1990 because of the increased sample size, because better measures of population size were available for the selection of sample clusters, and because sample weights were less variable. The overall CV decreased about 40 percent from 1990 levels, and forty-seven states saw their CV decline, with an average reduction of 37 percent. The A.C.E. design expectation of state-level CV of less than 0.5 percent was achieved. CVs at the congressional district, place, and county level all showed similar levels of improvement, as detailed in Analysis Report B-11, "Variance Estimates by Size of Geographic Area."

Other important quality indicators for the A.C.E. operations include the following:

- Consistent reporting of Census Day address may have been somewhat better than achieved in 1990 due to the better interview made possible by being held closer to Census Day and an improved interviewing instrument.

- Matching error in the A.C.E. was low, with indications that it is substantially lower than that achieved in 1990. Additionally, other processing errors are probably lower than those measured in 1990.

---

[15]Outliers are extreme blocks with high effect on the estimates.

[16]B-1, "Data and Analysis to Inform the ESCAP Report."

[17]B-1, Ibid.

- A.C.E. fabrication was tightly controlled in 2000; an improved interviewing instrument, tighter management of field operations, and better detection of falsification through targeting, likely lowered the level of fabrication below 1990 levels.

- The level and pattern of missing data in the A.C.E. were near or below that in the 1990 PES and the effect of missing data on A.C.E. quality is similar to that experienced in 1990.

In short, the A.C.E. operations appear to have been in control, performed as expected, and produced data as good or better than the data produced by the 1990 PES.

## Historical Measures of Census Coverage - Comparison with Demographic Analysis

By far the largest issue facing the ESCAP has been the surprising inconsistency between the DA and A.C.E. estimates. The initial DA figures estimate that Census 2000 resulted in a net overcount of 1.8 million individuals, that Census 2000 overcounted the population by 0.7 percent. DA has long provided the standard against which the accuracy of both censuses and coverage measurement surveys are measured, making this inconsistency troubling. The inconsistency between the A.C.E. estimates and the demographic analysis estimates is most likely the result of one or more of the following three scenarios:

1. The estimates from the 1990 census coverage measurement survey (the Post-Enumeration Survey), the 1990 demographic analysis estimates, and the 1990 census were far below the Nation's true population on April 1, 1990. This scenario means that the 1990 census undercounted the population by a significantly greater amount and degree than previously believed, but that Census 2000 included portions of this previously un-enumerated population.

2. Demographic analysis techniques to project population growth between 1990 and 2000 do not capture the full measure of the Nation's growth.

3. Census 2000, as corrected by the A.C.E., overestimates the Nation's population.

The inconsistency between the demographic analysis estimates and the A.C.E. estimates raises the possibility of an as-yet undiscovered problem in the A.C.E. or census methodology. The Census Bureau has determined that it must further investigate this inconsistency, and the possibility of a methodological error, before it can recommend that adjustment would improve accuracy.

DA assesses accuracy in a fundamentally different manner from the survey-based approach used in the A.C.E. Instead of comparing the results of an independent survey, DA uses

administrative records of births, deaths, legal immigration, and Medicare enrollments along with calculated estimates of legal emigration and net undocumented immigration to estimate the national population. Most of these components of population change are well measured (especially for recent decades), but undocumented immigration is not directly measured and must be estimated by comparing detailed data between two consecutive censuses with administrative data on legal immigration. Given the uncertainty of the initial DA results, the Census Bureau has reexamined certain of these components and created an alternative set of DA estimates that allows for additional undocumented immigration in the 1990s. This alternative set estimates a net undercount of 0.9 million individuals. This would imply that the 2000 Census undercounted the population by 0.3 percent.[18]

For the decade between 1990 and 2000, the base demographic analysis relied on extrapolations of net undocumented immigration derived from data reflecting the changes between the 1980 and 1990 censuses. This analysis estimated the flow of undocumented immigration during the 1990's at 2.8 million. The accuracy of that assumption can only be assessed once the Census 2000 questions on country of birth and year of immigration become available. However, related data that examine the percent Hispanic and Non-Hispanic in Census 2000, and data on the percent foreign-born from the re-weighted March 2000 Current Population Survey (CPS), provide an indication of the accuracy of the original assumptions about immigration and emigration during the 1990's. These data show that the base DA implies a foreign-born percentage of the population below the value reported in the March 2000 CPS (10.3 percent versus 10.6 percent). Similarly, the base DA implies a percent Hispanic (12.1 percent) that is below the Census 2000 percent Hispanic (12.6 percent). Since the undocumented population has recently been predominantly Hispanic, these numbers would be consistent with an underestimate of the undocumented population component in the base DA.

Census Bureau researchers have therefore assumed that the base DA is a reasonable low estimate of net undocumented immigration in the 1990s, and examined several different scenarios to create a reasonable high estimate. For purposes of simplicity, researchers assumed a doubling of net undocumented immigration over the decade for the alternative DA. Doubling net undocumented immigration implies a percent foreign-born of 11.1, which is higher than the 10.6 percent from the re-weighted CPS, and a percent Hispanic of 12.7, which is higher than the 12.6 percent in the unadjusted Census 2000 results. Until data from Census 2000 on country of birth and year of immigration are available to recalibrate DA in detail, this alternative assumption should be considered a reasonable higher bound on net undocumented immigration during the 1990's.

---

[18]Similarly, legal emigration from the U. S. must be measured indirectly and several scenarios were run that varied this component as well as undocumented immigration. Those scenarios did not fit the observed data as well as the those that simply varied undocumented immigration. Scenarios that changed smaller components such as legal temporary immigration will be examined in future research.

DA and the A.C.E. do not differ completely. DA and the A.C.E. agree on a reduction in the net undercount in Census 2000 compared with 1990, but DA implies a greater change. DA estimated a 1.8 percent net undercount in 1990, compared with either a 0.7 percent net overcount (base set), or a 0.3 percent net undercount (alternative set) in 2000. The A.C.E. estimates show that the net undercount was reduced from 1.6 percent in 1990 to 1.2 percent in 2000. DA and the A.C.E. also concur that Census 2000 succeeded in reducing the differential undercount. Both DA and the A.C.E. measured a reduction in the net undercount rates for Black and non-Black children (aged 0-17) compared to 1990. Both methods also measure a reduction in the net undercount rates of Black men and women (aged 18 and over).

The DA estimates indicate that correlation bias has not been reduced from 1990 levels.[19] The A.C.E. sex ratios[20] for Black adults are lower than DA "expected" sex ratios, implying that the A.C.E. did not capture the high undercount rates of Black men relative to Black women. Historically, DA's important strength has been its ability to measure sex ratios accurately. (The ESCAP believes that correlation bias cannot be ignored. The correlation bias for 2000 measured by DA is about the same magnitude as that measured in 1990.)

It is important to understand the limitations and uncertainties associated with the DA estimates:

- Like the A.C.E., DA has an associated level of uncertainty; the ranges of DA uncertainty are a matter of judgment.

- DA estimates do not provide independent coverage benchmarks for all of the characteristics estimated in the A.C.E.[21]

- DA has difficulty in estimating the sub-national population.

- The DA method requires reconciling the reporting of race in the vital statistics system with race as reported in the census. The Census 2000 questionnaire used the instruction "mark one or more races," introducing a new consideration into the reconciliation of reported race data.

- DA provides estimates for the total population (people living in households and group quarters (GQ)), while the A.C.E. provides estimates only for the housing

---

[19]Correlation bias is discussed in B-12, "Correlation Bias."

[20]The ratio of men per 100 women.

[21]DA estimates can be tabulated by year-specific age, sex, and Black/Non-Black; the A.C.E. permits tabulation for additional racial categories and other characteristics, such as whether the housing unit is owned or rented.

Page 17 of 28

unit population, but excludes the group quarters population, which includes college dormitories and prisons.

DA estimates for the 1980 and 1990 censuses did not immediately confirm the results of the coverage measurement surveys in those censuses either. Initial DA estimates for the 1980 census implied a net overcount of 0.4 percent, but were later revised upward, partially to account for an increase in undocumented immigration. DA estimated a 1.8 percent undercount for the 1990 census, leading Secretary Mosbacher and others to question the accuracy of the 1990 adjusted counts. The Census Bureau, however, concluded that the differences between DA and the 1990 PES were explainable as within the bounds of DA uncertainty.[22]

However, in Census 2000 the differences between DA and the A.C.E. are larger than in 1990, with DA measuring an undercount from 1.9 to 0.9 percentage points less than the A.C.E. The Census Bureau acknowledges DA's inconsistency with the A.C.E. estimates and will continue to research this important issue.

## Measures of Census and A.C.E. Accuracy

### Total Error Model

The total error model and loss function analysis are methods used to compare the accuracy of the adjusted and unadjusted 2000 data. The total error model brings together all of the components of error that can be measured for the A.C.E. The total error model is used to correct the A.C.E. for biases and thus produces a measure of "truth" that can be used to assess the accuracy of both the adjusted and unadjusted census. The measures of the truth are referred to as targets since the components of error must be estimated. By using a range of targets as the basis of comparing the A.C.E and Census 2000, calculations can be done that indicate whether the adjusted or unadjusted census results are more accurate. Situations are defined by the methods and assumptions that are used to vary the components of error in the total error model.

The total error model identifies and estimates the various components of error and their variances for groups of the A.C.E. post-strata designated as evaluation post-strata.[23] Estimates of the component errors are derived for each evaluation post-stratam, then a simulation

---

[22]Bureau of the Census, "Technical Assessment of the Accuracy of Unadjusted Versus Adjusted 1990 Census Counts," 4.

[23]The Census Bureau can only estimate error components for at most sixteen evaluation post-strata. The error components reflect, for the most part, measures of nonsampling error. Estimation of nonsampling error requires extensive methodology carried out by extremely well qualified staff. Because few such staff exist, this limits the size of the sample for which measures can be obtained. Therefore direct estimates of the targets can only be obtained for a smaller number of evaluation post-strata.

methodology is used to create a range of target populations. Loss functions, described in the next section, are then used to determine which of the adjusted or unadjusted census populations is closer to the targets, taking into account the uncertainty in the targets and in the adjustment.[24]

The components of error for the total error model are as follows:[25]

1. P-sample matching error
2. P-sample data collection error
3. P-sample fabrication
4. E-sample data collection error
5. E-sample processing error
6. Correlation bias
7. Ratio estimator bias
8. Sampling error
9. Imputation error

The Census Bureau has data from DA, Census 2000, and the A.C.E. that can be used to produce estimates of components 6, 7 and 8 (Correlation Bias, Ratio Estimator Bias, and Sampling Error), and is relying on 1990 data to estimate the remaining components. The ESCAP discussed the use of 1990 measures for these error components, and determined that doing so would provide conservative estimates of the level of error in the A.C.E. The ESCAP noted that the A.C.E. is similar in design and operation to the 1990 PES, except that the A.C.E. was conducted with higher quality as noted above.[26]

The ESCAP analyzed the sensitivity of various components of the total error model, particularly the office processing components, because the Committee believes that it achieved better results for these components in 2000 than in 1990. Also, the ESCAP used a number of models of correlation bias in the total error model, given the importance of this component, and the understanding of the significant influence that this component has on the estimates of total error and thus on the target populations.

## Loss Function Analysis

Loss function analysis is used to compare the adjusted and unadjusted census populations to the target populations derived from the total error model as described above. Loss functions are constructed to measure the loss or error associated with differences from the targets. Loss

---

[24]Mary Mulry and Bruce D. Spencer. "Accuracy of the 1990 Census and Undercount Adjustments." Journal of the American Statistical Association 88 (September 1993): 1080-91; B-19, Mulry and Spencer.

[25]Ibid.

[26]B-19, Mulry and Spencer.

functions are defined to measure the loss in accuracy due to differences from the target populations. Loss functions are also specified based on various criteria related to the intended uses of the data. A general description of loss functions is as follows:

$$CensusLoss = \sum_{i=1}^{n} W_i \left( Cen_i - T_i \right)^2$$

$$ACELoss = \sum_{i=1}^{n} W_i \left( ACE_i - T_i \right)^2$$

Where:

$n$ represents the number of entities for which the comparison is conducted;

$T_i$, $Cen_i$, and $ACE_i$ represent the target population, unadjusted census population, and the adjusted census population, respectively for the i[th] entity; and

$W_i$ represents a weight defined for the criterion to be studied for a particular use of the data.

If the *Census loss* is greater than the *ACE loss*, then the adjusted data are determined to be more accurate for the criterion represented by the loss function.

The Census Bureau believes that both numeric and distributive accuracy are important measures of census accuracy and accordingly designed loss functions to measure both types of accuracy. Numeric accuracy refers to how close the overall count of a particular geographic area is to the truth, whereas distributive accuracy refers to how close the relative proportion or share of a geographic area is to its true share relative to other areas.[27] As discussed in B-13, "Comparing Accuracy," the ESCAP directed the preparation of four types of loss functions:

1. Squared Error Loss
2. Weighted Squared Error Loss
3. Relative Squared Error Loss
4. Equal Congressional District Squared Error Loss

The Committee determined that the second and fourth loss functions, weighted squared error loss and equal CD squared error loss, were the most appropriate to measure accuracy for redistricting data. The ESCAP directed the preparation of loss functions at the state, congressional district and county levels, believing these geographic levels most relevant to the

---

[27]The relationship between numeric and distributive accuracy is discussed in the Feasibility Document, pp. 15 - 18.

decision before the Secretary. County level data is intended to simulate state legislative districts, because these districts are usually smaller than congressional districts.

The ESCAP studied the sensitivity of the loss functions by varying the assumptions for various of the components in the total error model. As described above, extensive sensitivity analysis was conducted for the various models and levels of correlation bias that were used to generate the target populations.[28]

Loss functions that measure only a small gain in accuracy for the A.C.E. may be problematic, given the associated uncertainty with these estimates. Accordingly, the Committee examined the loss functions for evidence of a clearly measurable improvement and found the following: [29]

1. At the state and congressional district level, when only sampling variance was included, the loss functions showed that the change due to adjustment was significant in comparison to sampling error, that is, if sampling error were the only concern, adjustment would result in more accurate data. The ESCAP recognizes, of course, that sampling error is not the only error in the A.C.E., and thus this analysis was conducted to determine whether sampling error alone would result in finding that adjustment was less accurate. This was not the case so the ESCAP proceeded with more extensive analyses.

2. Correlation bias is a significant factor in influencing the results of the loss functions, and a variety of models were used to test the sensitivity of the analysis to correlation bias effects in creating the target populations. When full components of estimated correlation bias were used to construct the target populations, at the state, congressional district, and county levels, the loss functions showed a marked improvement for adjustment, regardless of the model. When only 50 percent of the estimated correlation bias was used in constructing the target populations, the loss functions continued to show a clear improvement. The ESCAP considered this to be an important finding because while there may be disagreement regarding the existence of correlation bias, assuming no correlation bias is clearly an unlikely possibility.

3. When either no or only a modest amount of correlation bias is factored into the loss functions, they tend to favor the unadjusted census at all geographic levels. The ESCAP noted that assuming no correlation bias would result in a lower bound for the degree of improvement for adjustment, since as noted above, it is not reasonable to assume no correlation bias.

4. The loss functions for counties with populations below 100,000 indicated that the unadjusted census was more accurate regardless of the level of correlation bias assumed. This caused some concern, since this was not the case for the 1990 census adjustment. However, the

---

[28]B-13, "Comparing Accuracy."

[29]Ibid.

ESCAP found that the adjustment was more accurate when considered for all counties using both numeric and distributive accuracy. Therefore, the adjustment was improving the data for areas in which the majority of the population resided. This is further indication of the closeness of the A.C.E. estimates and Census 2000.

The conclusion that can be drawn from the loss function analysis is that, absent the concerns with consistency between DA and the A.C.E., the adjustment would result in data that are more distributively and numerically accurate at the state and congressional district levels if correlation bias is recognized at a likely level, but that the data are not more accurate for smaller counties. Even though smaller counties would have been less accurate; the analysis indicated an overall improvement in accuracy from adjustment. However, the ESCAP notes its concern regarding the unexplained differences between DA and the A.C.E. estimates, which may be indicative of an unmeasured problem in Census 2000 or in the A.C.E. The potential for a reversal of these findings is strong enough to preclude a conclusion at this time that adjustment would improve accuracy. When considering the additional concerns described below and taking into account the inconsistencies with DA, the Committee was not prepared to recommend at this time that adjustment would improve accuracy.

# Other Factors That May Affect Accuracy

## Synthetic Error

The A.C.E. methodology produced estimated coverage correction factors for each of the post-strata. These factors were carried down within the post-strata to the census block level in a process called synthetic estimation. The key assumption underlying synthetic estimation is that the net census coverage is relatively uniform within the post-strata. In other words, the probability that people in a particular post stratum will be missed by the census is assumed to be roughly the same. The failure of this assumption causes synthetic error.

The design underlying synthetic estimation methodology is directed at correcting a systematic under or over count in the census. The synthetic estimates will not correct random counting errors that occur at any geographic level (blocks, tracts, counties, etc). Therefore, the synthetic estimate will not result in extreme changes in small geographic entities, nor will it correct for extreme errors. Synthetic estimation is designed to remove the effects of systematic errors, so that when small entities are aggregated, systematic and differential coverage errors can be corrected.

The ESCAP was concerned with synthetic error, because this type of error is not included as a component of the total error model (which estimates error in post-stratum level DSE's, where there is, by definition, no synthetic error). Furthermore, synthetic error cannot be estimated directly, as direct estimation would require more sample observations for the A.C.E than practicable.

The ESCAP analyzed the effects of synthetic error by conducting artificial population analysis. This analysis creates artificial populations with surrogate variables thought to reflect

the distribution of net coverage error. These surrogate variables are known for the entire population. An analysis of these artificial populations for the effect of synthetic error is the basis on which this otherwise unknown effect is studied.

The detailed analysis of synthetic error is described more fully in reports B-1, "Data and Analysis to Inform the ESCAP Report," and B-14, "Assessment of Synthetic Assumptions." Briefly, four artificial populations were constructed based on census variables thought to be related to census coverage. The Census Bureau calls these variables "surrogates."[30] The Census Bureau distributed the post-stratum level gross undercount (gross overcount) in proportion to the gross undercount surrogate variable (gross overcount surrogate variable) to the geographic levels to be studied. This process results in a population with surrogate values for coverage error which are known at all levels. Unlike other approaches, artificial population analysis provides measures of net coverage for all local areas, within a post-stratum. Therefore the effect of synthetic error can be assessed for these artificial populations.

The four artificial populations are described in Table 3 below:

## Table 3: Surrogate Variables used to Create Artificial Populations

|  | Undercount Surrogate | Overcount Surrogate |
|---|---|---|
| Artificial Population 1 | (#non-GQ persons) - (#persons in whole household substitutions) | (#non-GQ persons) - (# persons for whom date of birth was allocated consistent with reported age) |
| Artificial Population 2 | (#non-GQ persons) - (#persons in whole household substitutions) | (#non-GQ persons) - (#persons in whole household substitutions) |
| Artificial Population 3 | # non-GQ persons with 2 or more item allocations | # persons for whom date of birth was allocated consistent with reported age |
| Artificial Population 4 | # non-GQ persons whose household did not mail back the questionnaire | # non-GQ persons whose household did not mail back the questionnaire |

GQ = Group Quarters

---

[30]The methodology used is similar to that suggested by Freedman and Wachter (1994, Statistical Science).

Page 23 of 28

Three types of analysis were conducted using these artificial populations:[31]

1.  The effect of relative bias for synthetic estimation was assessed by calculating the ratio of the absolute unadjusted census error to the absolute adjusted census error for state and congressional district population totals and shares. An analysis of the distribution of these relative biases indicated that within the artificial populations, synthetic estimation improved the majority of entities.

2.  Biases for synthetic estimation were also calculated and compared to the level of bias in the dual system estimates, including correlation bias from the total error model. Since the total error model does not include synthetic bias, the purpose of this analysis was to determine whether the level of synthetic error was small enough to be ignored when compared to the other errors estimated for the A.C.E. This analysis showed that the level of synthetic error could not be ignored for several of the artificial populations. This finding led to the third analysis.

3.  Because synthetic error affects both the unadjusted and adjusted census, the Census Bureau studied the effect of synthetic error on both unadjusted and adjusted census loss, as measured by the loss functions, and concluded that synthetic error would increase the loss of both the unadjusted and adjusted census. The question was how this error would affect the relative losses for the adjusted and unadjusted data.

    Therefore, the ESCAP directed the addition of synthetic error to the loss measured for both the adjusted and unadjusted census. This study indicated that synthetic error could, in certain situations, affect the relative comparison of adjusted or unadjusted loss.

    For the analyses based on several of the artificial populations for state and congressional district counts, the loss function analysis understated the true gains from adjustment. However, for some of the analyses, the loss function results understate the true gain for the unadjusted census. In these situations, the effect could be as high as 58 percent.

The ESCAP noted that a conservative view of the loss function results should be used in assessing the gain in accuracy from adjustment. Given the concerns described above, the ESCAP believes that this finding must be fully understood before recommending for an adjustment.

## Balancing Error

The A.C.E. actually consists of two surveys, based on two samples: – the P-sample and the E-sample. The P-sample is an enumeration independent from the census, used to measure omissions or missed persons. The E-sample is a sample of census records that are reexamined to measure erroneous inclusions. Balancing error occurs when cases are handled differently in the

---

[31]See Analysis Report B-14, "Assessment of Synthetic Assumptions" for a detailed discussion.

Page 24 of 28

CSHPDF - www.fastio.com

P- and E-samples. For example, the effort spent to identify gross omissions should be comparable to the effort spent to identify erroneous enumerations. The ESCAP examined whether balancing error may have been introduced during the Targeted Extended Search (TES) operation. TES was the A.C.E. operation designed to look for matches in surrounding A.C.E. block clusters. The DSE model attempts to match people in the A.C.E with people in the census. Balancing error occurs when the search area for the P-sample matching does not agree with the search area for E-sample erroneous enumerations. Specifically, if A.C.E. records are allowed to match to records that were not in the common area of search, the DSE ratio will be incorrectly estimated.

One can assess TES balance by seeing if the proportions of errors of inclusion and of exclusion are approximately equal after completion of the search, assuming that there is no geocoding error in the P-sample. In other words, the number of TES people found on the P-sample (coded as a Match) and E-sample (coded as a Correct Enumeration) sides should be about equal. In Census 2000, the much greater increase in the match rate (3.8 percent) than the correct enumeration rate (2.9 percent) may indicate that some aspect of A.C.E. is out of balance. The ESCAP directed a review of this situation. Preliminary results from an early A.C.E. evaluation indicate that a number of E-sample cases coded as correct enumerations were in fact outside of the search area. That means that they should have been coded as Erroneous Enumerations and subtracted from the DSEs. This error could introduce an upward bias in the DSE. In addition, there are also concerns that the search for census duplicate enumerations in surrounding blocks could have understated the estimate of duplicates used in the DSE. The net effect of correcting these two errors could have the effect of reducing the A.C.E. estimate of total net undercount. However, additional work must be completed to quantify this effect.

The ESCAP was concerned about the possibility of balancing error. The ESCAP noted that some measures of this error were included in the total error model. However, this result, in combination with the inconsistency between DA and the A.C.E., added to the concerns that adjustment could not be shown to improve accuracy at this time. The Committee also believes that balancing error must be further investigated before a recommendation can be made.

## Late Adds and Whole Person Imputations

There are records included in Census 2000 that do not contain information sufficient for matching to the A.C.E independent sample. The methodology that has been established and used to produce coverage estimates, given that this situation will occur, is to produce the dual system estimate based on the census population that has sufficient information to be included into the A.C.E. matching process. In effect, this excludes records that do not contain sufficient information for matching from the dual system estimation. The dual system estimate then produces a measure of the correct population total. The undercount (or overcount) is estimated by comparing the complete census count to the dual system estimate of the correct population total. Therefore, the effect of these census records is included in the estimates of undercount produced by dual system estimation.

The key assumption underlying this methodology of estimating coverage error is that the probability of including the people represented by these records in the A.C.E. P-sample is the same as the probability of including the people who report sufficient information to be included in the matching procedures.

Census 2000 contains over five million records where imputation procedures were used to create all of the information. These are referred to as whole person imputations. Since these records do not contain information sufficient to be included in the matching, they are handled as described above. The Census Bureau plans to evaluate the causes for these imputations.

In addition, as discussed in the preceding section on census quality, the Housing Unit Unduplication Operation reinstated over a million previously removed housing units (representing over two million individual person records) into the census files. These reinstated "Late Additions" were incorporated into the estimates of coverage error using the same process as described for census records that do not contain sufficient information for matching. The same assumption underlies this treatment of late additions as described above for records without sufficient information for matching. That is, the probability of inclusion in the P-sample for the people Census 2000 correctly enumerated in the universe of late additions is assumed to be the same as for correctly enumerated people not in this universe.

The ESCAP reviewed the treatment of late additions and whole person imputations because the number of these cases had increased significantly from 1990. The ESCAP concluded that the key assumptions underlying the methodology for including these records into the estimates of A.C.E coverage error could be expected to hold. However, the ESCAP noted that these assumptions would not hold perfectly and examined the effects of deviations from this assumption. The ESCAP concluded that three effects were likely to result (1) the sampling variance of the dual system estimator would be increased; (2) the heterogeneity of the A.C.E inclusion probabilities would be increased, leading to increased correlation bias; and (3) to the extent that these records clustered geographically within the A.C.E. post-strata, synthetic error would be increased.

The ESCAP was comfortable that the measures available for assessing the effects of sampling variance and correlation bias would include the effects of the treatment of late additions and whole person imputations. However, the ESCAP was concerned that synthetic error might be increased and continued its review of the effect of increased synthetic error. The committee reviewed tabulations of late census additions and whole person imputations for A.C.E post-strata by census region. The committee found that these data did indicate some degree of geographic clustering within post-strata. The committee noted that the synthetic error analysis included the effect of clustering of whole person imputations. The committee concluded that there was a possibility for increased synthetic error, and that it was reflected to some degree in the analysis based on artificial populations. The committee concluded further that a higher degree of conservatism should be used in reviewing the results of the loss function analysis. The committee did not view the effect of increased synthetic error as large enough to change the findings described previously.

## Misclassification Error

Misclassification error occurs when an individual is classified into different post-strata in the census and the A.C.E.   While the Census Bureau has never detected a significant impact of misclassification error in earlier post-enumeration surveys,  the introduction of multiple race reporting in both the census and the A.C.E. raised concerns about this type of error.  The evidence reveals that misclassification error affected only two groups, the domains of American Indians off reservation and Native Hawaiians and Pacific Islanders.  ESCAP has concluded that for these two groups, it appears that inconsistency may have contributed to having lower than anticipated undercount rates because of how they were classified.  The misclassification error in these two domains had little or no effect on the validity of the dual system estimates as a whole, given their small sizes.  Misclassification error, in general, was not a problem.

# Additional Issues

There are several issues or concerns that have been raised regarding census adjustment. These issues did not concern the ESCAP, but are briefly discussed below.

## Block Level Accuracy

Block level accuracy is not an important criterion to evaluate either Census 2000 or the A.C.E.  The population of stand-alone blocks is not used to determine either congressional or state legislative districts, nor is block-level data used to distribute funds.  Rather, blocks are added together to form the more meaningful levels of aggregation studied by the loss functions: states, congressional districts, and counties.

Block level accuracy has two components, random error and systematic errors or biases. Random error can be minimized through the conduct of census operations aimed at improving quality.  Systematic biases, on the other hand, are caused by systematic errors that occur during the conduct of census operations.  Random errors at the block level diminish greatly as blocks are added together to form larger aggregations of the data.  Systematic errors, if not corrected, will remain in the data at all levels of aggregation, leading to data that systematically over or understate affected population groups.   Therefore, it is more important for adjustment to remove systematic errors from block level data.

## Adjustment for Overcounts

It is important to emphasize that the statistical correction of Census 2000 would involve some amount of downward adjustment for overcounts.  While the A.C.E. would mostly result in an increase in the estimated size of most undercounted geographic entities, there are likely to be a small number of overcounted areas that would require decreasing the estimated size.  The 2000

A.C.E. data do not show that any state or congressional district was overcounted; all states and congressional districts would increase in measured size. The data do reveal, however, that certain substate entities were overcounted and would thus be subject to downward adjustment.

There are concerns that an adjustment for overcounts removes people from Census 2000 data files. This is not the case; the downward adjustment is accomplished by creating statistical records with negative weights that, when added to Census 2000 tabulations, reduce the count to reflect overcounts. No records would have been removed from the Census 2000 files. However, the effects of the adjustment for overcounts may subtract a person's individual characteristics from the Census 2000 tabulations.

The ESCAP discussed the downward adjustment for overcounts, and noted that it was subject to the same concerns that are related to adjustment for undercounts. The ESCAP concluded that the analysis of the accuracy of the adjustment included the effects of uncertainties for adjustments of over and undercounts, and that any final determination on the potential improvement of accuracy would reflect these uncertainties.

## Attachments:

1. Index of Supporting Documentation
2. List of "B-Series" Analysis Reports
3. List of planned Census 2000 final evaluations

Attachment 1

# Outline of Documents/Records Underlying the Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy Regarding the Methodology to be Used to Produce the Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. 141(c)

A..    Reports Supporting the Recommendation – Chapter B (Final reports)

B.    Detailed Specifications for A.C.E. Methodology

C.    Executive Steering Committee for A.C.E. Policy (ESCAP) Meetings

D.    October 2, 2000, Presentation to the National Academy of Sciences

E.    Prior Steps to Determining Feasibility

F.    Prior Documentation of Adjustment Research

G.    Census 2000 Decision Memoranda

H.    Census 2000 Dress Rehearsal Evaluations Summary (1999)

I.    Census 2000 Informational Memoranda

J.    U.S. Census Monitoring Board Reports

K.    U.S. General Accounting Office Reports

L.    U.S. Department of Commerce Office of the Inspector General Reports

**Note:**  Because of the large volume of underlying documentation, not all will be posted to the Census Bureau's website at the time that the ESCAP report is made available.  The remaining documents will be posted in the near future.

Attachment 2

February 27, 2001

**B-Series Documents**

| | Title | Author |
|---|---|---|
| 1 | Accuracy and Coverage Evaluation: Data and Analysis to Inform the ESCAP Report | Hogan |
| 2 | Quality Indicators of Census 2000 and the Accuracy and Coverage Evaluation | Farber |
| 3 | Quality of Census 2000 Processes | Baumgardner/Moul/Pennington/ Piegari/Stackhouse/Zajac/Albert/ Reichert/Treat |
| 4 | Accuracy and Coverage Evaluation: Demographic Analysis Results | Robinson |
| 5 | Accuracy and Coverage Evaluation: Person Interviewing Results | Byrne/Imel/Ramos/Stallone |
| 6 | Accuracy and Coverage Evaluation: Person Matching and Follow-up Results | Childers/Byrne/Adams/Feldpausch |
| 7 | Accuracy and Coverage Evaluation: Missing Data Results | Cantwell/McGrath/Nguyen/Zelenak |
| 8 | Accuracy and Coverage Evaluation: Decomposition of Dual System Estimation Components | Mule |
| 9 | Accuracy and Coverage Evaluation: Dual System Estimation Results | Davis |
| 10 | Accuracy and Coverage Evaluation: Consistency of Post-Stratification Variables | Farber |
| 11 | Accuracy and Coverage Evaluation: Variance Estimates by Size of Geographic Area | Starsinic/Sissel/Asiala |
| 12 | Correlation Bias | Bell |
| 13 | Comparing Accuracy | Mulry/Navarro |
| 14 | Accuracy and Coverage Evaluation: Assessment of Synthetic Assumptions | Griffin/Malec |
| 15 | Census 2000: Service Based Enumeration Multiplicity Estimation | Griffin |
| 16 | Demographic Full Count Review: 100% Data Files and Products | Batutis |
| 17 | Census 2000: Missing Housing Unit Status and Population Data | Griffin |
| 18 | Accuracy and Coverage Evaluation: Effect of Targeted Extended Search | Navarro/Olson |
| 19 | Overview of Total Error Modeling and Loss Function Analysis | Mulry/Spencer |

CutePDF - www.cutepdf.com

**Attachment 3**

February 27, 2001

## Census 2000 Evaluations Program
## Category Report Schedule

| CATEGORY | AVAILABILITY OF CATEGORY REPORT |
|---|---|
| A: Response Rates & Behavior Analysis | Spring 2002 |
| B: Content/Data Quality | Summer 2003 |
| C: Data Products | Summer 2001 |
| D: Partnership and Marketing Programs | Winter 2001 |
| E: Special Populations | Winter 2001 |
| F: Address List Development | Fall 2002 |
| G: Field Recruiting & Management | Summer 2001 |
| H: Field Operations | Winter 2002 |
| I: Coverage Improvement | Winter 2002 |
| J: Ethnographic Studies | Spring 2003 |
| K: Data Capture | Fall 2002 |
| L: Processing Systems | Winter 2002 |
| M: Quality Assurance Evaluations | Spring 2003 |
| N: Accuracy & Coverage Evaluation Survey Operations | Fall 2002 |
| O: Coverage Evaluations of the Census & of A.C.E. Survey | Summer 2002 |
| P: A.C.E. Survey Statistical Design & Estimation | Winter 2003 |
| Q: Organization/Budget & MIS | Fall 2001 |
| R: Automation of Census Processes | Summer 2001 |



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001
OFFICE OF THE DIRECTOR

March 1, 2001

MEMORANDUM FOR   Donald L. Evans
                 Secretary of Commerce

From:            William G. Barron, Jr.
                 Acting Director

Subject:         Recommendation on Adjustment of Census Counts

I am forwarding the report of the Executive Steering Committee for A.C.E. Policy (ESCAP) on whether the Accuracy and Coverage Evaluation (A.C.E.) should be used to adjust the Census 2000 counts. I asked the ESCAP to provide a recommendation in its report because I rely on the knowledge, experience, and technical expertise of the Committee and Census Bureau staff who have worked extremely hard with tremendous dedication and expertise through every phase of Census 2000.

As a member of the ESCAP and as Acting Director, I concur with and approve the Committee's recommendation that unadjusted census data be released as the Census Bureau's official redistricting data. The law requires that the Census Bureau issue data for use in redistricting by April 1, 2001 (13 U.S.C. 141(c)). The Committee reached this recommendation because it is unable, based on the data and other information currently available, to conclude that the adjusted data are more accurate for use in redistricting. The primary reason for arriving at this conclusion is the apparent inconsistency in population growth over the decade as estimated by the A.C.E. and demographic analysis. These differences cannot be resolved in the time available for the Committee's work. The importance of completing this type of analysis has been emphasized clearly and explicitly in the Census Bureau's public presentations outlining the scope, intent, and purpose of ESCAP deliberations. For example, the June 2000 Feasibility Document contained various references to the importance of demographic analysis and demographic estimates as key components of data and analysis to inform the ESCAP recommendation. This point was reinforced in materials the Census Bureau presented on October 2, 2000, at a public workshop sponsored by the National Academy of Sciences. The inconsistency raises the possibility of an unidentified error in the A.C.E. estimates or Census 2000. This possibility cannot be eliminated by the legally mandated deadline.

I believe the attached report and this cover memo meet the requirements set forth in regulation 66 Fed. Reg. 11231 (February 23, 2001), "Report of Tabulations of Population to States and Localities Pursuant to 13 U.S.C. 141(c) and Availability of Other Population Information; Revocation of Delegation of Authority."

Please let me know if I can provide you with additional information on these matters.

U S C E N S U S B U R E A U
*Helping You Make Informed Decisions*                                    www.census.gov



**UNITED STATES DEPARTMENT OF COMMERC**
**Bureau of the Census**
Washington, D C  20233

March 2, 2001

DSSD CENSUS 2000 PROCEDURES AND OPERATIONS MEMORANDUM SERIES B-4 *

MEMORANDUM FOR      Howard Hogan
                              Chief, Decennial Statistical Studies Division

From:                      J. Gregory Robinson
                              Chief, Population Analysis & Evaluation Staff
                              Population Division

Subject:                  Accuracy and Coverage Evaluation Survey:
                              Demographic Analysis Results

The attached document was prepared at your request to assist the Executive Steering Committee
on A.C.E. Policy in its recommendation regarding the release of the statistically corrected data or
data without statistical correction.

This report focuses on the consistency of the A.C.E. results with findings based on Demographic
Analysis (DA).  DA is a separate and independent coverage evaluation program conducted at the
Census Bureau.

DSSD Census 2000 Procedures and Operations Memorandum Series B-4*
March 2, 2001

# Accuracy and Coverage Evaluation: Demographic Analysis Results

J. Gregory Robinson
U.S. Census Bureau

CVISPDF – www.fineso.com

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Table A. Estimates of Percent Net Undercount:1990 and 2000 . . . . . . . . . . . . . . . . . . 4

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Limited detail of DA estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Uncertainty in DA estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Inconsistencies in race classifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    DA and A.C.E. universe differences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Development of "Alternative" DA estimates based on benchmark analysis . . . . . . . . . . 9

        Census-level error of closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        Other comparisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        Setting the Alternative DA assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Comparison of 2000 A.C.E. coverage patterns with Base and Alternative DA estimates
    and historical trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        Total population . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        Sex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        Sex and age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Race and sex . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        Race, sex, and age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        Comparison of sex ratio results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    Other demographic coverage benchmarks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Appendix A:  Description of methodology for Demographic Analysis . . . . . . . . . . . . . . . . A-1

Appendix B:  Description of methodology for other demographic benchmarks . . . . . . . . . . . B-1

Appendix C:  Foreign born methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

# List of Tables

Table 1:  Comparisons of Census 2000 Counts with Demographic-based Population Estimates

Table 2 A: Percent of the US Population that is Hispanic According to Census Counts, DA, and A.C.E.: 1990 and 2000

Table 2 B: Percent of the US Population that is Foreign Born According to Census Counts, CPS, DA, and A.C.E.: 1990 and 2000

Table 3: Census Count, Base DA and Alternative DA Estimates, and A.C.E. Estimates for the U.S. Resident Population: April 1, 2000

Table 4:  Estimates of Percent Net Undercount by Sex, Using Two DA Sets of Estimates: 1940 to 2000

Table 5:  Estimates of Percent Net Undercount by Sex and Age, Using Two DA Sets of Estimates: 1960 to 2000

Table 6: Estimates of Percent Net Undercount by Race and Sex, Using Two DA Sets of Estimates: 1960 to 2000

Table 7: Estimates of Percent Net Undercount by Race, Sex  and Age, Using Two DA Sets of Estimates: 1960 to 2000

Table 8: Sex Ratios for the Census, A.C.E./PES, and DA by Race: 1990 and 2000

Table 9: Ratios of Census Counts to Demographic Benchmarks for County Groupings

Appendix Table 1: Comparison of the Census, A.C.E., and DA Estimates of Population and Percent Net Undercount: 2000 - Model 1

Appendix Table 2:  Comparison of the Census, A.C.E., and DA Estimates of Population and Percent Net Undercount: 2000 - Model 2

Appendix Table 3:  Comparison of the Census, PES and DA Estimates of Percent Net Undercount: 1990

Appendix Table 4: Uncertainty Intervals for the Demographic Analysis Estimates of Percent Net Undercount by Race, Sex, and Age: 1990

Table 6--Estimates of Percent Net Undercount by Race and Sex, Using Two DA Sets of Estimates: 1960 to 2000
(a minus sign denotes a net overcount)

| Category | Demographic Analysis | | | | | | | | | | Survey-based | | |
| | 1960 | 1970 | 1980 | 1990 | 2000 - Base DA | | | 2000 - All DA | | | PES 1990 | A.C.E. Model 1 | A.C.E. Model 2 |
| | | | | | Average | Model 1 | Model 2 | Average | Model 1 | Model 2 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Population | 3.08 | 2.71 | 1.22 | 1.85 | -0.65 | -0.65 | -0.65 | 0.32 | 0.32 | 0.32 | 1.58 | 1.15 | 1.15 |
| Black | 6.57 | 6.48 | 4.50 | 5.68 | 2.80 | 4.67 | 0.91 | 3.51 | 5.36 | 1.65 | 4.43 | 2.05 | 2.08 |
| Male | 8.76 | 9.10 | 7.47 | 8.49 | 5.10 | 6.94 | 3.26 | 5.81 | 7.64 | 3.98 | 4.90 | 2.36 | 2.39 |
| Female | 4.42 | 3.97 | 1.67 | 3.01 | 0.63 | 2.52 | -1.27 | 1.32 | 3.20 | -0.56 | 4.01 | 1.77 | 1.80 |
| Nonblack | 2.65 | 2.21 | 0.77 | 1.29 | -1.19 | -1.48 | -0.90 | -0.17 | -0.45 | 0.12 | 1.18 | 1.02 | 1.01 |
| Male | 2.87 | 2.71 | 1.47 | 1.97 | -0.93 | -1.21 | -0.65 | 0.17 | -0.11 | 0.44 | 1.52 | 1.40 | 1.39 |
| Female | 2.44 | 1.73 | 0.09 | 0.63 | -1.44 | -1.74 | -1.14 | -0.50 | -0.79 | -0.20 | 0.85 | 0.64 | 0.63 |
| Black:Nonblack Diff. | 3.92 | 4.27 | 3.73 | 4.39 | 3.99 | 6.15 | 1.83 | 3.67 | 5.81 | 1.53 | 3.25 | 1.03 | 1.07 |

Source: U.S. Census Bureau, Population Division

Note: Model 1 compares the 2000 DA estimates for Blacks with Census 2000 tabulations for people who only reported Black. Model 2 compares the 2000 DA estimates for blacks with Census 2000 tabulations for people who reported Black whether or not they reported any other race. An average of the two model estimates is shown. These averages represent the midpoint of the range

Source of DA: 1960-1990-- Robinson, J. Gregory, Bashir Ahmed, Prithwis Das Gupta, and Karen Woodrow, "Estimates of Population Coverage in the 1990 United States Census Based on Demographic Analysis", Journal of the American Statistical Association, Vol. 88, No. 423, pp. 1061-1077. Estimates for 2000. See Appendix Table 1 and Table 2.

Source of PES / A.C.E. See Appendix Tables 1-3.

which is about a block away. Persons in need of special arrangements should contact the person listed below.

**FOR FURTHER INFORMATION CONTACT:** Deirdre O'Sullivan, Amtrak Reform Council, Room 7105, JM–ARC, 400 Seventh Street, SW., Washington, DC 20590, or by telephone at (202) 366–0591; FAX: 202–493–2061. For information regarding ARC's upcoming events, the agenda for meetings, the ARC's First Annual Report, information about ARC Council Members and staff, and much more, you can also visit the Council's website at www.amtrakreformcouncil.gov.

**SUPPLEMENTARY INFORMATION:** The ARC was created by the Amtrak Reform and Accountability Act of 1997 (Reform Act), as an independent commission, to evaluate Amtrak's performance and to make recommendations to Amtrak for achieving further cost containment, productivity improvements, and financial reforms. In addition, the Reform Act provides: that the Council is to monitor cost savings from work rules established under new agreements between Amtrak and its labor unions; that the Council submit an annual report to Congress that includes an assessment of Amtrak's progress in the resolution of productivity issues; and that, after a specified period, the Council has the authority to determine whether Amtrak can meet certain financial goals specified under the Reform Act and, if it finds that Amtrak cannot, to notify the President and the Congress.

The ARAA prescribes that the Council is to consist of eleven members, including the Secretary of Transportation and ten others nominated by the President and the leadership of the Congress. Members serve a five-year term.

Issued in Washington, DC, March 6, 2001.

**Thomas A. Till,**
*Executive Director.*
[FR Doc. 01–6117 Filed 3–12–01; 8:45 am]
**BILLING CODE 4910–06–P**

---

**DEPARTMENT OF COMMERCE**

**Submission For OMB Review; Comment Request**

**DOC has submitted to the Office of Management and Budget (OMB) for clearance the following proposal for collection of information under the provisions of the Paperwork Reduction Act (44 U.S.C. chapter 35).**

**AGENCY:** U.S. Census Bureau.

*Title:* 2002 Census of Governments, Prelist Survey of Special Districts.

*Form Number(s):* G–24.

*Agency Approval Number:* None.

*Type of Request:* New collection.

*Burden:* 1,520 hours.

*Number of Respondents:* 3,039.

*Avg Hours Per Response:* 30 minutes.

*Needs and Uses:* The Census Bureau requests OMB approval of data collection Form G–24. This form will be used to update the universe list of special district governments for the 2002 Census of Governments authorized by Title 13 of the United States Code. This form will be used specifically to verify the existence of special districts for the 2002 Census of Governments and to obtain current addresses and to identify new districts. The information requested on this form is identical to that requested in the prelist phase of the 1997 Census of Governments. The G–24 survey form will be imprinted with a list of known special districts within the areas of each of the 3,039 counties, consolidated city-county governments, and independent cities designated to receive the form. Respondents will use the G–24 form to update the listing by correcting the imprinted special district list and by reporting any additional districts. The mail canvass is supplemented by calls to major nonrespondents. Procedures, with the exception of using more advanced computer technology to generate the form imprinted with the list of known special districts, are the same as used for the 1997 Prelist Survey.

*Affected Public:* State, local, or Tribal government.

*Frequency:* Every 5 years.

*Respondent's Obligation:* Voluntary.

*Legal Authority:* Title 13 USC, Section 161.

*OMB Desk Officer:* Susan Schechter, (202) 395–5103.

Copies of the above information collection proposal can be obtained by calling or writing Madeleine Clayton, Departmental Forms Clearance Officer, (202) 482–3129, Department of Commerce, room 6086, 14th and Constitution Avenue, NW, Washington, DC 20230 (or via the Internet at mclayton@doc.gov).

Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to Susan Schechter, OMB Desk Officer, room 10201, New Executive Office Building, Washington, DC 20503.

Dated: March 8, 2001.

**Madeleine Clayton,**
*Departmental Forms Clearance Officer, Office of the Chief Information Officer.*
[FR Doc. 01–6167 Filed 3–12–01; 8:45 am]
**BILLING CODE 3510–07–P**

---

**DEPARTMENT OF COMMERCE**

**Bureau of the Census**

**Decision of the Secretary of Commerce to Release the Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. 141(c)**

**AGENCY:** Bureau of the Census, Department of Commerce.

**ACTION:** Notice.

**SUMMARY:** On March 6, 2001, the Secretary of Commerce announced his acceptance of the recommendations of the Census Bureau and made a final determination that unadjusted data should be used in calculating the tabulations of population to be reported to States and localities pursuant to 13 U.S.C. 141(c). This notice publishes the Secretary's decision memorandum of March 7, 2001, providing the rationale for his determination.

**FOR FURTHER INFORMATION CONTACT:** Alden F. Abbott, Acting General Counsel, U.S. Department of Commerce, (202) 482–1328.

**SUPPLEMENTARY INFORMATION:** Through the Census Act, which is codified in title 13 of the United States Code, Congress has delegated to the Secretary of Commerce its broad constitutional authority to conduct the decennial census (see U.S. Constitution Art. I, Sec. 2, Cl.3). Included in the Census Act is a requirement for the Secretary to report tabulations of population to States and localities pursuant to 13 U.S.C. 141(c).

To meet this reporting requirement in connection with Census 2000, the Secretary decided the appropriate methodology to be used in calculating the tabulations of populations to be reported to States and localities for redistricting purposes. The procedural framework within which the Secretary made his decision is codified at Part 101 of Title 15, Code of Federal Regulations. Specifically, a committee of senior career officials of the Census Bureau reported to the Director of the Census. This committee unanimously recommended the release of unadjusted data. The Director of the Census forwarded to the Secretary of Commerce the committee's report along with the Director's concurrence in and approval of the committee's recommendation (66 FR 14004, March 8, 2001). In addition,

prominent non-Government statisticians and demographers each individually recommended to the Secretary the release of unadjusted data.

On March 6, 2001, the Secretary of Commerce announced his acceptance of the Census Bureau's recommendations and determined to release unadjusted data to the States for purposes of redistricting. Set forth below is the Secretary's decision memorandum of March 7, 2001, providing the rationale for his determination.

Dated: March 7, 2001.

**Alden F. Abbott,**

*Acting General Counsel.*

### Decision of the Secretary of Commerce to Release the Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. 141(c)

As Secretary of Commerce, I have the privilege of overseeing the Census Bureau and its decennial census activities. One of those activities is the production of population counts for State and local redistricting purposes, as required by the Census Act. Section 141(c) of the Census Act requires the Secretary of Commerce to complete and to report the tabulations of population to each State within one year after the decennial census date. For the 2000 decennial census, that deadline is April 1, 2001.

In conjunction with the actual enumeration conducted for the 2000 census, the Census Bureau also conducted an Accuracy and Coverage Evaluation ("A.C.E.") and performed a detailed Demographic Analysis to evaluate the quality of the actual enumeration data. On March 1, 2001, the Acting Director of the Bureau of the Census, William G. Barron, Jr., forwarded to me the report and the recommendations of the Executive Steering Committee on A.C.E. Policy (ESCAP) regarding the data to be reported to the States as required by Section 141(c). The ESCAP was formed in November 1999 to "advise the Director in determining policy for the A.C.E. and the integration of the A.C.E. results into the census for all purposes except Congressional reapportionment." The members of the ESCAP include twelve senior career Census Bureau professionals with advanced degrees and/or decades of experience in the Federal statistical system. Acting Director Barron is a member of the Committee.[1]

On October 6, 2000, the Department of Commerce delegated to the Director of the Census Bureau the final determination regarding the methodology to be used in calculating the tabulations of population reported to States and localities pursuant to 13 U.S.C. 141(c). This action also required the ESCAP to prepare a written report to the Director of the Census Bureau with a recommendation regarding the methodological decision. The delegation to the Director was revised on February 14, 2001, to provide that the Secretary of Commerce would make the final decision regarding the reporting of the redistricting data after receiving the recommendation, if any, of the Director of the Census Bureau, together with the ESCAP's report and the advice of other experts.[2]

After evaluating a wide variety of evidence relating to the accuracy of Census 2000, in its March 1, 2001 report, the ESCAP recommended that the actual enumeration data be released as the Census Bureau's official redistricting data. The ESCAP was unable to conclude that data adjusted by use of the A.C.E. methodologies would be more accurate than the unadjusted data. The Committee reached these conclusions for several reasons:

1. Demographic Analysis estimates indicated fundamental differences with the results of the A.C.E. These differences could not be explained within the time available and raised the possibility of an as-yet undiscovered problem in the A.C.E. or census methodology.

2. The Census Bureau evaluations of synthetic error found variable results. These variable results indicate that synthetic error could, in certain circumstances, affect the results of a comparison of the adjusted and unadjusted data.

3. The Census Bureau also identified potential balancing error that indicated a possible upward bias for the A.C.E. undercount estimates, the effect of which might be a reduction in the A.C.E.'s net undercount estimates.

Acting Director Barron has advised me that he concurs with and approves

(i) Deputy Director and Chief Operating Officer; (ii) Principal Associate Director and Chief Financial Officer; (iii) Principal Associate Director for Program; (iv) Associate Director for Decennial Census (Chair); (v) Assistant Director for Decennial Census; (vi) Associate Director for Demographic Programs; (vii) Associate Director for Methodology and Standards; (viii) Chief; Planning, Research, and Evaluation Division; (ix) Chief; Decennial Management Division; (x) Chief, Decennial Statistical Studies Division; (xi) Chief; Population Division, and (xii) Senior Mathematical Statistician

the Committee's recommendation. In addition, I asked six prominent non-Government statisticians and demographers with extensive experience and knowledge of the methodologies and issues before the ESCAP to review the Committee's report and recommendation. Each of these experts also has individually expressed concurrence with the Committee's recommendation.

After considering these views and the ESCAP report, I hereby accept the recommendation of both the Acting Director and the ESCAP Committee, and determine that the unadjusted census data produced in Census 2000 be reported to the States pursuant to Section 141(c) of the Census Act as the Census Bureau's official redistricting data.

Dated: March 7, 2001.

**Donald L. Evans,**

*Secretary.*

[FR Doc. 01–6115 Filed 3–12–01; 8:45 am]

BILLING CODE 3510–07–U

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–357–813]

### Honey from Argentina: Preliminary Affirmative Countervailing Duty Determination and Alignment with Final Antidumping Duty Determination on Honey from the People's Republic of China

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce

**EFFECTIVE DATE:** March 13, 2001.

**FOR FURTHER INFORMATION CONTACT:** Dana Mermelstein or Doug Campau, Office of AD/CVD Enforcement VII, Import Administration, U.S. Department of Commerce, Room 7866, 14th Street and Constitution Avenue, NW.; Washington, DC 20230; telephone (202) 482–1391 and (202) 482–1395 respectively.

### Preliminary Determination

The Department of Commerce (the Department) preliminarily determines that countervailable subsidies have been provided to producers and/or exporters of honey from Argentina. For information on the estimated countervailing duty rate, please see the

---

[1] The ESCAP is composed of the following employees of the Bureau of the Census:

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 95 of 155

C

United States Court of Federal Claims.

**Guy R. NOLAN, Plaintiff,**
v.
**UNITED STATES, Defendant.**

**No. 98-124C.**

May 28, 1999.

Former Coast Guard officer filed suit seeking active duty pay and allowances from date of his discharge to the date of judgment, and reinstatement to active duty. On cross-motions for summary judgment, the Court of Federal Claims, Horn, J., held that; (1) unpublished 1987 order of the Secretary of Transportation delegating to the Commandant of the Coast Guard the authority to discharge Coast Guard officers could not revoke prior reservation of that same authority to the Secretary which was published in the Code of Federal Regulations, and which was annually republished, both before and after the delegation order, and thus (2) Commandant did not have the authority in 1992 to approve officer's involuntary discharge.

Plaintiff's motion granted; defendant's motion denied.

West Headnotes

**[1] Armed Services ☞4**
34k4

Rules relating to a military function of the United States, including delegations and reservations, can be effective regardless of publication in the Federal Register or the Code of Federal Regulations. 5 U.S.C.(1988 Ed.) § 553(a)(1), (b)(3)(A).

**[2] Administrative Law and Procedure ☞408**
15Ak408

Requirement for publication of rules stems from the government's duty to inform the public by publishing those matters that may adversely impact a member of the public; thus, there is no requirement that internal delegations and appointments of authority be published, as they do not adversely impact the public.

**[3] Administrative Law and Procedure ☞416.1**
15Ak416.1

An agency is bound by the express terms of its regulations until it amends or revokes them.

**[4] Administrative Law and Procedure ☞305**
15Ak305

**[4] Administrative Law and Procedure ☞416.1**
15Ak416.1

A government agency is legally bound to adhere to both the governing statute and to its own regulations, even though it might not have been required to issue them at all.

**[5] Administrative Law and Procedure ☞416.1**
15Ak416.1

An agency, by a published exercise of its authority and administration rules, may take on procedural obligations that it otherwise would not have had to follow.

**[6] Armed Services ☞11**
34k11

Unpublished order of the Secretary of Transportation delegating to the Commandant of the Coast Guard the authority to discharge Coast Guard officers could not revoke prior reservation of that same authority to the Secretary which was published in the Code of Federal Regulations, and which was annually republished, both before and after the delegation order.

*50 Eugene R. Fidell, Feldesman, Tucker, Leifer, Fidell & Bank, LLP, Washington D.C., attorney of record, for plaintiff. David P. Sheldon and Joseph E. Cazenavette, of counsel.

Matthew D. Lee, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C., with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Assistant Director, attorneys of record, for the defendant. Lt. William Kelleher, Office of Claims and Litigation, Office of the Chief Counsel, United States Coast Guard, and Alexander J. Millard, Office of General Counsel, United States Department of Transportation, of counsel.

*OPINION*

HORN, Judge.

This case comes before the court on the defendant's

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082    Document 4    Filed in TXSD on 07/20/2001    Page 96 of 155

motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC), and on the plaintiff's motion for summary judgment pursuant to RCFC 56. The parties concurred at oral argument that their motions both should be treated as motions for summary judgment. In this military pay action, the plaintiff filed suit against the United States seeking "active duty pay and allowances" from March 1, 1993 to the date of judgment, and "to restore plaintiff to active duty" in the United States Coast Guard while simultaneously "delete[ing] from plaintiff's service record all reference to his discharge." The central issue in the above-captioned case is whether the Commandant of the Coast Guard was delegated the authority at the time pertinent to plaintiff's claim to approve the plaintiff's discharge from active duty in the wake of conflicting delegations and reservations of authority.

## FACTS

Plaintiff, Guy. R. Nolan, was commissioned as a regular officer of the United States Coast Guard and entered active duty on May 25, 1977. Mr. Nolan served continuously on active duty until he was involuntarily discharged on March 1, 1993 while serving in the grade of Lieutenant Commander.

The Coast Guard is a military service and branch of the armed forces of the United States, contained within the Department of Transportation, as is stated in 14 U.S.C. § 1 (1988). [FN1] Pursuant to 14 U.S.C. § 326 (1988), the Secretary of Transportation may involuntarily discharge an officer of the Coast Guard from active duty if removal is recommended by a board of review. The statute specifically states:

> FN1. **Establishment of Coast Guard**
> The Coast Guard as established January 28, 1915, shall be a military service and a branch of the armed forces of the United States at all times. The Coast Guard shall be a service in the Department of Transportation, except when operating as a service in the Navy.
> 14 U.S.C. § 1.

**Removal of officer from active duty; action by Secretary**
> The Secretary may remove an officer from active duty if his removal is recommended by a board of review under section 323 of this title. The Secretary's action in such a case is final and

conclusive.

14 U.S.C. § 326. Section 323 governs the convening of a board of review:

**Boards of review**
> (a) Boards of review shall be convened at such times as the Secretary may prescribe, to review the records of cases of officers recommended by boards of inquiry for removal.
> *51 (b) If, after reviewing the record of the case, a board of review determines that the officer has failed to establish that he should be retained, it shall send its recommendation to the Secretary for his action.
> (c) If, after reviewing the record of the case, a board of review determines that the officer has established that he should be retained on active duty, his case is closed. However, at any time after one year from the date of the determination in a case arising under clause (1) of section 321 of this title and at any time after the date of the determination in a case arising under clause (2) of that section, an officer may again be required to show cause for retention.

14 U.S.C. § 323 (1988).

On November 20, 1992, a board of review recommended that plaintiff "be separated from active duty" because "[t]he behavior exhibited by the respondent is considered inappropriate not only by today's standards, but contrary to personnel policies existing at the time." On December 17, 1992, the Commandant of the Coast Guard, Admiral J.W. Kime, believing that he was taking final action on plaintiff's case, stated:

> The proceedings, findings, and recommendation of the Board of Review are approved. Pursuant to the authority of Title 14, U.S.Code, Section 326, LCDR Nolan shall be separated.

Plaintiff was discharged on March 1, 1993.

Admiral Kime believed he was taking final action pursuant to a memorandum, which was signed on January 6, 1987 by Secretary of Transportation Elizabeth Hanford Dole, that the Commandant believed delegated to him the power, conferred on the Secretary by 14 U.S.C. § 326, to remove officers involuntarily from active duty. The memorandum states in its entirety:

> To: The Commandant, United States Coast Guard

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 97 of 155

Subj: DELEGATION OF AUTHORITY TO THE COMMANDANT TO REMOVE AN OFFICER FROM ACTIVE DUTY
The Commandant of the Coast Guard is delegated the authority to remove an officer from active duty under Title 14, United States Code, Section 326.

The January 6, 1987 delegation document signed by Secretary Dole was not published in the *Federal Register* or codified in the *Code of Federal Regulations*.

At the time of the Commandant's approval of plaintiff's discharge from the Coast Guard on December 17, 1992, in fact, from April 1, 1967 until July 3, 1996 (including after the January 6, 1987 delegation [FN2]), the *Code of Federal Regulations*, as issued, and the Department of Transportation Organization Manual, reserved the power to remove an officer involuntarily under 14 U.S.C. § 326 to the Secretary of Transportation or a delegatee of the Secretary within the Office of the Secretary. *See* 49 C.F.R. § 1.44(m)(4) (1991); U.S. Dep't of Transportation, *Organization Manual,* at 1-49 (DOT 1100.60A, Nov. 14, 1988). The regulations issued by the Department of Transportation, without alteration, from April 1, 1967 up to July 3, 1996, stated in relevant part:

FN2. *See infra* note 5.

§ 1.44 Reservation of authority.
The delegations of authority ... do not extend to the following actions, authority for which is reserved to the Secretary or the Secretary's delegatee within the Office of the Secretary:

* * *

(m) Coast Guard. The following powers relating to the Coast Guard:

* * *

(4) Removal of an officer from active duty when recommended by a board convened under section 323 of title 14, United States Code (14 U.S.C. § 326).

49 C.F.R. § 1.44(m)(4); *see also* U.S. Dep't of Transportation, *Organization Manual,* at 1-49 (containing identical language reserving removal authority under 14 U.S.C. § 326 to the Secretary of Transportation). The parties have stipulated that the Commandant is not "within the Office of the

Secretary," pursuant *52 to 49 C.F.R. subpt. B, §§ 1.21-.22 (1997).

On June 21, 1996, after the date of the plaintiff's discharge, the Secretary of Transportation issued a final rule, which was subsequently published in the *Federal Register,* 61 Fed.Reg. 34,745 (July 3, 1996), addressing Secretary Dole's January 6, 1987 delegation. The preamble stated that "[t]he necessary changes to the Code of Federal Regulations were never completed" and the *Code of Federal Regulations* needed to be amended to "correctly reflect secretarial delegation of authority to the Commandant of the Coast Guard." 61 Fed.Reg. at 34,745. The 1996 final action, as published, reads in relevant part as follows:

**Organization and Delegation of Powers and Duties; Delegation to the Commandant, United States Coast Guard**
**AGENCY:** Office of the Secretary, DOT.
**ACTION:** Final rule.
**SUMMARY:** The Secretary of Transportation has delegated to the Commandant, United States Coast Guard, the authority contained in 14 U.S.C. § 326 to remove an officer from active duty .... The Code of Federal Regulations does not reflect these delegations; therefore, a change is necessary.
**EFFECTIVE DATE:** July 3, 1996.

* * *

**SUPPLEMENTARY INFORMATION:** ...
Title 14, U.S.Code, sections 321, 322, and 323 provide a three- board (Determination Board, Board of Inquiry, and Board of Review) process to consider the record of a Coast Guard officer whose performance is substandard or whose record shows moral or professional dereliction. If the third board, the Board of Review, recommends separation of the officer, 14 U.S.C. § 326 requires that recommendation to be forwarded to the Secretary for final action. On January 6, 1987, then Secretary Elizabeth Dole delegated the Secretary's authority under 14 U.S.C. § 326 to the Commandant of the Coast Guard. The necessary changes to the Code of Federal Regulations were never completed, however, and the current CFR sections relating to delegations still show this authority reserved to the Secretary of Transportation. (See 49 CFR § 1.44(m)(4)).
This rule removes the reservations of authority in section 1.44 and adds specific delegations of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082 Document 4 Filed in TXSD on 07/20/2001 Page 98 of 155

authority to 49 CFR § 1.46, thus amending the codification to correctly reflect secretarial delegations of authority to the Commandant of the Coast Guard.

Since this amendment relates to departmental management, organization, procedure, and practice, notice and comment on it are unnecessary and it may be made effective in fewer than 30 days after publication in the Federal Register. Therefore, this final rule is effective upon publication in the Federal Register.

61 Fed.Reg. at 34,745. These changes were reflected in Part 1 of Title 49, *Code of Federal Regulations,* which was amended, in that section 1.44(m)(4) was "removed and reserved," see 49 C.F.R. § 1.44(m)(4) (1997), and section 1.46 was "amended by adding new paragraph[ ] ... (bbb)" to read as follows:

§ 1.46 Delegations to Commandant of the Coast Guard.

* * *

(bbb) Remove an officer from active duty under section 326, Title 14, U.S.Code.

61 Fed.Reg. 34,745; *see also* 49 C.F.R. § 1.46(bbb) (1997).

In plaintiff's case, the parties have stipulated that the Secretary of Transportation never approved the proceedings of the board of review, or the action of the Commandant of the Coast Guard, that resulted in Mr. Nolan's discharge. In addition, the parties also have stipulated that following the revision to the *Code of Federal Regulations,* the Commandant did not re-approve the proceedings of the board of review that resulted in the plaintiff's discharge from the Coast Guard.

**DISCUSSION**

The defendant filed a motion to dismiss on May 20, 1998, pursuant to RCFC 12(b)(4) for *53 failure to state a claim upon which relief can be granted, arguing that the Commandant had the authority on December 17, 1992 to discharge Mr. Nolan from the Coast Guard. In response, on June 1, 1998, the plaintiff filed a cross-motion for summary judgment pursuant to RCFC 56, along with an opposition to the defendant's motion, arguing that the Commandant was not authorized to discharge the plaintiff, as any

delegation of authority from the Secretary of Transportation on January 6, 1987, was contrary to the express published reservation of authority in the *Code of Federal Regulations.* Oral argument was conducted on May 11, 1999, at which time the parties concurred that their pleadings should be treated as motions for summary judgment.

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. [FN3] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

FN3. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld-Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630-31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 99 of 155

material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228-29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250-52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions *54 and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute

exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

In the above-captioned case, the parties agree that summary judgment is appropriate and have filed affidavits, documents and joint stipulations of fact. Moreover, no material issues of disputed fact have been identified by the parties or the court.

The defendant states that the Commandant of the Coast Guard was lawfully delegated the authority to approve the proceedings, findings and recommendations of the board of review, and was authorized to involuntarily discharge the plaintiff from the service. The government argues that the delegation of authority from the Secretary of Transportation on January 6, 1987 to the Commandant was effective, despite not having been published, as it was a rule of internal agency procedure, and that the plaintiff cannot establish an adverse impact from the failure to publish the delegation order. The defendant also suggests that even in the absence of the January 6, 1987 delegation, the Commandant is empowered to act for the Secretary of Transportation in making decisions that directly relate to the Commandant's duties.

The plaintiff contends that the Secretary's 1967 published reservation to himself, or to a delegatee within the Office of the Secretary, to approve the involuntary discharge of Coast Guard officers, such as Mr. Nolan, takes precedence over the January 6, 1987 internal delegation of authority from the Secretary of Transportation to the Commandant. The plaintiff asserts that the government's argument that there was no impact upon the plaintiff as a result of the failure to publish the January 6, 1987 delegation of authority, is irrelevant because the issue

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 100 of 155

is not the obligation to publish the delegation, but rather the existence of contrary regulations. Mr. Nolan also argues that he was prejudiced because, by removing secretarial review from the involuntary discharge process, the plaintiff "was denied his one opportunity for *civilian* review." (emphasis in original). The plaintiff adds that there was loss of commission, along with loss of pay and allowances, as a result of the Commandant's allegedly unauthorized discharge. The plaintiff also states that the defendant's argument, suggesting that the Commandant is automatically cloaked with the authority of the Secretary of Transportation in matters pertaining to assigned Coast Guard duties, is contrary to the agency's efforts to write and publish express reservations and delegations, and contrary to the express reservation applicable to the instant action that only the Secretary, or a delegatee within the Secretary's Office, was authorized to involuntarily discharge officers from the Coast Guard.

As a general proposition, the United States Court of Appeals for the Federal Circuit, in *Voge v. United States,* 844 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988), has emphasized that "[j]udicial deference must be 'at its apogee' in matters pertaining to the military and national defense." Moreover, it has been stated that "[s]trong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters," *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979) (citing *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971)), because, "it would be hard to measure the damaging effect of shifting this type of sensitive personnel and management decision from trained military professionals, to a nonspecialist judiciary ...," *Taylor v. United States,* 33 Fed.Cl. 54, 58 (1995). [FN4] The United States Supreme Court has noted:

> FN4. There is also precedent which states that "[t]he merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review." *Adkins v. United States,* 68 F.3d 1317, 1322 (Fed.Cir.1995) (citing *Orloff v. Willoughby,* 345 U.S. at 94, 73 S.Ct. 534; *Murphy v. United States,* 993 F.2d 871, 874 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994); *Sargisson v. United States,* 913 F.2d 918, 922 (Fed.Cir.1990); *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983); *Sanders v. United States,*

219 Ct.Cl. 285, 594 F.2d 804 (1979); *Doggett v. United States,* 207 Ct.Cl. 478, 482, 1975 WL 22827 (1975)).

judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby,* 345 U.S. at 93-94, 73 S.Ct. 534. In the instant case, although the military service branch at issue is located within a civilian agency, the Department of Transportation, 14 U.S.C. § 1 makes it evident that the Coast Guard is to be considered "a military service and branch of the armed forces."

[1] In *D & W Food Centers, Inc. v. Block,* 786 F.2d 751 (6th Cir.1986), the United States Court of Appeals for the Sixth Circuit addressed when rules must be published, as follows:

> An agency pronouncement must be published if it is of such a nature that knowledge of it is needed to keep parties informed of the agency's requirement as a guide for their conduct. *United States v. Hayes,* 325 F.2d 307, 309 (4th Cir.1963) (per curiam). An interpretation is not "of general applicability" if (1) only a clarification or explanation of existing laws is expressed, and (2) the interpretation results in no significant impact on any segment of the public. *Anderson v. Butz,* 550 F.2d 459, 463 (9th Cir.1977). Agencies need not publish "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(A). However, a rule required to be published which is not published is void, and may not be enforced against a non-complying party. *Northern California Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), *aff'd sub nom. Northern California Power Agency v. Kleppe,* 539 F.2d 243 (D.C.Cir.1976). *See also Anderson,* 550 F.2d at 463; 5 U.S.C. § 552(a)(1).

*D & W Food Centers, Inc. v. Block,* 786 F.2d at 757. It is also correct that the Administrative Procedure Act (APA) specifically states that rule making

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082 Document 4 Filed in TXSD on 07/20/2001 Page 101 of 155

relating to "a military ... function of the United States," 5 U.S.C. § 553(a)(1) (1988), and "rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(3)(A) (1988), are exempt from notice and comment requirements. Thus such rules, including delegations and reservations, can be effective regardless of publication in the *Federal Register* or the *Code of Federal Regulations.*

Moreover, courts have affirmed repeatedly an agency's administrative rule making involving delegations of authority which were not published in the *Federal Register* or the *Code of Federal Regulations. See United *56 States v. Saunders,* 951 F.2d 1065, 1068 (9th Cir.1991) ("Accordingly, we hold that the Federal Register Act does not mandate the publication of the TDOs [Treasury Delegation Orders] and that, as a consequence, the government's failure to publish them does not affect the validity of the Secretary's delegation of authority to the Commissioner."); *Lonsdale v. United States,* 919 F.2d 1440, 1446 (10th Cir.1990) ("We conclude, as have other courts, that the APA does not require publication ... which internally delegate authority to enforce the Internal Revenue laws."); *United States v. Goodman,* 605 F.2d 870, 887-88 (5th Cir.1979) (holding that unpublished delegation of authority from Attorney General to Acting Administrator of the DEA did not violate either the Federal Register Act or the APA, because internal delegations of authority need not be published and do not "adversely affect" the public); *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir.1970) ("We hold that the Administrative Procedure Act does not require that all internal delegations of authority from the Attorney General must be published in order to be effective."), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971); *United States v. McCall,* 727 F.Supp. 1252, 1254 (N.D.Ind.1990) ("It is well-settled that rules of agency organization, procedure, or practice need not be published to be effective. The court finds the delegation orders at issue here to be such rules of internal agency procedure, obviating their publication in the Federal Register.") (citing *D & W Food Centers, Inc. v. Block,* 786 F.2d 751 (6th Cir.1986); 5 U.S.C. § 553(b)(3)(A)).

[2] Based on a reading of 5 U.S.C. § 552 (1988), case precedent suggests that the requirement for publication stems from the government's duty to inform the public by publishing those matters that may adversely impact a member of the public. *See Hogg v. United States,* 428 F.2d at 280; *United States v. McCall,* 727 F.Supp. at 1254. Internal delegations

and appointments of authority have previously been viewed as not adversely impacting the public. *See United States v. Goodman,* 605 F.2d at 888; *Hogg v. United States,* 428 F.2d at 280; *United States v. McCall,* 727 F.Supp. at 1254 ("McCall has not advanced (nor can the court conceive of) any argument explaining how the Secretary's failure to publish intra-agency delegation orders adversely affects him.").

The case presently before the court, however, presents an issue not addressed in the above-cited and quoted cases. Specifically, although pursuant to the Secretary of Transportation's January 6, 1987 delegation order the Secretary tried to delegate to the Commandant the authority to discharge Coast Guard officers, at the time there was already in existence a prior, and unrevoked, reservation of that same authority published in the *Code of Federal Regulations,* which was annually republished, both before and after the 1987 delegation order. The instant case would be a simple matter to decide if there had been no contrary, unrevoked reservation. In that scenario, the Secretary of Transportation's January 6, 1987 delegation of authority to the Commandant of the Coast Guard would be lawful and proper and plaintiff's claim would be without foundation, as there is no requirement to publish the delegation. *See* 5 U.S.C. § 553(b)(3)(A); *see, e.g., United States v. Saunders,* 951 F.2d at 1068; *Lonsdale v. United States,* 919 F.2d at 1446; *D & W Food Centers, Inc. v. Block,* 786 F.2d at 757; *United States v. Goodman,* 605 F.2d at 887-88; *Hogg v. United States,* 428 F.2d at 280. However, the incongruity between the older, and annually republished, regulation exclusively reserving the authority to remove officers involuntarily to the Secretary, or a delegatee of the Secretary within the Secretary's Office, and the unpublished January 6, 1987 intra-agency delegation to make discharge decisions to the Commandant, demands a different legal analysis from that adopted in the cases noted above.

It is not challenged that on January 6, 1987, the agency attempted, by act of then Secretary of Transportation Dole, to provide an express delegation of the authority to involuntarily discharge Coast Guard officers pursuant to 14 U.S.C. § 326 to the Commandant of the Coast Guard. In 1987, when Secretary Dole issued her delegation order, however, there was in effect a regulatory provision reserving the discharge authority to the Secretary, or a delegatee within the Office of the Secretary, which

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 102 of 155

had been published *57 and reissued each year in the *Federal Register* since 1967. In the much later 1996 corrective publication in the *Federal Register*, the Department of Transportation indicates that in 1987 Secretary Dole appears to have intended to supersede the reservation of authority to involuntarily discharge officers and to allow the Commandant to act on the Secretary's behalf for an indefinite period of time and without limitation. The Department of Transportation, however, repeatedly and annually continued to include the reservation of the Secretary's authority to discharge in its regulations that were published in the *Code of Federal Regulations* from 1967 through and including the 1996 edition. [FN5] In fact, no fewer than ten (10) complete editions of the *Code of Federal Regulations* appeared that not only failed to incorporate or acknowledge the January 6, 1987 delegation, but specifically continued to reserve discharge authority to the Secretary or a delegatee within the Office of the Secretary.

> FN5. It might be possible to argue that Secretary of Transportation Dole's delegation to the Commandant was in effect from January 6, 1987, when it was signed, until the next annual issuance of the *Code of Federal Regulations* on October 1, 1987, which once again expressly reserved the authority to involuntarily discharge officers of the Coast Guard to the Secretary, or a delegatee within the Office of the Secretary. Mr. Nolan's alleged discharge pursuant to approval by the Commandant occurred on March 1, 1993, well after the window when the January 6, 1987 delegation to the Commandant was possibly in force.

[3][4] "It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all ...." *Voge v. United States,* 844 F.2d at 779. "An agency is bound by the express terms of its regulations until it amends or revokes them." *Clean Ocean Action v. York,* 57 F.3d 328, 333 (3d Cir.1995) (citing *Facchiano Const. Co., Inc. v. U.S. Dept. of Labor,* 987 F.2d 206, 213 (3d Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993) (citing *United States v. Nixon,* 418 U.S. 683, 695-96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)); *Accardi v. Shaughnessy,* 347 U.S. 260, 266-67, 74 S.Ct. 499, 98 L.Ed. 681 (1954)). This court has held that: "A government agency is legally bound to adhere to both the governing statute and to its own regulations, even though it might not have been required to issue them

at all. *E.g., Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir.1990) (citing *Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 377, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988))." *Finkelstein v. United States,* 29 Fed.Cl. 611, 616 (1993).

Under 44 U.S.C. § 1510(e) (1988) of the Federal Register Act:

### Code of Federal Regulations

* * *

(e) The codified documents of the several agencies published in the supplemental edition of the Federal Register under this section, as amended by documents subsequently filed with the Office [of the Federal Register] and published in the daily issues of the Federal Register, shall be prima facie evidence of the text of the documents and of the fact that they are in effect on and after the date of publication.

Congress, therefore, plainly contemplated that the amendment or revocation of a regulation published in the *Code of Federal Regulations* is effected by a subsequent publication of a document in the *Federal Register,* in that the *Federal Register* "serves as a daily supplement to the Code of Federal Regulations." 1 C.F.R. § 5.5 (1998).

Moreover, under section 3(a)(1) of the original Administrative Procedure Act, agencies were required to publish delegations of authority as part of their mandatory *Federal Register* description of agency organization. 60 Stat. 237 (1946). Consistent with this publication requirement, various powers conferred on the Secretary of the Treasury by legislation, Pub.L. No. 88- 130, 77 Stat. 175, 189 (1963), that included section 326 were delegated to the Commandant by publication. *See* Treas. Dep't Order No. 167-56, 28 Fed.Reg. 11,570 (1963). The Commandant, however, specifically was not granted the power to approve involuntary discharges of officers pursuant to 14 U.S.C. § 326. *Id.* When the *58 Department of Transportation came into being on April 1, 1967 and assumed control of the Coast Guard, it published its secretarial delegations and reservations, including the reservation of authority to involuntarily discharge Coast Guard officers consistent with the Department of Treasury's 1963 nondelegation. 32 Fed.Reg. 5606, 5608 (1967).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 103 of 155

The parties have stipulated that after the creation of the Department of Transportation, Congress repealed the requirement to publish delegations in the *Federal Register* and the *Code of Federal Regulations,* 81 Stat. 54 (1967), thus leaving "each agency [with] discretion to determine what delegations it should include in its descriptions of agency organization." U.S. Department of Justice, *Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act* 7 (June 1967), 2 Jacob A. Stein, Glenn A. Mitchell & Basil J. Mezines, *Administrative Law* App. 7A-13 (1998). The parties also have stipulated that the Department of Transportation "has exercised that discretion in favor of continuing to publish secretarial delegations," *see* 49 C.F.R. § 1.45-47, and "has also continued to publish secretarial reservations of authority," *see* 49 C.F.R. § 1.44.

[5] A reservation of authority is the diametric opposite of a delegation. Assuming, however, that after 1967, delegations and reservations stand on the same discretionary footing for purposes of not requiring *Federal Register* or *Code of Federal Regulations* publication, because the Department of Transportation continued to publish the reservation of the Secretary's authority to remove officers from active duty, the codified version remained in effect until repealed by further *Federal Register* and *Code of Federal Regulations* publication. Such repeal finally occurred on July 3, 1996 at 61 Fed.Reg. 34,745. *See Finkelstein v. United States,* 29 Fed.Cl. at 616 ("A government agency is legally bound to adhere to both the governing statute and to its own regulations, even though it might not have been required to issue them at all."). Thus, an agency, by a published exercise of its authority and administration rules, may take on procedural obligations that it otherwise would not have had to follow. *See Sargisson v. United States,* 913 F.2d at 921; *Voge v. United States,* 844 F.2d at 779; *see also Rodway v. U.S. Dep't of Agriculture,* 514 F.2d 809, 813-14 (D.C.Cir.1975). The United States Court of Appeals for the Federal Circuit examined the obligations assumed through publication in *Sargisson v. United States:*

> The Secretary of the Air Force is authorized to release reserve officers from active duty under 10 U.S.C. § 681(a) (1970): "Except as otherwise provided in this title, the Secretary concerned may at any time release a Reserve under his jurisdiction from active duty." The statute does not place any procedural or substantive limitations on the Secretary's discretion.

*Woodward v. United States,* 871 F.2d 1068, 1071 (Fed.Cir.1989). Nevertheless, once the Secretary promulgated regulations and instructions and made them the basis for Sargisson's release, his action became subject to judicial review for compliance with those regulations and instructions, even though he was not required to issue them at all. *See Vitarelli v. Seaton,* 359 U.S. 535, 539, 79 S.Ct. 968, 972, 3 L.Ed.2d 1012 (1959) ("Since ... the Secretary gratuitously decided to give a reason, ... he was obligated to conform to the procedural standards he had formulated ... for the dismissal of employees on [those] grounds," citing *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)); *see also Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988) ("It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all ..."); ...

*Sargisson v. United States,* 913 F.2d at 921.

[6] The Federal Register Act's directive that *Federal Register* and *Code of Federal Regulations* publication of codified documents "shall be prima facie evidence ... of the fact that they are in effect on and after the date of publication," 44 U.S.C. § 1510(e), would be totally frustrated by permitting the January 6, 1987 delegation order to have effect contrary to the reservation codified in the *Code of Federal Regulations* until 1996. The instant case is further compounded because *59 the reservation of the Secretary's authority to remove included in 14 U.S.C. § 326, was included in ten (10) subsequent annual publications in the *Code of Federal Regulations* from 1987 to 1996, even though it would not have been necessary to publish in the *Federal Register* a delegation of authority from the Secretary of Transportation to the Commandant to effect removal of Coast Guard officers from active duty. To allow a published regulation to be revoked by an internal, unpublished delegation or action would appear to violate the fundamental fairness requirements of notice to the public. The critical fact is that the initial and continued publication in the *Federal Register* and the *Code of Federal Regulations* created a reasonable expectation that any revocation of the same reservation likewise would be published. A failure to publish the delegation and change of policy resulting in a revocation of the reservation, therefore, adversely impacts members of the public who are entitled to notice of change. The court, therefore, concludes that in 1967, the Secretary

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

of Transportation reserved and specifically did not delegate the authority to involuntarily discharge an officer of the Coast Guard (*see* 49 C.F.R. § 1.5(q)(9) (1967)), and did not effectively delegate that authority to the Commandant until July 3, 1996 (*see* 61 Fed.Reg. at 34, 745), with the possible exception of a limited window from January 6, 1987 to October 1, 1987.

In 1996, the Secretary of Transportation, Frederico F. Pena, revoked the longstanding reservation of authority to involuntarily remove Coast Guard offices from active duty and effectively delegated that authority, from July 3, 1996 forward, to the Commandant by published regulation. 61 Fed.Reg. at 34,745. In the final notice's preamble to the regulations, Secretary Pena expressly recognized that such revisions to the codified and published regulatory reservation were "necessary changes." *Id.* For all these reasons, the Department of Transportation's published regulations reserving the Secretary's authority to involuntarily remove Coast Guard officers pursuant to 14 U.S.C. § 326 take priority over the contrary unpublished 1987 internal agency delegation. In sum, at the time the Commandant approved Mr. Nolan's involuntary discharge, the authority to discharge was governed by the regulatory reservation of authority to the Secretary of Transportation then codified, published and in effect.

Finally, the government argues that the Commandant had the power to approve Mr. Nolan's discharge regardless of whether Secretary of Transportation Dole's 1987 order, which attempted to delegate authority to remove officers from active duty to the Commandant indefinitely, was effective at the time the Commandant approved the discharge of Mr. Nolan on December 17, 1992. The defendant cites

*Law v. United States,* 26 Cl.Ct. 382 (1992), *aff'd,* 11 F.3d 1061 (Fed.Cir.1993), for the proposition that the Commandant can act as the Secretary of Transportation's *alter ego,* or rather, that the Commandant was cloaked with the authority of the Secretary, despite contrary regulations.

This court notes that the decision in *Law v. United States* addressed the relationship between the President of the United States and a member of the Cabinet. This relationship is unique and cannot be invoked as a basis for a broader principle that subordinates in the government are automatically cloaked with the authority of their superiors. Moreover, it is apparent in the instant action that the Coast Guard and Department of Transportation thought revision of the reservation and delegation regulations was necessary to effect a delegation of authority, to involuntarily discharge an officer, to the Commandant of the Coast Guard, prompting the 1996 changes that were incorporated in the *Code of Federal Regulations.* *See* 61 Fed.Reg. 34,745. The case of *Law v. United States* is not dispositive regarding the factual or legal analysis in the instant action.

This court holds that plaintiff Guy R. Nolan is entitled to judgment as a matter of law.

### CONCLUSION

The plaintiff's motion for summary judgment is **GRANTED**. The defendant's motion for summary judgment, which was converted from a motion to dismiss, is **DENIED**.

**IT IS SO ORDERED.**

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# Statistics

## THIRD EDITION



# David Freedman
# Robert Pisani
# Roger Purves

CVisPDF - www.fastio.com

llege, 48 were
l graduates of
number on the

on of all man-
he sample had
establishments
ite.

ken from the
ts: 216 people
iore. Estimate
employees or

chance error?

*or estimating*

opose that in
error for the

n the box in
rst sample is
:s the SE by

———, and

as ———,

———, and

stimate the
chooses a
people did
the sample

## 2. CONFIDENCE INTERVALS

In the example of the previous section, 79% of the students in the sample were living at home: the sample percentage was 79%. How far can the population percentage be from 79%? (Remember, "population percentage" means the percentage of all students at the university who were living at home.) The standard error was estimated as 2%, suggesting a chance error of around 2% in size. So the population percentage could easily be 77%. This would mean a chance error of 2%:

| sample percentage | = | population percentage | + | chance error |
|---|---|---|---|---|
| 79% | = | 77% | + | 2% |

The population percentage could also be 76%, corresponding to a chance error of 3%. This is getting unlikely, because 3% represents 1.5 SEs. The population percentage could even be as small as 75%, but this is still more unlikely; 4% represents 2 SEs. Of course, the population percentage could be on the other side of the sample percentage, corresponding to negative chance errors. For instance, the population percentage could be 83%. Then the estimate is low by 4%: the chance error is −4%, which is −2 SEs.

With chance errors, there is no sharp dividing line between the possible and the impossible. Errors larger in size than 2 SEs do occur—infrequently. What happens with a cutoff at 2 SEs? Take the interval from 2 SEs below the sample percentage to 2 SEs above:



This is a *confidence interval* for the population percentage, with a *confidence level* of about 95%. You can be about 95% confident that the population percentage is caught inside the interval from 75% to 83%.

What if you want a different confidence level? Anything except 100% is possible, by going the right number of SEs in either direction from the sample percentage. For instance:

- The interval "sample percentage ± 1 SE" is a 68%-confidence interval for the population percentage.
- The interval "sample percentage ± 2 SEs" is a 95%-confidence interval for the population percentage.
- The interval "sample percentage ± 3 SEs" is a 99.7%-confidence interval for the population percentage.

However, even 10 SEs may not give 100% confidence, because there is the remote possibility of very large chance errors. There are no definite limits to the normal curve: no matter how large a finite interval you choose, the normal curve has some area outside that interval.[6]

U.S. Census Bureau



# ACCURACY AND COVERAGE EVALUATION

## STATEMENT ON THE FEASIBILITY OF USING STATISTICAL METHODS TO IMPROVE THE ACCURACY OF CENSUS 2000

**Kenneth Prewitt, Director**
**U.S. Bureau of the Census**
**June 2000**

# Table of Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Background and Overview** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Uses of Decennial Census Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
The Differential Undercount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Summary of Census 2000 Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
The Accuracy and Coverage Evaluation Methodology . . . . . . . . . . . . . . . . 9
    The A.C.E. in Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    The Sample Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Conducting the Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Dual System Estimation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Assessment of Feasibility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

The Definition of Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Operational Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Release of Data Products for Use in Redistricting . . . . . . . . . . . . . . . . . . 14
    Operational Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Resource Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    The Census 2000 Dress Rehearsal . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Technical Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Defining Numeric and Distributive Accuracy . . . . . . . . . . . . . . . . . . . . 15
    Importance of and Relationship Between the Two Types of Accuracy . . . . . 16
    Impact of the A.C.E. on Accuracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Historical Experience with Coverage Measurement Surveys
Demonstrates Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    The 1980 Census Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Early Research and Development for the 1990 Census . . . . . . . . . . . . . . . 21
    Litigation Challenging Decision to Halt 1990 Adjustment-Related Planning
    Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Conducting the 1990 Census and Deciding Against Adjustment . . . . . . . . 23
    Postcensal Estimates and Survey Controls Decision . . . . . . . . . . . . . . . . 24
    Early Census 2000 Planning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    The Census 2000 Dress Rehearsal . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    External Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# Table of Contents (Continued)

**A.C.E. Implementation Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Measuring Accuracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Assessment of Issues Emerging from 1990 . . . . . . . . . . . . . . . . . . . . . . . . 31
  The Proper Standard to Use in Deciding Whether to Statistically Correct the
  Counts for Non-Apportionment Purposes . . . . . . . . . . . . . . . . . . . . . . . . . 32
  Numeric v. Distributive Accuracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  Correlation Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
  Accuracy at Different Geographic Levels . . . . . . . . . . . . . . . . . . . . . . . . . 36
  Consistency with Demographic Analysis . . . . . . . . . . . . . . . . . . . . . . . . . 38
  Timing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
  Level of Sampling Variance/Smoothing . . . . . . . . . . . . . . . . . . . . . . . . . . 41
  Level of Nonsampling Error/Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    Enhancements to the Matching Process . . . . . . . . . . . . . . . . . . . . . 43
    Enhancements to Computer Processing . . . . . . . . . . . . . . . . . . . . . 44
    Enhancements to Minimize Missing Data . . . . . . . . . . . . . . . . . . . . 45
  Homogeneity and the Synthetic Assumption . . . . . . . . . . . . . . . . . . . . . . . 46
Additional Design Changes from 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
  Use of the Telephone in A.C.E. Interviewing . . . . . . . . . . . . . . . . . . . . . . 48
  New Treatment to Account for Movers . . . . . . . . . . . . . . . . . . . . . . . . . . 49
  Search Area for Matching . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
  Reporting More Than One Race . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Making the Final Decision** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**Bibliography** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

- Calculate the coverage correction factors using DSE, that is, determine the extent to which people in each post-stratum have been over- or undercounted by the initial census.
- Apply the coverage correction factors to correct the initial census data.
- Tabulate the statistically corrected census results.

## The Sample Design

For the 2000 A.C.E., the Census Bureau selected a stratified random sample of blocks designed to be representative of racial and ethnic composition; tenure (owner or renter); and other variables. The sample consists of approximately 11,800 block clusters with approximately 314,000 housing units. The sample is designed to provide sufficient precision to estimate the true population for groupings of the population known as post-strata. Each person belongs to one and only one post-stratum. Post-strata are constructed with the goal of grouping individuals who have a similar probability of having been included in the initial census. Census 2000 post-stratification variables include race, ethnicity, age, sex, tenure, mail return rate, and metropolitan status/census enumeration method. For example, one post-stratum would include non-Hispanic Black males, aged 18-29, in non-owner units, in mailout/mailback areas of metropolitan statistical areas with 500,000 or more population, in tracts with a low mail return rate in the census. By comparing the estimated true population based on the dual system estimate for each post-stratum to the number of individuals counted in the initial census enumeration for each post-stratum, the Census Bureau estimates over- and undercounts for each post-stratum.

## Conducting the Survey

Essential to the proper conduct of the A.C.E. is the need to ensure that the A.C.E. and the initial census are operationally independent. Independence requires that the probability of a particular household or person being included in the A.C.E. is not affected by the initial census operations and that the probability of people being included in the initial census is not affected by A.C.E. operations. Such independence is a critical criterion for DSE.

The A.C.E. independent interview is conducted by separately hired and trained staff through the use of Computer Assisted Personal Interviewing (CAPI) either by telephone or in person. CAPI is a method of data collection using a laptop computer in which the questions to be asked are displayed on the screen and responses are entered directly into the computer. The Census Bureau expects that the use of CAPI will improve the accuracy of the A.C.E. interview. To get an early start for the A.C.E. interviewing, where possible, a telephone interview using CAPI may be conducted for households where the census questionnaire has been completed and for which a telephone number was obtained. This activity is carried out concurrently with the initial census followup of nonresponse households. The door-to-door interviewing with CAPI does not begin until the initial census nonresponse followup is nearly completed in a given block cluster. The A.C.E. enumerators will attempt to secure an in-person interview with a household member. If the interview cannot be obtained, the enumerator will interview a proxy respondent.

10

After the A.C.E. independent interviews have been completed, computer matching between the initial census and the A.C.E. person records is carried out, followed by a clerical matching operation using an automated review system. The matching process allows the Census Bureau to determine who may have been missed by the initial census or to determine erroneous enumerations. It should be noted that the census can miss either entire households or individuals within households. This is also the case for erroneous enumerations.

The Census Bureau has carefully designed the A.C.E. to minimize matching errors. Incorrect matching generally results either from errors caused by incomplete, inaccurate, or conflicting data, or from errors where a poor match decision was made even though the data were sufficient. It is critical that the matching be as accurate as possible. Accordingly, as necessary, the Census Bureau conducts a personal visit follow-up operation to obtain the additional information needed to accurately code A.C.E. and census nonmatches. After this followup, the Census Bureau conducts a final clerical matching operation.

Even after this intense effort, occasionally some information will still be missing, either person characteristics, status of enumeration in the initial census, or match status for A.C.E. cases that could not be resolved. Before any calculations can be made to determine the estimated true population, missing person characteristics, initial census enumeration status, and A.C.E. match status must be resolved. Missing person characteristics such as age, race, sex, and tenure are statistically imputed from data reported for other household members or from similar households in the geographic area. For unresolved cases, the Census Bureau uses statistical imputation methodology to impute probabilities of being correctly enumerated or matched. The Census Bureau then estimates the true population by using these results in Dual System Estimation.

## Dual System Estimation

DSE is an established and accepted statistical technique that is also referred to as "capture/recapture."[12] Because the Census Bureau has conducted years of research into the likelihood that people of varying characteristics will be included in the census enumeration (this likelihood is known as inclusion probability), it is able to divide the nation's population into post-strata. Each post-stratum is defined so as to contain people with a similar probability of being included in the initial census. At the conclusion of the A.C.E. processes described previously, data are available for each post-stratum to calculate a dual system estimate.[13]

---

[12]Michael L. Cohen, Andrew A. White, and Keith F. Rust, Measuring a Changing Nation - Modern Methods for the 2000 Census (Washington, D.C.: National Academy Press, 1999), 31; and Kirk M. Wolter, "Some Coverage Error Models for Census Data," Journal of the American Statistical Association 81 (June 1986): 338.

[13]Production of these estimates is discussed in more detail in Bureau of the Census, "Accuracy and Coverage Evaluation Survey: Dual System Estimation," by Donna Kostanich

The dual system estimate is an estimate of the true population total for each post-stratum. The dual system estimates are then used to calculate a coverage correction factor for each post-stratum. The coverage correction factor is a ratio of the dual system estimate (the estimate of the true population) to the initial census count. These factors are then applied to correct the initial census data files. For example, if the coverage correction factor for non-Hispanic Black males, aged 18-29, in non-owner units, in mailout/mailback areas of metropolitan statistical areas with 500,000 or more population, in a tract with a low mail return rate in the census, is 1.02, then for every 100 such person records counted in the census in those areas, two numerical records will be added. Once these factors are applied, the corrected population estimates are created and tabulated.

---

and Richard Griffin, DSSD Census 2000 Procedures and Operations Memorandum Series #Q-20, 12 January 2000.

# Assessment of Feasibility

Section 195 of the Census Act states that "the Secretary shall, if he considers it feasible, authorize the use of sampling," but the term "feasible" is not defined. As discussed in a legal opinion from the Department of Commerce's General Counsel, the Census Bureau understands this term in accordance with its ordinary meaning and the overall purposes of Title 13. It is important to note that even if Title 13 were silent as to the obligation to use sampling if feasible, the Census Bureau would apply criteria similar to those described below to determine whether to correct the census through the use of statistical sampling. The Census Bureau is committed to using reliable statistical methods if those methods can be expected to improve the overall accuracy of the census.

## The Definition of Feasibility

The Census Bureau's determination that sampling is "feasible" is based on whether its use is possible, that is, compatible with other aspects of the census plan and with any statutory, timing, and funding constraints. Equally important, this determination is based on whether the use of sampling is expected to improve the overall accuracy of census data by improving overall coverage and reducing the differential undercount. These two components of the feasibility determination represent operational feasibility and technical feasibility. Can the Census Bureau produce the statistically corrected block-level numbers by the April 1, 2001, statutory deadline? Can the statistically corrected counts be expected to improve the overall accuracy of census data?

More specifically, in the context of Census 2000, the use of statistical sampling is feasible to correct the census if the two components of feasibility, operational and technical, are satisfied. Operational feasibility refers to the Census Bureau's ability to conduct the A.C.E. with available resources and within required deadlines or time frames. Technical feasibility refers to the Census Bureau's expectation that the A.C.E. statistical methodology, if carried out as planned, will improve the accuracy of the census for non-apportionment uses of the data. As discussed below, the Census Bureau's extensive experience with coverage measurement surveys, including its incorporation of improvements since 1990, confirms the conclusion that the A.C.E. is both operationally and technically feasible.

## Operational Feasibility

Operational feasibility refers to the Census Bureau's ability to conduct each major component of the census within applicable deadlines and with available resources. The Census Bureau expects to conduct each major component of the census, including the A.C.E., in time to meet the April 1, 2001, deadline for producing the redistricting data.

### Release of Data Products for Use in Redistricting

13

The Census Bureau's goal is to produce the most accurate numbers possible within the constraints imposed by the federal statute and available resources. Section 141(c) of Title 13 requires the Census Bureau to deliver redistricting numbers to the states by April 1, 2001.[14] In past decennial censuses, the Census Bureau has been able to release redistricting numbers to certain states prior to the federal deadline, enabling redistricting officials in those states to meet deadlines set by state statutes and constitutions. The Census Bureau will, as in the past, release the numbers from Census 2000 to the states as they are ready, giving priority to states that need to meet early deadlines.

## Operational Considerations

The Census Bureau's detailed plan for carrying out the entirety of the census operation, including the A.C.E., is set forth in the "Master Activity Schedule" (MAS).[15] This plan has undergone thorough reviews and analyses and supports the Census Bureau's confidence that it can implement the A.C.E. methodology correctly and successfully. The Census Bureau introduced its original Census 2000 plan in 1995. Since that time, the plan has been refined to incorporate testing, analysis, expert and other public input, and policy and programmatic changes, including the Supreme Court's January 25, 1999, ruling. During the last five years, the Census Bureau has put into place a comprehensive project management framework based on a powerful project management tool used by some of the world's largest private organizations. The use of this and other project tools, such as an integrated cost model and function and process modeling software, led to the Census Bureau's determination that it could produce the statistically corrected numbers by April 1, 2001. A revised Census 2000 MAS, reflecting this determination, along with the Census 2000 Operational Plan, were presented to the U.S. House of Representatives Subcommittee on the Census, as well as the Census Bureau's other oversight and appropriations committees and subcommittees, in March 1999.

## Resource Considerations

Resources are also relevant to a feasibility determination. Based on current FY 2000 appropriations and the anticipation that the Administration's FY 2001 budget request for Census 2000 will be appropriated, the Census Bureau should be able to hire sufficient staff and acquire the necessary equipment to complete Census 2000 and produce statistically corrected redistricting numbers by the April 1, 2001, statutory deadline.

## The Census 2000 Dress Rehearsal

---

[14]The Census Bureau's FY 1998 Appropriations Bill (P.L. 105-119) requires the Census Bureau, when it releases redistricting numbers based on statistical methods, to also release data produced without the use of statistical methods at all levels of geography.

[15]Bureau of the Census, "Master Activity Schedule for Census 2000."

14

analyses of the CAPE report focused on the accuracy of the unadjusted versus the adjusted census counts for different levels of geography and the status of the technical issues introduced.[58]

In addition to the discussion of technical issues, Secretary Mosbacher's analysis (and other reports critical of sampling) introduced a number of non-technical considerations. Secretary Mosbacher, for example, opined that "adjustment would open the door to political tampering with the census in the future"[59] — a theme frequently repeated in political, though not in scientific, discussions of sampling. No evidence has been presented that the Census Bureau has the competence to assess how its selection or implementation of census operations, including the many technical components of the A.C.E., might predetermine partisan outcomes. Furthermore, the highly pre-specified A.C.E. procedures make Census 2000 highly resistant to any form of manipulation. Although there are a number of agencies and groups – including the congressional committees charged with oversight of Census 2000, the General Accounting Office, the Census Monitoring Board, the Inspector General of the Department of Commerce, numerous advisory committees and other watchdog efforts – scrutinizing the planning and conduct of Census 2000, no evidence has been presented suggesting that the Census Bureau has any intention to affect political outcomes, or, if it did, that it has the technical ability to do so. The Census Bureau disputes any and all accusations that it would act out of political motives, and in this document restricts its discussion of concerns about the A.C.E. to those with technical and scientific content.

## The Proper Standard to Use in Deciding Whether to Statistically Correct the Counts for Non-Apportionment Purposes

As was discussed earlier, Secretary Mosbacher's adjustment decision regarding the 1990 census was controlled by eight guidelines promulgated in connection with pending litigation. Secretary Mosbacher's decision not to adjust the 1990 census was based in large part on the standard articulated in the first guideline – that the unadjusted census would be ". . . considered the most accurate count of the population of the United States, at the national, state, and local level, unless an adjusted count is shown to be more accurate."

### *Analysis and Response*

This guideline assumed *a priori* that the unadjusted census counts were superior and required proof that the adjusted counts were better in terms of distributive accuracy at all three levels.

---

2000.

[58]Obenski and Fay, "Analysis of CAPE Findings on PES Accuracy;" and Bureau of the Census, "Analysis of CAPE Findings on 1990 PES Technical Issues," by Sally M. Obenski, 9 June 2000.

[59]Department of Commerce, "Adjustment of the 1990 Census," 33583.

31

This decision guideline required the adjusted counts to satisfy criteria that no other census operation could meet – in effect, the 1990 census coverage measurement survey was subjected to a higher standard than all other census operations.

If the Census Bureau had historically applied a similar presumption that a change to the census operation must demonstrate increased accuracy with convincing evidence for small levels of geography, it would not have made many important changes in census-taking methodology.  For example, such a standard would not have permitted the Census Bureau to replace 100-percent in-home "personal" visits with mail questionnaires in the 1970 census.  The Census Bureau did not know whether this fundamental change to the census operation would increase accuracy at all levels.  Nor, in 2000, could the Census Bureau determine *a priori* that extensive promotion and paid advertising would increase accuracy at all levels, or for that matter, would be effective in all areas or for all demographic groups.  If applied to all proposals to improve the initial census counts, this standard would effectively halt the Census Bureau's long tradition of scientific and technical innovation.

For Census 2000, the Census Bureau will make the determination on whether to use the A.C.E. to correct Census 2000 after evaluating (1) the conduct of key operations, (2) the consistency of the A.C.E. results with historical measures of undercount, and (3) measures of quality.  As described previously, the Census Bureau's comprehensive ongoing analyses and experience with conducting coverage measurement surveys have led it to expect that the A.C.E. will improve overall numeric and distributive accuracy and that it will reduce the differential undercount.  Therefore, statistical correction is appropriate absent strong evidence that it will degrade the overall quality of the final census data.  However, the Census Bureau will conduct an objective review before making a final determination to release the statistically corrected data.  The process that the Census Bureau will follow in making this determination is described in more detail at the end of this document.  The Census Bureau will be documenting and discussing both this process and the criteria on which the determination will be made in a public setting in the fall of 2000.

## Numeric v. Distributive Accuracy

The 1990 census adjustment decision (and the closely related decision on the adjustment of the postcensal estimates) was unequivocal in giving priority to distributive over numeric accuracy.  Secretary Mosbacher interpreted the Constitutional and legal purposes of the census to require that:

> . . . accuracy should be defined predominately in terms of getting the proportional distribution of the population right among geographic and political units.  This argues for putting aside the judgment of accuracy based on getting absolute numbers right (numeric accuracy) and instead focusing on the question of whether there is convincing evidence that the accuracy of population distribution in the adjusted numbers (distributive

32

# Making the Final Decision

The Census Bureau expects that the A.C.E., if properly conducted, will make the census more accurate by improving coverage and reducing differential undercounts. The Census Bureau will not, however, release corrected redistricting data until it has brought its technical judgment to bear in assessing the available data to verify that its expectations have been met. The Census Bureau will consider operational data to validate the successful conduct of the A.C.E, assess whether the A.C.E. measurements of undercount are consistent with historical patterns of undercount and independent Demographic Analysis benchmarks, and review measures of quality.

In preparing for this determination, the criteria and the process that will be followed for the assessment of the A.C.E. results will be shared and discussed with outside statistical experts and other interested parties in the fall of 2000. This plan is consistent with the principle of pre-specification adopted by the Census Bureau for the Census 2000 A.C.E. and with its open and transparent planning and decision processes. The extent of pre-specification already publicly provided is very extensive.

It should be noted that all major census operations are vulnerable to unanticipated difficulties. Such difficulties could affect production of the apportionment counts. If, for example, a major natural disaster were to occur in a region of the country during census nonresponse followup, and this operation were seriously disrupted, the Census Bureau might conclude that the apportionment count so misrepresented the "true" state-by-state population distribution that it should not be used until corrective action was taken, possibly delaying delivery of the apportionment counts past January 1, 2001. Unanticipated difficulties could also affect the A.C.E. The Census Bureau would respond to any major unanticipated operational difficulty by taking steps to conduct and complete (or repeat, as necessary) all planned operations necessary to ensure that an accurate A.C.E. had taken place before releasing the statistically corrected data. If the Census Bureau determines that incorporating the results of the survey would not improve the accuracy of the initial census counts, then the uncorrected data would be denominated as the P.L. 94-171 file.

Secretary Mosbacher's 1991 decision document raised the specter of "political tampering" in any use of statistically corrected census data. To avoid even the appearance of political manipulation, the Census Bureau has proposed a process for verifying the agency's expectations regarding the improvements in accuracy from the A.C.E. Under that proposal, a committee of senior Census Bureau officials responsible for resolving policy and technical issues regarding the A.C.E. and assessing the technical effectiveness of its operations would make a recommendation to the Census Bureau Director regarding the use of the statistically corrected census data. The Director would make a determination regarding the use of the statistically corrected data, taking into consideration the recommendation of the committee.

51

# AMENDMENT OF TITLE 13, UNITED STATES CODE, RELATING TO CENSUS

## HEARING

BEFORE THE

## COMMITTEE ON
## POST OFFICE AND CIVIL SERVICE
## HOUSE OF REPRESENTATIVES

EIGHTY-FIFTH CONGRESS

FIRST SESSION

ON

## H. R. 7911

A BILL TO AMEND CERTAIN SECTIONS OF TITLE 13 OF THE
UNITED STATES CODE, ENTITLED "CENSUS"

JUNE 19, 1957



Printed for the use of the Committee on Post Office and Civil Service

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1957

94434

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 119 of 155

## 4    AMENDMENT OF TITLE 13, UNITED STATES CODE

SEC. 16. Section 222 of title 13, United States Code, is amended by striking "I or IV" and inserting in lieu thereof "II, III, IV or V".

SEC. 18. Section 224 of title 13, United States Code, is amended by inserting the words "VI" immediately following the numbers "IV".

SEC. 18. Section 224 of title 13, United States Code, is amended by inserting the words "by certified mail," immediately following the words "by registered mail,".

SEC. 19. Section 241 of title 13, United States Code, is amended by inserting the words "or certified" after the word "registered".

Mr. BECKWORTH. This bill was introduced (by request) by the chairman of our committee, Representative Murray. The official request and explanation of the Secretary of Commerce will be inserted in the record at this point.

(The information follows:)

THE SECRETARY OF COMMERCE,
*Washington, D. C., March 19, 1957.*

HON. SAM RAYBURN,
*Speaker of the House of Representatives,*
*Washington, D. C.*

DEAR MR. SPEAKER: There is attached four copies of a proposed bill to amend certain sections of title 13 of the United States Code, entitled "Census."

There are also attached four copies of a statement of purpose and need for the proposed legislation.

We are advised by the Bureau of the Budget that it would interpose no objection to the submission of this proposed legislation.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

STATEMENT OF PURPOSE AND NEED AND SECTIONAL ANALYSIS OF PROPOSED LEGISLATION TO AMEND CERTAIN SECTIONS OF TITLE 13, UNITED STATES CODE, ENTITLED "CENSUS"

The codification of acts relating to the census in title 13 took place without substantial change in the legislation. Many individual sections of the title, therefore, are in the form in which they appeared in the act of June 18, 1929, and the act of June 18, 1930, and, as in any other provision of the title, represent endments to that act and other provisions of more recent enactments. As a result of these amendments and the fact that some original sections have not been revised to reflect present needs, there is a lack of uniformity among the various censuses and surveys authorized in regard to matters of timing, geographic scope, content, and other features. The changes proposed here are designed to correct these inconsistencies and to clarify points presently in doubt.

The first section of the bill would amend the analysis of chapter 1 of title 13, United States Code, to conform the analysis of the chapter to changes in chapter 1.

Section 2 of the bill would amend present section 3 of title 13 to provide that judicial notice shall be taken of the seal. The Bureau is frequently required to furnish certified copies of census records. Some courts have refused to accept the Bureau of the Census seal on the basis that the law does not provide that judicial notice shall be taken thereof, therefore, it is now necessary to have the Department seal and a certification that the Bureau certification is in fact a true statement. The proposed amendment would remove the requirement of the Department seal and certification and the curtailed delay and expense.

Section 3 of the bill would amend section 6 of title 13, which deals, presently, authorizing the Secretary to obtain information from other departments and offices of the Government, and section 162 authorizes the purchase from various governmental units and private individuals, materials and reports necessary to conduct the census of Government. The amendment would extent that authority limited to the census of governments to all the functions performed under title 13. Extension of the authority is needed to efficiently conduct the various censuses and surveys.

Section 4 of the bill would amend subsections (b) and (d) of section 8 of title 13. The purpose of the amendment to subsection (b) is to provide the present authority for the furnishing of joint statistical periods with census geographical designations on a shared cost basis. Existing laws permit the performance of statistical

## AMENDMENT OF TITLE 13, UNITED STATES CODE    5

services on an "actual" cost basis. Frequently, however, organizations express the need for information that can be met, for example, in such cases where it would otherwise be done. In such cases surveys, tabulations, or other work is planned by the Bureau to serve a particular need, a question may be raised as to whether the statute is broad enough to permit the work through the use of private funds contributed in augmentation of the Bureau's appropriations. It is intended that the addition to *section 8* (b) authorize such joint undertaking, and establish a basis for sharing costs on an equitable basis.

The amendment to section 8 (d) eliminates language which has been held by the Comptroller General to have been superseded by the language contained in title 15, United States Code, section 192, and clarifies the language in title 15, United States Code, section 192, along with interpretations of the General Accounting Office. Classification such as level, share of telephone switchboard expense, or certain joint costs are particularly important with respect to accounting for money, supplies, consumption used, charges for use of electronic equipment, maintenance of Government-owned equipment, and other instances in which the costs to be paid from moneys received cannot be determined until such joint costs have been defined with the and distributed on cost accounting methods developed in connection with the such costs from an appropriation account. The proposed language would make it clear that the appropriation whose moneys originally bore the costs is to be reimbursed from the funds received for the same purpose.

Section 5 of the bill would add to chapter 1 of title 13, new sections 12 and 13, new by the Bureau. Various appropriation acts have authorized the Bureau to conduct the type of work outlined by this section, and such work has long been any an important operation of the Bureau. The new section 12 would authorize mechanical and electronic development doubt as to the authority for the Bureau to carry on this work and will eliminate special authorization by way of annual appropriation language.

The proposed section 13 would provide authority for procurement of certain professional services, collected by the Bureau is disseminated in the form of statutes. Because the preparation of such reports require specialized knowlmeans whereby and research facilities, it is often impractical for reasons of cost, staffing, and time to do the work at the Bureau. Section 7 of title 13 authorizes the Bureau to publication, and distribution of census reports; this new section would remove any doubt of the Secretary's authority to contract with organizations for the preparation of special reports.

Section 6 would add to chapter 1 of title 13 a new section 26 which would provide for transportation to be exercised. To accomplish the censuses authorized by this title, it is sometimes necessary to employ nonconventional means of transportation, such as horses, mules, and boats. Frequently, there is no formal source of such means of transportation, but the field employee may own or be able to procure the necessary means of transportation. Authority to permit the able rental fees in such cases is presently lacking, and hence for use in this new section. Outside the continental United States, particularly in Alaska, during the last census, it was found advantageous to hire automobiles or to employ persons regularly engaged in the provision of the established rates for the provision of this automobile on a contract basis authorized by the Travel Expense Act of 1949 for the service exceed the established rate for the use of other vehicles. Although it would have been within the existing authority to contract for the use of such transportation by air or specially equipped employees, there were objections raised to payment at contract rates. The enumeration plots or driver was appointed as a field employee and under such amended, is therefore special exemption from the Travel Expense Act of 1949, as amended, is therefore requested for these areas. The source of supply, the sum involved, and the payment of prevailing rates would, of course, place these contracts outside the scope of Revised Statutes, section 3709.

Section 7 of the bill would amend the analysis of chapter 5 of title 13, to conform analysis of the chapter to changes in chapter 5 proposed by the bill.

Section 8 of the bill would amend section 131 of title 13 to remove the geographical designations of areas to be covered by the censuses authorized in each section authorizing a census be contained in an entirely new section.

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 120 of 155

6      AMENDMENT OF TITLE 13, UNITED STATES CODE

Section 9 of the bill would amend section 141 of title 13 in the following way:

(1) The present language of section 141 relating to the censuses of agriculture, irrigation, and drainage has been deleted in the amended section 141 and inserted in a new section 142.

(2) The section has been amended to exclude the geographic scope of the censuses; the areas to be covered are now found in section 191. An explanation of the change accompanies that section.

(3) The provision for a census of housing (including utilities and equipment) has been added to the present section 141. The language of the present section 141 censuses of population and housing are to be taken together is thereby stressed while simplifying the references. The references to geographic scope of the housing census were not brought forward, but rather moved to a new section 191 for the reasons given in the statement accompanying that section. The portion of the language that reads "in order to provide information concerning the number, characteristics * * * and geographical distribution of dwelling units in the United States" has been deleted as unnecessary in the light of the authority granted the Secretary in section 5 to determine the inquiries. The parenthetical phrase "(including utilities and equipment)" has been inserted to indicate the language would in any way affect the scope or content of the census of housing as presently conducted by section 142.

(4) The present section 143 (b) and the present provision of section 145 (a) pertaining to the census date have been added to this section.

Section 10 of the bill would provide for a new section 142 relating to censuses of agriculture. (The provisions of the present sec. 142 have been included in the proposed secs. 191 and 193 for the reasons found in the explanations of those sections.)

(a) The proposed new section 142, which includes the provision to make possible the taking of all censuses of agriculture at the conclusion of the crop year, that is, October 1959, and each 5 years thereafter, has the following advantages:

(a) It provides the results a full 5 months in advance of the time they would otherwise be available.

(b) It allows the farm operator to report matters of acreage, production, and other items at the time that these figures are immediately available rather than after a lapse of several months.

(c) It provides for the enumeration prior to the time of reorganization and reconstitution of farms and movement of farm operators which take place during the fall harvest season.

(d) It provides more even distribution of work for the Bureau and, particularly, avoids the danger of so overloading a temporary field staff that they fail to do an adequate job.

These advantages are so great that it is expected that the Secretary would exercise the authority, also provided in the new section to take the October 1959 census and those of each 10th year thereafter in conjunction with the censuses of population, unemployment, and housing, only in certain Territories and possessions, or under conditions of emergency, the flexibility provided, however, would permit such a possibility in the event it was felt desirable.

Section 11 of the bill would repeal present sections 143, 144, 145, and 146 of title 13. Present section 143 (a) would be deleted and section 143 (b) is proposed to be added to the new section 141. The reference to the decennial census period is no longer fully applicable because some censuses are no longer taken during the decennial period. If there is acceptance of the proposed revision permitting the initiation of the census of agriculture in the fall of 1959 and each 5 years thereafter the specific dates of the decennial period would be partially inapplicable to this census, it is believed therefore that initiation and termination of activities is best left to the control of appropriations and the appropriation language.

The present section 144 was incorporated into title 13 without substantive change from the form in which it appeared in the act of June 18, 1929, as modified by the act of July 15, 1949. In view of the fact that the scope of each census and survey is now subject to review by the Secretary under the provisions of section 5, and by the Office of Statistical Standards of the Bureau of the Budget, this section appears unnecessary.

For simplification the dates presently specified in section 145 (a) have been included in the proposed new sections 141 and 142. Improved methods of transportation, particularly in Alaska, now make it possible to conduct the census of population and housing as of the first day of April in all areas. Experience has also shown that in some cases, such as persons leaving on temporary assignments, census information should be recorded

---

AMENDMENT OF TITLE 13, UNITED STATES CODE      7

as of the census date but in advance thereof, and in other cases such as in 1950 when April 2 fell on Sunday; there is an advantage in beginning census on April 1. In view of these considerations, it is proposed to delete in section 1 Also, it has that enumerators should begin work on the day following that in Almo, it has been found that in the course of the actual enumeration storms, floods, and illness may prevent the enumerator from complying with the specifications on completion.

The present section 146 is deleted in its entirety and certain portions added to the proposed new sections 142, 191, and 195.

The proposed new sections 142 and 195 would contain portions of present section 146. The provisions for placing certain portions of present section 146 in the new sections will be found in the explanation of those sections.

Section 12 of the bill would amend section 161 of title 13 whereby geographical limitations in section 161 have been eliminated for the same reason and to accomplish the same results as outlines in the comments pertaining to the proposed amendments to section 131.

Section 13 of the bill would repeal section 162 of title 13. The provisions of section 162 have been incorporated into the new section 6 to make such provisions applicable to the entire title 13. In section 13 rather than only to the censuses of government as presently provided by section 162.

Section 14 of the bill adds to chapter 5 of title 13 a new subchapter V consisting of three new sections, 191, 193, and 195.

The geographic scope of all censuses would be consolidated in the proposed section 191.

Amendments to prior sections eliminated references to the geographic scope of censuses in order to have one section accomplish that purpose. Presently the geographic scope of each census varies from the others. It is felt that uniformity of coverage is most desirable. The new section makes coverage of each State, the District of Columbia, Alaska, Hawaii, the Virgin Islands, Guam, and also the Commonwealth of Puerto Rico, mandatory, with coverage of other areas permissive.

Provision is made, however, for satisfying the census requirement in the case of the Virgin Islands, Guam, and areas not specifically named with data supplied by the Governor. Clarification of the coverage of other areas is also provided.

The Commonwealth of Puerto Rico is in this respect in the same position as a State. The present law is ambiguous in this respect. In providing for Puerto Rico, it is the purpose to reaffirm its own operations and an increasing willingness of the neighborhood of the census to the successful accomplishment. In providing for the ness to devote attention to its own resources in census undertaking, it is found unnecessary to prejudice the use of such resources in census undertaking.

The proposed section continues the authority of the Secretary when found in section 146 (b), to include in a census report information from other government sources pertinent to those areas not included in the census, but removes the specification that this must form an appendix.

Preliminary authority is needed in order to take the census which would be provided by section 193, a new section. The present law is demonstrated as an increasing awareness of the significance of the census to its own operations and an increasing willingness to devote attention to its own resources in census undertakings. It is felt that such authority is necessary not only for the two censuses named but would result in the censuses authorized by title 13. The new section would accomplish this result.

The proposed new section also includes authority to take surveys in conjunction with the various censuses, in addition to the present authority found in section 181 to take surveys in order to obtain annual and other information related to the main topic of a census. For example, in taking the census of housing each dwelling is enumerated, but it may be desired to obtain related information such as the mortgage status and financing through a separate survey.

The new authority is needed in order to take the census data without the necessity of obtaining related information on a complete census basis.

The use of sampling procedures would be authorized by the proposed new section 195. It had generally been held that the term "census" implies a complete enumeration. Experience has also revealed that some of the information which is desired in connection with the complete enumeration of other survey which could be secured efficiently through a sample census which in some instances a portion of the universe to be included might be desired in connection with the complete enumeration of other items; some instances a portion of the universe to be included might be obtained by covered on a sample rather than a complete enumeration; it is believed that under some circumstances a sample enumeration of a sample survey might be substituted for a full census to the advantage of the Government. The sup-

Case 1:01-cv-00082   Document 4   Filed in TXSD on 02/20/2008   Page 121 of 155

8    AMENDMENT OF TITLE 13, UNITED STATES CODE

tion, in combination with section 103, would give recognition to these facts and would provide the necessary authority to the Secretary to permit the use of sampling where he believes that it would be advantageous to do so.

Sections 15, 16, and 17 of the bill would amend present sections 221, 222, and 223 of title 13 to take account of the newly created subchapter V of chapter 5, which includes some provisions previously appearing in other subchapters. The changes are, therefore, only conforming amendments.

Sections 18 and 19 of the bill would amend present sections 224 and 241 of title 13 to authorize the use of certified mail to effect economies by using a less expensive means of notifying respondents by use of certified mail in the registered mail where practical.

Mr. BECKWORTH. I confess I am not familiar with what the bill provides. I have had an opportunity to look at an outline that has been prepared by the able staff of this committee. I believe, in view of the brevity of time, that we will proceed to let you tell us exactly what it does provide.

The first witness we will hear from will be Mr. Robert W. Burgess, Director, Bureau of the Census.

Mr. Burgess, you may proceed.

**STATEMENT OF ROBERT W. BURGESS, DIRECTOR, BUREAU OF THE CENSUS; ACCOMPANIED BY A. ROSS ECKLER, DEPUTY DIRECTOR; RAY HURLEY, CHIEF, AGRICULTURE DIVISION; KENNETH F. McCLURE, ASSISTANT GENERAL COUNSEL, DEPARTMENT OF COMMERCE**

Mr. BURGESS. Thank you.

I am glad to appear before this subcommittee to make a brief statement regarding the provisions of H. R. 7911, a bill to amend certain sections of title 13 of the United States Code. We believe that this bill, by authorizing certain changes in the forthcoming censuses and by clarifying present authorities at a number of points, will contribute materially to the efficiency of our operations in the years ahead.

The biggest job the Bureau of the Census has during the next 3 years is the preparing for and the taking of the nationwide censuses of population, housing, agriculture, and business. These censuses involve obtaining information about every person, family, household, farm, and business in the United States, its Territories and possessions, and Puerto Rico.

Next month we will start more active planning for these censuses. In order to do our job as economically and as accurately as possible, we need some changes in census legislation. The changes we need have been incorporated in H. R. 7911.

The proposed changes have been discussed with and endorsed by other agencies and our advisory committee. The Bureau of the Budget has cleared the proposed changes with such interested agencies as the Department of Agriculture, the Department of the Interior, the Department of State, the Housing and Home Finance Agency, and the General Services Administration.

The most important proposed change is that, providing for the changing of the date of the census of agriculture from April 1 in the years ending in "9" to October in the years ending in "4," About 5 years ago this committee and Congress approved a change so that the middecade census of agriculture would be taken in the autumn, starting in October 1954. This change was supported by the United

AMENDMENT OF TITLE 13, UNITED STATES CODE    9

States Department of Agriculture and farm organizations. The proposed change will make the date of the decennial census of agriculture the same as that for the middecade census. Our experience with the 1954 census of Agriculture indicated that a better and a more timely census of agriculture can be taken starting in October at the close of the harvest season rather than 6 months later when several hundred thousand farm operators have moved to new farm lands. Moreover, this change will help us spread the work of taking major censuses over a longer period, reduce the number of temporary employees—required, and will enable us to perform a more satisfactory job of enumeration for our major censuses. We know of no opposition to this change. A representative of the Department of Agriculture is here to indicate the full support of that Department.

Another important change is to consolidate the provisions for geographical scope of the censuses, eliminating such provisions from the separate census sections which were enacted at various dates in the past and differ somewhat in their provisions. This change specified the major areas other than States which are to be included in the several censuses, and clarifies procedures as to minor areas. The several censuses, and clarifies procedures as to geographical coverage have the approval of the Departments of Interior and State.

Also the proposed changes in several cases extend authority to all our major censuses for provisions that now exist for one or more major censuses. For example, section 3 provides authority to obtain by purchase or otherwise, copies of records, reports, et cetera, required for a census. This authority now exists for the census of governments. Provisions are also made for the conduct of surveys in connection with censuses, a procedure designed to improve the quality of census undertakings and to effect economies. Such authority now exists. Section 5 provides for the development of special electronic equipment, in order to reduce the cost of the large-scale censuses, to minimize the large-scale employment of temporary personnel, and to accelerate the publication of results.

Provisions are also made for obtaining professional assistance from educational and research organizations for the preparation of special reports that can be prepared more economically through such professional reports rather than through the temporary employment of technical experts.

All the changes proposed in H. R. 7911 are needed for the timely and efficient performance of the biggest jobs the Bureau of the Census has ever undertaken. We need these changes now so that our planning for the major censuses can proceed on a satisfactory and efficient basis.

Mr. Chairman, this statement covers some of the more important provisions of the proposed changes. We will be glad to explain the need for any of the other changes or to answer any questions the committee may wish to ask.

Mr. BECKWORTH. Mr. Scott, do you have any questions?

Mr. SCOTT. Mr. Chairman, I have not studied this bill.

Mr. BECKWORTH. Mr. Burgess, let me ask you this question. Section 3 would extend the authority of the Secretary of Commerce to obtain reports and material pertinent to the census, as I understand it. Give me an example of one of those reports on the material to which you refer?

*Unpublished Hearings relates to PL 85-207*

→ CIS NO: 85 SPoc-T.30 (Unpublished-Hearing)
   TITLE: <Censuses of Population, Housing, Agriculture and Business;
      Compensation of Rural Mail Carriers; Postal Rates on Disaster Relief
      Parcels>
   DATE: July 3, 1957                 COLLATION: 39 p.
   CONGRESS-SESSION: 85-1             SESSION YEAR(S): 1957
   CONGRESS: 85
   COMMITTEE: Senate Committee on Post Office and Civil Service
   SUBCOMMITTEE: Senate Subcommittee on Post Office
   CONTENT NOTATION: Censuses of population, housing, agric, and business,
      revisions
   DESCRIPTORS (and special content notations): BUREAU OF CENSUS; CENSUS
      (Population, housing, agric, and business censuses, revisions); FEDERAL
      EMPLOYEES; TERRITORIES OF THE U.S.; POSTAL EMPLOYEES (Rural
      substitute employees compensatory time for holidays worked,
      authorization); HOLIDAYS (Postal rural substitute employees
      compensatory time for holidays worked, authorization); POSTAL RATES AND
      REVENUES (Disaster relief parcels, reduced rates authorization);
      DISASTER RELIEF (Postage rate reduction for disaster relief parcels,
      authorization)
   BILLS: 85 S.1631; 85 S.904; 85 S.919; 85 S.132
   WITNESSES (and witness notations):
      BURGESS, ROBERT W. (Dir, Bur of Census, p. 4.)
      NEWELL, STERLING R. (Dir, Agric Estimates Div, Agric Mktg Service,
      USDA, p. 11.)
      EMEIGH, JOHN W. (sec, Natl Rural Letter Carriers Assn, p. 31.)
   AFFILIATIONS: Department of Agriculture; National Rural Letter Carriers
      Association

→ CIS NO: 85 SPoc-T.31 (Unpublished-Hearing)
   TITLE: <Post Office and Civil Service Miscellaneous Legislation>
   DATE: July 18, 1957               COLLATION: 81 p.
   CONGRESS-SESSION: 85-1            SESSION YEAR(S): 1957
   CONGRESS: 85
   NOTES: Executive Session No. 9.
   COMMITTEE: Senate Committee on Post Office and Civil Service
   CONTENT NOTATION: Civil service and postal misc legislation, committee
      markup session
   DESCRIPTORS (and special content notations): ADMINISTRATIVE EXPENSES ACT;
      FEDERAL EMPLOYEES PAY ACT; FEDERAL EMPLOYEES GROUP LIFE INSURANCE ACT;
      CIVIL SERVICE RETIREMENT ACT; CIVIL SERVICE SYSTEM; POSTAL EMPLOYEES;
      WAGES AND SALARIES; LIFE INSURANCE; CIVIL SERVICE PENSIONS;
      LOYALTY-SECURITY PROGRAM; TRAVEL (Fed employees assigned abroad,
      travel expenses payment provision revision, committee markup session);
      U.S. CITIZENS ABROAD (Fed employees assigned abroad, travel expenses
      payment provision revision, committee markup session); FARMS AND
      FARMERS (Agric census procedure revision and simplification, committee
      markup session); CENSUS (Agric census procedure revision and
      simplification, committee markup session); BUREAU OF CENSUS (Agric
      census procedure revision and simplification, committee markup session);
      TRAFFIC ACCIDENTS AND SAFETY (Fed employees motor vehicle accident
      liability insurance authorization); LIABILITY INSURANCE (Fed employees
      motor vehicle accident liability insurance authorization); PANAMA
      CANAL (Ship pilots retirement benefits revision, committee markup
      session); PILOTS (Panama Canal ship pilots retirement benefits
      revision); DEPARTMENT OF POST OFFICE; CIVIL SERVICE COMMISSION;
      CONGRESSIONAL COMMITTEE MARKUP SESSIONS

BILLS: 85 S.1631; 85 S.9__; 85 S.384; 85 S.27; 85 S.__4; 85 S.72;
85 S.1903; 85 S.1901; 85 S.2127; 85 S.1411; 85 S.821

CutePDF - www.feviio.com

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 124 of 155

address, however, is a matter of conjecture, with other estimates ranging
from 800,000 upward.[12]

4. Foreign visitors and U.S. citizens living abroad: While short-term travel
was not unheard of in the late eighteenth century, the number of
Americans living abroad and the number of foreign citizens visiting in the
United States were insignificant. In contrast, throughout 1990,
approximately 16 million foreign citizens visited the United States for
business and/or pleasure. Furthermore, on Census Day in 1990, about
1 million federal civilian and military employees were living and working
abroad. (The Bureau's residency rules generally do not include in the
population count either Americans living abroad who are not federal or
military employees, or foreign visitors to this country.)

The lack of specificity in the Constitution about who should be counted
has raised questions over time about the eligibility of certain categories of
people. When Congress passed the 14th amendment in 1868, which
modified Article 1, section 2, to eliminate the language concerning slaves
and indentured servants, Congress debated whether to change the
definition of those to be counted from "persons" to "citizens" or
"voters," but decided to keep the original language. The effect of
legislation and court decisions over the past centuries is that the language
of Article 1, section 2, is read at its most inclusive. All persons who are
resident in the United States on Census Day, whether here legally or
illegally, are to be counted.

## Deciding What to Ask in the Census

The decennial census never simply counted heads. Since the earliest days
of the republic, Congress directed the Bureau or its predecessors to gather
additional information as it enumerated the population. In the nineteenth
century, the trend to greater numbers of questions, which peaked with an
encyclopedic number[13] in 1890 on a large variety of issues, was inspired by
the curiosity of a self-conscious young nation and by the need to form
public policy. In the twentieth century, the census questions have been
increasingly shaped by the need to fulfill the data requirements of
programs legislated by Congress and to properly allocate the federal funds
authorized by those programs.

[12]"Homelessness: Toward Another Decade of Homelessness? An Issue Paper," GAO/RCED,
September 16, 1995.

[13]The 1890 Census contained inquiries on subjects that later became separate censuses; these inquiries
included the subjects of agriculture, crime, insurance, mines and mining, manufacturing,
transportation, etc. This census contained a total of 13,161 questions, the majority of households
probably answered little more than the 46 questions on population.

Case 1:01-cv-00082 Document 4 Filed in TXSD on 07/20/2001 Page 125 of 155

# HISTORICAL BACKGROUND—Continued

from 1920 to 1940; the U.S. Navy enumerated in 1950, and the U.S. High Commissioner carried out the 1958 census (the results of which appeared in the 1960 U.S. census). The Census Bureau conducted the 1970 and 1980 censuses[2]; in 1980 and 1990, there was a separate census of the Commonwealth of the Northern Mariana Islands, which had been part of the Trust Territory.

A number of the censuses noted above collected data on agriculture, housing, and economic subjects and included enumerations on isolated islands, such as Truk and Yap, mainly in the Pacific.

In some censuses, there were supplemental questionnaires for American Indians; in 1980, enumerators used these forms only on reservations to collect additional information about households with one or more American Indian, Eskimo, or Aleut residents.

From the 1840 through the 1900 censuses, a temporary census office had been established before each decennial enumeration and disbanded as soon as the results were compiled and published. Congress established a permanent Bureau of the Census in 1902 in the Department of the Interior, so there would be an ongoing organization capable of taking frequent censuses throughout the decades instead of concentrating all the work in the years ending in "0." The Bureau moved to the new Department of Commerce and Labor in 1903 and continued with the Commerce Department when the Labor Department was split off in 1913.

The 1910 census had several notable features. First, prospective census employees took open competitive examinations administered throughout the country (since 1880, appointees had been given noncompetitive tests). Second, the way in which results were published was changed. Those statistics that were ready first—and especially those in greatest demand (such as the total population of individual cities and States, and of the United States as a whole)—were issued first as press releases, then in greater detail as bulletins and abstracts, the latter appearing 6 months to a year before the final reports were issued.

In 1920 and also in 1930, there were minor changes in scope. A census of unemployment accompanied the 1930 census; data were collected for each person reported to have a gainful occupation but who was not at work on the working day preceding the enumerator's visit.

Sampling. In many ways, 1940 saw the first contemporary census. One of its major innovations was the use of advanced statistical techniques, such as probability sampling, that had only been tried experimentally before, such as in crop sampling in the 1920's, a trial census of unemployment carried out by the Civil Works Administration in 1933-1934 and surveys of retail stores in the same decade, and an official sample survey of

unemployment in 1940 that covered about 20,000 households. Sampling in the 1940 census allowed the addition of a number of questions for just 5 percent of the persons enumerated without unduly increasing the overall burden on respondents and on data processing, and also made it possible to publish preliminary returns 8 months ahead of the complete tabulations. The Bureau was able to increase the number of detailed tables published and, also by sampling, to review the quality of the data processing with more efficiency.

Most population and housing inquiries included in the 1940 census were repeated in later years, and a few were added, for example, place of work and means of transportation to work (1960), occupation 5 years before the census (1970 and 1980 only), and housing costs (1980). In 1940 and 1950, the sample population questions were asked only for those persons whose names fell on the schedules' sample lines. Sampling was extended to the housing schedule in 1950, with a few questions asked on a cyclic basis: One pair of questions for household 1, another pair for household 2, etc., until household 6, when the cycle was started again with the first pair of questions. In the 1960 census, the sampling pattern was changed for population and housing questions alike: If a housing unit was in the sample, all of the household members were in the sample too. This scheme yielded sufficient data for accurate estimates of population and housing characteristics for areas as small as a census tract (an average of 4,000 people). The only population questions asked on a 100-percent basis (name and address, age, sex, color or race [and beginning in 1980, Spanish/Hispanic origin, marital status, and relationship to the householder) were those necessary to identify the population and avoid duplication.

The sampling pattern changed in later censuses. For 1970, some sample questions were asked of either a 15-percent or a 5-percent sample of households, but some were asked for both, thus constituting a 20-percent sample. There was no "split sample" for 1980, but it was used at every other household (50 percent) in places with fewer than 2,500 inhabitants and at every sixth household (17 percent) elsewhere. For 1990, the sample was tailored even more to population size. (See p. 98 for details.)

New inquiries. Reflecting the concerns of the Depression years, the 1940 census asked several questions to measure employment and unemployment, internal migration, and income. It was also the first to include a census of housing; this obtained a variety of facts on the general condition of the Nation's housing and the need for public housing programs. (Prior to this, the housing data collected as part of the population censuses generally were limited to one or two items.)

At the time of the 1950 census, a survey of residential financing was conducted as a related, but separate, operation, with information collected on a sample basis from owners of owner-occupied and rental properties and mortgage lenders. Similar surveys accompanied the subsequent censuses. There also were surveys of components of housing change with the 1960, 1970, and 1980 censuses (but not 1990, when the survey was scheduled for 1989 and 1991); these measured the quantitative and qualitative impact of basic changes that occurred in the Nation's housing stock during the previous decade. The survey also offered a measure of "same" units, i.e., the preponderant part of the housing inventory that was not affected by the basic changes. The first survey of this type had been a key part of the National Housing Inventory in 1956. (The housing

---

[2]In 1986, compacts of free association were implemented between the Federated States of Micronesia and the Marshall Islands, and the United States. Under the terms of Title 13, U.S. Code, the United States was no longer authorized to take the decennial censuses in those areas that were formerly part of the Trust Territory. As of the summer of 1989, the compact of free association had not been passed with Palau. If the compact is not implemented before April 1990, the Census Bureau will take a 1990 census in Palau; however, if the compact is implemented before April, the Census Bureau will not carry out the planned enumeration.

*[left margin fragments:]*

[71 STAT.

register of
title to the
tates if, at
Secretary
purposes.
y referred
School of
r a period
o wish to

rospective
igh school
ffairs, and
School of

ition shall
than two

he United
t, and the
and regu-

in and to
ok County,

es of the
Adminis-
onvey by
ion of the
e United
Executive
f land in
quitclaim
Chicago,
s of Cook
act legal
strator of

rized and
a munici-
raska, all
uranium,
5 (b) (1)
eculiarly
ed in the
hich was
ica to the
ge 47, in
ving been
, General
on behalf
ed States

## Public Law 85-207

### AN ACT

August 28, 1957
[S. 1631]

To amend certain sections of title 13 of the United States Code, entitled "Census."

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the analysis of chapter 1 of title 13, United States Code, immediately preceding section 1 of such title, is amended—

Census.
Title 13, U.S.
Code, amendments.
68 Stat. 1012.

(a) by striking out all of item 6 in such analysis and in lieu thereof inserting:

"6. Requests to other departments and offices for information, acquisition of reports from governmental and other sources."

(b) by adding immediately after and underneath item 11 in such analysis the following two items:

"12. Mechanical and electronic development.
"13. Procurement of professional services."

(c) by adding immediately after and underneath item 25 of such analysis the following new item:

"26. Transportation by contract."

SEC. 2. Section 3 of title 13, United States Code, is amended by adding at the end thereof the following new sentence: "Judicial notice shall be taken of the seal."

68 Stat. 1012.

SEC. 3. Section 6 of title 13, United States Code, is amended to read as follows:

68 Stat. 1013.

"§ 6. Requests to other departments and offices for information, acquisition of reports from governmental and other sources

"(a) The Secretary, whenever he deems it advisable, may call upon any other department or office of the Government for information pertinent to the work provided for in this title.

"(b) The Secretary may acquire by purchase or otherwise from States, counties, cities, or other units of government, or their instrumentalities, or from private persons and agencies such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title."

SEC. 4. (a) Subsection (b) of section 8 of title 13, United States Code, is amended by adding at the end thereof the following:

68 Stat. 1013.

"In the case of nonprofit organizations or agencies the Secretary may engage in joint statistical projects, the cost of which shall be shared equitably as determined by the Secretary and provided that the purposes are otherwise authorized by law."

(b) Subsection (d) of section 8 of title 13, United States Code, is amended to read as follows:

"(d) All moneys received in payment for work or services enumerated under this section shall be deposited in a separate account which may be used to pay directly the costs of such work or services, to repay appropriations which initially bore all or part of such costs, or to refund excess sums when necessary."

SEC. 5. Title 13, United States Code, is further amended by inserting in chapter 1 of such title immediately following section 11 the following two new sections:

68 Stat. 1014.

"§ 12. Mechanical and electronic development

"The Secretary is authorized to have conducted mechanical and electronic development work as he determines is needed to further

"(b) For censuses taken in the Virgin Islands, Guam, or any possession or area not specifically designated in (a) above, the Secretary may utilize or adopt census data collected by the governor or highest ranking Federal official, when such data are obtained in accordance with plans prescribed or approved by the Secretary.

"(c) When, under determination by the Secretary as provided in paragraph (a) above, any census is not taken in a possession or area over which the United States exercises jurisdiction, control, or sovereignty, the Secretary may include in the census report data obtained from other Federal agencies or Government sources. Any data obtained from foreign governments shall be obtained through the Secretary of State."

"§ 193. Preliminary and supplemental statistics

"In advance of, in conjunction with, or after the taking of each census provided for by this chapter, the Secretary may make surveys and collect such preliminary and supplementary statistics related to the main topic of the census as are necessary to the initiation, taking, or completion thereof."

"§ 195. Use of sampling

"Except for the determination of population for apportionment purposes, the Secretary may, where he deems it appropriate, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title."

68 Stat. 1023.
SEC. 15. Section 221 (a) of chapter 7 of title 13, United States Code, is amended by striking "I, II, and IV" and inserting in lieu thereof "I, II, IV, and V".

68 Stat. 1023.
SEC. 16. Section 222 of title 13, United States Code, is amended by striking "II or IV" and inserting in lieu thereof "II, IV, or V".

68 Stat. 1023.
SEC. 17. Section 223 of title 13, United States Code, is amended by the insertion of "or V" immediately following the numeral "IV".

68 Stat. 1024.
SEC. 18. Section 224 of title 13, United States Code, is amended by inserting the words "by certified mail," immediately following the words "by registered mail,".

68 Stat. 1025.
SEC. 19. Section 241 of title 13, United States Code, is amended by inserting the words "or certified" after the word "registered".

Approved August 28, 1957.

---

Public Law 85-208

August 28, 1957
[H. R. 7914]

AN ACT

To amend the Career Compensation Act of 1949 to provide incentive pay for human test subjects.

Hazardous duty.
69 Stat. 19.
*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 204 (a) of the Career Compensation Act of 1949, as amended (37 U. S. C. 235 (a)), is further amended—

(1) by striking out the word "and" at the end of clause (11);
(2) by striking out the period at the end of clause (12) and inserting "; and" in lieu thereof; and
(3) by adding the following clause: "(13) duty as human test subject in thermal stress experiments."

69 Stat. 21.
SEC. 2. Section 204 (c) of the Career Compensation Act of 1949, as amended (37 U. S. C. 235 (c)), is further amended by striking out "(12)" and inserting "(13)" in lieu thereof.

Approved August 28, 1957.

**Public Law 94–521**
**94th Congress**

## An Act

To amend title 13, United States Code, to provide for a mid-decade census of population, and for other purposes.

Oct. 17, 1976
[H.R. 11337]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 1 of title 13, United States Code, relating to definitions, is amended to read as follows:

Mid-decade
census of
population.

## "§ 1. Definitions

"As used in this title, unless the context requires another meaning or unless it is otherwise provided—

"(1) 'Bureau' means the Bureau of the Census;

"(2) 'Secretary' means the Secretary of Commerce; and

"(3) 'respondent' includes a corporation, company, association, firm, partnership, proprietorship, society, joint stock company, individual, or other organization or entity which reported information, or on behalf of which information was reported, in response to a questionnaire, inquiry, or other request of the Bureau."

SEC. 2. Section 3 of title 13, United States Code, relating to the seal of the Bureau of the Census, is amended by striking out "affixed to all certificates and attestations that may be required from the Bureau" and inserting in lieu thereof "affixed to all documents authenticated by the Bureau".

SEC. 3. (a) Section 4 of title 13, United States Code, relating to the functions of the Secretary, is amended to read as follows:

## "§ 4. Functions of Secretary; regulations; delegation

"The Secretary shall perform the functions and duties imposed upon him by this title, may issue such rules and regulations as he deems necessary to carry out such functions and duties, and may delegate the performance of such functions and duties and the authority to issue such rules and regulations to such officers and employees of the Department of Commerce as he may designate."

(b) The table of sections of chapter 1 of title 13, United States Code, is amended by striking out—

"4. Functions of Secretary; delegation."

and inserting in lieu thereof—

"4. Functions of Secretary; regulations; delegation."

SEC. 4. (a) Section 5 of title 13, United States Code, relating to schedules and inquiries, is amended—

(1) in the section heading, by striking out **"Schedules"** and inserting in lieu thereof **"Questionnaires"**; and

(2) in the text thereof, by striking out "schedules" and inserting in lieu thereof "questionnaires".

(b) The table of sections of chapter 1 of title 13, United States Code, is amended by striking out—

"5. Schedules; number, form, and scope of inquiries."

and inserting in lieu thereof—

"5. Questionnaires; number, form, and scope of inquiries."

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 129 of 155

such other possessions and areas over which the United States exercises jurisdiction, control, or sovereignty. Inclusion of other areas over which the United States exercises jurisdiction or control shall be subject to the concurrence of the Secretary of State.

"(b) For censuses taken in the Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, or any possession or area not specifically designated in subsection (a) of this section, the Secretary may use census information collected by the Governor or highest ranking Federal official, if such information was obtained in accordance with plans prescribed or approved by the Secretary.

"(c) If, pursuant to a determination by the Secretary under subsection (a) of this section, any census is not taken in a possession or area over which the United States exercises jurisdiction, control, or sovereignty, the Secretary may include data obtained from other Federal agencies or government sources in the census report. Any data obtained from foreign governments shall be obtained through the Secretary of State.".

Sec. 10. Section 195 of title 13, United States Code, relating to use of sampling, is amended to read as follows:

## "§ 195. Use of sampling

"Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title.".

Sec. 11. (a) Subchapter V of chapter 5 of title 13, United States Code, is amended by adding at the end thereof the following new section:

13 USC 196.

## "§ 196. Special censuses

Ante, p. 2463.

"The Secretary may conduct special censuses for the government of any State, or of any county, city, or other political subdivision within a State, for the government of the District of Columbia, and for the government of any possession or area (including political subdivisions thereof) referred to in section 191(a) of this title, on subjects covered by the censuses provided for in this title, upon payment to the Secretary of the actual or estimated cost of each such special census. The results of each such special census shall be designated 'Official Census Statistics'. These statistics may be used in the manner provided by applicable law."

(b) The table of sections of subchapter V of chapter 5 of title 13, United States Code, is amended by adding at the end thereof—

"196. Special censuses."

Sec. 12. (a) Section 214 of title 13, United States Code, relating to wrongful disclosure of information, is amended to read as follows:

## "§ 214. Wrongful disclosure of information

13 USC 21.

13 USC 9.

"Whoever, being or having been an employee or staff member referred to in subchapter II of chapter 1 of this title, having taken and subscribed the oath of office, or having sworn to observe the limitations imposed by section 9 of this title, publishes or communicates any information, the disclosure of which is prohibited under the provisions of section 9 of this title, and which comes into his possession by reason of his being employed (or otherwise providing services) under the provisions of this title, shall be fined not more than $5,000 or imprisoned not more than 5 years, or both."

1   a number of potential flaws in the statistical methodology.  Faced with the prospect

2   that its adjusted data could be less accurate than the headcount, the professional staff

3   recommended against releasing the adjusted data as the official United States

4   census.[1]  The Secretary's adoption of that recommendation is the subject of the

5   present lawsuit.

6          Plaintiffs, who are municipalities and individuals from throughout the nation,

7   ultimately ask this Court to reject the Secretary's adoption of the recommendation of

8   the Census Bureau's professional staff. In support of that request, Plaintiffs find in the

9   governing statutes a presumption of accuracy in the adjusted data, and argue that the

10  Secretary must release the adjusted data unless he conclusively proves it inaccurate.

11  Because the Census Bureau's professional staff found evidence that the statistically

12  adjusted figure improves accuracy, Plaintiffs claim that the adjusted data has not been

13  proven inaccurate and should be released as the official census.

14         On the other hand, the Secretary contends he has discretion to reject the use of

15  statistically adjusted data where strong evidence exists that its use will not improve the

16  accuracy of the final census figure. Since the Census Bureau's professional staff found

17  evidence that the statistical methods used to adjust the headcount figure may contain

18  serious errors, the Secretary contends that he properly exercised his discretion in

19  releasing the unadjusted headcount as the official United States census.

20         Both parties base their arguments on a single statute, 13 U.S.C. § 195, whose

21  text fails to articulate either standard set forth by the parties. Moreover, a search for

22  Congressional intent through the traditional means of statutory construction likewise

23  provides the Court with no more insight than the text itself. Thus, with respect to the

24  adjustment decision, the Court finds no clear statement of Congressional intent.

25  Without such legislative guidance, this case falls within the scope of Regions Hospital

26

27  ─────────────────

28         [1]The Court adopts the parlance of the Census Bureau, and hereafter refers to the choice
    between releasing adjusted data and unadjusted data as the "adjustment decision." (See, e.g.,
    Comp. Ex. D p. 1 n. 1).

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 131 of 155

1 v. Shalala, 522 U.S. 448, 457 (1998) and Chevron v. Natural Resources Defense

2 Council, Inc., 467 U.S. 837, 842 (1984). Under those cases, the question before the

3 Court is whether the Secretary's actions are consistent with a permissible construction

4 of the statute. Chevron, 467 U.S. at 843.

5     Because the Court concludes that the paramount objective of the Census Act is

6 accuracy in counting population, and because substantial evidence supports the

7 Census Bureau's recommendation against adjustment, the Court finds that the

8 Secretary's actions are consistent with a permissible construction of the Census Act.

9 Accordingly, Plaintiffs' motion for a preliminary injunction is **DENIED** and the suit for a

10 permanent injunction is **DISMISSED**.

11                                    II.

12                        **FACTUAL BACKGROUND**

13 A. PURPOSES AND AUTHORITY BEHIND THE CENSUS

14     The Constitution requires Congress to conduct a decennial census "in such

15 Manner as it shall by Law direct" for the purpose of apportioning Representatives to

16 the states. U.S. CONST. ART. 1 § 1 cl. 3. ("Representatives ... shall be apportioned

17 among the several States ... according to their respective Numbers ... "); AMEND. 14, §

18 2 ("Representatives shall be apportioned among the several States according to their

19 respective numbers, counting the whole number of persons in each State ... "). The

20 Constitution vests in Congress the authority to determine the manner in which the

21 census is conducted. Department of Commerce v. United States House of

22 Representatives, 525 U.S. 316 (1999). Congress, in turn, has delegated its authority to

23 the Secretary of Commerce to conduct the census "in such form and content as he

24 may determine, including the use of sampling procedures and special surveys." 13

25 U.S.C. § 141(a). The Secretary performs these duties through the Census Bureau, an

26 organization within the Department of Commerce charged with conducting the census.

27 13 U.S.C. § 2.

28 //

1    Although the Framers envisioned that the census would count the population

2    every ten years for reapportionment of the House of Representatives, the modern

3    census is used for a "galaxy" of secondary purposes. City of New York v. United States

4    Department of Commerce, 822 F. Supp. 906, 911 (1993), rev'd 34 F.3d 1114 (1994).

5    Two such secondary purposes are of concern to Plaintiffs here: (1) federal agencies

6    use the census data for distributing federal funds; and (2) state governments use the

7    data for their own internal redistricting. Id. With respect to the latter, the Secretary of

8    Commerce is obligated to report to the states tabulations of their population as

9    determined by Census 2000 no later than April 1, 2001. 13 U.S.C. § 141(c).

10   B. THE UNDERCOUNT AND DIFFERENTIAL UNDERCOUNT

11   Like all of its predecessors, Census 2000 produced less than perfect results,

12   though it is touted as producing "high quality data." Cf. Karcher v. Daggett, 462 U.S.

13   725, 732 (1983) (recognizing that 1980 "census data are not perfect,"); Gaffney v.

14   Cummings, 412 U.S. 735, 745 (1973) (noting that 1970 census data "are inherently

15   less than absolutely accurate"). Inaccuracies in the initial census data (which this Court

16   will refer to as the "headcount") take many forms: "[p]ersons who should have been

17   counted are not counted at all or are counted at the wrong location; persons who

18   should not have been counted (whether because they died before or were born after

19   the decennial census date, because they were not a resident of the country, or

20   because they did not exist) are counted; and persons who should have been counted

21   only once are counted twice." Wisconsin v. City of New York, 517 U.S. 1, 8 (1996).

22   Historically, these errors have resulted in a net undercount. Id.

23   Furthermore, statistical evidence developed in connection with the 1980 and

24   1990 censuses indicated that the undercounts were not uniform; racial and ethnic

25   minorities, renters and children were undercounted to a greater degree than the

26   population as a whole. Department of Commerce, 525 U.S. at 322; City of New York,

27   822 F. Supp. at 911. "Because the counts are used to calculate the political

28   representation [for both federal and state congressional seats] and financial aid to be

-4-

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 133 of 155

1    afforded to a given area, the fear that the census may be perpetuating a system in

2    which those most in need of representation and aid are deprived of both is a major

3    concern." City of New York, 822 F.Supp. at 911.

4        **1. The Accuracy Coverage Evaluation Survey ("A.C.E.")**

5        The Census Bureau attempts to identify and measure the accuracy of the

6    headcount by comparing the headcount results with two population estimates. The first

7    estimate is derived through a comprehensive sampling process, or Accuracy Coverage

8    Evaluation ("A.C.E.") Survey, performed after the original headcount is conducted. The

9    A.C.E. uses a "capture-recapture" methodology to assess the accuracy of the

10   headcount, which, as Chief Justice Rehnquist explains, brings to light the overcounts

11   and undercounts in a rough way. Suppose one

12            wanted to use [the capture-recapture method] to determine

13            the number of pumpkins in a large pumpkin patch.  First,

14            one would choose a particular section of the patch as the

15            representative subset to which the "recapture" phase will be

16            applied.  Let us assume here that it is a section exactly

17            one-tenth the size of the entire patch that is selected.  Then,

18            at the next step—the "capture" stage—one would conduct a

19            fairly quick count of the entire patch, making sure to record

20            both the number of pumpkins counted in the entire patch

21            and the number of pumpkins counted in the selected

22            section.  Let us imagine that this stage results in a count of

23            10,000 pumpkins for the entire patch and 1,000 pumpkins

24            for the selected section. Next, at the "recapture" stage, one

25            would perform an exacting count of the number of

26            pumpkins in the selected section.  Let us assume that we

27            now count 1,100 pumpkins in that section.  By comparing

28            the results of the "capture" phase and the results of the

- 5 -

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 134 of 155

1    "recapture" phase for the selected section, it is possible to

2    estimate that approximately 100 pumpkins actually in the

3    patch were missed for every 1,000 counted at the "capture"

4    phase.  Extrapolating this data to the count for the entire

5    patch, one would conclude that the actual number of

6    pumpkins in the patch is 11,000.

7  Wisconsin, 517 U.S. at 9.

8       In actual application, the capture-recapture methodology involves a much more

9  complex process designed to reveal two factors of great importance: what geographic

10  portions of the pumpkin patch are typically undercounted and what types of pumpkins

11  are typically overlooked. Thus, as Chief Justice Rehnquist's example suggests, those

12  performing the capture-recapture analysis must ensure that the "particular section[s] of

13  the patch [selected] as the representative subset" are indeed representative. Id.

14       In the census context, the original enumeration (capture) is followed by a limited

15  post-enumeration survey (recapture) in which representative geographical areas are

16  more intensively surveyed, and the results compared with the original headcount in

17  those areas. By itself, this would produce an error rate over the entire population, but

18  would not shed light on the differential undercount. To accomplish the goals of

19  determining where erroneous counts occur, and who, if anyone, has been left

20  uncounted, the A.C.E. assigns individuals counted in the recapture to one, and only

21  one, "of over 1,000 post-strata defined by five categories: geography; age; sex; status

22  of housing unit (rent versus own); and race (including Hispanic versus non-Hispanic

23  origin)." Id. at 9-10. Poststratum are assumed to be "a group of people who have

24  similar chances of being counted in the initial data collection." Department of

25  Commerce, 525 U.S. at 325. Thus, by comparing the post-stratified data to the results

26  of the initial enumeration, the Bureau is able to estimate not only an overall undercount

27  rate, but also an undercount rate for each post-strata. This process enables the

28  Bureau to determine whether certain strata, and by extension, certain demographic

-6-

1    groups, were undercounted. Wisconsin, 517 U.S. at 10.

2        **2. Demographic Analysis**

3        Census results are also verified by comparison to another population estimate

4    derived through a process known as "demographic analysis" or "DA". (FAC Ex. D p. 3).

5    DA is a calculation of the national population based on the net sum of all records of

6    births, deaths, legal immigration, Medicare enrollments, and estimates of emigration

7    and net undocumented immigration. (Id.) One shortcoming of the DA is that it can only

8    provide population totals for the nation as a whole, since it is derived from records that

9    do not reveal where the new immigrants or newborns currently live.

10        **3. Comparison of the headcount with A.C.E. data**

11        By comparing census data to A.C.E. data, or by comparing the census data to

12    the DA, the Census Bureau identifies what population groups appear to be

13    undercounted, and develops computations for determining the extent of the

14    undercount. These processes have historically revealed the differential undercount

15    described in the Department of Commerce decision. 525 U.S. at 325

16        Nonetheless, Census 2000's unadjusted figures are believed to be the most

17    accurate headcount in census history. The Census Bureau reaches this conclusion by

18    comparing the undercount revealed by the 1990 statistical sampling to that revealed in

19    the 2000 A.C.E. results. These comparisons suggest that the national undercount fell

20    from 1.61% in 1990 to approximately 1.18%, while the undercount for African-

21    Americans fell from 4.57% in 1990 to 2.17% in 2000, and the undercount for Hispanics

22    fell from 4.99% to 2.85%. (FAC Ex. D p. 4).

23    **C. THE ADJUSTMENT DECISION**

24        When all of the data has been collected, reviewed, compared and adjusted, the

25    Census Bureau must decide whether the headcount should be released as the official

26    census of the United States, for purposes other than apportioning congressional seats

27    among the states, or whether the adjusted population figure should be used. This

28    decision has real consequences, because the headcount and the adjusted population

1 figure differ both as to the actual population and the geographic location of the
2 population.

3       When it decides which data to use, the Census Bureau considers a number of
4 factors, including the accuracy of the post-enumeration survey and the assumptions
5 built into the design of the post-strata, all of which bear on the validity of the adjusted
6 number. Unless adjustment generates population data that contains less error than the
7 headcount, the Census Bureau is understandably reluctant to recommend using an
8 adjusted figure. In both 1980 and 1990, the Census Bureau professional staff
9 recommended to the Secretary of Commerce the use of adjusted census figures. On
10 both occasions, the Secretary considered, but ultimately rejected, those proposals.
11 See, e.g. Wisconsin, 517 U.S. at 9-11. The Secretary has done so again with respect
12 to Census 2000, but only after the Census Bureau's professional staff recommended
13 against the release of the adjusted census data. (Heinz Dec. Ex. 18).

14       **1. The standard applied**

15       The Census Bureau has established three factors that must be taken into
16 account in determining whether or not to adjust the headcount. These factors are: "(1)
17 the conduct of key operations, (2) consistency of A.C.E. results with historical
18 measures of undercount, and (3) measures of quality." (Currey Dec. Ex. O p. 32
19 (hereinafter "Feasibility Report")). The Bureau also decided that should "strong
20 evidence" reveal through these factors that the A.C.E. does not lead to a more
21 accurate data set, the unadjusted data should be used. (Id.)

22       **2. The ESCAP recommendation**

23       Before a recommendation was made to the Secretary, the Executive Steering
24 Committee for A.C.E. Policy (ESCAP), a standing committee of Census Bureau
25 employees whose membership is defined by regulation, evaluated the proposed
26 adjustment to the Census 2000 headcount. 15 C.F.R. § 101.1(b)(3). On March 1,
27 2001, ESCAP released the results of its evaluation in its *Recommendation Concerning*
28 *the Methodology to be Used in Producing the Tabulations of Population Reported to*

1   *States and Localities Pursuant to 13 U.S.C. § 141(c)*, wherein the committee

2   unanimously recommended that the unadjusted census data prevail. (FAC Ex. D.

3   ("Recommendation")). ESCAP premised its Recommendation on two of the factors

4   outlined in the Feasibility Report: consistency of A.C.E. results with historical measures

5   of undercount and the conduct of key operations.

6         ESCAP began by comparing A.C.E. data with the demographic analysis, a

7   historic measure of undercount, and noted that "the demographic analysis estimates

8   are significantly lower than both Census 2000 and the A.C.E. estimates for important

9   population groups." (Recommendation, p. ii). ESCAP concluded that the demographic

10  data suggests that the unadjusted data overcounts the nation's population by 0.7%.

11  (Recommendation, p. ii, 17). Although ESCAP "investigated this inconsistency

12  extensively," it could not, "in the time available, . . . explain it." (Recommendation, p. ii).

13        ESCAP posited two possible explanations for the divergent A.C.E. and DA

14  results. First, ESCAP expressed concern that synthetic error may have corrupted the

15  A.C.E. data. Synthetic error occurs when the probability that individuals in A.C.E.-

16  sampled post strata are undercounted varies from the probability of undercounting

17  individuals in the strata as a whole. (Recommendation, p. 22). After conducting an

18  extensive study of computer generated population models, ESCAP noted that

19  synthetic error could, under certain conditions, lead to an error in estimating the true

20  population of certain strata as great as 58%. (Recommendation, p. 23-24).

21  Accordingly, ESCAP decided that it must more fully explore the impact of synthetic

22  error before adjusting the original census enumeration. (Recommendation, p. 24).

23        Second, ESCAP expressed concern with the impact of balancing error, which

24  arises from the manner in which the A.C.E. is conducted. (Recommendation, p. 24).

25  The A.C.E. actually consists of two surveys, based on two different samples: the P-

26  sample which is an enumeration independent from the census that is used to measure

27  erroneous omissions, and the E-sample, which is a sample of census records that are

28  re-examined to measure erroneous inclusions. (Recommendation, p. 24). Balancing

-9-

1    error occurs when the time, effort or expense expended on the P-sample differs from

2    that used in the E-sample. (Recommendation, p. 24). Having found evidence that

3    disparate search patterns may have been used, and that those disparate patterns

4    resulted in a probable upward bias in the A.C.E, ESCAP recommended against

5    adjustment until further research could be conducted into this possible error.

6    (Recommendation, p. 25).

7         In sum, after a careful review of the sampled data and the sampling

8    methodologies, ESCAP concluded that the inconsistencies between DA and A.C.E.

9    could be explained by synthetic error, balancing error, or by another "as yet

10   undiscovered problem in the A.C.E" which merited additional research and analysis.

11   (Recommendation, p. ii). Because ESCAP could not complete such research by the

12   statutorily mandated date for release of census data, ESCAP unanimously

13   recommended against adjustment. (Recommendation, p. ii).

14        **3. The Director's recommendation and Secretary's adoption thereof**

15        The Director of the Census concurred in ESCAP's conclusion and forwarded it,

16   along with his recommendation, to the Secretary. (FAC Ex. E). Secretary Donald

17   Evans adopted ESCAP's recommendation the following week, and directed that only

18   unadjusted numbers would be released. (Heinz Dec. Ex. 18).

19                              III.

20                           **DISCUSSION**

21        Although the issues before the Court were initially presented on a motion for

22   preliminary injunction, the parties agreed at the hearing to consolidate the preliminary

23   injunction motion with the trial of the action on the merits. Fed. R. Civ. P. 65(a)(2).

24   Accordingly, the Court addresses only the merits of Plaintiffs' claims.

25        To clarify, this case presents no Constitutional challenge to the Secretary's[2]

26

27        [2]The Court will adopt the Census Act's parlance to some degree, and will use the term
     "Secretary" as a shorthand term for the agency involved in the adjustment decision, including the
28   Department of Commerce, the Census Bureau and ESCAP. When referring to the actual Secretary
     of Commerce, the Court will use the term "Secretary Evans."

                              - 10 -

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 139 of 155

1   adjustment decision.[3]  Rather, the suit focuses on whether the Secretary properly

2   refused to adjust the headcount because of concerns over the accuracy of the

3   statistically adjusted census data.  The challenge to the Secretary's adjustment

4   decision therefore presents two possible issues: First, did the Secretary have

5   discretion under the Census Act to consider accuracy when making the adjustment

6   decision?  Second, did the Secretary properly assess the evidence bearing on

7   accuracy before deciding against the release of adjusted data?  In the end, plaintiffs do

8   not seriously challenge the Secretary's authority to consider accuracy in making the

9   adjustment decision.  However, they vigorously assert that he applied the wrong

10  standard in deciding not to adjust.  In doing so, plaintiffs necessarily contend that the

11  Secretary incorrectly interpreted his duties and responsibilities under the Census Act.

12  The Court therefore must first determine how to evaluate the Secretary's interpretation,

13  and then determine whether the Secretary's interpretation is within the limits

14  established under controlling authority.

15  A. EVALUATING AN AGENCY'S STATUTORY INTERPRETATION

16      Congress often enacts statutes that provide an administrative agency with

17  general authority over the subject matter of the legislation, but leaves to the agency

18  the details of implementation.  Administrative agencies therefore frequently find

19

20  _____

21  Further, the reader should keep in mind the functions performed by the various participants
    in the relevant decision: the Census Bureau laid out the standard by which the adjustment decision
22  was made; ESCAP found balancing and synthetic error could explain the divergence between the
    DA and A.C.E. data; ESCAP applied the standard to its findings and recommended against
23  adjustment; the Director of the Census Bureau adopted the findings and recommended against
    adjustment and Secretary Evans followed that recommendation.  Thus, although the adjustment
24  decision was "made by the Secretary," he based that decision on the work of the Census Bureau's
    professional staff, and ESCAP's analysis of that work.

25  [3]The text of the Constitution vests Congress with virtually unlimited discretion in conducting
26  the decennial 'actual Enumeration,' and notwithstanding the plethora of lawsuits that inevitably
    accompany each decennial census, there is no basis for thinking that Congress' discretion is more
27  limited than the text of the Constitution provides."  Wisconsin, 517 U.S. at 19 (citations and
    footnotes omitted). Further, "through the Census Act, Congress has delegated its broad authority
28  over the census to the Secretary," who in turn oversees the Department of Commerce and the
    Census Bureau. Id.

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 140 of 155

1    themselves called on to interpret the statute, and those interpretations have so

2    regularly become the subject of litigation that a body of law has developed for

3    reviewing those interpretations.

4        When examining an agency's interpretation of a statute, a court must first

5    determine whether "the intent of Congress is clear" as to "the precise question at

6    issue." Regions Hospital v. Shalala, 522 U.S. 448, 457 (1998); Chevron U.S.A. Inc. v.

7    Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). Where the intent

8    of Congress is clear, the agency charged with enforcing the statute must adhere to

9    Congress's mandate. Determining whether Congress has manifested its clear intent

10   through statutory language must be determined by the Court, which performs this task

11   by "employing traditional tools of statutory construction." Chevron, 467 U.S. at 843, n.

12   9. If those methods reveal a clear Congressional intent on the subject at hand, "that is

13   the end of the matter." Id. at 842. The agency has no discretion to deviate from the

14   Congressionally mandated path.

15        On the other hand, if the statute is "silent or ambiguous" with respect to the

16   issue before the Court and Congressional intent is not otherwise ascertainable, the

17   statute has no plain meaning and is the proper subject of construction by the courts

18   and the agency entrusted to enforce it. See, generally, American Water Works Assn. v.

19   EPA, 40 F.3d 1266, 1271 (D.C. Cir. 1994) (citing Chemical Mfrs. Assn. V. National

20   Resources Defense Council, 470 U.S. 116 (1985)). Where the responsible

21   administrative agency has interpreted such statutory language, the Court must

22   determine only whether the agency's actions are consistent with a permissible

23   construction of the statute. Chevron, 467 U.S. at 843. If so, the courts will defer to the

24   agency's construction of the statute that fills a gap or defines a term in a reasonable

25   way in light of the Legislature's design, even if its construction differs from the

26   construction the Court would have given the statute "if the question initially had arisen

27   in a judicial proceeding." Chevron, 467 U.S. at 843, n. 11.

28   //

1    In this case, the question before the Court is whether the agency's decision not

2    to release adjusted data was based on an interpretation of the statute that contravened

3    Congress's clear intent on that subject, and if not, whether it was based on an

4    interpretation that was permissible in light of the overall statutory purpose.  Under the

5    Chevron framework, the Court must first investigate the text, and if necessary, the

6    legislative history, of the Census Act. The purpose of this investigation is to determine

7    whether Congress has mandated the manner in which the Secretary should determine

8    whether or not to release statistically adjusted figures as the official population of the

9    United States.

10   **B. CONGRESSIONAL INTENT**

11   According to the parties, the adjustment decision arises from the interplay of two

12   statutes: 13 U.S.C. §§ 141 and 195. Section 141 requires the Secretary to tabulate

13   total populations for the states, and report that data to the states no later than one year

14   after the census date, April 1, 2000.  The pertinent portion of § 141(a) reads as follows:

15   (a) The Secretary shall, in the year 1980 and every 10 years thereafter,

16   take a decennial census of population as of the first day of April of such

17   year, which date shall be known as the "decennial census date," in such

18   form and content as he may determine, including the use of sampling

19   procedures and special surveys. . . .

20   13 U.S.C. § 141(a).  Section 141(c) describes the Secretary's responsibility for

21   supplying population data to the states for purposes of permitting the legislative

22   reapportionment or re-districting.

23   Section 195, titled "Use of Sampling," reads as follows:

24   Except for the determination of population for purposes of apportionment

25   of Representatives in Congress among the several States, the Secretary

26   shall, if he considers it feasible, authorize the use of the statistical

27   method known as "sampling" in carrying out the provisions of this title.

28   13 U.S.C. § 195.

- 13 -

1    Does the text of either of these statutes, whether read separately or as a pair,

2    reveal Congress' "clear intent" as to the Secretary's obligation to release adjusted

3    census data? Regions Hospital, 522 U.S. at 457. After considering that question, the

4    Court concludes that it must answer in the negative, for three reasons. First, these

5    statutes, particularly § 195, which Plaintiffs contend governs the adjustment decision,

6    is internally inconsistent. Second, to the extent § 195 has the plain meaning Plaintiffs

7    ascribe to it, it is nonsensical. Third, § 195 predates the concept of an adjustment

8    decision, and therefore cannot be said to govern.

9        **1. Section 195 contains internally inconsistent language**

10    The search for a clear statement of Congressional intent commences with the

11    paradoxical wording of §195. At its core, that statute is internally inconsistent

12    because the statute's command contains both mandatory and discretionary language

13    in the following phrase: "the Secretary *shall*, if he *considers* it *feasible,* authorize the

14    use of the statistical method known as 'sampling'. . . ." The language "shall . . .

15    authorize" and "feasible" imply a lack of discretion. "Shall" is a clear mandate, and

16    "feasible," as defined in the Oxford English Dictionary, means "possible." OXFORD

17    ENGLISH DICTIONARY, available at http://dictionary.oed.com (last modified Dec. 4 2000).

18    This inartfully worded statute was probably meant to reveal some preference for

19    sampling, but Plaintiffs' attempt to translate this preference into a mandate, by relying

20    on the term "feasible," is misplaced.

21    Relying on limited case law and a variety of dictionaries, Plaintiffs contend that

22    "feasible" means "capable of being accomplished or brought about." (Memo. p. 10-11

23    (citing American Textile Mfrs. Inst. Inc. v. Donovan, 452 U.S. 490, 508 (1981);

24    WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (1976)).

25    Moreover, under at least some circumstances the use of the term "feasible" in statutory

26    language may preclude the agency charged with enforcement of the statute from

27    considering any factors other than the sheer impossibility of implementation. For

28    example, the Supreme Court held in American Textile, that the Secretary of Labor had

- 14 -

Case 1:01-cv-00082   Document 4   Filed in TXSD on 07/20/2001   Page 143 of 155

1    no discretion to balance the cost to employers of health regulations with the benefits to

2    protected workers when 29 U.S.C. § 655(b)(5) charged the Secretary with drafting

3    regulations to protect health "to the extent feasible." 453 U.S. at 508. In the context of

4    29 U.S.C. § 655, the Supreme Court found that Congress had already balanced costs

5    and benefits, and that the Secretary was required to implement the Congressional

6    mandate unless the "attainment of this benefit [was] unachievable." Id

7        Yet, American Textile offers little help in the present context. The language of

8    §195 is not so simple as that in § 655(b)(5), because the absolute term "feasible" is

9    modified by the phrase "if he considers it." This critical distinction is repeatedly

10    overlooked by Plaintiffs, who construct their entire case around the phrase "if feasible,"

11    a phrase which never appears in the statutes at issue. Instead, the operative phrase is

12    "if he considers it feasible." 13 U.S.C. § 195. Inclusion of the word "considers"

13    attenuates, at least to some extent, the mandatory nature of "shall" and "feasible" —

14    otherwise the phrase would have no meaning at all. That proviso must vest in the

15    Secretary at least some discretion to determine what is and what is not "feasible," if

16    nothing more. The word "feasible" simply cannot be interpreted apart from the grant of

17    some deference to the Secretary to "consider" the feasibility of sampling.

18        Likewise, Plaintiffs' reliance on the Supreme Court's discussion of § 195's

19    history in Department of Commerce is unavailing. 522 U.S. at 316. The Supreme

20    Court noted that Congress amended § 195 in 1976 by removing the phrase, "the

21    Secretary may, where he deems it appropriate, authorize the use of the statistical

22    method known as sampling," and replacing it with "the Secretary shall, if he deems it

23    feasible, authorize the use of the statistical method known as sampling." Id. at 338-39.

24    The Court went on to explain that "the section now requires the Secretary to use

25    statistical sampling in assembling the myriad demographic data that are collected in

26    connection with the decennial census." Id. at 339. Thus, the 1976 amendments to §

27    195 "served a very important purpose: They changed a provision that permitted the

28    use of sampling for purposes other than apportionment into one that required that

- 15 -

Case 1:01-cv-00082  Document 4   Filed in TXSD on 07/20/2001   Page 144 of 155

1    sampling be used for such purposes if 'feasible.'" Id. at 341.

2    Although at first blush this discussion might appear telling, the Court finds it

3    inapposite for two reasons. First, while the Supreme Court observed that the use of

4    sampling is mandated in "collecting and assembling" a myriad of data, it never stated

5    that statistically adjusted data so collected must be *released* by the Secretary, even if

6    the adjusted data improved accuracy. Second, the Supreme Court's inclusion of the

7    word "feasible" at the end of its discussion without defining it brings the analysis full

8    circle — what does "feasible" mean and how does its meaning bear on the issue

9    before this Court? The Supreme Court does not answer those questions.

10   Thus, the Court is confronted with a statute that contains both mandatory and

11   discretionary language, with no controlling authority that resolves the internal conflict.

12   Although the Court cannot say what these words mean, the Court can and does

13   conclude that § 195 fails to reflect the clear intent of Congress on the issue before the

14   Court.

15   **2. Plaintiffs' plain meaning argument is inconsistent with the fundamental**

16   **objective of the Census Act**

17   Ignoring for the moment the qualifying language "if he considers it," as Plaintiffs

18   do, the Court notes that Plaintiffs' proposed plain meaning of the statute leads to

19   absurd results, even if Plaintiff's construction could be described as literally plausible.

20   Plaintiffs imply that Congress's use of the term "feasible" shows such a strong

21   preference for sampling that Congress has concluded that sampling always improves

22   accuracy.  Therefore, Congress left the Secretary only enough authority to determine

23   whether sampling is "operationally" possible, but nothing else. Yet, Plaintiffs offer

24   nothing to support such an extreme interpretation of the statute, which would bar the

25   Secretary from assessing the accuracy of statistically sampled data.

26   Yet, even Plaintiffs retreat from this extreme interpretation. Thus, Plaintiffs'

27   concede that "it is true, however, that in certain circumstances, 'feasibility' may be

28   analyzed in light of statutory purposes," perhaps recognizing that imputing such an

1   intent to Congress contradicts the fundamental objective of the census. (Memo. p.13.)

2   It is a grudging retreat however, and is tempered by Plaintiffs' assertion that any

3   consideration of accuracy in making the adjustment decision must afford deference to

4   "the very existence of the statute" containing that term. (Id.) Clarifying that murky

5   observation, Plaintiffs assert that "it must be at least presumed that sampling is to be

6   used unless the adjusted data are shown to be less accurate than the unadjusted

7   data." (Id.) Thus, plaintiffs in substance argue that Congress has shown a strong

8   preference for the use of statistically adjusted data, and that the Secretary must use

9   such data unless he proves the adjusted data less accurate than the headcount.

10   Such a concession reveals that Plaintiffs lack confidence in the strict textual

11   interpretation they put before the Court. Instead, they set up a hyperbolic straw man —

12   the plain meaning of "feasible" — so that their retreat from it will make their final stance

13   — that the A.C.E. should be presumed accurate — appear more reasonable. Although

14   the shift in Plaintiffs' argument seems abrupt and contradictory, it is essential to the

15   preservation of their position's credibility.

16   Plaintiffs must make this concession, because the literal reading of § 195 they

17   put forward would lead to an absurd result. If "feasible" means nothing more than

18   operational feasibility — i.e., physically possibility — then the statute, literally read,

19   strips the Secretary of all ability to consider the accuracy of an adjusted census figure,

20   even if all evidence indicates that the adjustment process developed flawed data.

21   Under such circumstances, the strict reading initially offered by Plaintiffs would require

22   release of a population count that was universally regarded as grossly inaccurate.

23   Reading the statute in this way defeats the purpose of the Census Act in general and

24   the specific purpose behind Congress's encouragement of the use of statistical

25   methods.

26   **3. Historical evidence undermines plaintiffs' construction**

27   On the other side of this dispute, Defendants offer historical evidence and

28   legislative history in support of their claim that the statute is actually silent on the issue

- 17 -

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 146 of 155

1   before this Court. As an initial matter, the Court notes that neither § 141, nor § 195,

2   indicate that the Secretary must adjust the final census when making the adjustment

3   decision. Additionally, Defendants note that § 195 was adopted in 1957, and amended

4   in 1976, before serious consideration was given to adjusting the decennial census.

5   (Defendant's Memo. p. 11.) Thus, § 195 was originally drafted to authorize the

6   Secretary to use sampling in accumulating supplementary demographic data. The

7   Court notes that a letter from the Secretary of Commerce, when the legislation was

8   first proposed (and ultimately enacted) in 1957, made the following observation:

9           Experience has shown that some of the information which is desired in

10          connection with a census could be secured efficiently through a sample

11          survey which is conducted concurrently with the complete enumeration of

12          other items; that in some instances a portion of the universe to be

13          included might be efficiently covered on a sample rather than a complete

14          enumeration basis . . . .

15  While the Court questions Defendants' limited interpretation of § 195, the evidence

16  presented suggests that Congress did not have, and in fact could not have had, the

17  present issue in mind when the legislation was written, which is further evidence that

18  Plaintiffs' attempt to construct a Congressional intent on this issue is in vain.

19          **4. Congress expressed no intent on the issue before the Court**

20          In sum, three flaws in § 195 prevent it from revealing a clear Congressional

21  intent. First, it combines mandatory language with the language of discretion, in a

22  combination that resists explication. The Court cannot say what this combination of

23  words means, although they do not appear to say anything about census accuracy or

24  adjustment. Second, notwithstanding Plaintiffs' initial arguments to the contrary, neither

25  party actually contends that the Secretary is without any discretion to consider

26  accuracy, because even after ignoring the internal inconsistency of the statute, such a

27  reading would render it absurd. Third, the Court has found no legislative history or

28  case authority that speaks to the question of the adjustment decision. Likewise, on its

1   face, §195 says nothing about presumptions and burdens of proof in the adjustment

2   decision that are the true bone of contention between the parties here. For these

3   reasons, the Court concludes that Congress has not expressed a clear legislative

4   intent on the specific issue before this Court, which therefore places the case squarely

5   within the scope of Chevron and Regions Hospital.

6   **C. THE SECRETARY'S CONSTRUCTION IS ENTITLED TO DEFERENCE IF REASONABLE**

7       Under Chevron and Regions Hospital an agency's construction of a statute is

8   entitled to deference so long as it is reasonable, in view of the overall purposes of the

9   Census Act. Regions Hospital, 522 U.S. at 457, Chevron, 467 U.S. at 842. Under

10   Chevron the Court must defer only to the agencies' construction of the Census Act, not

11   to ESCAP's finding of the existence or severity of error in the A.C.E. Presumably, the

12   existence and severity of error are factual questions that could be challenged with

13   appropriate expert testimony. See, e.g., City of New York 822 F. Supp. at 911. But

14   here Plaintiffs do not challenge ESCAP's findings that the DA and the A.C.E. diverge,

15   and that synthetic error and balancing error explain that divergence.

16       Instead, Plaintiffs challenge the Recommendation ESCAP reached after making

17   these factual findings. Accordingly, three aspects of the agencies' construction of the

18   Census act require examination. First, the Census Bureau has determined that the

19   Census Act allows consideration of accuracy when making the adjustment decision.

20   Second, the Census Bureau has determined that in making the accuracy

21   determination, it should consider (1) the conduct of key A.C.E. operations and (2) the

22   consistency of A.C.E. data with DA, and reject the adjusted data if strong evidence so

23   indicates. Third, ESCAP determined that this standard compels the release of the

24   unadjusted data from Census 2000, given the apparent flaws in the A.C.E. Each of

25   these aspects of the Secretary's construction must be evaluated below.

26     **1. Consideration of accuracy**

27       This component of the Secretary's construction hardly requires enunciation, and

28   in fact all parties concur that accuracy should be a component of the adjustment

1   decision. In addition, Congress recently foreclosed any question regarding its

2   intentions on the subject of census accuracy in a funding bill which contained findings

3   regarding the decennial census. Therein Congress stated the obvious: "it is essential

4   that the decennial enumeration of the population be as accurate as possible,

5   consistent with the Constitution and the Laws of the United States." P.L. 105-119, title

6   II, § 209(a)(6)-(7), 111 stat. 2480 (Nov. 26 1997). In that same bill, Congress made the

7   following observation regarding sampling:

8           [T]he use of statistical sampling or statistical adjustment in conjunction

9           with an actual enumeration to carry out the census with respect to any

10          segment of the population poses the risk of an inaccurate, invalid, and

11          unconstitutional census . . . .

12  Thus, at least in connection with the appropriation of funds to conduct Census 2000,

13  Congress clearly stated that the primary objective of the census is to obtain an

14  accurate count, and expressed its skepticism over the degree of accuracy obtained

15  from statistical sampling. In view of these statements, the Court concludes that the

16  Secretary's construction of the Census Act permitting him to consider accuracy in

17  making the adjustment decision is reasonable, and therefore entitled to deference

18  under Chevron.[4]

19      **2. The standard for making the accuracy determination**

20          As described above, Plaintiffs attack ESCAP's ultimate recommendation and

21  the Secretary's decision to accept that recommendation. That is, Plaintiffs challenge

22

23          [4]See also § 181 of the Census Act, which directs the Secretary to use sampling to the

24  extent he "determines [it] will produce current, comprehensive and *reliable* data" in connection with
    the publication of annual census data. 13 U.S.C. § 181(a) (emphasis added). This language

25  demonstrates Congress' desire that data produced and released by the Department of Commerce
    be reliable, i.e., accurate. Although one might argue that the inclusion of the term "reliable" in the

26  statute governing the publication of data in the years between the decennial census, while omitting
    it from § 195, demonstrates that Congress had no interest in assuring that the decennial census

27  be accurate, such an argument is robbed of its persuasive power by the fact that § 195 was drafted
    before the enactment of § 181. Thus, § 181 reveals that Congress considered the paramount

28  importance of accuracy to be so self-evident that it need not emphasize the point in statutory
    language enacted in 1957.

1   the standard applied by ESCAP to its findings, but not ESCAP's findings themselves.

2   Accordingly, the Court must decide whether the legal standard devised by the Census

3   Bureau is consistent with a permissible interpretation of the statute. If so, then the

4   standard is entitled to deference, and the Court must turn to ESCAP's application of

5   that standard.

6          The legal standard is found in the Feasibility Report. (Currey Dec. Ex. O).

7   Therein, the Census Bureau indicated that it "will not . . . release corrected redistricting

8   data until it has brought its technical judgment to bear in assessing the available data

9   to verify that its expectations have been met." (Id. at 51). In doing so, the Census

10  Bureau held that it must "assess whether the A.C.E. measurements of undercount are

11  consistent with historical patterns of undercount and independent Demographic

12  Analysis benchmarks, and review measures of quality." (Id. at 51). Thus, the Census

13  Bureau decided that it will make the adjustment decision based upon the following

14  criteria: "(1) the conduct of key operations, (2) consistency of the A.C.E. results with

15  historical measures of undercount, and (3) measures of quality." (Id. at 32). If "strong

16  evidence" is presented that reveals a flaw in the A.C.E., then ESCAP would

17  recommend against releasing adjusted data. (Id.) Plaintiffs concede that this is a

18  proper standard, and largely focus their attention on ESCAP's application of this

19  standard, to which the Court now turns.

20         **3. Application of the appropriate standard**

21         **a. ESCAP's application of the standard**

22         Turning to the application of this standard to the findings of ESCAP, the Court

23  reiterates that ESCAP's principal concern with the A.C.E. data was that demographic

24  analysis revealed an **overcount** in the initial enumeration. Further, ESCAP could not

25  explain this historically unprecedented divergence through the anticipated margin of

26  error in the demographic analysis. Noting that the DA's calculation of undocumented

27  immigration, although based on immigration patterns established in the 1990's, was

28  impossible to verify, ESCAP doubled its undocumented immigration estimate, thus

Case 1:01-cv-00082  Document 4  Filed in TXSD on 07/20/2001  Page 150 of 155

1   establishing an upper limit of possible immigration. Nevertheless, the modified DA

2   revealed an undercount of only 0.3%, drastically less than the undercount revealed by

3   the A.C.E.

4        Although these results could be explained by an error in the DA, a proposition

5   Plaintiffs urge the Court to adopt as true, Plaintiffs offer no evidence to support that

6   contention. What's more, that explanation, while plausible, is not the only plausible

7   explanation. Rather, ESCAP noted that the diverging data sets could reveal an as-yet

8   undiscovered problem in the A.C.E., or could be caused by two types of errors in the

9   A.C.E. methodology. (Recommendation, p. ii).

10       The first potential methodological error is referred to as "synthetic error." During

11  the recapture phase, discussed above, the Census Bureau conducts intense sampling

12  of post-strata. A key assumption underlying the recapture phase is that the probability

13  of undercounting certain types of individuals is uniform throughout the country. If this

14  assumption is erroneous, then the A.C.E. will contain synthetic error. As a matter of

15  logic, such an assumption is unverifiable through statistical methods, and even to

16  estimate it would "require more sample observations for the A.C.E. than practicable."

17  (Recommendation, p. 22). Through use of complex computer models, however,

18  ESCAP determined that synthetic error could arise in certain circumstances, leading to

19  an A.C.E. that overcorrects for certain population segments by as much as 58%.

20  Although such circumstances are unlikely, ESCAP noted that even with a

21  "conservative view" the impact of synthetic error must be fully understood before

22  recommending adjustment. (Recommendation, p. 22).

23       Second, ESCAP noted that it is certain balancing error occurred, although it is

24  not clear on the scope thereof. (Recommendation, p. 24). "This error could introduce

25  an upward bias in the" A.C.E., and combined with synthetic error, it could have the

26  effect of increasing the differential between the A.C.E. data and the headcount.

27  (Recommendation, 25).

28       Remedying these two errors would bring the A.C.E. data more in line with the

- 22 -

1    DA data. Id. Accordingly, ESCAP found that both "the conduct of key operations" and

2    the "consistency of the A.C.E. results with historical measures of undercount" dictate

3    that only unadjusted data should be released. (Recommendation, i-ii).

4        Since Plaintiffs concede that the standard laid out in the Feasibility Report is the

5    proper measure of the accuracy of the A.C.E., Plaintiffs invite the Court to find that

6    ESCAP misapplied this standard. In other words, Plaintiffs contend that the concerns

7    identified are of insufficient caliber to support ESCAP's Recommendation, because

8    they fail to amount to strong evidence in favor of the unadjusted numbers.

9        ***b. Plaintiffs' argument that the standard was misapplied***

10       The thrust of Plaintiff's argument proceeds as follows: when ESCAP stated that

11   "the majority of evidence indicates . . . the superior accuracy of the adjusted numbers,"

12   (Recommendation p. i), that statement ends the inquiry, because it forecloses the

13   possibility of "strong evidence" against adjustment. In other words, any additional

14   reservations ESCAP identifies must be inconsequential, and therefore ignored, and

15   accordingly the adjusted data must be released, or so the argument goes.

16       Yet, Plaintiffs mischaracterize the ESCAP report. First, although the Committee

17   did indicate that the A.C.E. was of high quality, it also indicated that after spending

18   "many weeks examining the voluminous evidence relating to the accuracy of Census

19   2000, . . . it was unable to conclude . . . that the adjusted Census 2000 data are more

20   accurate for redistricting." (Recommendation, p. i).

21       Additionally, when the context of the Recommendation is considered, it is clear

22   that ESCAP drafted its report with the goal of fairly laying out the costs and benefits of

23   using adjusted data to educate the Secretary, but to do so in a way that did not

24   denigrate their own staff's hard work. ESCAP's recommendation should not be viewed

25   as an inartful or self-contradictory piece of advocacy. Rather, it should be viewed more

26   as an objective memorandum with a conclusion appended thereto. In such a setting, it

27   is the conclusion, and not the consideration of alternative positions preceding it, that

28   should be given more weight.

- 23 -

Case 1:01-cv-00082　Document 4　Filed in TXSD on 07/20/2001　Page 152 of 155

1    Furthermore, ESCAP expressly noted that the conduct of key operations and an

2    inconsistency between A.C.E. and DA should inform ESCAP's final recommendation. It

3    is undisputed that balancing error occurred, although its extent is unknown, and it is

4    equally undisputed that the DA and the A.C.E. diverge sharply from one another. This

5    undisputed evidence would certainly satisfy any reasonable definition of "strong

6    evidence."

7    Moreover, the Court does not adopt the interpretation of strong evidence offered

8    by Plaintiffs. The meaning of strong evidence should not be gauged by comparison to

9    legally derived standards of proof, such as "beyond a reasonable doubt," "clear and

10   convincing evidence" or "preponderance of the evidence." Instead, the context

11   surrounding the Feasibility Report should be taken into account. The Report was

12   meant to be a preliminary determination that the A.C.E. would improve census data.

13   Strong evidence in that context was meant to mean the sort of evidence that would

14   give professionals in the field pause before recommending substitution of adjusted

15   data for unadjusted data. On the record before the Court, that standard was certainly

16   met here.

17       ***c. Plaintiffs' arguments are unavailing***

18   In short, Plaintiffs concede that the Feasibility Report lays out the appropriate

19   standard by which the adjustment decision should be made, and they concede that the

20   errors identified by ESCAP exist. Thus, Plaintiffs argue that ESCAP had no strong

21   evidence to support their unanimous conclusion, and therefore it failed to meet its

22   burden of proof. However, to reach that conclusion, Plaintiffs must construct a strict

23   evidentiary standard atop the non-legal phrase "strong evidence," a superstructure it

24   cannot withstand. Accordingly, the Secretary's construction and application of the

25   Census Act were reasonable.

26       **3. Summary**

27   Since the Secretary's construction of the Census Act is reasonable and his

28   application of that construction to the facts at hand is proper, the Court is obligated to

- 24 -

CutePDF - www.hsmio.com

1  give it deference. This deference does not yield to ESCAP's conclusion that these

2  concerns exist — presumably Plaintiffs could, if they were so inclined, demonstrate

3  with expert testimony that the DA and ESCAP are in harmony, and that neither

4  sampling nor balancing error occurred. Rather, the Court, under Chevron, must defer

5  to the Secretary's determination that accuracy should inform the adjustment decision

6  and the adjusted data should not be used if (a) its key operations are flawed and (b) it

7  is inconsistent with the DA. Further, the Court finds ESCAP's application of this

8  standard reasonable, because ESCAP's finding that adjusted data was plagued by

9  synthetic error and balancing error which apparently caused a noted inconsistency with

10  DA data, amounted to strong evidence that the A.C.E. does not improve the accuracy

11  of the Census.

12                              IV.

13                          CONCLUSION

14        Congress has never expressed its clear intent regarding the issue before the

15  Court.  Therefore, the Secretary's decision should be given deference under Chevron

16  and Regions Hospital so long as he has reasonable interpreted the governing statute.

17  For the reasons stated in this memorandum, the Court concludes that Secretary of

18  Commerce Donald Evans' decision to release the unadjusted headcount data was

19  consistent with a permissible interpretation of the Census Act.  Accordingly, the Court

20  refuses to overturn the Secretary's decision to release the unadjusted headcount as

21  the official United States census.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

                              - 25 -

1    The case is ordered **DISMISSED** and **JUDGMENT** entered in favor of

2  Defendants.

3

4    IT IS SO ORDERED.

5

6  DATED: April 25, 2001

7

8    _____

9    Judge Gary Allen Feess
   United States District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 26 -

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

CLERK, U.S. DISTRICT COURT
FILED
APR 25 2001
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED
CLERK, U S DISTRICT COURT
APR 26 2001
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
JS-2/JS-3 _____
Scan Only _____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| CITY OF LOS ANGELES, et al. | NO. CV 01-1671 (GAF)(MCx) |
|---|---|
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' REQUEST FOR PERMANENT INJUNCTION AND DISMISSING ACTION** |
| v. | |
| DONALD EVANS, SECRETARY OF THE DEPARTMENT OF COMMERCE, et al. | |
| Defendants. | |

—— Docketed
—— Copies / NTC Sent
—— JS - 5 / JS - 6
—— JS - 2 / JS - 3
—— CLSD

I.

**INTRODUCTION AND SUMMARY**

Every decade, the United States Department of Commerce, through the Census Bureau, counts the nation's population, and then measures the accuracy of that "headcount" by comparing it to two alternate estimates of the population: one derived from statistical sampling and the other from records of demographic data, such as births and deaths. Through this comparison, the Census Bureau learned that Census 2000, albeit the most accurate census ever, was not perfect. As in years past, the statistical sampling revealed an **undercount** of the nation's population. However, for the first time in Census history, the demographic data contradicted the sampling results and revealed an **overcount**. The professional staff of the Census Bureau investigated the cause of this divergence, and determined that it could be explained by

31