United States District Court
Southern District of Texas
FILED

SEP 1 0 2001

Michael N. Milby
Clerk of Court

'ORIGINAL

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| CAMERON COUNTY, TEXAS, HIDALGO COUNTY, TEXAS et. al. | |
| Plaintiffs, | Case No: B-01-082 |
| v. | |
| DONALD EVANS, SECRETARY OF THE DEPARTMENT OF COMMERCE, in his official capacity; and UNITED STATES DEPARTMENT OF COMMERCE, | |
| Defendants. | |

### Plaintiffs' Memorandum In Opposition to Defendants' Motions to Dismiss

## I. INTRODUCTION

Plaintiffs filed this action on May 10, 2001 challenging the accuracy of the 2000 Census population counts for Hidalgo and Cameron Counties and the included cities. Plaintiffs ask this Court to issue a declaratory judgment finding that the census numbers were inaccurate and that the adjusted census numbers (adjusted to more accurately count minorities) or more accurate data developed in this proceeding, are the official population numbers for named Plaintiffs.

Defendants Donald Evans *et. al.* have moved for dismissal, or in the alternative for summary judgment, of this case for lack of ripeness and standing, and that some of the issues raised are moot. Dismissal of this case is not warranted because this Court can and must exercise jurisdiction over the claims brought by Plaintiffs; indeed, this Court is the only avenue available to remedy the harm being perpetrated upon the Plaintiffs.

## II. FACTUAL BACKGROUND

A.    The 2000 Census

The Defendants are constitutionally charged with performing an "actual enumeration" of the people of the United States every ten years. See U.S. Const. Art. 1, § 2. cl. 3 and the Census Act, 13 U.S.C. § 1 *et seq.*   Although the Framers envisioned that the census would count the population every ten years for reapportionment of the House of Representatives, the modern census is used for a "galaxy" of secondary purposes. *City of New York v. United States Department of Commerce*, 822 F. Supp. 906, 911 (1993) *rev'd* 34 F. 3d 1114 (1994). One such secondary purpose is of concern to Plaintiffs here: federal and state agencies use the census data for distributing federal funds. Because of the methodology employed in conducting the 2000 Census, as has occurred every census in recent history, the Defendants undercounted the Hispanic population in higher proportions than other racial/ethnic groups.   Since many federal funding programs are based on census population data, the undercount will result in the unfair loss of federal funds to Plaintiffs.

Indeed, statistical evidence developed in connection with the 1980 and 1990 Censuses indicate that racial and ethnic minorities, renters and children were undercounted to a greater degree than the population as a whole. *Department of Commerce*, 525 U.S. at 322; *City of New York*, 822 F. Supp. at 911. "Because the counts are used to calculate. ... financial aid to be afforded to a given area, the fear that the census may be perpetuating a system in which those most in need of ... aid are deprived ...is a major concern." *City New York*, 822 F. Supp. at 911.

### III. LEGAL STANDARD

Motion to Dismiss Standard of Review:

The standard of review on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is well-settled. The Defendant as mover bears the burden of showing that the Plaintiffs can prove no set of facts consistent with the allegations in the complaint which would entitle it to relief. *Baton Rouge Building and Construction Trades Council AFL-CIO v. Jacobs Constructors, Inc.*, 804 F. 2d 879, 881

2

CVisPDF - www.fasioo.com

(5th Cir. 1986), citing *Hishon v. King & Spalding*, 467 U.S. 69, 104 S. Ct. 2229, 2233, 81 L.Ed. 2d 59 (1984). The purpose of a Rule 12 (b)(6) motion is to test the sufficiency of the complaint not to decide the merits of the case, even if it "appear[s] on the face of the pleadings that a recovery is very remote and unlikely." *Scheur v Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974). The Court must accept all well-pleaded factual allegations in the complaint as true and view the allegations in the light most favorable to the non-moving party. *American Waste & Pollution Control Company, Inc. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991). Motion to dismiss for failure to state a claim are viewed with disfavor and rarely granted. *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir. 1988).

## IV. ARGUMENT

Ripeness and standing

The Defendants assert that this case is not ripe because the undercount data "may be released in the future." It is telling, however, that the Defendants do not deny that there is an undercount, that the undercounts data exists, and that they have refused to release it. Further, Defendants claim that Plaintiffs lack standing because "they have not claimed that they would increase population share such that they could claim a larger portion of federal or state funding" (Defendants Motion, pp. 1).

Plaintiffs' case is ripe because it presents a live controversy between the parties and the threatened harm to Plaintiffs is neither remote nor speculative. The Defendants refused to release the undercount data after the census data became available April 1, 2001 and they have again refused to release the data recently by denying a formal request made by the Plaintiffs.[1] Presently, Plaintiffs must use the unadjusted census counts as the official population figures for various federal and state funding

---

[1] On July 16, 2001, the Defendants refused to release the adjusted census numbers that were requested by the Plaintiffs pursuant to the Freedom of Information Act (FOIA). This cause of action was added in our Amended Complaint that was filed on August 24, 2001. The Defendants filed their motion to dismiss before the Amended Complaint was filed and have, therefore, not had the opportunity to respond to the FOIA claim.

programs that are based on population. Exhibit 1 is an affidavit executed by Mr. Frank Bejarano who is the Director of the Cameron County Program Development & Management Department. Mr. Bejarano has knowledge of the loss of funds experienced by Cameron County because of Defendants actions.

Plaintiffs are suffering harm because of Defendants actions.[2]   Federal funding programs are ongoing and result in the present loss of funds. Simply because the Defendants at some time in the "future" may release the data does not negate the present existence of a controversy.   A suit is ripe when the "positions of the parties [are] sufficiently crystallized" to create a case or controversy. *State of Arizona v. Atchison, T.&S. F. R. Co.*, 656 F.2d 398, 403 (9th Cir. 1981). In this case, the Defendants have refused to release the adjusted census data and the Plaintiffs are suffering because of that decision.[3]

The Supreme Court has explained, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Railroad Reorganization Act Cases*, 419 U.S. 102, 141, 95 S.Ct. 335, 358, quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, (1923). *See also, Babbitt v. United Farm Workers National Union* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308 (1979); *Martin Tractor Co. V. Federal Election Commission*, 627 F.2d 375, 379 (D.C. Cir. 1980), *cert. denied sub nom. National Chamber Alliance for Politics v.*

---

[2] The defendants also raise a standing argument when they assert that the plaintiffs failed to claim that their "relative population shares would increase such that they would be eligible for additional funding. "As compared to standing, ripeness assumes that an asserted injury is sufficient to support standing, but asks whether the injury is too contingent or remote to support present adjudication." 13A C.Wright, A. Miller & E. Cooper, Federal Practice and Procedure, §3532.1 at 130. "[R]ipeness . . ., indeed, could be seen as providing time-bound perspective[] on the injury inquiry of standing." 13 C.Wright, A. Miller & E. Cooper, Federal Practice and Procedure, §3531 at 350.

[3]Attached as Exhibit 2 is a letter signed by over 50 congressmen expressing concern over the financial impact the use of unadjusted data will have on the "more than $185 billion per year in population-based federal grant funds. " Exhibit 2 page 2.

*Federal Election Commission*, 449 U.S. 954, 101 S.Ct. 360 (1980)("If the injury be a future one, the occurrence of the injury must be reasonably certain and clearly discernable for the action to be deemed 'ripe.'").

On the issue of standing, attached as Exhibit 3 is a report that was just released by the United States Census Monitoring Board[4] crystalizing the damage caused by the Defendants. The Report documents the expected loss of federal funds to governmental entities, including one of the named Plaintiffs in this case, resulting from the 2000 undercount (because of the significance of this Report, we have included a complete copy for the Court's convenience.). The Report, prepared by PricewaterhouseCooper, projects the loss of as much as $3.6 Billion in federal funds for 58 counties. It examines eight (8) Federal Formula Grant Programs that include Medicaid, Foster Care, Rehabilitation Services Basic Support, Child Care and Development Block Grant, Social Services Block Grant, Substance Abuse Prevention and Treatment Block Grant, Adoption Assistance, and Vocational Education Basic Grants.(Exh. 3 at page ES-3). These Programs are of particular importance to Cameron and Hidalgo Counties because of the high concentration of Hispanics.

The study looks at 31 states to measure the impact the undercount will have on these areas:

"Inaccuracies in the census can cause federal funds to be distributed in a way that is not fully consistent with congressional intent, ...The undercount not only misallocates funds among jurisdictions, it also causes a net loss to the states of funds from federal entitlement programs. Compounding the problem, many state-funded grant programs to localities also rely on census counts." (Exh. 3 at page 1)

The Study concludes that: "these findings present the most compelling evidence of the potential harm caused by the 2000 census undercount, ...The undercount will cost state and local governments billions of dollars in funds that are earmarked for programs that largely serve our nation's most disadvantaged." (Exh. 3 at page 1) Indeed, the Census Monitoring Board ranks Hidalgo County with

---

[4] The U.S Census Monitoring Board is a bi-partisian Presidential Commission created to monitor the 2000 United States Census.

the second highest percentage undercount in the country (Exh. 3 at page 6).  This translates into an expected loss of $41.7 million in federal funds over the next ten years.  At trial we expect to show that these estimated undercounts are real and that the number of persons missed by the census may be higher in Cameron and Hidalgo Counties  than the Pricewaterhouse estimates.

Further, courts have recognized the legal standing of undercounted areas to assert legal claims, *Department of Commerce*, 525 U.S. at 322; *City of New York*, 822 F. Supp. at 911.

Plaintiffs' § 195 Statutory Claim:

Plaintiffs allege that the Defendant violated § 195 by  not releasing the adjusted census even though release of the data was "feasible".  The Defendant attempts to dismiss our statutory claim by citing *City of Los Angeles, et. al. v Evans, et. al.*, CA No. 01-1671 (C.D. Cal.) as dispositive of our claim in this case.  The Defendants are misinterpreting and misapplying  that decision.

In *City of Los Angeles,* the Plaintiffs were seeking the release of the adjusted  population data so that it could be used for redistricting purposes.  It was a case with national implications directed at using the adjusted census numbers for redistricting nationally.  The decision in that case was made within that context of national  redistricting   not  federal funding.  This distinction is critical because data used for redistricting require accuracy at the block, and block group levels  whereas federal  funding formulas use  data at the county or state wide levels.  Each use  requiring different degrees of accuracy.  Indeed, the Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy ( Def. Exh. 4) focuses on the distinction:

1. Under what the Committee considered reasonable assumptions, state, congressional district, and county level analysis showed a marked improvement for adjustment...

3. The analysis of accuracy for counties with populations below 100,00 people indicate that the unadjusted census was more accurate. (Def. Exh. 4 at page iii)

The reasons  for  not  releasing  adjusted  census  data  for redistricting purposes  simply do not exist for data to be used for federal funding programs.  When the Census Bureau's Executive Steering

6

Committee for Accuracy and Coverage Evaluation Policy recommended the use of unadjusted data for redistricting, they specifically found that "The majority of the evidence indicates ... the superior accuracy of the adjusted numbers."[5] The committee also found that "[q]uality measures indicate the adjusted data are more accurate overall"[6]; however, because of concerns for accuracy of data in local areas, areas with population of less than 100,000, led to the decision to not release the adjusted data.

The case at bar is limited in scope; we are focused on two counties without any redistricting implications. Plaintiffs simply seek the adjusted data so they can determine their true population and obtain the federal funding to which they are entitled.

Also, the District Court in the *City of Los Angeles* Case was wrong when it refused to recognize that Congress limited the discretion of Secretary Evans. In 1976, Congress amended § 195 by removing the phrase, "the Secretary may, where he deems it appropriate, authorize use of the statistical method known as sampling," and replacing it with "the Secretary shall, if he deems it feasible, authorize the use of the statistical method known as sampling." In considering this specific language, the Supreme Court stated "the section now *requires* the Secretary to use statistical sampling in assembling the myriad demographic data that are collected in connection with the decennial census." *Department of Commerce*, 525 U.S. at 316. Therefore, the 1976 amendments to § 195 "served a very important purpose: They changed a provision that permitted the use of sampling for purposes other that apportionment into one that *required* that sampling be used for such purposes if 'feasible.' " *Id.* At 341.

Since this case is restricted to the use of the adjusted data for federal funding purposes, for the above stated reasons, the district court decision in the *City of Los Angeles* case is of limited value to the Defendants.

---

[5]Report of Tabulations of Population to States and Localities Pursuant to Title 13 U.S.C., Section 141(c), and Availability of Other Population Information; the Executive Steering Committee for Accuracy and Coverage Evaluation Policy (ESCAP) Report; and the Census Bureau Director's Recommendation; Notice, 66 Fed. Reg. 14005 (2001) (emphasis added).

[6]*Id* at 14006

CUtePDF - www.fineva.com

B.    Plaintiffs Equal Protection Claim

Defendants also ask  this Court to dismiss Plaintiffs' equal protection claim.  Defendants essentially argue that Plaintiffs have failed to allege intentional discrimination on the part of Defendants and therefore lack an essential element of their claim ( Defendants' Motion to Dismiss, pp.22-24).  Yet, it is well settled that intentional discrimination may be proven from a review of circumstantial evidence as well as direct evidence of intent. *Village of Arlington Heights v. Metropolitan Housing Development Corp.* 429 U.S. 252, 266-68 (1977).  Among the factors that a court may consider in evaluating a claim of intentional discrimination are: (1) the impact on the minority community of the challenged governmental action; (2) whether a pattern of events actions exists that are unexplainable on grounds other than race; (3) the historical background of the action; (4) the sequence of events leading to the decision; and (5) any departure from normal or previous procedures. *Id.*  These of course are not an exhaustive or even an exclusive list of the factors a court may consider in determining whether Plaintiffs have made a claim of invidious discrimination. *Id.*

Plaintiffs here have alleged sufficient facts within the context of the *Arlington Heights* framework to show intentional discrimination.  Plaintiffs have detailed the adverse effect the failure to adjust the inaccurate 2000 census will have on the Plaintiff jurisdictions and on the Mexican American community of Hidalgo and Cameron County, Texas  ( Plaintiffs' First Amended Complaint, paragraphs 4-43, 54, 59, and 60).  Moreover, Plaintiffs have alleged facts regarding the historical background of the challenged decision and the historical effects of the undercount on the Mexican American community (See Plaintiffs' First Amended Complaint, paragraphs 4-42).  Plaintiffs have also detailed the sequence of events and the departure from prior rules that suggest an improper motive in the decision to let the discriminatory unadjusted census data stand.  (See Plaintiffs' First Amended Complaint, paragraphs 46-50).  Finally, Plaintiffs have detailed facts showing an apparent inconsistency between the decision of the Defendants and the Congressional mandate to adjust the census data when feasible (See: Plaintiffs'

8

First Amended Complaint, paragraphs 51-55). These facts, taken together show that Defendants knew and intended the disparate effect on Plaintiff jurisdictions and on the Mexican American community that result from their decision not to correct for the undercount of minority residents in the 2000 Census.

Clearly, Plaintiffs have pled sufficient facts to support a claim of intentional discrimination in violation of Plaintiffs equal protection constitutional guarantees.

C.     Freedom of Information Act Claim

As mentioned above, Plaintiffs have asserted a FOIA cause of action in the Amended Complaint because of the Defendants refusal to release the adjusted population figures.   The Defendants refusal is based on the "deliberative" exemption to the FOIA – Exemption 5. (See Exhibit 4).

FOIA   requires that government agencies disclose to the public any requested documents. 5 U.S.C. § 552(a).  The agency may avoid  disclosure only if it proves that the documents fall within one of nine enumerated exemptions.  5 U.S.C. § 552(b)(1)-(9).  FOIA's purpose is to encourage disclosure, and to that end, its exemptions are to be interpreted narrowly. *Department of Justice v. Julian*, 486 U.S. 1, 8, 108  S. Ct. 1606, 1611, 100 l. Ed. 2d 1 (1988); *Department of the Air Force v. Rose*,  425 U.S. 352, 360-61, 96 S. Ct. 1592, 1599, 48 l. Ed. 2d 11 (1976).  The government has the burden to prove that a requested document  falls within one of FOIA's exemptions.  5 U.S.C. § 552 (a)(3).

In *Assembly of the State of California, et al. v United States Department of Commerce*, 968 F. 2d 916 at 920, the  9th Circuit stated:

> Exemption 5 cases contrast agency documents leading to a decision with documents explaining or interpreting the decision after the fact.  Because an agency's interpretations of its decisions often become the "working law' of the agency, documents deemed "postdecisional' do not enjoy the protection of the deliberative process privilege. *NLRB v. Sears*, 421 U.S. at 153, 95 S. Ct. at 1517.  This insures that the agency does not operate on the basis of "secret law." *Coastal States,* 617 F. 2d. At 866.

The 9th Circuit went on to agree with the district court that the adjusted census numbers were factual data and in no way divulged  the reasoning process through which the data was derived or in any

9

way explains any recommendation or decision not to adjust the census. *Id.* at 922. The Census Bureau was required to release the data.

## V. CONCLUSION

For all of the above reasons, this Court should not dismiss this case and allow these Plaintiffs to bring before this Court the trial on the merits of their claims.

Dated: September 7, 2001

Respectfully Submitted

ROLANDO L. RIOS
SBN: 16935900 FBN: 14370
GEORGE KORBEL
LAW OFFICE OF ROLANDO L. RIOS
MILAM BUILDING
115 East Travis, Suite 1024
San Antonio, Texas 78205
(210) 222-2102
(210) 222-2898 fax
rios@world-net.net

JOSE GARZA
SBN: 07731950
FBN: 1959
1913 Fordham
McAllen, Texas 78504
(956)928-0088
garzpalm@aol.com

ATTORNEYS IN CHARGE FOR PLAINTIFFS

C. DOUGLAS WRIGHT
SBN: 22024100 FBN: 15516
RICHARD O. BURST
SBN: 00785586 FBN 15515
Legal Division Commissioners Court
Cameron County Courthouse

10

964 E. Harrison St.
Brownsville, Texas 78520
956-550-1345
956-550-1348 fax
igonzales@co.cameron.tx.us

LOCAL COUNSEL FOR CAMERON COUNTY

GARY GURWITZ
SBN: 08631000 FBN: 1194
ADRIANA H. CARDINAS
SBN: 24001836 FBN: 22193

ATLAS & HALL L.L.P.
P.O. BOX 3725
McAllen, Texas 78502-3725
956-682-5501
956-686-6109 fax
ahc@atlashall.com

OF COUNSEL FOR HIDALGO COUNTY

JAMES E. DARLING
SBN: 05386000
FBN: 5400
McAllen City Attorney
P.O. Box 220
McAllen, Texas 78505-0220

OF COUNSEL FOR THE CITY OF McALLEN

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the Plaintiffs Response to Defendants Motion to Dismiss has been sent by first class mail on this the 7th day of September, 2001 to:

Mr. Tom Millet, Esq.
Federal Programs Branch
United States Department of Justice
901 E. St. N.W.
Washington D.C.  20530

_____
ROLANDO L. RIOS

11

CVisPDF – www.fastio.com

# AFFIDAVIT OF FRANK BEJARANO

I, Frank Bejarano, hereby execute the following statement:

1. I, Frank Bejarano, am the Director of the Cameron County Program Development & Management Department. I have worked for Cameron County in this capacity for 12 years.

2. As the Program Director, I am aware that certain Federal funding programs are based on Census population data. Programs that affect our community include Medicaid, Foster Care, Rehabilitation Services Basic Support, Child Care and Development Block Grant, Social Services Block Grant, Substance Abuse Prevention and Treatment Block Grant, Adoption Assistance, Vocational Education Basic Grants, and the Community Development Block Grant.

3. In my work as Program Director, I was involved in preparing an estimate of the amounts of money Cameron County would lose as a result of the 1990 Census undercount.

4. Also, through my work as one of the coordinators with the 2000 Census and with local communities, I have knowledge and documentation of undercounts that occurred in specific areas in Cameron County.

SWORN AND SUBSCRIBED TO on this the 5th day of September, of 2001.

_____
Frank Bejarano, Director
Program Development & Management

STATE OF TEXAS          §

COUNTY OF CAMERON    §


This instrument was acknowledged before me on September 5, 2001 by,

LETICIA DIAZ
Notary Public
STATE OF TEXAS
My Comm. Exp.

_____
Notary Public, State of Texas

CVisPDF – www.fasiso.com

# Congress of the United States

## Washington, DC 20515

June 25, 2001

JUN 26 2001

The Honorable Ernest F. Hollings
Chairman
Committee on Commerce, Science, and
Transportation
Washington, D.C. 20510

The Honorable Joseph I. Lieberman
Chairman
Committee on Governmental Affairs
Washington, D.C. 20510

JUL 1 0 2001

Dear Chairmen Hollings and Lieberman:

Congratulations on your new positions. We look forward to working with you on issues of mutual interest and concern, such as the 2000 Census.

As you may know, in conducting the 2000 Decennial Census, the Census Bureau compiled two sets of data. One set is a population count determined through the use of Census forms returned by mail and interviews conducted at addresses for which no Census form was returned. Recognizing that this raw population count is not entirely accurate, the Bureau prepared a second set of data: the population count was enhanced using statistical techniques designed to correct for errors in the Census count. The Commerce Department released the first set of data on March 6, 2001, but has decided not to use or to release publicly the second set of data.

There are substantial questions about the accuracy of the 2000 Census data that the Commerce Department has chosen to release. According to news reports, the unadjusted numbers missed at least 6.4 million people and counted at least 3.1 million people twice.[1]

On March 1, 2001, the Census Bureau's Executive Steering Committee for Accuracy and Coverage Evaluation Policy made a recommendation about which set of data should be released to the public and to the states by April 1, 2001, for purposes of redistricting. Although the Steering Committee concluded that the adjusted numbers should not be released at that time for redistricting purposes, it reached this decision only because the pending April 1, 2001, statutory deadline prevented a full analysis of the accuracy of the adjusted data. In fact, the Steering Committee expressly found that "the majority

---

[1]"Count of 2000 Census Said to Err by Millions." *New York Times* (March 16, 2001).

Page 1 of 6

of the evidence indicates...the superior accuracy of the adjusted numbers."[2] The committee also found that "[q]uality measures indicate the adjusted data are more accurate overall."[3]

We have requested the corrected data from the Commerce Department, but have so far not received it. The data are important for several reasons. First, it could have an enormous impact on the allocation by Congress of more than $185 billion per year in population-based federal grant funds. The General Accounting Office, using data from the 1990 Census and a statistical method similar to the one used for the 2000 Census, analyzed how the use of adjusted Census data in 1990 would have affected the distribution of federal resources. Examining a sample of 15 major programs that administer federal funds, GAO concluded that the use of corrected population counts would have changed the distribution of nearly $450 million in federal funds each year.

The adjusted data also could have a significant effect on the appropriateness of congressional redistricting efforts currently being undertaken by the states. The reports that the Census Bureau missed 6.4 million people in its most recent count, mostly our nation's African Americans, Hispanics, Asian Pacific Americans, and American Indians, raise serious questions about whether or not all of our citizens will have an equal voice in government.

The refusal to provide the requested data is particularly troublesome in light of the Commerce Department's recent decision to try to put new limits on Congressional oversight of the Census. The Commerce Department is attempting to set conditions on Congressional access to Census information, particularly as it relates to evaluations of the Accuracy Coverage Evaluation.

Given these concerns and the importance of the issues at stake, some of us have filed litigation to obtain the corrected data. In addition, we are writing to request that you consider holding hearings on, or otherwise exercise the oversight powers of your committees to investigate the Commerce Department's refusal to release the corrected data.

Thank you for your kind attention to this matter.

Sincerely,


**CAROLYN B. MALONEY**
**Member of Congress**

**WM. LACY CLAY**
**Ranking Member**
**House Subcommittee on the Census**

---

[2] Report of Tabulations of Population to States and Localities Pursuant to Title 13 U.S.C., Section 141(c), and Availability of Other Population Information; the Executive Steering Committee for Accuracy and Coverage Evaluation Policy (ESCAP) Report; and the Census Bureau Director's Recommendation; Notice, 66 Fed. Reg. 14005 (2001) (emphasis added).

[3] *Id.* at 14006.

CHARLES A. GONZALEZ
Chair
Hispanic Caucus, Census and Civil Rights
Task Force

CARRIE MEEK
Chair
Congressional Black Caucus, Task Force on
the Census

MARTIN FROST
Chairman
House Democratic Caucus

HENRY WAXMAN
Ranking Member
House Committee on Government Reform

DAVID WU
Chairman
Asian-Pacific-American Caucus

JOHN BALDACCI
Member of Congress

KEN BENTSEN
Member of Congress

SHELLEY BERKLEY
Member of Congress

LOIS CAPPS
Member of Congress

JAMES CLYBURN
Member of Congress

JOHN CONYERS, JR.
Member of Congress

ELIJAH CUMMINGS
Member of Congress

Page 3 of 6

DIANA DEGETTE
Member of Congress

ROSA DELAURO
Member of Congress

BOB FILNER
Member of Congress

EARL HILLIARD
Member of Congress

RUBEN HINOJOSA
Member of Congress

MICHAEL HONDA
Member of Congress

JESSE JACKSON, JR.
Member of Congress

SHEILA JACKSON-LEE
Member of Congress

EDDIE BERNICE JOHNSON
Member of Congress

STEPHANIE TUBBS JONES
Member of Congress

DENNIS KUCINICH
Member of Congress

JAMES LANGEVIN
Member of Congress

BARBARA LEE
Member of Congress

JOHN LEWIS
Member of Congress

CYNTHIA MCKINNEY
Member of Congress

MICHAEL MCNULTY
Member of Congress

Page 4 of 6

PATSY MINK
Member of Congress

SOLOMON ORTIZ
Member of Congress

FRANK PALLONE
Member of Congress

DAVID PHELPS
Member of Congress

SILVESTRE REYES
Member of Congress

CIRO RODRIGUEZ
Member of Congress

TOM SAWYER
Member of Congress

JOSÉ SERRANO
Member of Congress

PETE STARK
Member of Congress

JOHN TIERNEY
Member of Congress

ROBERT UNDERWOOD
Member of Congress

NYDIA VELÁZQUEZ
Member of Congress

MAXINE WATERS
Member of Congress

MELVIN WATT
Member of Congress

Page 5 of 6

**ALBERT WYNN**
Member of Congress

**TOM LANTOS**
Member of Congress

**JOHN DINGELL**
Member of Congress

**GREGORY MEEKS**
Member of Congress

**ROBERT MENENDEZ**
Member of Congress
Vice Chair of the Democratic Caucus

**MAURICE HINCHEY**
Member of Congress

**SANFORD BISHOP**
Member of Congress

cc: Senator Daschle
    Senator Kerry
    Senator Levin

CVISPDF – www.fastio.com

Case 1:01-cv-00082  Document 8  Filed in TXSD on 09/10/2001  Page 22 of 122



PRESIDENTIAL MEMBERS

## CMBP News Headlines

August 7, 2001

For Immediate Release

Contacts: John Chambers
301-713-6672

## CENSUS 2000 UNDERCOUNT COULD COST STATES BILLIONS

### PRICEWATERHOUSECOOPERS PROJECTS $4.1 BILLION FEDERAL FUNDING LOSS IN 31 STATES, $3.6 BILLION FOR 58 COUNTIES

*WASHINGTON* -- Today, PricewaterhouseCoopers, one of the nation's leading professional services firms, released a report estimating that the 2000 census undercount could result in a federal funding loss of more than $4 billion in 31 states and the District of Columbia, with a majority of the funds lost ($3.6 billion) in 58 of the nation's largest counties over the next ten years. The funding loss translates into nearly $3,000 per uncounted person in these counties.

"Inaccuracies in the census can cause federal funds to be distributed in a way that is not fully consistent with congressional intent," said Dr. Peter Merrill, head of PricewaterhouseCoopers' National Economic Consulting group. "The census undercount not only misallocates funds among jurisdictions, it also causes a net loss to the states of funds from federal entitlement programs. Compounding the problem, many state-funded grant programs to localities also rely on census counts."

The PricewaterhouseCoopers report, which was conducted at the request of the Presidential members of the U.S. Census Monitoring Board, examined eight programs most affected by the census: Medicaid, Foster Care, Rehabilitation Services Basic Support, Social Services Block Grants, Substance Abuse Prevention and Treatment Block Grants, Adoption Assistance, Child Care and Development Block Grants, and Vocational Education Basic Grants.

"These findings present the most compelling evidence of the potential harm caused by the 2000 census undercount," said Gilbert F. Casellas, Presidential Co-Chair of the Monitoring Board. "The undercount will cost state and local governments billions of dollars in funds that are earmarked for programs that largely serve our nation's most disadvantaged."

The report found states and counties with large metropolitan areas were the most adversely affected. California and Texas, two of the worst counted states, risk losing the most, $1.5 billion and $1 billion respectively over the fiscal 2002 to 2012 period. Counties topping the list included Los Angeles County, CA ($636 million), Bronx County, NY ($362 million), Kings County, NY ($269 million), Harris County, TX ($234 million), New York County, NY ($212 million) and Cook County, IL ($193 million). The report also found that large counties would not only share in state losses, but would also lose funds to other areas within the state because of the high relative undercount of urban centers.

"The report comes at a time when many jurisdictions are contesting the results of the 2000 census citing significant undercounts and the Census Bureau is blocking their requests to have adjusted numbers released which would correct for millions missed in the 2000 count," said Casellas.

CfMPDF - www.fenito.com

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 23 of 122

Census Bureau officials have said that a decision on whether to release adjusted numbers for federal funding purposes will come in mid-October, but many in Congress and in state and county governments are concerned that the most accurate data will not be used in the appropriation process.

Approximately $185 billion in Federal funds are allocated by Congress each year based on each state's respective share of the U.S. population, as determined every 10 years by the census.

"The undercount not only deprives Congress of its ability to direct federal funds where they are needed, it also denies taxpayers the right to have their money come back to their community in the form of federal program funds," added Casellas.

The estimates of the Census 2000 undercount for states and counties with populations larger than 500,000 are derived from undercount rates estimated by the Census Bureau and extended by Dr. Eugene P. Ericksen, a decennial census expert and professor of statistics at Temple University. After determining the program's allocation formulae, PricewaterhouseCoopers projected national funding levels for these federal programs through 2012. These formula allocations were calculated with unadjusted and then adjusted population figures to estimate the change in federal funds flowing to each state and then translated into changes at the county level.

The eight programs selected represent 87 percent of the funding of major programs identified by the General Accounting Office (GAO) as being affected by the undercount. Medicaid, which provides assistance to low-income individuals, represents the largest share of these federal grant obligations at $130 billion.

Merrill noted that actual funding losses could be higher than projected because data were not available to analyze all of the affected federal programs or any of the state programs distributed based on census data. "Our projected funding distortions should be treated as conservative," he said.

The report is the first post-Census 2000 analysis of how the allocation of federal funds among the states and large counties for fiscal years 2002-2012 will be affected by the net census 2000 undercount.

Background: Last spring the Census Bureau recommended not to adjust the census for purposes of redrawing the lines of congressional, state and local political districts. The Census Bureau estimates that the 2000 census missed 6.4 million people, disproportionately minority, children and the poor, and counted 3.1 million people twice, largely white and affluent, for a net undercount of 3.3 million people.

###

The bipartisan Census Monitoring Board was established in 1997 to monitor Census 2000 operations. Its findings are reported to Congress every six months. The board's next and final report will be submitted to Congress on September 1, 2001.

🔼 Back to Top

U.S. Census Monitoring Board
Presidential Members

4700 Silver Hill Road
Suite 1250 - 3
Suitland, MD 20746

Phone: (301) 457-9900
Fax: (301) 457-9901
comments@cmbp.census.gov

# PRICEWATERHOUSECOOPERS ⬛

---

# Effect of Census 2000 Undercount on Federal Funding to States and Selected Counties, 2002-2012

*prepared*

*for*

## U.S. Census Monitoring Board, Presidential Members

August 7, 2001

---

National Economic Consulting                **NEC**

# EFFECT OF CENSUS 2000 UNDERCOUNT ON FEDERAL FUNDING TO STATES AND SELECTED COUNTIES, 2002-2012

## ABSTRACT

Congress relies on the census for purposes of allocating funds under various federal grant programs to state governments. Inaccuracies in the census count can cause federal funds to be distributed in a way that is not fully consistent with congressional intent. Many state-funded grant programs to localities also rely on census counts, compounding the misallocation of grant money. For those jurisdictions that are counted relatively poorly by the census, this translates into fewer services for families with the greatest needs.

Analysis by the Census Bureau estimates that Census 2000 undercounted the actual U.S. population by a net of over three million individuals, representing an undercount rate of 1.18 percent.

This study focuses on eight programs with a combined total of $145 billion in federal spending in FY 2001 that would be most affected by the undercount. Because this study does not consider all programs affected by census population figures, the total effect of the Census 2000 undercount on the allocation of federal funds is likely to exceed the estimates in this report.

For the eight federal grant programs included in this study, the Census 2000 undercount is estimated to cause the District of Columbia and the 31 states adversely affected by the undercount to lose $4.1 billion in federal funding over the 2002-2012 fiscal year period. The shift in federal funds due to the undercount is most pronounced in metropolitan counties. These areas not only share in state losses from the undercount but also lose funds to other localities within the state because of the relatively high undercounts of urban areas.

The federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion over the ten year period, or $2,913 per uncounted person in these jurisdictions.

The census undercount not only redistributes funds among jurisdictions, it also causes a *net loss* to the states of funds from federal entitlement programs, such as Medicaid and Foster Care. For the programs included in this study, the Census 2000 undercount is estimated to reduce net federal funds to the states by $478 million over the 2002-2012 period.

i

CutePDF - www.tesilia.com

# EFFECT OF CENSUS 2000 UNDERCOUNT ON FEDERAL FUNDING TO STATES AND SELECTED COUNTIES, 2002-2012

## TABLE OF CONTENTS

|  | **Page** |
|---|---|
| EXECUTIVE SUMMARY | ES-1 |

**I.   INTRODUCTION** ..........................................................................................1

**II.   ESTIMATE OF CENSUS 2000 UNDERCOUNT** ...............................................2

    A.  Methodology Used by the Census Bureau and Dr. Eugene P. Ericksen.................2
    B.  Estimated 2000 Undercount by State.......................................................3
    C.  Estimated 2000 Undercount by Selected County ......................................5

**III.   FUNDING EFFECT OF CENSUS 2000 UNDERCOUNT** ...................................8

    A.  Federal Programs Analyzed......................................................................8
    B.  Current Services Funding Levels over FY 2002-2012 Period..............................9
    C.  Funding Effect of Census 2000 Undercount on States .........................................12
    D.  Funding Effect of Census 2000 Undercount on Selected Counties.......................17

**IV.   CONCLUSION** ......................................................................................**20**

## APPENDICES

    A.  2000 Population Counts and Estimated Undercounts of Persons Over and Under 18 Years of Age by State
    B.  2000 Population Undercounts by Selected County
    C.  Federal Program Descriptions
    D.  Estimated Funding Effect by State by Program
    E.  Estimated Funding Effect by Selected County
    F.  Contact Information

CVISPDF - www.fineice.com

# EFFECT OF CENSUS 2000 UNDERCOUNT ON FEDERAL FUNDING TO STATES AND SELECTED COUNTIES, 2002-2012

## TABLES

                                                                              **Page**
Table A.  Federal Formula Grant Programs and FY 2001 Obligations .......................ES-3
Table 1.  Estimated Census 2000 Undercount by State.......................................................4
Table 2.  Census 2000 Undercount by Selected County:
          25 Counties with the Largest Undercount Rates ................................................6
Table 3.  Census 2000 Undercount by Selected County:
          25 Counties with the Largest Total Undercount .................................................7
Table 4.  Federal Grant Programs and FY 2001 Obligations..............................................8
Table 5.  Current Services Budget Projections for Eight Federal Grant
          Programs, FY 2002-2012 ......................................................................................11
Table 6.  Estimated Funding Effect of Census 2000 Undercount by State on
          Eight Federal Grant Programs, FY 2002-2012 ................................................14
Table 7.  Estimated Funding Effect of Census 2000 Undercount on
          Eight Federal Programs: States with High Undercounts, FY 2002-2012 .........15
Table 8.  Estimated Funding Effect of Census 2000 Undercount by
          Federal Grant Program, FY 2002-2012............................................................16
Table 9.  Estimated Effect of Census 2000 Undercount on Eight Federal Grant
          Programs: 25 selected Counties with Largest Funding Losses,
          FY 2002-2012...................................................................................................19

## FIGURES

Figure A.  Estimated Effect of Census 2000 Undercount on Eight Federal Grant
           Programs: 31 States with Funding Losses and the District of Columbia,
           Fiscal Years 2002-2012 ..............................................................................ES-7
Figure B.  Estimated Effect of Census 2000 Undercount on Eight Federal Grant
           Programs: All States and the District of Columbia,
           Fiscal Years 2002-2012 ..............................................................................ES-8
Figure C.  Estimated Effect of Census 2000 Undercount on Eight Federal Grant
           Programs: 25 Selected Counties with Largest Funding Loss,
           Fiscal Years 2002-2012 ..............................................................................ES-9

CutePDF - www.tevisz.com

# EFFECT OF CENSUS 2000 UNDERCOUNT ON FEDERAL FUNDING TO STATES AND SELECTED COUNTIES, 2002-2012

## EXECUTIVE SUMMARY

A number of federal grant programs rely on population counts from the decennial census for purposes of allocating funds among states. Consequently, a population undercount can affect the distribution of federal funds to states and localities that benefit from federal programs. From the perspective of jurisdictions that are counted relatively poorly by the census, this translates into fewer services for families in need.

The Presidential Members of the United States Census Monitoring Board[1] retained Dr. Eugene P. Ericksen of Temple University to analyze and extend the Census Bureau's estimate of the Census 2000 undercount and retained PricewaterhouseCoopers LLP (PwC) to project the effect of the Census 2000 undercount on the allocation of federal funds among the states and 112 selected counties over the next decade.[2]

Under the programs analyzed in this report, the District of Columbia and the 31 states adversely affected by the undercount are estimated to lose $4.1 billion in federal funding over the 2002-2012 period. Counties not only share in the state losses but can also lose funds to other areas within the state because of the high relative undercounts. The federal funding loss in the 58 largest counties adversely affected by the undercount[3] is estimated to reach $3.6 billion over the 2002-2012 period, which translates into a loss of $2,913 per uncounted person in these jurisdictions. Because this report does not include all population-based federal programs or any of the state programs distributed using census data, these estimates should be treated as conservative.

### Previous Research

In March 2000, PricewaterhouseCoopers prepared a study[4] for the Presidential Members of the U.S. Census Monitoring Board that estimated the impact of the projected Census 2000 undercount on the allocation of federal funds. This March 2000 report assumed similar undercount rates by demographic group as were estimated following the 1990 census and used Census population projections for 2000. The study projected that the 2000 census undercount rate would be 1.75 percent. This was considered a conservative estimate since the Census Bureau predicted an undercount rate of 1.9%.

---

[1] The Presidential Members of the U.S. Census Monitoring Board are Gilbert F. Casellas (Co-Chairman), Cruz M. Bustamante, Everett M. Ehrlich, and Lorraine A. Green.
[2] The 112 counties were selected as the 111 counties (excluding the District of Columbia) with enumerated population over 500,000 plus Richmond County, New York (Staten Island).
Source: www.census.gov/population/cen2000/phc-t4/tab02.pdf.
[3] Of the 112 counties examined in our study, 58 of them are adversely affected by the undercount.
[4] *Effect of Census 2000 Undercount on Federal Funding to States and Local Areas, 2002-2012* (March 2000).

CutePDF - www.fatsia.com

Now that Census 2000 is complete, the data indicate that the Census Bureau counted a higher percentage of the population in 2000 than in 1990. The Census Bureau estimates that the Census 2000 net undercount rate was 1.18 percent.

This report updates PricewaterhouseCooper's previous study by using Dr. Ericksen's analysis and extension of the information the Census Bureau has made public about the Census 2000 undercount rate rather than projections based on the 1990 Census experience.

*Methodology*

This study generally follows the same methodology for estimating funding effects as the March 2000 PricewaterhouseCoopers report.

The eight programs studied accounted for $145 billion in federal grant spending in fiscal year 2001 (see Table A). These programs represent 87 percent of the funding of major programs identified by the General Accounting Office (GAO) as being affected by the undercount.[5] The effect of the undercount on smaller federal programs has been excluded. State programs that rely on census data to distribute funds to localities also have been excluded. Because all federal and state grant programs affected by the undercount were not analyzed in this study, the shift in funds due to the Census 2000 undercount is likely to be larger than is estimated in this report.

The methodology used in this report can be summarized as follows:

1. Based on the Census Bureau's and Dr. Ericksen's estimates of the Census 2000 undercount rate by state and selected county, derive adjusted state and county population levels for comparison with Census 2000 population counts.

2. Determine the formulae for allocating the eight federal grant programs included in this study.

3. Project national funding levels for these federal programs through 2012.

4. Project the effect of the Census 2000 undercount on the allocation of federal funds to states and selected counties over the period affected by Census 2000 (generally, fiscal years 2002-2012).

---

[5] General Accounting Office, *Formula Grants: Effects of Adjusted Population Counts on Federal Funding to States*, GAO/HEHS-99-69, February 1999.

CHMPDF – www.foxitx.com

## Table A. Federal Formula Grant Programs and FY 2001 Obligations
[Dollar amounts in billions; Major programs affected by census undercount]

| | Program | Description | Obligations |
|---|---|---|---|
| 1. | Medicaid | Provides medical assistance (such as inpatient and outpatient hospital care, laboratory and x-ray services, and physician services) to low-income individuals. Eligible individuals include low-income children and pregnant women, low-income persons with disabilities, and low-income elderly persons. | $130.0 |
| 2. | Foster Care | Provides support to homes and facilities that provide homes to needy foster children. Payments cover food, shelter, and supervision costs. Any foster child eligible for Aid to Families with Dependent Children, as in effect in 1995, is eligible for the program. | 5.1 |
| 3. | Rehabilitation Services Basic Support | Provides vocational rehabilitation to disabled individuals and their families. Services include reader services for the blind, interpreter services for the deaf, prosthetic devices, and job placement. | 2.4 |
| 4. | Child Care and Development Block Grant | Provides assistance to low-income families to improve the availability and quality of childcare. Name changed to Child Care and Development Fund Discretionary Funds. | 2.0 |
| 5. | Social Services Block Grant | Provides support to states to prevent or reduce dependency; promote self-sufficiency; prevent abuse, neglect, or exploitation of children and adults; prevent inappropriate institutional care; and secure institutional care where appropriate. Funds have been used for child day care, protective and emergency services for children and adults, and counseling. | 1.7 |
| 6. | Substance Abuse Prevention and Treatment Block Grant | Provides resources to states to design and implement programs to reduce drug and alcohol abuse and provide rehabilitation to individuals with drug and alcohol problems. | 1.7 |
| 7. | Adoption Assistance | Provides support for the adoption of children with special needs. Payments train professional staff and parents involved in the adoptions, provide resources to families adopting the children, and cover costs associated with placing children in adoptive homes. | 1.2 |
| 8. | Vocational Education Basic Grants | Provides grants to states for vocational education programs for youths and adults. Funds used for activities such as purchasing occupationally-relevant equipment and curriculum materials, providing career counseling and guidance, hiring staff, and offering remedial classes. | 1.1 |
| **Total for eight programs included in this report** | | | **$145.1** |
| **Total for major grant programs affected by undercount** | | | **$166.6** |

ES-3

Several key assumptions underlie the results in this report. First, Dr. Ericksen's extension of the Census Bureau's methods is assumed to be accurate. Second, the undercount rate is assumed to not vary substantially between group-quarters and non-group-quarters persons.[6] Third, current formulae for allocating federal grant programs are assumed to remain unchanged over the 2002-12 period. Fourth, the national funding level for these programs over the FY 2002-2012 period is based on the Administration's fiscal year 2001 Current Services Budget. Last, states are assumed to allocate federal funding among local governments in proportion to their respective populations, as enumerated in the decennial census. To the extent possible, the results in this study are based on federal data, estimates, and methodology.

### *Effect of Census 2000 Undercount on Federal Funding to States*

The Census Bureau has estimated a national net undercount rate for the non-group-quarters population in Census 2000 of 1.18 percent, totaling nearly 3.3 million persons missed. Assuming the same undercount rate for the group-quarters population, Dr. Ericksen estimates a total net undercount of 3.4 million.[7] Over the 2002-2012 fiscal year period, for the eight programs analyzed, PricewaterhouseCoopers estimates that this Census 2000 undercount will result in a loss of $4.1 billion in federal funding among the 31 states adversely affected by the undercount and the District of Columbia. Medicaid accounts for the largest shift in federal funds, representing 92 percent of all reallocated funds (see Figure A).[8]

The estimated 2000 undercount is expected to cause the biggest dollar losses in California, Texas and Georgia (see Figure B). These are large states that have relatively large undercount rates.

Even in states that are relatively well counted by the census, certain portions of the state may have high undercount rates. For example, while Massachusetts is counted relatively well, Suffolk County (containing Boston, MA) is estimated to lose $58 million in federal

---

[6] The Census Bureau only provided undercount rates for the non-group-quarters population. In order to evaluate the funding effects, we require an undercount estimate for the entire population. We assumed that the undercount rate for the group-quarters population equals the undercount rate for the non-group-quarters population. The alternative assumption of a perfect count of the group-quarters population would not materially affect our results.

[7] The Census Bureau excluded the group-quarters population (7.8 million persons) from its undercount estimates. Assuming that the group-quarters population is undercounted at the same rate as the non-group-quarters population implies a national undercount of 3.4 million persons and an overall national undercount rate of 1.18 percent. Source: *Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy*, March 1, 2001 and Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

[8] Because of statutory provisions that guarantee minimum reimbursement rates, Medicaid funding for certain states would remain the same using either adjusted or unadjusted population counts. Some states, like New York, receive the minimum reimbursement of 50 percent of state expenditures under adjusted or unadjusted figures. The District of Columbia has a reimbursement rate set by statute at 70 percent. These areas experience significant undercounts, but the Medicaid minimum reimbursement provisions limit the federal funding losses from the undercount.

funds over the 2002-2012 period as a result of its high undercount. Similarly, while Illinois is counted relatively well, Cook County (containing part of Chicago, IL) is estimated to lose $193 million in federal funds over the 2002-2012 period.

Note that the funding effects of the Census 2000 undercount are not a "zero-sum game." The shift in federal funds *away from* states that are counted relatively poorly is greater than the shift in funds *to* states that are counted relatively well. The Census 2000 undercount is expected to result in a *net* loss of $478 million in federal funds to the states as a whole. This overall loss in federal funding is due to federal entitlement programs such as Medicaid, under which the national level of funding depends on population measures and is not a fixed sum.

### *Effect of Census 2000 Undercount on Federal Funding to Selected Counties*

The Census 2000 undercount also will affect counties receiving a portion of federal grants allotted to states. The net impact on county funding depends on the effect of the undercount on both the allocation of federal funds between states (the "between-state" effect) and the allocation of funds among jurisdictions within a state (the "within-state" effect). The *net* impact of the Census 2000 undercount on the allocation of federal funds to counties is the sum of the between-state and within-state effects.

Over the 2002-2012 period, the federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion, or $2,913 per uncounted person in these jurisdictions. Because counties with large populations generally experience undercount rates that are higher than the state average, we assume that they will fail to receive their proportionate share of any funds distributed by the state based on unadjusted population counts. These "within-state" effects cause the funding losses of metropolitan areas to exceed the funding losses at the state level.

Eight counties are estimated to lose over $100 million each in federal funds: Los Angeles County, CA; Bronx County, NY; Kings County, NY (which comprises the borough of Brooklyn, NY); Harris County, TX (which contains the city of Houston, TX); New York County, NY (which comprises the borough of Manhattan, NY); Cook County, IL (Chicago), Dallas County, TX, and Miami-Dade County, FL (see Figure C). In New York City, the funding loss across the five boroughs is estimated to reach $847 million. Because some state-funded grant programs also rely on the decennial census for purposes of allocating funds among localities, the impact of the Census 2000 undercount on metropolitan areas will be larger than the federal funding effect.

### *Conclusion*

Congress relies on the census for purposes of allocating funds under various federal grant programs to state governments. Inaccuracies in the census count can cause federal funds to be distributed in a way that is not fully consistent with congressional intent. We estimate that unadjusted Census 2000 population estimates will result in a loss of $4.1

billion in federal funding in the District of Columbia and the 31 states adversely affected over the FY 2002-2012 period.  Many state-funded grant programs to localities also rely on census counts, compounding the misallocation of grant money.  For those jurisdictions that are counted relatively poorly by the census, this translates into fewer services for families with the greatest needs.

ES-6

**Figure A.  Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs: 31 States with Funding Losses and the District of Columbia, Fiscal Years 2002-2012**
**[Millions of Dollars]**



□ Medicaid

■ Foster Care

■ Rehabilitation Services

■ Child Care and Dev't Block Grant

□ Substance Abuse Block Grant

□ Vocational Education

▦ Adoption Assistance

■ Social Services Block Grant

-82
-72
-48
-44
-33
-32
-27

-3,735

Source:  PricewaterhouseCoopers calculations.

ES-7

CutePDF – www.fastio.com



**Figure B. Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs: All States and the District of Columbia, Fiscal Years 2002-2012 [Millions of Dollars]**

ES-8

Source: PricewaterhouseCoopers calculations.



Figure C. Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs: 25 Selected Counties with Largest Funding Loss, Fiscal Years 2002-2012 [Millions of Dollars]

ES-9

Source: PricewaterhouseCoopers calculations.

## I.   INTRODUCTION

The Presidential Members of the United States Census Monitoring Board[1] retained PricewaterhouseCoopers LLP (PwC) to conduct an independent estimate of the funding effects of the Census 2000 undercount, based on undercount rate estimated by decennial census expert and Temple University statistics professor Dr. Eugene P. Ericksen. PwC was asked to project the undercount's effects on the allocation of federal funds among states and selected counties over the next decade.

This report updates the results of the March 2000 PwC report[2] which was based on projections of the Census 2000 undercount rate made before Census 2000 was completed.

Estimates of the Census 2000 undercount at the state and selected county levels are presented in this report.  These undercounts are derived from undercount rates estimated by the Census Bureau and extended by Dr. Eugene P. Ericksen of Temple University.  Using these undercount estimates, we calculate adjusted population counts for the states and selected counties for comparison with the Census 2000 counts.

Additionally, the impact of the Census 2000 undercount on the allocation of federal funds to states and selected counties is estimated in this report.  Formula allocations under federal grant programs that depend on population counts were calculated with unadjusted and then adjusted population figures to estimate the change in federal funds flowing to each state.  Changes in funding levels at the state level were then translated into changes at the county level.

The main findings of the report are summarized in the final section.

Six appendices accompany this report:
1. Appendix A reports Census 2000 state population totals (adjusted and unadjusted) along with estimated undercounts and undercount rates of persons over and under 18 years of age.
2. Appendix B shows 2000 population totals by selected county with and without adjustments for the estimated undercount along with number of persons missed and the undercount rate.
3. Appendix C describes the federal programs analyzed in this report.
4. Appendix D provides detailed information on the estimated funding effects of the Census 2000 undercount by state by program.
5. Appendix E provides details on the funding effects for selected counties.
6. Appendix F lists contact information.

---

[1] The Presidential Members of the U.S. Census Monitoring Board are Gilbert F. Casellas (Co-Chairman), Cruz M. Bustamante, Everett M. Ehrlich, and Lorraine A. Green.
[2] *Effect of Census 2000 Undercount on Federal Funding to States and Local Areas, 2002-2012* (March 2000).

## II.   ESTIMATE OF CENSUS 2000 UNDERCOUNT

### A.   Methodology Used by the Census Bureau and Dr. Ericksen

For the 2000 Census, the Census Bureau conducted the Accuracy and Coverage Evaluation (A.C.E.) survey, the successor to the Census 1990 Post-Enumeration Survey (PES), to determine the accuracy of the census count.  Historically the census has not achieved an exact count of the population because it has missed certain individuals and incorrectly enumerated others.[3]  For the A.C.E. survey, the Bureau conducted detailed interviews with a sample of households.  The results of this intensive interview process can be compared to the official 2000 census enumeration to assess the accuracy of the census.  This information can be used to estimate the net undercount (persons missed less persons incorrectly enumerated) by geographic region or demographic group, and to prepare an adjusted 2000 population count (i.e., the official count plus an estimate of net uncounted persons).

The A.C.E. survey established undercount adjustment factors for 448 post-strata (e.g., Black renters in small Metropolitan Statistical Areas or White owners in large Metropolitan Statistical Areas in the North).  From the results of the A.C.E. survey, the Census Bureau developed undercount rates for the 50 states, and the District of Columbia.  Dr. Eugene P. Ericksen, a census expert and professor of statistics at Temple University, working on behalf of the Presidential Members of the U.S. Census Monitoring Board, has reviewed the estimates of the state undercount rates and extended the analysis for counties with population in excess of 500,000 plus Richmond County (Staten Island), NY.[4]

For the states and the District of Columbia, Dr. Ericksen obtained the undercount adjustment factors from a file that the Bureau provided.  The file contains adjustment factors for 448 post-strata for each of the 50 states plus the District of Columbia.[5]  For each state-level post-stratum, Dr. Ericksen divided the dual system undercount estimate by the census count to calculate the adjustment factor, or ratio.  Dr. Ericksen then created a weighted average of the adjustment factors, where the population shares in the post-strata were the weights.  For the large county undercount rate estimates, Dr. Ericksen did not have the exact distributions of post-strata populations by county, but he approximated them with 2000 Census state totals by racial group and 1990 census data sorted by racial group and housing tenure.

---

[3] Incorrect enumerations would arise from the inclusion of a child born after April 1, a person who died before April 1, or a college student living away from home but counted in the parents' house instead of his or her usual place of residence.

[4] Dr. Ericksen's estimates, like the Census Bureau rate upon which they are based, are for non-group-quarters residents.  For this study we will be assuming that the undercount rate for group-quarters residents is comparable by state and post-strata.

[5] Access to this file was given to the Census Subcommittee, the National Academy of Sciences, and the Census Monitoring Board in February 2001.

**B.    Estimated 2000 Undercount by State**

Based on the Census Bureau's methodology, the undercount rate for the non-group-quarters population in Census 2000 is estimated to be 1.18 percent or nearly 3.3 million persons. Assuming the same undercount rate for the group-quarters population, Dr. Ericksen estimates a total national undercount of 3.4 million (see Table 1).[6] Table A-2 in Appendix A shows net undercount rates by state for populations over and under 18 years of age. Children have undercount rates that exceed the national average. Nationally, persons under the age of 18 are estimated by Dr. Ericksen to have an undercount rate of 1.56 percent[7] of the actual population, resulting in over 1.1 million uncounted children. Consequently, funding programs targeting children, such as the Child Care and Development Block Grant, are especially vulnerable to the undercount.[8]

Four states account for nearly 40 percent of the estimated Census 2000 undercount: California (522,796), Texas (373,567), New York (209,123), and Florida (200,670). States (plus the District of Columbia) with the highest percentage undercounts are Alaska (2.67 percent), Hawaii (2.16 percent), the District of Columbia (2.15 percent), New Mexico (1.94 percent), and Texas (1.76 percent). States with the lowest undercount rates are Minnesota (0.29 percent), Missouri (0.46 percent), North Dakota (0.47 percent), Iowa (0.48 percent), Nebraska (0.56 percent), and South Dakota (0.56 percent).

---

[6] The Census Bureau excluded the group-quarters population (7.8 million persons) from its undercount estimates. In order to evaluate the funding effects, we require an undercount estimate for the entire population. We assumed that the undercount rate for the group-quarters population equals the undercount rate for the non-group-quarters population. Assuming that the group-quarters population is undercounted at the same rate as the non-group-quarters population implies a national undercount of 3.4 million persons and an overall national undercount rate of 1.18 percent. The alternative assumption of a perfect count of the group-quarters population would not materially affect our results. Source: *Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy,* March 1, 2001 and Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates,* May 1, 2001.

[7] In the *Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy,* March 1, 2001, the Census Bureau reports a national undercount for the under 18 population of 1.54 percent.

[8] See the GAO report for a detailed description of the funding formulas. General Accounting Office, *Formula Grants: Effects of Adjusted Population Counts on Federal Funding to States,* GAO/HEHS-99-69, February 1999.

3

## Table 1.  Estimated Census 2000 Undercount by State

| State | 2000 Population Projections | | Estimated 2000 Census Undercount | |
|---|---|---|---|---|
| | Without adjustment for undercount | With adjustment for undercount | Number[a] | Rate[b] |
| United States | 281,421,906 | 284,777,491 | 3,355,585 | 1.18 |
| Alabama | 4,447,100 | 4,500,658 | 53,558 | 1.19 |
| Alaska | 626,932 | 644,130 | 17,198 | 2.67 |
| Arizona | 5,130,632 | 5,205,064 | 74,432 | 1.43 |
| Arkansas | 2,673,400 | 2,708,063 | 34,663 | 1.28 |
| California | 33,871,648 | 34,394,444 | 522,796 | 1.52 |
| Colorado | 4,301,261 | 4,356,148 | 54,887 | 1.26 |
| Connecticut | 3,405,565 | 3,438,923 | 33,358 | 0.97 |
| Delaware | 783,600 | 795,533 | 11,933 | 1.50 |
| District of Columbia | 572,059 | 584,629 | 12,570 | 2.15 |
| Florida | 15,982,378 | 16,183,048 | 200,670 | 1.24 |
| Georgia | 8,186,453 | 8,309,433 | 122,980 | 1.48 |
| Hawaii | 1,211,537 | 1,238,284 | 26,747 | 2.16 |
| Idaho | 1,293,953 | 1,315,528 | 21,575 | 1.64 |
| Illinois | 12,419,293 | 12,527,025 | 107,732 | 0.86 |
| Indiana | 6,080,485 | 6,127,668 | 47,183 | 0.77 |
| Iowa | 2,926,324 | 2,940,438 | 14,114 | 0.48 |
| Kansas | 2,688,418 | 2,706,279 | 17,861 | 0.66 |
| Kentucky | 4,041,769 | 4,092,102 | 50,333 | 1.23 |
| Louisiana | 4,468,976 | 4,529,674 | 60,698 | 1.34 |
| Maine | 1,274,923 | 1,292,108 | 17,185 | 1.33 |
| Maryland | 5,296,486 | 5,371,690 | 75,204 | 1.40 |
| Massachusetts | 6,349,097 | 6,397,720 | 48,623 | 0.76 |
| Michigan | 9,938,444 | 10,009,512 | 71,068 | 0.71 |
| Minnesota | 4,919,479 | 4,933,787 | 14,308 | 0.29 |
| Mississippi | 2,844,658 | 2,880,375 | 35,717 | 1.24 |
| Missouri | 5,595,211 | 5,621,068 | 25,857 | 0.46 |
| Montana | 902,195 | 916,585 | 14,390 | 1.57 |
| Nebraska | 1,711,263 | 1,720,900 | 9,637 | 0.56 |
| Nevada | 1,998,257 | 2,032,401 | 34,144 | 1.68 |
| New Hampshire | 1,235,786 | 1,249,910 | 14,124 | 1.13 |
| New Jersey | 8,414,350 | 8,512,241 | 97,891 | 1.15 |
| New Mexico | 1,819,046 | 1,855,034 | 35,988 | 1.94 |
| New York | 18,976,457 | 19,185,580 | 209,123 | 1.09 |
| North Carolina | 8,049,313 | 8,160,293 | 110,980 | 1.36 |
| North Dakota | 642,200 | 645,233 | 3,033 | 0.47 |
| Ohio | 11,353,140 | 11,418,224 | 65,084 | 0.57 |
| Oklahoma | 3,450,654 | 3,499,649 | 48,995 | 1.40 |
| Oregon | 3,421,399 | 3,465,410 | 44,011 | 1.27 |
| Pennsylvania | 12,281,054 | 12,382,591 | 101,537 | 0.82 |
| Rhode Island | 1,048,319 | 1,057,306 | 8,987 | 0.85 |
| South Carolina | 4,012,012 | 4,060,741 | 48,729 | 1.20 |
| South Dakota | 754,844 | 759,095 | 4,251 | 0.56 |
| Tennessee | 5,689,283 | 5,760,133 | 70,850 | 1.23 |
| Texas | 20,851,820 | 21,225,387 | 373,567 | 1.76 |
| Utah | 2,233,169 | 2,263,729 | 30,560 | 1.35 |
| Vermont | 608,827 | 618,161 | 9,334 | 1.51 |
| Virginia | 7,078,515 | 7,173,928 | 95,413 | 1.33 |
| Washington | 5,894,121 | 5,978,417 | 84,296 | 1.41 |
| West Virginia | 1,808,344 | 1,830,122 | 21,778 | 1.19 |
| Wisconsin | 5,363,675 | 5,401,485 | 37,810 | 0.70 |
| Wyoming | 493,782 | 501,607 | 7,825 | 1.56 |

Source: PricewaterhouseCoopers calculations.

[a] Adjusted minus unadjusted 2000 population projections. Dr. Ericksen's undercount totals are slightly larger than those estimated by the Census Bureau (which excluded the group-quarters population from its analysis).  For further explanation see footnote 6 on page 3.

[b] Undercount as a percent of adjusted population. Source: U.S. Census Bureau and Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

4

## C.    Estimated 2000 Undercount by Selected County

Appendix B provides net undercount rates of 112 selected counties. These counties are the 111 counties with population counts in excess of 500,000 plus Richmond County, NY (Staten Island). For these selected counties the average undercount rate is estimated to be 1.28 percent in comparison with the national average 1.18 percent. Table 2 lists the 25 counties (out of the selected 112) with the highest undercount rates. Counties with the highest percentage undercounts are Bronx County, NY (2.68 percent), Hidalgo County, TX (2.38 percent), Hudson County, NJ (2.19 percent), DeKalb County, GA (2.15 percent), Dallas County, TX (2.08 percent). Counties with the greatest number of persons missed are Los Angeles County, CA (175,378), Cook County (Chicago), IL (76,819), Harris County (Houston), TX (71,592), Dallas County, TX (47,229), and Miami-Dade, FL (43,546).

CVisPDF - www.fastio.com

## Table 2. Census 2000 Undercount by Selected County: 25 Counties with the Largest Undercount Rates

| County | 2000 Population Projections | | Estimated 2000 Undercount | |
|---|---|---|---|---|
| | Without adjustment for undercount | With adjustment for undercount | Number | Rate[a] |
| Total, 112 Selected Counties | 125,460,358 | 127,081,879 | 1,621,521 | 1.28 |
| 1. Bronx County, NY | 1,332,650 | 1,369,358 | 36,708 | 2.68 |
| 2. Hidalgo County, TX | 569,463 | 583,365 | 13,902 | 2.38 |
| 3. Hudson County, NJ | 608,975 | 622,595 | 13,620 | 2.19 |
| 4. DeKalb County, GA | 665,865 | 680,465 | 14,600 | 2.15 |
| 5. Dallas County, TX | 2,218,899 | 2,266,128 | 47,229 | 2.08 |
| 6. Baltimore City, MD | 651,154 | 664,993 | 13,839 | 2.08 |
| 7. Harris County, TX | 3,400,578 | 3,472,170 | 71,592 | 2.06 |
| 8. El Paso County, TX | 679,622 | 693,922 | 14,300 | 2.06 |
| 9. Honolulu County, HI | 876,156 | 894,559 | 18,403 | 2.06 |
| 10. Fulton County, GA | 816,006 | 833,051 | 17,045 | 2.05 |
| 11. Prince George's County, MD | 801,515 | 817,093 | 15,578 | 1.91 |
| 12. New York County, NY | 1,537,195 | 1,567,060 | 29,865 | 1.91 |
| 13. Bexar County, TX | 1,392,931 | 1,419,991 | 27,060 | 1.91 |
| 14. Miami-Dade County, FL | 2,253,362 | 2,297,091 | 43,729 | 1.90 |
| 15. Travis County, TX | 812,280 | 828,012 | 15,732 | 1.90 |
| 16. Essex County, NJ | 793,633 | 808,624 | 14,991 | 1.85 |
| 17. Los Angeles County, CA | 9,519,338 | 9,694,716 | 175,378 | 1.81 |
| 18. Kings County, NY | 2,465,326 | 2,508,872 | 43,546 | 1.74 |
| 19. Mecklenburg County, NC | 695,454 | 707,386 | 11,932 | 1.69 |
| 20. Tarrant County, TX | 1,446,219 | 1,470,880 | 24,661 | 1.68 |
| 21. Shelby County, TN | 897,472 | 912,769 | 15,297 | 1.68 |
| 22. Oklahoma County, OK | 660,448 | 671,690 | 11,242 | 1.67 |
| 23. Suffolk County, MA | 689,807 | 701,348 | 11,541 | 1.65 |
| 24. Denver County, CO | 554,636 | 563,619 | 8,983 | 1.59 |
| 25. Fresno County, CA | 799,407 | 812,347 | 12,940 | 1.59 |

Source: PricewaterhouseCoopers calculations.

[a] Undercount as a percent of adjusted population. Source: Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

## Table 3. Census 2000 Undercount by Selected County:
## 25 Counties with the Largest Total Undercount

| County | 2000 Population Projections | | Estimated 2000 Undercount | |
|---|---|---|---|---|
| | Without adjustment for undercount | With adjustment for undercount | Number | Rate[a] |
| Total, 112 Selected Counties | 125,460,358 | 127,081,879 | 1,621,521 | 1.28 |
| 1. Los Angeles County, CA | 9,519,338 | 9,694,716 | 175,378 | 1.81 |
| 2. Cook County, IL | 5,376,741 | 5,453,560 | 76,819 | 1.41 |
| 3. Harris County, TX | 3,400,578 | 3,472,170 | 71,592 | 2.06 |
| 4. Dallas County, TX | 2,218,899 | 2,266,128 | 47,229 | 2.08 |
| 5. Miami-Dade County, FL | 2,253,362 | 2,297,091 | 43,729 | 1.90 |
| 6. Kings County, NY | 2,465,326 | 2,508,872 | 43,546 | 1.74 |
| 7. Maricopa County, AZ | 3,072,149 | 3,109,081 | 36,932 | 1.19 |
| 8. Bronx County, NY | 1,332,650 | 1,369,358 | 36,708 | 2.68 |
| 9. San Diego County, CA | 2,813,833 | 2,850,103 | 36,270 | 1.27 |
| 10. Orange County, CA | 2,846,289 | 2,881,546 | 35,257 | 1.22 |
| 11. Wayne County, MI | 2,061,162 | 2,091,394 | 30,232 | 1.45 |
| 12. New York County, NY | 1,537,195 | 1,567,060 | 29,865 | 1.91 |
| 13. Queens County, NY | 2,229,379 | 2,257,703 | 28,324 | 1.25 |
| 14. Bexar County, TX | 1,392,931 | 1,419,991 | 27,060 | 1.91 |
| 15. Tarrant County, TX | 1,446,219 | 1,470,880 | 24,661 | 1.68 |
| 16. San Bernardino County, CA | 1,709,434 | 1,732,375 | 22,941 | 1.32 |
| 17. Clark County, NV | 1,375,765 | 1,396,215 | 20,450 | 1.46 |
| 18. King County, WA | 1,737,034 | 1,757,102 | 20,068 | 1.14 |
| 19. Broward County, FL | 1,623,018 | 1,642,842 | 19,824 | 1.21 |
| 20. Alameda County, CA | 1,443,741 | 1,463,267 | 19,526 | 1.33 |
| 21. Santa Clara County, CA | 1,682,585 | 1,702,011 | 19,426 | 1.14 |
| 22. Philadelphia County, PA | 1,517,550 | 1,536,930 | 19,380 | 1.26 |
| 23. Honolulu County, HI | 876,156 | 894,559 | 18,403 | 2.06 |
| 24. Riverside County, CA | 1,545,387 | 1,563,399 | 18,012 | 1.15 |
| 25. Fulton County, GA | 816,006 | 833,051 | 17,045 | 2.05 |

Source: PricewaterhouseCoopers calculations.
[a] Undercount as a percent of adjusted population. Source: Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

CVISPDF - www.fineprint.com

## III.   FUNDING EFFECT OF CENSUS 2000 UNDERCOUNT

### A.  Federal Programs Analyzed

This study examines the effect of the Census 2000 undercount on the allocation of funds under eight federal grant programs:  (1) Medicaid; (2) Foster Care; (3) Rehabilitation Services Basic Support; (4) Social Services Block Grant; (5) Substance Abuse Prevention and Treatment Block Grant; (6) Adoption Assistance; (7) Child Care and Development Block Grant; and (8) Vocational Education Basic Grants. These eight programs account for all of the funding shifts identified in the General Accounting Office (GAO) study of the effects of the 1990 census undercount on federal funding to states in fiscal year 1998.[9]

The GAO study focused on 25 large formula grant programs, whose funding represented 90 percent of the total federal grants affected by the census undercount. Of the 25 programs analyzed in the GAO study, ten programs (amounting to $21 billion in 2001) were excluded because their funding formulae depended on population variables for which undercount rates are not available (e.g., the population below the poverty line).  Of the remaining 15 programs, five of the programs (amounting to $43 billion) were not affected by the undercount because the formulae had components which made the undercount immaterial.  Two programs (amounting to $2 million) used population figures adjusted for the undercount.[10]

The remaining eight programs (listed in Table 4) were affected by the undercount. These programs represent over 87 percent of the funding under major programs that depend on unadjusted census counts.

#### Table 4:  Federal Grant Programs and FY 2001 Obligations
[Obligations in billions of dollars; Major programs affected by census undercount]

| Program | Obligations |
|---|---|
| Medicaid | $130.0 |
| Foster Care | 5.1 |
| Rehabilitation Services Basic Support | 2.4 |
| Child Care and Development Block Grant | 2.0 |
| Social Services Block Grant | 1.7 |
| Substance Abuse Prevention and Treatment Block Grant | 1.7 |
| Adoption Assistance | 1.2 |
| Vocational Education Basic Grants | 1.1 |
| Subtotal, eight programs included in study | 145.1 |
| Total for major grant programs affected by undercount | $166.6 |

Source: *Budget of the United States, FY 2002,* GAO, and PricewaterhouseCoopers calculations.

---

[9] General Accounting Office, *Formula Grants:  Effects of Adjusted Population Counts on Federal Funding to States,* GAO/HEHS-99-69, February 1999.

[10] These two programs, administered by the Department of Labor, rely on estimates of the civilian labor force.  If the Department of Labor does not adjust its estimates of the labor force, these programs would also be affected by the undercount.

CSitPDF - www.texto.com

## B.    Current Services Funding Levels over FY 2002-2012 Period

Depending on the first year of impact, Census 2000 will affect federal grant allocations over the 2002-2011 or the 2003-2012 period.[11]

For each of the eight federal grant programs analyzed in this report, the Administration's FY 2002 budget projects Current Services funding levels through 2011. The Current Services Budget estimates funding levels necessary to continue programs at a level equal to the most recently funded year (i.e., 2001 for the 2002 budget). In essence, it is a prediction of the funding necessary to support current law expenditures over the budget period.

The Current Services Budget projects that funding of *discretionary* programs will grow with inflation. Unlike entitlement programs, the funding of discretionary programs is dependent on the annual Congressional appropriations process. Three of the eight federal grant programs included in this study are classified as discretionary: (1) Substance Abuse Block Grant, (2) Vocational Education, and (3) Child Care and Development Block Grant.

The Current Services Budget projects that funding for *entitlement* programs will grow with the underlying eligible population and inflation. Three of the federal programs included in this study are classified as entitlement programs:  (1) Medicaid, (2) Foster Care, and (3) Adoption Assistance.

The remaining two programs included in this study, Social Services Block Grant and Rehabilitation Services, are *mandatory* programs that are projected to grow at rates consistent with their enacting legislation.

The fiscal year 2002 budget includes Current Services funding levels through 2011. Funding levels for four programs included in this study were extrapolated through 2012 based on the growth rates projected by the Office of Management and Budget over the FY 2002-2011 budget period (see Table 5).

Current Services funding levels for the Substance Abuse Block Grant are extrapolated through 2012 using the annual Office of Management and Budget general budget inflator for the 2003-2011 period of 2.2 percent. The Current Services Budget projects slowing growth for the entitlement programs, and this trend is assumed to continue through 2012. No extrapolations were necessary for the mandatory programs because the 2000 Census will affect their funding allocations over 2002-2011, the current budget period.

---

[11] This report assumes that the effects of Census 2000 are not incorporated until 2000 population figures are used in allocation formulas. If population estimates from earlier years, such as 1999, are adjusted consistent with Census 2000, allocations could be affected before 2002.

9

Assuming the Current Services spending levels, census population counts from Census 2000 ultimately will be used to distribute $2.5 trillion over the 2002-2012 fiscal year period.

CVisPDF – www.fastio.com

Table 5. Current Services Budget Projections for Eight Federal Grant Programs, FY 2002-2012

[Fiscal Years; Millions of Dollars]

| Program | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2002-2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Medicaid | - | $153,786 | $167,410 | $182,381 | $198,256 | $215,576 | $234,266 | $254,293 | $276,362 | $299,739 | $325,572 | $2,307,641 |
| 2. Foster Care | - | 5,361 | 5,726 | 6,214 | 6,734 | 7,269 | 7,847 | 8,469 | 9,139 | 9,882 | 10,669 | 77,311 |
| 3. Rehabilitation Services Basic Support | 2,481 | 2,541 | 2,607 | 2,675 | 2,742 | 2,811 | 2,880 | 2,952 | 3,026 | 3,102 | - | 27,817 |
| 4. Child Care and Development Block Grant | 2,042 | 2,085 | 2,129 | 2,174 | 2,219 | 2,266 | 2,313 | 2,362 | 2,411 | 2,462 | - | 22,463 |
| 3. Adoption Assistance | - | 1,512 | 1,615 | 1,753 | 1,900 | 2,051 | 2,214 | 2,389 | 2,578 | 2,788 | 3,010 | 21,809 |
| 5. Substance Abuse Prevention and Treatment Block Grant | - | 1,763 | 1,803 | 1,843 | 1,884 | 1,926 | 1,969 | 2,013 | 2,058 | 2,104 | 2,151 | 19,514 |
| 6. Social Services Block Grant | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | - | 17,000 |
| 7. Vocational Education Basic Grants | 1,100 | 1,125 | 1,150 | 1,175 | 1,201 | 1,228 | 1,256 | 1,284 | 1,312 | 1,342 | - | 12,172 |
| Total | $7,323 | $169,874 | $184,140 | $199,915 | $216,636 | $234,827 | $254,444 | $275,462 | $298,586 | $323,117 | $341,401 | $2,595,727 |

Source: Administration Fiscal Year 2002 Budget and PricewaterhouseCoopers calculations.
Note: Baseline estimates are shown for the 10-year period over which funding levels are affected by Census 2000.

11

CWPDF - www.texto.com

## C.    Funding Effect of Census 2000 Undercount on States

State allocation shares under federal grant programs are determined before the onset of the funding year; thus, state allocations for the current year are based on population estimates from several years earlier.  The Census Bureau publishes population estimates for the years between decennial censuses.  These estimates are based on the decennial population enumeration and are updated using administrative records (e.g., birth and death certificates).  Consequently, errors in the decennial population count persist for ten years, until the next census enumeration.  Consequently, the Census 2000 undercount will affect federal grant allocations over a ten-year period.

For example, the funding formula for the Social Services Block Grant program depends on population estimates from the second prior year.  Thus, Census 2000 will affect Social Services Block Grant allocations over the 2002-2011 period.  For the eight programs included in this report, Census 2000 will first affect grant allocations in either 2002 or 2003, and the effect will persist over the 2002-2011 or 2003-2012 period, depending on the program.

The effect of the Census 2000 undercount on the allocation of federal funds to states initially was calculated for a base year and then extrapolated over the 2002-2012 period.  The base year for each grant program was determined as: the first year affected by the 2000 census figures or the most recent year for which data were available for all of the variables (other than population) in the funding formula.  For most programs, 2002 was the base year used in the calculations.  Because data for some of the formulae were not available to calculate the 2002 allocation, the base year for the corresponding programs is 2001.  For example, the formula for Vocational Education depends on per capita personal income by state as released by the Bureau of Economic Analysis (BEA) for the second preceding year.  Final per capita personal income figures are available for 1999; consequently, the base year for the Vocational Education program is 2001.

Once a base year was established for each program, we calculated state funding allocations using both official and adjusted 2000 state population projections.  These calculations take into account all elements of the current funding formulae, including hold harmless and minimum share provisions.  Each state's share of national program funding in the base year was then determined under both the official and adjusted 2000 population projections.  The difference between these two shares of national program funding is an estimate of the impact of the Census 2000 undercount on the state's allocation of federal funds.  For example, suppose that a state's share of federal program funds increases from 3.0 percent to 3.1 percent, in the base year, as a result of using adjusted versus official 2000 population projections.  For this state, the effect of the Census 2000 undercount is estimated to be a loss of 0.1 percentage points (3.1 percent minus 3.0 percent) of national program funding.

For the eight federal grant programs analyzed in this study, the Census 2000 undercount is estimated to reduce federal funding in 31 states and the District of

12

Columbia by $4.1 billion over the 2002-2012 period (see Table 6). In 2003 alone, the undercount is estimated to reduce federal funds allocated to these states by $277 million. By comparison, the General Accounting Office estimated that the effect of the 1990 census undercount on these federal programs was to shift $449 million among states in 1998. Because the estimated 2000 undercount is both smaller and more uniform across jurisdictions than the estimated 1990 undercount, the total amount of federal funds reallocated is smaller.

States that are counted relatively well in the census are estimated to receive higher levels of federal funding as a result of the undercount; however, the additional federal funds received by these states are less than the loss of federal funds in the other states. The effect of census undercounts on the federal funding of *entitlement* programs is not a "zero-sum game" among the states because an increase in funding to one state does not require a reduction in funding to other states. For the federal programs analyzed in this study, federal funds allocated to all 50 states and the District of Columbia are estimated to be $478 million less over the 2002-2012 fiscal year period as a result of the Census 2000 undercount.

The loss of funds over the 2002-2012 period for the eight analyzed programs ranges from $26 per undercounted person in Colorado to over $6,300 per person missed by the census in Alaska (see Table 7).[12] In 2003, the first year fully impacted by the undercount, the funding loss in 31 undercounted states and the District of Columbia averages $114 per uncounted individual. This figure is less than GAO's 1998 estimate of $145 per uncounted individual, which was based on the higher 1990 undercount rate.

Of the eight federal programs analyzed in this report, Medicaid accounts for 92 percent of the federal funds that would be shifted as a result of the Census 2000 undercount. As a percent of total program funding, the programs most affected by the Census 2000 undercount are Vocational Education (0.28 percent) and Rehabilitation Services (0.27 percent).[13] Table 8 summarizes the impact of the Census 2000 undercount by program.

---

[12] Because of statutory provisions that guarantee minimum reimbursement rates, Medicaid funding for certain states would remain the same using either adjusted or unadjusted population counts. Some states, like New York, receive the minimum reimbursement of 50 percent of state expenditures under adjusted or unadjusted figures. The District of Columbia has a reimbursement rate set by statute at 70 percent. These areas experience significant undercounts, but the Medicaid minimum reimbursement provisions limit the federal funding losses from the undercount. Table D-5 in Appendix D lists the effect of the census undercount on state funding levels under the Medicaid program.
[13] These percentages translate into $33 million for Vocational Education and $72 million for Rehabilitation Services.

13

### Table 6.  Estimated Funding Effect of Census 2000 Undercount on Eight Federal Grant Programs by State, FY 2002-2012

[Fiscal Years; Millions of Dollars]

| State | 2002 | 2003 | 2004 | 2005 | 2006 | 2012 | 2002-2012 | Percent of Total Funding |
|---|---|---|---|---|---|---|---|---|
| Alabama | -$0.1 | -$0.3 | -$0.4 | -$0.4 | -$0.4 | -$0.5 | -$4.9 | -0.01% |
| Alaska | -0.3 | -7.3 | -7.9 | -8.6 | -9.4 | -14.8 | -$108.5 | -1.53% |
| Arizona | -0.5 | -5.3 | -5.7 | -6.2 | -6.7 | -10.1 | -$77.2 | -0.23% |
| Arkansas | -0.1 | -1.2 | -1.3 | -1.4 | -1.5 | -2.2 | -$17.1 | -0.08% |
| California | -3.8 | -102.1 | -110.7 | -120.2 | -130.2 | -205.8 | -$1,506.2 | -0.59% |
| Colorado | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | 0.0 | -$1.4 | -0.01% |
| Connecticut | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.1 | $2.6 | 0.01% |
| Delaware | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | 0.0 | -$1.0 | -0.02% |
| District of Columbia | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | 0.0 | -$1.1 | -0.01% |
| Florida | -0.5 | -6.2 | -6.8 | -7.3 | -7.9 | -12.2 | -$91.6 | -0.09% |
| Georgia | -1.1 | -14.3 | -15.4 | -16.7 | -18.1 | -27.8 | -$208.8 | -0.41% |
| Hawaii | -0.4 | -7.2 | -7.8 | -8.4 | -9.1 | -14.2 | -$105.5 | -1.35% |
| Idaho | -0.2 | -2.6 | -2.8 | -3.1 | -3.3 | -5.1 | -$38.1 | -0.36% |
| Illinois | 1.6 | 2.0 | 2.0 | 2.0 | 2.1 | 0.4 | $21.1 | 0.03% |
| Indiana | 1.0 | 15.5 | 16.8 | 18.2 | 19.7 | 30.5 | $227.6 | 0.49% |
| Iowa | 0.8 | 12.1 | 13.1 | 14.2 | 15.4 | 23.6 | $177.1 | 0.80% |
| Kansas | 0.6 | 8.7 | 9.4 | 10.2 | 11.0 | 16.9 | $126.7 | 0.65% |
| Kentucky | -0.1 | -1.3 | -1.4 | -1.5 | -1.7 | -2.5 | -$19.3 | -0.05% |
| Louisiana | -0.3 | -4.7 | -5.1 | -5.5 | -6.0 | -9.2 | -$68.8 | -0.14% |
| Maine | -0.1 | -1.9 | -2.0 | -2.2 | -2.4 | -3.7 | -$27.5 | -0.15% |
| Maryland | -0.4 | -0.5 | -0.5 | -0.5 | -0.5 | -0.1 | -$5.5 | -0.02% |
| Massachusetts | 0.7 | 1.0 | 1.0 | 1.0 | 1.0 | 0.2 | $10.3 | 0.02% |
| Michigan | 1.8 | 34.8 | 37.7 | 40.9 | 44.3 | 69.1 | $511.3 | 0.69% |
| Minnesota | 1.5 | 1.9 | 1.9 | 2.0 | 2.0 | 0.4 | $20.5 | 0.05% |
| Mississippi | -0.1 | -0.9 | -0.9 | -1.0 | -1.1 | -1.6 | -$12.5 | -0.04% |
| Missouri | 1.6 | 35.3 | 38.3 | 41.6 | 45.1 | 71.0 | $521.5 | 0.90% |
| Montana | -0.1 | -1.5 | -1.6 | -1.7 | -1.8 | -2.8 | -$21.3 | -0.26% |
| Nebraska | 0.4 | 7.6 | 8.2 | 8.9 | 9.6 | 15.0 | $111.4 | 0.80% |
| Nevada | -0.3 | -0.4 | -0.4 | -0.4 | -0.5 | -0.1 | -$4.6 | -0.06% |
| New Hampshire | * | * | * | * | * | 0.0 | $0.1 | * |
| New Jersey | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | -* | $1.5 | * |
| New Mexico | -0.4 | -7.5 | -8.1 | -8.8 | -9.5 | -14.9 | -$109.9 | -0.52% |
| New York | 0.7 | 0.8 | 0.9 | 0.9 | 0.9 | 0.2 | $9.2 | * |
| North Carolina | -0.7 | -11.1 | -12.0 | -13.0 | -14.1 | -21.9 | -$162.9 | -0.23% |
| North Dakota | 0.1 | 2.2 | 2.3 | 2.5 | 2.8 | 4.3 | $31.9 | 0.56% |
| Ohio | 2.5 | 54.0 | 58.6 | 63.6 | 68.9 | 108.1 | $796.1 | 0.82% |
| Oklahoma | -0.4 | -3.4 | -3.7 | -4.0 | -4.3 | -6.5 | -$50.0 | -0.18% |
| Oregon | -0.1 | -2.3 | -2.5 | -2.7 | -2.9 | -4.5 | -$33.6 | -0.12% |
| Pennsylvania | 1.4 | 45.2 | 49.1 | 53.3 | 57.8 | 92.0 | $669.8 | 0.56% |
| Rhode Island | 0.1 | 4.8 | 5.2 | 5.6 | 6.1 | 9.9 | $71.0 | 0.56% |
| South Carolina | -0.1 | -0.6 | -0.7 | -0.7 | -0.8 | -1.2 | -$9.2 | -0.02% |
| South Dakota | 0.2 | 2.1 | 2.3 | 2.5 | 2.7 | 4.1 | $30.7 | 0.57% |
| Tennessee | -0.2 | -2.6 | -2.9 | -3.1 | -3.4 | -5.2 | -$38.8 | -0.06% |
| Texas | -4.6 | -69.4 | -75.1 | -81.3 | -88.0 | -135.5 | -$1,014.6 | -0.74% |
| Utah | -0.1 | -1.2 | -1.3 | -1.4 | -1.5 | -2.3 | -$17.4 | -0.14% |
| Vermont | -0.1 | -1.8 | -2.0 | -2.1 | -2.3 | -3.7 | -$26.9 | -0.36% |
| Virginia | -0.4 | -6.0 | -6.5 | -7.0 | -7.6 | -11.7 | -$87.5 | -0.27% |
| Washington | -0.5 | -12.5 | -13.5 | -14.7 | -16.0 | -25.2 | -$184.7 | -0.41% |
| West Virginia | -* | -0.1 | -0.2 | -0.2 | -0.2 | -0.3 | -$2.1 | -0.01% |
| Wisconsin | 1.0 | 17.1 | 18.6 | 20.1 | 21.8 | 33.9 | $251.9 | 0.64% |
| Wyoming | -0.1 | -0.8 | -0.9 | -1.0 | -1.0 | -1.6 | -$11.9 | -0.42% |
| **Total, United States** | **$0.0** | **-$31.9** | **-$34.7** | **-$37.8** | **-$41.1** | **-$67.4** | **-$478.3** | **-0.02%** |
| Funding Gains | $16.4 | $245.7 | $265.9 | $288.1 | $311.8 | $479.9 | $3,594.8 | 0.15% |
| Funding Losses | -$16.4 | -$277.6 | -$300.6 | -$326.0 | -$352.9 | -$547.3 | -$4,073.1 | -0.17% |

Source:  PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $50,000 or 0.005%; a negative asterisk (-*) denotes a negative shift of less than $50,000.

14

**Table 7.  Estimated Funding Effect of Census 2000
Undercount on Eight Federal Programs:
States with High Undercount Rates,
FY 2002-2012**

| State | Funding Loss Per Uncounted Individual | |
|-------|------|------|
| | **2003** | **2002-2012** |
| Alabama | -$6 | -$91 |
| Alaska | -426 | -6,306 |
| Arizona | -71 | -1,037 |
| Arkansas | -34 | -493 |
| California | -195 | -2,881 |
| Colorado | -2 | -26 |
| Delaware | -8 | -81 |
| District of Columbia | -9 | -91 |
| Florida | -31 | -457 |
| Georgia | -116 | -1,697 |
| Hawaii | -268 | -3,945 |
| Idaho | -121 | -1,768 |
| Kentucky | -26 | -383 |
| Louisiana | -77 | -1,133 |
| Maine | -108 | -1,601 |
| Maryland | -7 | -74 |
| Mississippi | -24 | -349 |
| Montana | -101 | -1,482 |
| Nevada | -12 | -134 |
| New Mexico | -208 | -3,055 |
| North Carolina | -100 | -1,468 |
| Oklahoma | -70 | -1,020 |
| Oregon | -52 | -764 |
| South Carolina | -13 | -188 |
| Tennessee | -37 | -547 |
| Texas | -186 | -2,716 |
| Utah | -39 | -570 |
| Vermont | -195 | -2,881 |
| Virginia | -63 | -917 |
| Washington | -148 | -2,191 |
| West Virginia | -6 | -95 |
| Wyoming | -104 | -1,523 |
| **Weighted Average** | **-$114** | **-$1,679** |

Source:  PricewaterhouseCoopers calculations.

15

**Table 8.  Estimated Funding Effect of Census 2000 Undercount by Federal Grant Program, FY 2002-2012**
[Millions of Dollars]

| | Total Funding | State Funding Losses Due to Undercount in States With Losses | State Funding Gains Due to Undercount in States With Gains | Losses as a Percent of Total Funding | Gains as a Percent of Total Funding |
|---|---|---|---|---|---|
| Medicaid | $2,181,418 | -$3,735 | $3,275 | -0.17% | 0.15% |
| Foster Care | 77,061 | -82 | 65 | -0.11% | 0.08% |
| Rehabilitation Services Basic Support | 26,732 | -72 | 72 | -0.27% | 0.27% |
| Adoption Assistance | 21,808 | -32 | 31 | -0.15% | 0.14% |
| Child Care and Development Block Grant | 21,722 | -48 | 48 | -0.22% | 0.22% |
| Substance Abuse Prevention and Treatment Block Grant | 18,260 | -44 | 44 | -0.24% | 0.24% |
| Social Services Block Grant | 16,905 | -27 | 27 | -0.16% | 0.16% |
| Vocational Education Basic Grants | 11,682 | -33 | 33 | -0.28% | 0.28% |
| Total | $2,375,587 | -$4,073 | $3,595 | -0.17% | 0.15% |

Source:  PricewaterhouseCoopers calculations.

Note:  Total funding levels reflect totals of amounts distributed to states.  Amounts distributed to territories and undistributed amounts are excluded.

## D.    Funding Effect of Census 2000 Undercount on Counties

This section analyzes the effect of the Census 2000 undercount on counties. The county effects are estimated under the assumption that states allocate federal funds among county in proportion to their official census population counts.

The Census 2000 undercount can affect federal funding to counties in two ways. First, the undercount at the state level affects the allocation of funds among the states, which alters the amount of funds that states have available to pass through to local governments (the "between-state" funding effect). For example, the Census 2000 undercount is estimated to cause the state of Illinois to receive a larger share of the federal funds under the programs analyzed than it would with an accurate census count (other states, therefore, receive a smaller share because of the undercount). Counties in the state, such as Cook County (Chicago), benefit from the fact that the state receives these additional funds. The *between-state* effect measures the effect on metropolitan areas of the funding shifts among the states due to the census undercount.

Second, the undercount at the local level may affect a state's allocation of federal funds among its counties (the "within-state" funding effect). Assuming the state allocates funds to local areas within the state using population counts, any undercount would distort the flow of funds within the state. Because Cook County is estimated to experience a high undercount rate relative to the other areas in Illinois, it receives a smaller share of the state funds than it would have gotten under an accurate census count. Therefore, it experiences a negative within-state effect. The *within-state* effect measures the impact of the undercount on funding allocations within states.

The "net" funding effect of the census undercount on a county is the sum of the between-state and within-state funding effects. Because the between-state and within-state effects could have the same or different signs, the *net* effect could be larger or smaller than the between-state or within-state effects alone.

### 1.    Between-State Funding Effect

For the counties within each state, the between-state funding effect was estimated in two steps. The effect of the Census 2000 undercount on the state's level of federal funding was first calculated for the 2002-2012 period (see section III.C., above). The funding effect at the state level was then apportioned among the counties in proportion to their *unadjusted* population counts. Thus, counties in states that lose federal funding as a result of the Census 2000 undercount are each estimated to share proportionately in this funding loss.

### 2.    Within-State Funding Effect

For the counties within each state, the within-state funding effect was estimated in four steps. First, the state's share of federal funding over the 2002-2012 period was

17

determined based on adjusted 2000 population counts (as described in section III.C., above). Second, state funding was apportioned among the counties in proportion to their estimated 2000 *adjusted* census counts. Third, state funding was apportioned among the counties in proportion to their 2000 *official* (unadjusted) census counts. Finally, the within-state funding effect was estimated by subtracting the county funding levels determined in step two (based on *adjusted* population counts) from step three (based on *official* population counts).

Counties with an undercount rate higher than the overall state average have a negative within-state funding effect, while relatively well counted areas have a positive within-state funding effect.

## 3.    Net Funding Effect

For the counties within each state, the net funding effect of the Census 2000 undercount over the 2002-2012 period was calculated as the sum of the between-state and within-state funding effects. For any county, these two funding effects can work in the same or opposite directions. For example, Cook County is estimated to have a *positive* $9 million *between-state* funding effect, because the State of Illinois is relatively well counted by the census. However, Cook County is estimated to have a *negative* $202 million *within-state* funding effect because it is relatively poorly counted by the census compared to other jurisdictions within the state. Thus, the *net* federal funding effect in Cook County of the Census 2000 undercount is *negative* $193 million ($9 million less $202 million) over the 2002-2012 period, because the funding loss from the within-state effect is larger than the funding gain from the between-state effect. The federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion over the period, or an average of $2,913 per uncounted person in these jurisdictions.

Table 9 shows the net funding effect of the Census 2000 undercount on the 25 counties that are estimated to experience the largest loss in federal funding over the 2002-2012 period. The five counties expecting the largest funding loss from the Census 2000 undercount are Los Angeles County, CA ($636 million), Bronx County, NY ($362 million), Kings County, NY ($269 million), Harris County, TX ($234 million), and New York County, NY ($212 million). Results for all 112 selected counties are shown in Appendix E.

This analysis only considers the effect of the Census 2000 undercount on *federal* funds allocated to local governments. Because a variety of *state* grant programs are also distributed to local governments on the basis of official population counts, the total shift in funds from federal and state grant programs will likely be larger than the estimates in this report.

18

**Table 9. Estimated Effect of Census 2000 Undercount on Eight Federal Grant Programs:  25 Selected Counties with the Largest Funding Loss, FY 2002-2012**
[Dollar amounts in thousands]

| County | Net Funding Effect |
|---|---|
| 1. Los Angeles County, CA | -635,860 |
| 2. Bronx County, NY | -361,999 |
| 3. Kings County, NY | -268,503 |
| 4. Harris County, TX | -234,400 |
| 5. New York County, NY | -212,094 |
| 6. Cook County, IL | -192,570 |
| 7. Dallas County, TX | -156,278 |
| 8. Miami-Dade County, FL | -104,947 |
| 9. Bexar County, TX | -81,378 |
| 10. San Diego County, CA | -71,626 |
| 11. Honolulu County, HI | -70,396 |
| 12. Tarrant County, TX | -62,301 |
| 13. Orange County, CA | -61,761 |
| 14. Queens County, NY | -60,764 |
| 15. Suffolk County, MA | -57,661 |
| 16. Hidalgo County, TX | -51,615 |
| 17. San Bernardino County, CA | -50,289 |
| 18. Fulton County, GA | -50,243 |
| 19. Shelby County, TN | -49,935 |
| 20. Hudson County, NJ | -49,876 |
| 21. Travis County, TX | -47,148 |
| 22. El Paso County, TX | -46,797 |
| 23. DeKalb County, GA | -45,246 |
| 24. Essex County, NJ | -43,900 |
| 25. Alameda County, CA | -43,599 |

Source:  PricewaterhouseCoopers calculations.

19

## IV.        CONCLUSION

This study expands on a previous study by PricewaterhouseCoopers that was released prior to the completion of Census 2000. In that study, we estimated the Census 2000 undercount based on the Census 1990 experience. Analysis of preliminary data by the Census Bureau and Dr. Eugene P. Ericksen of Temple University indicates that Census 2000 achieved a significantly lower undercount rate than Census 1990. This study uses Dr. Ericksen's analysis to estimate the effect of the Census 2000 undercount on the allocation of eight federal grant programs. We estimate that the Census 2000 undercount will cause the District of Columbia and 31 states adversely affected by the undercount to lose $4.1 billion in federal funding over the 2002-2012 fiscal year period.

The shift in federal funds due to the Census 2000 undercount is most pronounced in large urban counties because relatively poorly counted demographic groups are concentrated in these areas. They not only share in state losses from the undercount but also lose funds to other localities within the state because of the high relative undercounts of urban areas. The federal funding loss to the 58 largest counties adversely affected by the undercount is estimated to reach $3.6 billion over the period, or $2,913 per uncounted person in these jurisdictions. Because this report does not include all population-based federal programs or any of the state programs distributed using census data, these estimates should be treated as conservative.

The census undercount not only redistributes funds among jurisdictions, it also causes a net loss in federal funding to the states from entitlement programs such as Medicaid and Foster Care. For the programs included in this study, the Census 2000 undercount is estimated to reduce federal funds to *all* states combined by $478 million over the 2002-2012 period.

20

# APPENDICES

CVisPDF – www.fwvlvx.com

**Appendix A:  2000 Population Counts and Estimated Undercounts of Persons Over and Under 18 Years of Age by State**

## Table A-1. Unadjusted and Adjusted Year 2000 Census Population Counts by State

| State | Unadjusted Population Counts [1] | | | Adjusted Population Counts [2] | | |
|---|---|---|---|---|---|---|
| | State/US Total | Over 18 | Under 18 | State/US Total | Over 18 | Under 18 |
| United States | 281,421,906 | 209,128,094 | 72,293,812 | 284,777,491 | 211,341,436 | 73,436,055 |
| Alabama | 4,447,100 | 3,323,678 | 1,123,422 | 4,500,658 | 3,354,582 | 1,146,075 |
| Alaska | 626,932 | 436,215 | 190,717 | 644,130 | 448,098 | 196,033 |
| Arizona | 5,130,632 | 3,763,685 | 1,366,947 | 5,205,064 | 3,814,335 | 1,390,730 |
| Arkansas | 2,673,400 | 1,993,031 | 680,369 | 2,708,063 | 2,014,343 | 693,720 |
| California | 33,871,648 | 24,621,819 | 9,249,829 | 34,394,444 | 24,998,670 | 9,395,773 |
| Colorado | 4,301,261 | 3,200,466 | 1,100,795 | 4,356,148 | 3,237,899 | 1,118,249 |
| Connecticut | 3,405,565 | 2,563,877 | 841,688 | 3,438,923 | 2,586,781 | 852,141 |
| Delaware | 783,600 | 589,013 | 194,587 | 795,533 | 596,972 | 198,561 |
| District of Columbia | 572,059 | 457,067 | 114,992 | 584,629 | 465,879 | 118,750 |
| Florida | 15,982,378 | 12,336,038 | 3,646,340 | 16,183,048 | 12,468,415 | 3,714,633 |
| Georgia | 8,186,453 | 6,017,219 | 2,169,234 | 8,309,433 | 6,094,998 | 2,214,435 |
| Hawaii | 1,211,537 | 915,770 | 295,767 | 1,238,284 | 933,251 | 305,033 |
| Idaho | 1,293,953 | 924,923 | 369,030 | 1,315,528 | 938,913 | 376,615 |
| Illinois | 12,419,293 | 9,173,842 | 3,245,451 | 12,527,025 | 9,246,298 | 3,280,727 |
| Indiana | 6,080,485 | 4,506,089 | 1,574,396 | 6,127,668 | 4,534,460 | 1,593,208 |
| Iowa | 2,926,324 | 2,192,686 | 733,638 | 2,940,438 | 2,201,785 | 738,653 |
| Kansas | 2,688,418 | 1,975,425 | 712,993 | 2,706,279 | 1,986,671 | 719,609 |
| Kentucky | 4,041,769 | 3,046,951 | 994,818 | 4,092,102 | 3,078,249 | 1,013,852 |
| Louisiana | 4,468,976 | 3,249,177 | 1,219,799 | 4,529,674 | 3,283,507 | 1,246,167 |
| Maine | 1,274,923 | 973,685 | 301,238 | 1,292,108 | 983,235 | 308,873 |
| Maryland | 5,296,486 | 3,940,314 | 1,356,172 | 5,371,690 | 3,990,873 | 1,380,817 |
| Massachusetts | 6,349,097 | 4,849,033 | 1,500,064 | 6,397,720 | 4,884,369 | 1,513,351 |
| Michigan | 9,938,444 | 7,342,677 | 2,595,767 | 10,009,512 | 7,385,498 | 2,624,013 |
| Minnesota | 4,919,479 | 3,632,585 | 1,286,894 | 4,933,787 | 3,638,847 | 1,294,940 |
| Mississippi | 2,844,658 | 2,069,471 | 775,187 | 2,880,375 | 2,089,389 | 790,985 |
| Missouri | 5,595,211 | 4,167,519 | 1,427,692 | 5,621,068 | 4,180,603 | 1,440,465 |
| Montana | 902,195 | 672,133 | 230,062 | 916,585 | 681,946 | 234,639 |
| Nebraska | 1,711,263 | 1,261,021 | 450,242 | 1,720,900 | 1,266,872 | 454,028 |
| Nevada | 1,998,257 | 1,486,458 | 511,799 | 2,032,401 | 1,511,027 | 521,375 |
| New Hampshire | 1,235,786 | 926,224 | 309,562 | 1,249,910 | 934,690 | 315,220 |
| New Jersey | 8,414,350 | 6,326,792 | 2,087,558 | 8,512,241 | 6,397,661 | 2,114,580 |
| New Mexico | 1,819,046 | 1,310,472 | 508,574 | 1,855,034 | 1,335,507 | 519,526 |
| New York | 18,976,457 | 14,286,350 | 4,690,107 | 19,185,580 | 14,428,065 | 4,757,515 |
| North Carolina | 8,049,313 | 6,085,266 | 1,964,047 | 8,160,293 | 6,156,125 | 2,004,168 |
| North Dakota | 642,200 | 481,351 | 160,849 | 645,233 | 483,302 | 161,931 |
| Ohio | 11,353,140 | 8,464,801 | 2,888,339 | 11,418,224 | 8,495,548 | 2,922,676 |
| Oklahoma | 3,450,654 | 2,558,294 | 892,360 | 3,499,649 | 2,586,403 | 913,246 |
| Oregon | 3,421,399 | 2,574,873 | 846,526 | 3,465,410 | 2,603,182 | 862,228 |
| Pennsylvania | 12,281,054 | 9,358,833 | 2,922,221 | 12,382,591 | 9,416,396 | 2,966,196 |
| Rhode Island | 1,048,319 | 800,497 | 247,822 | 1,057,306 | 806,842 | 250,464 |
| South Carolina | 4,012,012 | 3,002,371 | 1,009,641 | 4,060,741 | 3,031,370 | 1,029,371 |
| South Dakota | 754,844 | 552,195 | 202,649 | 759,095 | 554,727 | 204,368 |
| Tennessee | 5,689,283 | 4,290,762 | 1,398,521 | 5,760,133 | 4,333,431 | 1,426,701 |
| Texas | 20,851,820 | 14,965,061 | 5,886,759 | 21,225,387 | 15,231,864 | 5,993,523 |
| Utah | 2,233,169 | 1,514,471 | 718,698 | 2,263,729 | 1,533,133 | 730,597 |
| Vermont | 608,827 | 461,304 | 147,523 | 618,161 | 466,666 | 151,495 |
| Virginia | 7,078,515 | 5,340,253 | 1,738,262 | 7,173,928 | 5,404,866 | 1,769,062 |
| Washington | 5,894,121 | 4,380,278 | 1,513,843 | 5,978,417 | 4,435,942 | 1,542,475 |
| West Virginia | 1,808,344 | 1,405,951 | 402,393 | 1,830,122 | 1,421,169 | 408,954 |
| Wisconsin | 5,363,675 | 3,994,919 | 1,368,756 | 5,401,485 | 4,017,548 | 1,383,938 |
| Wyoming | 493,782 | 364,909 | 128,873 | 501,607 | 370,236 | 131,372 |

[1] Source: U.S. Census Bureau, *Census 2000 Redistricting Data (P.L. 94-171) Summary File, Table 1.*

[2] Equals unadjusted population count plus undercount (See Table A-2).

Appendix A-1

## Table A-2. Year 2000 Census Undercount and Undercount Rate by State

| State | Undercount | | | Undercount Rate[3] | | |
|---|---|---|---|---|---|---|
| | State/US Total[1] | Over 18[2] | Under 18[2] | State/US Total | Over 18 | Under 18 |
| United States | 3,355,585 | 2,213,342 | 1,142,243 | 1.18 | 1.05 | 1.56 |
| Alabama | 53,558 | 30,904 | 22,653 | 1.19 | 0.92 | 1.94 |
| Alaska | 17,198 | 11,883 | 5,316 | 2.67 | 2.65 | 2.72 |
| Arizona | 74,432 | 50,650 | 23,783 | 1.43 | 1.33 | 1.70 |
| Arkansas | 34,663 | 21,312 | 13,351 | 1.28 | 1.06 | 1.90 |
| California | 522,796 | 376,851 | 145,944 | 1.52 | 1.51 | 1.54 |
| Colorado | 54,887 | 37,433 | 17,454 | 1.26 | 1.16 | 1.55 |
| Connecticut | 33,358 | 22,904 | 10,453 | 0.97 | 0.89 | 1.22 |
| Delaware | 11,933 | 7,959 | 3,974 | 1.50 | 1.33 | 2.00 |
| District of Columbia | 12,570 | 8,812 | 3,758 | 2.15 | 1.89 | 3.09 |
| Florida | 200,670 | 132,377 | 68,293 | 1.24 | 1.06 | 1.82 |
| Georgia | 122,980 | 77,779 | 45,201 | 1.48 | 1.28 | 2.04 |
| Hawaii | 26,747 | 17,481 | 9,266 | 2.16 | 1.87 | 3.01 |
| Idaho | 21,575 | 13,990 | 7,585 | 1.64 | 1.49 | 2.00 |
| Illinois | 107,732 | 72,456 | 35,276 | 0.86 | 0.78 | 1.07 |
| Indiana | 47,183 | 28,371 | 18,812 | 0.77 | 0.63 | 1.15 |
| Iowa | 14,114 | 9,099 | 5,015 | 0.48 | 0.41 | 0.69 |
| Kansas | 17,861 | 11,246 | 6,616 | 0.66 | 0.57 | 0.91 |
| Kentucky | 50,333 | 31,298 | 19,034 | 1.23 | 1.02 | 1.85 |
| Louisiana | 60,698 | 34,330 | 26,368 | 1.34 | 1.05 | 2.11 |
| Maine | 17,185 | 9,550 | 7,635 | 1.33 | 0.97 | 2.44 |
| Maryland | 75,204 | 50,559 | 24,645 | 1.40 | 1.27 | 1.78 |
| Massachusetts | 48,623 | 35,336 | 13,287 | 0.76 | 0.72 | 0.88 |
| Michigan | 71,068 | 42,821 | 28,246 | 0.71 | 0.58 | 1.06 |
| Minnesota | 14,308 | 6,262 | 8,046 | 0.29 | 0.17 | 0.60 |
| Mississippi | 35,717 | 19,918 | 15,798 | 1.24 | 0.95 | 1.97 |
| Missouri | 25,857 | 13,084 | 12,773 | 0.46 | 0.31 | 0.88 |
| Montana | 14,390 | 9,813 | 4,577 | 1.57 | 1.44 | 1.93 |
| Nebraska | 9,637 | 5,851 | 3,786 | 0.56 | 0.46 | 0.84 |
| Nevada | 34,144 | 24,569 | 9,576 | 1.68 | 1.63 | 1.82 |
| New Hampshire | 14,124 | 8,466 | 5,658 | 1.13 | 0.91 | 1.78 |
| New Jersey | 97,891 | 70,869 | 27,022 | 1.15 | 1.11 | 1.29 |
| New Mexico | 35,988 | 25,035 | 10,952 | 1.94 | 1.87 | 2.11 |
| New York | 209,123 | 141,715 | 67,408 | 1.09 | 0.98 | 1.39 |
| North Carolina | 110,980 | 70,859 | 40,121 | 1.36 | 1.15 | 1.99 |
| North Dakota | 3,033 | 1,951 | 1,082 | 0.47 | 0.40 | 0.67 |
| Ohio | 65,084 | 30,747 | 34,337 | 0.57 | 0.36 | 1.14 |
| Oklahoma | 48,995 | 28,109 | 20,886 | 1.40 | 1.09 | 2.27 |
| Oregon | 44,011 | 28,309 | 15,702 | 1.27 | 1.09 | 1.81 |
| Pennsylvania | 101,537 | 57,563 | 43,975 | 0.82 | 0.61 | 1.46 |
| Rhode Island | 8,987 | 6,345 | 2,642 | 0.85 | 0.79 | 1.05 |
| South Carolina | 48,729 | 28,999 | 19,730 | 1.20 | 0.96 | 1.88 |
| South Dakota | 4,251 | 2,532 | 1,719 | 0.56 | 0.46 | 0.84 |
| Tennessee | 70,850 | 42,669 | 28,180 | 1.23 | 0.98 | 1.94 |
| Texas | 373,567 | 266,803 | 106,764 | 1.76 | 1.75 | 1.79 |
| Utah | 30,560 | 18,662 | 11,899 | 1.35 | 1.22 | 1.62 |
| Vermont | 9,334 | 5,362 | 3,972 | 1.51 | 1.15 | 2.58 |
| Virginia | 95,413 | 64,613 | 30,800 | 1.33 | 1.20 | 1.74 |
| Washington | 84,296 | 55,664 | 28,632 | 1.41 | 1.25 | 1.85 |
| West Virginia | 21,778 | 15,218 | 6,561 | 1.19 | 1.07 | 1.58 |
| Wisconsin | 37,810 | 22,629 | 15,182 | 0.70 | 0.56 | 1.10 |
| Wyoming | 7,825 | 5,327 | 2,499 | 1.56 | 1.44 | 1.91 |

[1] Source: Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

[2] PricewaterhouseCoopers calculations based on undercount rates provided by Dr. Ericksen.

[3] Undercount as a percent of adjusted population. U.S. Census Bureau and Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates*, May 1, 2001.

Appendix A-2

# Appendix B:  2000 Population Undercount by Selected County

CUtePDF – www.fasiso.com

## Appendix B.  Year 2000 Census Undercount by County

| State, County | 2000 Population Projection | | Estimated Undercount | |
|---|---|---|---|---|
| | Unadjusted Count[1] | Adjusted Count[2] | Number[3] | Rate[4] |
| **Total, All 112 Selected Counties** | **125,460,358** | **127,081,879** | **1,621,521** | **1.28** |
| **Alabama** | **4,447,100** | **4,500,658** | **53,558** | **1.19** |
| Jefferson County | 662,047 | 672,565 | 10,518 | 1.56 |
| **Arizona** | **5,130,632** | **5,205,064** | **74,432** | **1.43** |
| Maricopa County | 3,072,149 | 3,109,081 | 36,932 | 1.19 |
| Pima County | 843,746 | 854,259 | 10,513 | 1.23 |
| **California** | **33,871,648** | **34,394,444** | **522,796** | **1.52** |
| Alameda County | 1,443,741 | 1,463,267 | 19,526 | 1.33 |
| Contra Costa County | 948,816 | 957,328 | 8,512 | 0.89 |
| Fresno County | 799,407 | 812,347 | 12,940 | 1.59 |
| Kern County | 661,645 | 670,843 | 9,198 | 1.37 |
| Los Angeles County | 9,519,338 | 9,694,716 | 175,378 | 1.81 |
| Orange County | 2,846,289 | 2,881,546 | 35,257 | 1.22 |
| Riverside County | 1,545,387 | 1,563,399 | 18,012 | 1.15 |
| Sacramento County | 1,223,499 | 1,236,842 | 13,343 | 1.08 |
| San Bernardino County | 1,709,434 | 1,732,375 | 22,941 | 1.32 |
| San Diego County | 2,813,833 | 2,850,103 | 36,270 | 1.27 |
| San Francisco County | 776,733 | 788,191 | 11,458 | 1.45 |
| San Joaquin County | 563,598 | 571,318 | 7,720 | 1.35 |
| San Mateo County | 707,161 | 714,694 | 7,533 | 1.05 |
| Santa Clara County | 1,682,585 | 1,702,011 | 19,426 | 1.14 |
| Ventura County | 753,197 | 761,381 | 8,184 | 1.07 |
| **Colorado** | **4,301,261** | **4,356,148** | **54,887** | **1.26** |
| Denver County | 554,636 | 563,619 | 8,983 | 1.59 |
| El Paso County | 516,929 | 521,732 | 4,803 | 0.92 |
| Jefferson County | 527,056 | 529,927 | 2,871 | 0.54 |
| **Connecticut** | **3,405,565** | **3,438,923** | **33,358** | **0.97** |
| Fairfield County | 882,567 | 891,041 | 8,474 | 0.95 |
| Hartford County | 857,183 | 866,052 | 8,869 | 1.02 |
| New Haven County | 824,008 | 831,688 | 7,680 | 0.92 |
| **Delaware** | **783,600** | **795,533** | **11,933** | **1.50** |
| New Castle County | 500,265 | 507,573 | 7,308 | 1.44 |
| **Florida** | **15,982,378** | **16,183,048** | **200,670** | **1.24** |
| Broward County | 1,623,018 | 1,642,842 | 19,824 | 1.21 |
| Miami-Dade County | 2,253,362 | 2,297,091 | 43,729 | 1.90 |
| Duval County | 778,879 | 787,957 | 9,078 | 1.15 |
| Hillsborough County | 998,948 | 1,010,386 | 11,438 | 1.13 |
| Orange County | 896,344 | 907,877 | 11,533 | 1.27 |
| Palm Beach County | 1,131,184 | 1,142,954 | 11,770 | 1.03 |
| Pinellas County | 921,482 | 929,008 | 7,526 | 0.81 |
| **Georgia** | **8,186,453** | **8,309,433** | **122,980** | **1.48** |
| Cobb County | 607,751 | 616,952 | 9,201 | 1.49 |
| DeKalb County | 665,865 | 680,465 | 14,600 | 2.15 |
| Fulton County | 816,006 | 833,051 | 17,045 | 2.05 |
| Gwinnett County | 588,448 | 596,806 | 8,358 | 1.40 |

Footnotes appear at end of table.

Appendix B-1

## Appendix B. Year 2000 Census Undercount by County, continued

| State, County | 2000 Population Projection | | Estimated Undercount | |
|---|---|---|---|---|
| | Unadjusted Count[1] | Adjusted Count[2] | Number[3] | Rate[4] |
| **Hawaii** | **1,211,537** | **1,238,284** | **26,747** | **2.16** |
| Honolulu County | 876,156 | 894,559 | 18,403 | 2.06 |
| **Illinois** | **12,419,293** | **12,527,025** | **107,732** | **0.86** |
| Cook County | 5,376,741 | 5,453,560 | 76,819 | 1.41 |
| DuPage County | 904,161 | 907,141 | 2,980 | 0.33 |
| Lake County | 644,356 | 647,892 | 3,536 | 0.55 |
| Will County | 502,266 | 503,952 | 1,686 | 0.33 |
| **Indiana** | **6,080,485** | **6,127,668** | **47,183** | **0.77** |
| Marion County | 860,454 | 868,891 | 8,437 | 0.97 |
| **Kentucky** | **4,041,769** | **4,092,102** | **50,333** | **1.23** |
| Jefferson County | 693,604 | 701,961 | 8,357 | 1.19 |
| **Maryland** | **5,296,486** | **5,371,690** | **75,204** | **1.40** |
| Baltimore City[5] | 651,154 | 664,993 | 13,839 | 2.08 |
| Baltimore County | 754,292 | 763,672 | 9,380 | 1.23 |
| Montgomery County | 873,341 | 885,453 | 12,112 | 1.37 |
| Prince George's County | 801,515 | 817,093 | 15,578 | 1.91 |
| **Massachusetts** | **6,349,097** | **6,397,720** | **48,623** | **0.76** |
| Bristol County | 534,678 | 537,658 | 2,980 | 0.55 |
| Essex County | 723,419 | 728,856 | 5,437 | 0.75 |
| Middlesex County | 1,465,396 | 1,474,743 | 9,347 | 0.63 |
| Norfolk County | 650,308 | 653,016 | 2,708 | 0.41 |
| Suffolk County | 689,807 | 701,348 | 11,541 | 1.65 |
| Worcester County | 750,963 | 755,887 | 4,924 | 0.65 |
| **Michigan** | **9,938,444** | **10,009,512** | **71,068** | **0.71** |
| Kent County | 574,335 | 577,662 | 3,327 | 0.58 |
| Macomb County | 788,149 | 790,664 | 2,515 | 0.32 |
| Oakland County | 1,194,156 | 1,200,981 | 6,825 | 0.57 |
| Wayne County | 2,061,162 | 2,091,394 | 30,232 | 1.45 |
| **Minnesota** | **4,919,479** | **4,933,787** | **14,308** | **0.29** |
| Hennepin County | 1,116,200 | 1,123,958 | 7,758 | 0.69 |
| Ramsey County | 511,035 | 513,913 | 2,878 | 0.56 |
| **Missouri** | **5,595,211** | **5,621,068** | **25,857** | **0.46** |
| Jackson County | 654,880 | 661,305 | 6,425 | 0.97 |
| St. Louis County | 1,016,315 | 1,022,272 | 5,957 | 0.58 |
| **Nevada** | **1,998,257** | **2,032,401** | **34,144** | **1.68** |
| Clark County | 1,375,765 | 1,396,215 | 20,450 | 1.46 |
| **New Jersey** | **8,414,350** | **8,512,241** | **97,891** | **1.15** |
| Bergen County | 884,118 | 892,354 | 8,236 | 0.92 |
| Camden County | 508,932 | 513,949 | 5,017 | 0.98 |
| Essex County | 793,633 | 808,624 | 14,991 | 1.85 |
| Hudson County | 608,975 | 622,595 | 13,620 | 2.19 |
| Middlesex County | 750,162 | 758,371 | 8,209 | 1.08 |
| Monmouth County | 615,301 | 620,014 | 4,713 | 0.76 |
| Ocean County | 510,916 | 514,011 | 3,095 | 0.60 |
| Union County | 522,541 | 529,612 | 7,071 | 1.34 |

Footnotes appear at end of table.

Appendix B-2

**Appendix B.  Year 2000 Census Undercount by County, continued**

| State, County | 2000 Population Projection | | Estimated Undercount | |
|---|---|---|---|---|
| | Unadjusted Count[1] | Adjusted Count[2] | Number[3] | Rate[4] |
| **New Mexico** | **1,819,046** | **1,855,034** | **35,988** | **1.94** |
| Bernalillo County | 556,678 | 564,539 | 7,861 | 1.39 |
| **New York** | 18,976,457 | 19,185,580 | 209,123 | 1.09 |
| Bronx County | 1,332,650 | 1,369,358 | 36,708 | 2.68 |
| Erie County | 950,265 | 955,016 | 4,751 | 0.50 |
| Kings County | 2,465,326 | 2,508,872 | 43,546 | 1.74 |
| Monroe County | 735,343 | 739,316 | 3,973 | 0.54 |
| Nassau County | 1,334,544 | 1,332,925 | -1,619 | -0.12 |
| New York County | 1,537,195 | 1,567,060 | 29,865 | 1.91 |
| Queens County | 2,229,379 | 2,257,703 | 28,324 | 1.25 |
| Richmond County[6] | 443,728 | 445,203 | 1,475 | 0.33 |
| Suffolk County | 1,419,369 | 1,416,194 | -3,175 | -0.22 |
| Westchester County | 923,459 | 928,775 | 5,316 | 0.57 |
| **North Carolina** | **8,049,313** | **8,160,293** | **110,980** | **1.36** |
| Mecklenburg County | 695,454 | 707,386 | 11,932 | 1.69 |
| Wake County | 627,846 | 637,077 | 9,231 | 1.45 |
| **Ohio** | **11,353,140** | **11,418,224** | **65,084** | **0.57** |
| Cuyahoga County | 1,393,978 | 1,407,137 | 13,159 | 0.94 |
| Franklin County | 1,068,978 | 1,077,965 | 8,987 | 0.83 |
| Hamilton County | 845,303 | 852,737 | 7,434 | 0.87 |
| Montgomery County | 559,062 | 563,089 | 4,027 | 0.72 |
| Summit County | 542,899 | 545,497 | 2,598 | 0.48 |
| **Oklahoma** | **3,450,654** | **3,499,649** | **48,995** | **1.40** |
| Oklahoma County | 660,448 | 671,690 | 11,242 | 1.67 |
| Tulsa County | 563,299 | 571,988 | 8,689 | 1.52 |
| **Oregon** | **3,421,399** | **3,465,410** | **44,011** | **1.27** |
| Multnomah County | 660,486 | 666,731 | 6,245 | 0.94 |
| **Pennsylvania** | **12,281,054** | **12,382,591** | **101,537** | **0.82** |
| Allegheny County | 1,281,666 | 1,287,406 | 5,740 | 0.45 |
| Bucks County | 597,635 | 600,363 | 2,728 | 0.45 |
| Delaware County | 550,864 | 554,354 | 3,490 | 0.63 |
| Montgomery County | 750,097 | 754,000 | 3,903 | 0.52 |
| Philadelphia County | 1,517,550 | 1,536,930 | 19,380 | 1.26 |
| **Rhode Island** | **1,048,319** | **1,057,306** | **8,987** | **0.85** |
| Providence County | 621,602 | 625,596 | 3,994 | 0.64 |
| **Tennessee** | **5,689,283** | **5,760,133** | **70,850** | **1.23** |
| Davidson County | 569,891 | 578,765 | 8,874 | 1.53 |
| Shelby County | 897,472 | 912,769 | 15,297 | 1.68 |
| **Texas** | **20,851,820** | **21,225,387** | **373,567** | **1.52** |
| Bexar County | 1,392,931 | 1,419,991 | 27,060 | 1.33 |
| Dallas County | 2,218,899 | 2,266,128 | 47,229 | 0.89 |
| El Paso County | 679,622 | 693,922 | 14,300 | 1.59 |
| Harris County | 3,400,578 | 3,472,170 | 71,592 | 1.37 |
| Hidalgo County | 569,463 | 583,365 | 13,902 | 1.81 |
| Tarrant County | 1,446,219 | 1,470,880 | 24,661 | 1.22 |
| Travis County | 812,280 | 828,012 | 15,732 | 1.15 |

Footnotes appear at end of table.

Appendix B-3

## Appendix B. Year 2000 Census Undercount by County, continued

| State, County | 2000 Population Projection | | Estimated Undercount | |
|---|---|---|---|---|
| | Unadjusted Count[1] | Adjusted Count[2] | Number[3] | Rate[4] |
| **Utah** | **2,233,169** | **2,263,729** | **30,560** | **1.35** |
| Salt Lake County | 898,387 | 907,947 | 9,560 | 1.05 |
| **Virginia** | **7,078,515** | **7,173,928** | **95,413** | **1.33** |
| Fairfax County | 969,749 | 981,909 | 12,160 | 1.24 |
| **Washington** | **5,894,121** | **5,978,417** | **84,296** | **1.41** |
| King County | 1,737,034 | 1,757,102 | 20,068 | 1.14 |
| Pierce County | 700,820 | 709,038 | 8,218 | 1.16 |
| Snohomish County | 606,024 | 611,706 | 5,682 | 0.93 |
| **Wisconsin** | **5,363,675** | **5,401,485** | **37,810** | **0.70** |
| Milwaukee County | 940,164 | 951,412 | 11,248 | 1.18 |

[1]Source: U.S. Census Bureau, *Census 2000 Redistricting Data (P.L. 94-171) Summary File, Table 1.*

[2]Equals unadjusted population count plus undercount.

[3]Equals adjusted minus unadjusted 2000 population projections.

[4]Undercount as a percent of adjusted population. U.S. Census Bureau and Dr. Eugene Ericksen, *Estimates of State and County Undercount Rates,* May 1, 2001.

[5]Baltimore City is an independent city (i.e., it is independent of any county organization).

[6]Richmond County is included in order to comprise the 5 counties of New York City.

Appendix B-4

# Appendix C:  Federal Program Descriptions

CutePDF – www.fasiso.com

# Federal Program Descriptions

The federal programs analyzed in the report are summarized below. Additional information, such as the formulas used to allocate funds to states, is available from the General Accounting Office report.[1] The total effect on the eight federal programs analyzed appears in Table D-1 in Appendix D.

## 1. Adoption Assistance

The Adoption Assistance program supports the adoption of children with special needs. Specifically, the program provides maintenance payments to the families adopting the qualifying children, payments to state agencies for the administrative costs involved with placing the children in adoptive homes, and payments for training professional staff and parents involved in the adoptions. States determine which children qualify for the assistance; in general, children with special circumstances that make their adoption less likely, such as a mental or physical handicap, are eligible for the program.

The federal government provides a specified percentage of the payments made to the qualifying families, and states provide the remainder. Administrative and training expenses are matched at the same rate in all states (50 percent and 75 percent, respectively). The federal government reimburses maintenance payments based on a state-specific percentage that depends on each state's per capita income. This percentage, the Federal medical assistance percentage (FMAP), ranges from 50 percent to 83 percent and also determines reimbursement rates under the Medicaid program.

To calculate the effect of the 2000 undercount on the Adoption Assistance funding received by each state, the FMAP for each state was calculated using adjusted and unadjusted per capita income, which relied on adjusted and unadjusted population counts. Adjusted and unadjusted funding levels by state were produced by calculating the product of the FMAP (adjusted or unadjusted) and the maintenance payments.[2] Table D-2 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

---

[1] General Accounting Office, *Formula Grants: Effects of Adjusted Population Counts on Federal Funding to States*, GAO/HEHS-99-69, February 1999. The formula used to allocate the Vocational Education differs slightly from that presented in the GAO report. See the listing for the program in the *Catalog of Federal Domestic Assistance* (CFDA# 84.048).

[2] Administrative and training expenses would not be affected by the undercount since those expenses are matched at rates that do not depend on population counts.

*2. Child Care and Development Fund Discretionary Funds*
*(formerly the Child Care and Development Block Grant)*

This program provides funding to assist low-income families with child care and to improve the availability and quality of child care. States establish programs with the funds subject to certain Federal restrictions. For instance, to qualify for services under the program, children must be from families that earn less than 85 percent of the state median income.

The program allocates funding amounts to states based on a formula that includes the state population under 5 years old, the number of children qualifying for the School Lunch program, and the state per capita income. To calculate the effect of the 2000 undercount on the funding received by each state, adjusted and unadjusted population (under 5 and overall) figures were used in the formula to calculate adjusted and unadjusted state shares. Multiplying these shares by the total funding level for the program yielded the adjusted and unadjusted state funding levels. Table D-3 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

*3. Foster Care*

The Foster Care program supports families and facilities that provide homes to needy foster children. The program provides funding for maintenance payments to the homes hosting the children, payments to the state agencies for administrative costs, and payments to state and local agencies for training expenses. Any foster child that would have qualified for the Aid to Families with Dependent Children (AFDC) program, as in effect in 1995, qualifies for Foster Care payments, which are made to the foster care family home, private child care facility, or public child care institution (with more than 25 people). The maintenance payments are intended to cover the costs associated with raising a child, such as expenses for food, shelter, and supervision.

Similar to the Adoption Assistance program, administrative and training expenses are matched at the same rate in all states (50 percent and 75 percent, respectively). The federal government reimburses maintenance payments based on the FMAP.

To calculate the effect of the 2000 undercount on the Foster Care funding received by each state, the FMAP for each state was calculated using adjusted and unadjusted per capita income, which relied on adjusted and unadjusted population counts. Adjusted and unadjusted funding levels by state were produced by calculating the product of the FMAP (adjusted or unadjusted) and the maintenance payments. Table D-4 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

## 4. Medicaid

The Medicaid program provides medical assistance to certain low-income individuals. States design and administer their own programs, subject to Federal regulations, and receive reimbursements from the Federal government for their expenses. In general, low-income children and pregnant women, adults in families with dependent children, low-income persons with disabilities, and low-income elderly persons qualify for the program. The program covers expenses for medical assistance such as inpatient and outpatient hospital care, laboratory and x-ray services, and physician services.

Administrative expenses, amounts for family planning, and amounts paid to Indian Health Services facilities are matched at the same rate in all states (50 percent, 90 percent, and 75 percent, respectively). Medical assistance payments (i.e., payments for care) are matched based on the FMAP.

To calculate the effect of the 2000 undercount on the Foster Care funding received by each state, the FMAP for each state was calculated using adjusted and unadjusted per capita income, which relied on adjusted and unadjusted population counts. Adjusted and unadjusted funding levels by state were produced by calculating the product of the FMAP (adjusted or unadjusted) and the medical assistance payments. Table D-5 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

## 5. Rehabilitation Services, Basic Grants

This program provides vocational rehabilitation to disabled individuals and their families. Specifically, individuals with physical or mental impairments receive services such as reader services for the blind, interpreter services for the deaf, prosthetic devices, job placement, and transportation to vocational rehabilitation facilities. States administer independent programs, subject to Federal guidelines, and receive grants annually from the Federal government.

The program allocates funding to states based on a formula that considers the amount received by the state in 1978, state population, and per capita income. To calculate the effect of the 2000 undercount, state shares were calculated using adjusted and unadjusted state and national population figures. Adjusted and unadjusted state funding levels were calculated by multiplying the state shares (adjusted and unadjusted) by the total funding for the program. States are guaranteed to receive at least one-third of one percent of the total appropriation; state funding levels (adjusted and unadjusted) were adjusted to conform to this restriction. Table D-6 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

### 6. Social Services Block Grant

This program provides grants to states for providing social services. States determine the use of the funds at their own discretion but must use the funds towards one of five goals: (1) to prevent, reduce, or eliminate dependency; (2) to achieve or maintain self-sufficiency; (3) to prevent neglect, abuse, or exploitation of children and adults; (4) to prevent or reduce inappropriate institutional care; and (5) to secure admission or referral for institutional care when other forms of care are inappropriate.[3] In the past, states have used the funds for child day care, protective and emergency services for children and adults, adoption, foster care, and counseling.

States receive allotments under the program based on a formula that relies on the state's share of the national population. To calculate the effect of the 2000 undercount, state shares were calculated using adjusted and unadjusted state and national population figures. Adjusted and unadjusted state funding levels were calculated by multiplying the state shares (adjusted and unadjusted) by the total funding for the program. Table D-7 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

### 7. Substance Abuse Prevention and Treatment Block Grant

This program provides grants to states for the prevention and treatment of drug and alcohol abuse. Subject to certain federal restrictions, states design and implement programs to reduce drug and alcohol abuse and provide rehabilitation to individuals with drug and alcohol problems.

States receive allocations under the program based on a formula that depends on the population aged 18 to 24, population aged 25 to 64, urban population aged 18 to 24, per capita income, and a cost index. The cost index, which is recalculated every three years, consists of a wage component and a measure of average rental prices for housing.

To calculate the effect of the 2000 undercount, state shares were calculated using adjusted and unadjusted state and national population figures (the cost index and urban share of population were assumed to remain constant). Adjusted and unadjusted state funding levels were calculated by multiplying the state shares (adjusted and unadjusted) by the total funding for the program. After the calculation of these funding levels, additional adjustments were made to guarantee that each state received a minimum share of the increase in the national funding level and a minimum share of the national funding level, as is standard practice under current

---

[3] As described in the *Catalog of Federal Domestic Assistance* (CFDA), General Services Administration.

law.[4] Table D-8 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

*8.  Vocational Education*

This program provides grants to states for vocational education programs for youths and adults.  State programs offer courses to prepare individuals for employment in occupations not requiring a baccalaureate or an advanced degree.  States use the funds provided by this program for a variety of activities, including purchasing occupationally-relevant equipment and curriculum materials, providing career counseling and guidance, hiring staff, and offering remedial classes.

The formula used to allot the funding amount to states depends on the population aged 15 to 19, population aged 20 to 24, population aged 25 to 65, and per capita income.  To calculate the effect of the 2000 undercount, state shares were calculated using adjusted and unadjusted state and national population figures.  Adjusted and unadjusted state funding levels were calculated by multiplying the state shares (adjusted and unadjusted) by the total funding for the program.  Current law contains a "hold-harmless" provision to guarantee that the amount a state receives in the current year always exceeds the amount received in the prior year (assuming the national funding level rises).  State funding levels were adjusted to ensure that this provision was satisfied.  Table D-9 in Appendix D summarizes the estimated effect of the Census 2000 undercount on this program.

---

[4] Specifically, the guaranteed increases used for 1999 funding levels have been used for future years. The actual rules governing minimum increases and shares of the national total have varied by year; we have assumed the 1999 rules continue to apply since newer rules are unavailable.

**Appendix D:  Estimated Funding Effect by State by Program**

CViiiPDF – www.fastio.com

**Table D-1.  Estimated Funding Effect of Census 2000 Undercount by State on Eight Federal Programs,
FY 2002-2012  [Fiscal years; thousands of dollars]**

| State | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2002-2012 |
|---|---|---|---|---|---|---|---|
| Alabama | -112 | -341 | -367 | -396 | -426 | -459 | -4,850 |
| Alaska | -293 | -7,321 | -7,945 | -8,633 | -9,363 | -10,157 | -108,455 |
| Arizona | -476 | -5,317 | -5,745 | -6,216 | -6,715 | -7,258 | -77,201 |
| Arkansas | -116 | -1,172 | -1,268 | -1,373 | -1,484 | -1,606 | -17,087 |
| California | -3,823 | -102,112 | -110,676 | -120,163 | -130,220 | -141,153 | -1,506,191 |
| Colorado | -100 | -132 | -135 | -138 | -141 | -143 | -1,429 |
| Connecticut | 184 | 245 | 249 | 254 | 259 | 264 | 2,635 |
| Delaware | -88 | -90 | -92 | -93 | -95 | -97 | -963 |
| District of Columbia | -106 | -108 | -110 | -111 | -113 | -115 | -1,145 |
| Florida | -488 | -6,247 | -6,766 | -7,337 | -7,942 | -8,600 | -91,641 |
| Georgia | -1,056 | -14,265 | -15,441 | -16,735 | -18,105 | -19,598 | -208,754 |
| Hawaii | -399 | -7,180 | -7,778 | -8,437 | -9,136 | -9,896 | -105,516 |
| Idaho | -198 | -2,612 | -2,826 | -3,062 | -3,311 | -3,582 | -38,145 |
| Illinois | 1,594 | 1,954 | 1,994 | 2,035 | 2,075 | 2,117 | 21,078 |
| Indiana | 971 | 15,518 | 16,804 | 18,220 | 19,720 | 21,354 | 227,572 |
| Iowa | 832 | 12,098 | 13,093 | 14,192 | 15,356 | 16,623 | 177,085 |
| Kansas | 583 | 8,653 | 9,366 | 10,153 | 10,986 | 11,893 | 126,708 |
| Kentucky | -122 | -1,314 | -1,423 | -1,543 | -1,669 | -1,808 | -19,253 |
| Louisiana | -348 | -4,684 | -5,075 | -5,504 | -5,959 | -6,455 | -68,794 |
| Maine | -89 | -1,862 | -2,020 | -2,194 | -2,378 | -2,578 | -27,516 |
| Maryland | -406 | -514 | -525 | -535 | -546 | -557 | -5,545 |
| Massachusetts | 744 | 953 | 971 | 991 | 1,010 | 1,029 | 10,258 |
| Michigan | 1,806 | 34,757 | 37,655 | 40,858 | 44,253 | 47,945 | 511,279 |
| Minnesota | 1,520 | 1,904 | 1,942 | 1,982 | 2,021 | 2,062 | 20,533 |
| Mississippi | -113 | -857 | -927 | -1,004 | -1,085 | -1,174 | -12,481 |
| Missouri | 1,570 | 35,315 | 38,302 | 41,589 | 45,072 | 48,867 | 521,486 |
| Montana | -110 | -1,454 | -1,575 | -1,708 | -1,848 | -2,001 | -21,326 |
| Nebraska | 431 | 7,579 | 8,212 | 8,908 | 9,647 | 10,450 | 111,424 |
| Nevada | -318 | -425 | -434 | -443 | -451 | -461 | -4,591 |
| New Hampshire | 7 | 7 | 8 | 8 | 8 | 8 | 79 |
| New Jersey | 162 | 136 | 139 | 142 | 144 | 147 | 1,455 |
| New Mexico | -394 | -7,475 | -8,100 | -8,787 | -9,516 | -10,309 | -109,930 |
| New York | 666 | 850 | 867 | 885 | 903 | 921 | 9,173 |
| North Carolina | -660 | -11,064 | -11,992 | -13,013 | -14,094 | -15,273 | -162,873 |
| North Dakota | 122 | 2,164 | 2,347 | 2,547 | 2,760 | 2,992 | 31,917 |
| Ohio | 2,539 | 54,039 | 58,567 | 63,566 | 68,864 | 74,629 | 796,077 |
| Oklahoma | -360 | -3,439 | -3,717 | -4,023 | -4,347 | -4,700 | -49,990 |
| Oregon | -143 | -2,285 | -2,476 | -2,687 | -2,910 | -3,153 | -33,623 |
| Pennsylvania | 1,446 | 45,229 | 49,075 | 53,322 | 57,823 | 62,723 | 669,759 |
| Rhode Island | 104 | 4,765 | 5,179 | 5,634 | 6,117 | 6,643 | 71,011 |
| South Carolina | -94 | -629 | -681 | -738 | -798 | -863 | -9,183 |
| South Dakota | 173 | 2,096 | 2,269 | 2,459 | 2,661 | 2,880 | 30,678 |
| Tennessee | -216 | -2,636 | -2,857 | -3,100 | -3,359 | -3,638 | -38,777 |
| Texas | -4,648 | -69,361 | -75,070 | -81,350 | -88,002 | -95,247 | -1,014,599 |
| Utah | -111 | -1,202 | -1,299 | -1,404 | -1,517 | -1,639 | -17,424 |
| Vermont | -73 | -1,816 | -1,971 | -2,141 | -2,322 | -2,519 | -26,894 |
| Virginia | -391 | -5,974 | -6,468 | -7,011 | -7,588 | -8,215 | -87,539 |
| Washington | -517 | -12,489 | -13,549 | -14,715 | -15,952 | -17,299 | -184,651 |
| West Virginia | -2 | -139 | -151 | -164 | -177 | -194 | -2,076 |
| Wisconsin | 974 | 17,143 | 18,570 | 20,143 | 21,810 | 23,624 | 251,858 |
| Wyoming | -58 | -812 | -879 | -954 | -1,032 | -1,118 | -11,920 |
| **Total, United States** | **0** | **-31,924** | **-34,726** | **-37,826** | **-41,114** | **-44,693** | **-478,297** |
| Funding Gains | 16,436 | 245,656 | 265,865 | 288,148 | 311,756 | 319,336 | 3,594,843 |
| Funding Losses | -16,436 | -277,580 | -300,591 | -325,974 | -352,870 | -364,028 | -4,073,140 |

Source: PricewaterhouseCoopers calculations.

Appendix D-1

Table D-2. Estimated Funding Effect of Census 2000 Undercount by State: Adoption Assistance, FY 2002-2012 [Fiscal years; thousands of dollars]

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2003-2007 | 2003-2012 |
|---|---|---|---|---|---|---|---|
| Alabama | -* | -* | -* | -* | -* | -1 | -3 |
| Alaska | -129 | -138 | -150 | -162 | -175 | -755 | -1,864 |
| Arizona | -54 | -58 | -63 | -68 | -74 | -317 | -784 |
| Arkansas | -6 | -7 | -7 | -8 | -9 | -38 | -93 |
| California | -1,200 | -1,281 | -1,390 | -1,507 | -1,626 | -7,005 | -17,299 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | -24 | -25 | -27 | -30 | -32 | -138 | -342 |
| Georgia | -88 | -93 | -101 | -110 | -119 | -511 | -1,262 |
| Hawaii | -63 | -67 | -73 | -79 | -85 | -366 | -905 |
| Idaho | -7 | -7 | -8 | -8 | -9 | -39 | -96 |
| Illinois | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana | 119 | 128 | 138 | 150 | 162 | 697 | 1,722 |
| Iowa | 178 | 190 | 206 | 224 | 241 | 1,039 | 2,567 |
| Kansas | 35 | 37 | 40 | 44 | 47 | 203 | 502 |
| Kentucky | -3 | -4 | -4 | -4 | -5 | -20 | -49 |
| Louisiana | -14 | -15 | -16 | -17 | -19 | -80 | -197 |
| Maine | -12 | -12 | -14 | -15 | -16 | -68 | -168 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | 729 | 779 | 845 | 916 | 989 | 4,258 | 10,515 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi | -2 | -2 | -2 | -2 | -2 | -10 | -26 |
| Missouri | 132 | 141 | 153 | 166 | 179 | 772 | 1,906 |
| Montana | -7 | -7 | -8 | -8 | -9 | -38 | -94 |
| Nebraska | 48 | 51 | 56 | 60 | 65 | 281 | 694 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | -52 | -55 | -60 | -65 | -70 | -303 | -748 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina | -43 | -45 | -49 | -53 | -58 | -248 | -613 |
| North Dakota | 10 | 11 | 11 | 12 | 13 | 58 | 142 |
| Ohio | 457 | 488 | 530 | 574 | 620 | 2,669 | 6,592 |
| Oklahoma | -16 | -17 | -19 | -20 | -22 | -94 | -232 |
| Oregon | -22 | -23 | -25 | -28 | -30 | -128 | -316 |
| Pennsylvania | 203 | 216 | 235 | 255 | 275 | 1,183 | 2,922 |
| Rhode Island | 37 | 39 | 43 | 46 | 50 | 214 | 529 |
| South Carolina | -2 | -2 | -3 | -3 | -3 | -14 | -33 |
| South Dakota | 11 | 11 | 12 | 14 | 15 | 63 | 155 |
| Tennessee | -4 | -5 | -5 | -6 | -6 | -26 | -63 |
| Texas | -340 | -363 | -394 | -427 | -461 | -1,987 | -4,906 |
| Utah | -8 | -8 | -9 | -10 | -10 | -44 | -109 |
| Vermont | -19 | -21 | -22 | -24 | -26 | -113 | -280 |
| Virginia | -28 | -30 | -33 | -35 | -38 | -164 | -406 |
| Washington | -85 | -91 | -99 | -107 | -115 | -497 | -1,226 |
| West Virginia | -* | -* | -1 | -1 | -1 | -3 | -7 |
| Wisconsin | 178 | 190 | 206 | 223 | 241 | 1,038 | 2,563 |
| Wyoming | -2 | -2 | -2 | -3 | -3 | -12 | -30 |
| | | | | | | | |
| Total, United States | -93 | -99 | -108 | -117 | -126 | -543 | -1,340 |
| Funding Gains | 2,137 | 2,282 | 2,476 | 2,684 | 2,897 | 12,476 | 30,810 |
| Funding Losses | -2,230 | -2,381 | -2,584 | -2,800 | -3,023 | -13,018 | -32,150 |

Source: PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $500. A negative asterisk (-*) denotes a negative shift of less than $500.

States with zeros would have identical reimbursement rates using unadjusted or adjusted population counts. See footnote 12 in main report.

Appendix D-2

**Table D-3. Estimated Funding Effect of Census 2000 Undercount by State: Child Care and Development Block Grant, FY 2002-2012** [Fiscal years; thousands of dollars]

| State | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 | 2002-2011 |
|---|---|---|---|---|---|---|---|
| Alabama | -63 | -64 | -65 | -67 | -68 | -327 | -691 |
| Alaska | -95 | -97 | -100 | -102 | -104 | -498 | -1,050 |
| Arizona | -133 | -136 | -139 | -142 | -144 | -693 | -1,462 |
| Arkansas | -33 | -34 | -34 | -35 | -36 | -171 | -361 |
| California | -766 | -782 | -798 | -815 | -832 | -3,993 | -8,422 |
| Colorado | -12 | -12 | -13 | -13 | -13 | -64 | -134 |
| Connecticut | 35 | 36 | 36 | 37 | 38 | 181 | 383 |
| Delaware | -24 | -24 | -25 | -25 | -26 | -125 | -263 |
| District of Columbia | -18 | -18 | -18 | -19 | -19 | -91 | -193 |
| Florida | -175 | -179 | -182 | -186 | -190 | -913 | -1,925 |
| Georgia | -345 | -353 | -360 | -368 | -375 | -1,800 | -3,798 |
| Hawaii | -148 | -152 | -155 | -158 | -161 | -774 | -1,634 |
| Idaho | -23 | -24 | -24 | -25 | -25 | -121 | -255 |
| Illinois | 477 | 487 | 497 | 508 | 518 | 2,487 | 5,245 |
| Indiana | 260 | 266 | 271 | 277 | 283 | 1,358 | 2,864 |
| Iowa | 230 | 235 | 240 | 245 | 250 | 1,200 | 2,530 |
| Kansas | 168 | 172 | 175 | 179 | 183 | 878 | 1,851 |
| Kentucky | -40 | -41 | -42 | -43 | -44 | -209 | -441 |
| Louisiana | -93 | -95 | -97 | -99 | -101 | -487 | -1,026 |
| Maine | -47 | -48 | -49 | -50 | -52 | -247 | -521 |
| Maryland | -90 | -92 | -94 | -96 | -98 | -472 | -995 |
| Massachusetts | 241 | 246 | 251 | 256 | 262 | 1,255 | 2,648 |
| Michigan | 467 | 477 | 487 | 497 | 508 | 2,437 | 5,140 |
| Minnesota | 392 | 400 | 409 | 417 | 426 | 2,043 | 4,311 |
| Mississippi | -44 | -45 | -46 | -47 | -48 | -231 | -488 |
| Missouri | 428 | 437 | 446 | 456 | 465 | 2,233 | 4,710 |
| Montana | -11 | -11 | -12 | -12 | -12 | -58 | -123 |
| Nebraska | 122 | 125 | 128 | 130 | 133 | 638 | 1,346 |
| Nevada | -70 | -72 | -73 | -75 | -76 | -367 | -774 |
| New Hampshire | -4 | -5 | -5 | -5 | -5 | -23 | -49 |
| New Jersey | 87 | 88 | 90 | 92 | 94 | 451 | 952 |
| New Mexico | -39 | -40 | -41 | -42 | -43 | -205 | -432 |
| New York | 218 | 223 | 228 | 232 | 237 | 1,138 | 2,401 |
| North Carolina | -225 | -230 | -235 | -240 | -245 | -1,174 | -2,477 |
| North Dakota | 23 | 24 | 24 | 25 | 25 | 121 | 256 |
| Ohio | 600 | 613 | 625 | 639 | 652 | 3,129 | 6,600 |
| Oklahoma | -97 | -99 | -101 | -103 | -105 | -505 | -1,066 |
| Oregon | -45 | -46 | -47 | -48 | -49 | -236 | -499 |
| Pennsylvania | 287 | 293 | 299 | 305 | 312 | 1,496 | 3,156 |
| Rhode Island | 36 | 36 | 37 | 38 | 39 | 186 | 392 |
| South Carolina | -45 | -46 | -47 | -48 | -49 | -234 | -494 |
| South Dakota | 62 | 63 | 65 | 66 | 67 | 324 | 683 |
| Tennessee | -98 | -100 | -103 | -105 | -107 | -513 | -1,082 |
| Texas | -1,317 | -1,345 | -1,373 | -1,402 | -1,431 | -6,869 | -14,489 |
| Utah | -3 | -3 | -3 | -3 | -3 | -15 | -33 |
| Vermont | -30 | -31 | -32 | -32 | -33 | -159 | -335 |
| Virginia | -91 | -93 | -95 | -97 | -99 | -476 | -1,005 |
| Washington | -128 | -131 | -134 | -137 | -139 | -669 | -1,411 |
| West Virginia | 2 | 2 | 2 | 2 | 2 | 11 | 24 |
| Wisconsin | 239 | 244 | 249 | 255 | 260 | 1,247 | 2,631 |
| Wyoming | -18 | -18 | -19 | -19 | -19 | -93 | -196 |
| **Total, United States** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Funding Gains | 4,375 | 4,467 | 4,561 | 4,657 | 4,754 | 22,813 | 48,122 |
| Funding Losses | -4,375 | -4,467 | -4,561 | -4,657 | -4,754 | -22,813 | -48,122 |

Source: PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $500.   A negative asterisk (-*) denotes a negative shift of less than $500.

Appendix D-3

**Table D-4. Estimated Funding Effect of Census 2000 Undercount by State: Foster Care, FY 2002-2012**
[Fiscal years; thousands of dollars]

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2003-2007 | 2003-2012 |
|---|---|---|---|---|---|---|---|
| Alabama | -* | -1 | -1 | -1 | -1 | -3 | -7 |
| Alaska | -67 | -72 | -78 | -85 | -91 | -393 | -970 |
| Arizona | -74 | -80 | -86 | -94 | -101 | -435 | -1,074 |
| Arkansas | -8 | -8 | -9 | -10 | -11 | -45 | -112 |
| California | -4,072 | -4,349 | -4,719 | -5,114 | -5,520 | -23,773 | -58,710 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | -63 | -67 | -73 | -79 | -85 | -367 | -907 |
| Georgia | -117 | -124 | -135 | -146 | -158 | -680 | -1,680 |
| Hawaii | -112 | -120 | -130 | -141 | -152 | -656 | -1,620 |
| Idaho | -5 | -6 | -6 | -7 | -7 | -31 | -77 |
| Illinois | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana | 143 | 153 | 166 | 180 | 194 | 837 | 2,068 |
| Iowa | 219 | 233 | 253 | 274 | 296 | 1,276 | 3,151 |
| Kansas | 222 | 237 | 258 | 279 | 301 | 1,298 | 3,206 |
| Kentucky | -14 | -15 | -17 | -18 | -19 | -83 | -206 |
| Louisiana | -44 | -47 | -51 | -55 | -60 | -257 | -636 |
| Maine | -61 | -65 | -71 | -77 | -83 | -357 | -881 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | 609 | 651 | 706 | 765 | 826 | 3,558 | 8,787 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi | -2 | -2 | -2 | -2 | -2 | -10 | -25 |
| Missouri | 314 | 336 | 364 | 395 | 426 | 1,836 | 4,534 |
| Montana | -15 | -16 | -17 | -19 | -20 | -88 | -216 |
| Nebraska | 126 | 134 | 145 | 158 | 170 | 733 | 1,810 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | -39 | -41 | -45 | -49 | -52 | -225 | -557 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina | -107 | -115 | -124 | -135 | -145 | -626 | -1,547 |
| North Dakota | 34 | 37 | 40 | 43 | 47 | 200 | 495 |
| Ohio | 1,310 | 1,399 | 1,518 | 1,645 | 1,776 | 7,647 | 18,885 |
| Oklahoma | -43 | -46 | -49 | -54 | -58 | -249 | -615 |
| Oregon | -18 | -19 | -21 | -23 | -25 | -106 | -262 |
| Pennsylvania | 1,203 | 1,285 | 1,395 | 1,512 | 1,632 | 7,027 | 17,354 |
| Rhode Island | 32 | 34 | 37 | 40 | 43 | 185 | 457 |
| South Carolina | -2 | -2 | -3 | -3 | -3 | -13 | -32 |
| South Dakota | 21 | 23 | 25 | 27 | 29 | 124 | 307 |
| Tennessee | -10 | -11 | -12 | -13 | -14 | -61 | -151 |
| Texas | -596 | -636 | -690 | -748 | -808 | -3,478 | -8,589 |
| Utah | -6 | -6 | -7 | -8 | -8 | -35 | -87 |
| Vermont | -51 | -55 | -59 | -64 | -69 | -298 | -736 |
| Virginia | -83 | -88 | -96 | -104 | -112 | -482 | -1,191 |
| Washington | -83 | -89 | -97 | -105 | -113 | -486 | -1,201 |
| West Virginia | -1 | -2 | -2 | -2 | -2 | -9 | -21 |
| Wisconsin | 289 | 309 | 335 | 364 | 392 | 1,690 | 4,173 |
| Wyoming | -8 | -9 | -10 | -11 | -12 | -50 | -122 |
| **Total, United States** | **-1,179** | **-1,259** | **-1,367** | **-1,481** | **-1,599** | **-6,885** | **-17,004** |
| Funding Gains | 4,524 | 4,831 | 5,243 | 5,682 | 6,133 | 26,412 | 65,228 |
| Funding Losses | -5,703 | -6,091 | -6,609 | -7,163 | -7,732 | -33,297 | -82,231 |

Source: PricewaterhouseCoopers calculations.
Note: An asterisk (*) denotes a positive shift of less than $500. A negative asterisk (-*) denotes a negative shift of less than $500.
States with zeros would have identical reimbursement rates using unadjusted or adjusted population counts. See footnote 12 in main report.

Appendix D-4

**Table D-5. Estimated Funding Effect of Census 2000 Undercount by State: Medicaid, FY 2002-2012 [Fiscal years; thousands of dollars]**

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2003-2007 | 2003-2012 |
|---|---|---|---|---|---|---|---|
| Alabama | -282 | -307 | -335 | -364 | -395 | -1,683 | -4,233 |
| Alaska | -6,826 | -7,430 | -8,095 | -8,800 | -9,568 | -40,719 | -102,424 |
| Arizona | -4,594 | -5,001 | -5,448 | -5,922 | -6,440 | -27,404 | -68,932 |
| Arkansas | -1,043 | -1,135 | -1,237 | -1,344 | -1,462 | -6,221 | -15,649 |
| California | -91,356 | -99,449 | -108,343 | -117,773 | -128,062 | -544,984 | -1,370,847 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | -5,681 | -6,184 | -6,737 | -7,323 | -7,963 | -33,889 | -85,243 |
| Georgia | -12,836 | -13,973 | -15,223 | -16,548 | -17,994 | -76,573 | -192,612 |
| Hawaii | -6,504 | -7,080 | -7,713 | -8,385 | -9,117 | -38,798 | -97,593 |
| Idaho | -2,353 | -2,561 | -2,790 | -3,033 | -3,298 | -14,034 | -35,301 |
| Illinois | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana | 14,037 | 15,281 | 16,647 | 18,096 | 19,677 | 83,739 | 210,636 |
| Iowa | 10,702 | 11,650 | 12,692 | 13,797 | 15,002 | 63,842 | 160,588 |
| Kansas | 7,689 | 8,370 | 9,119 | 9,912 | 10,778 | 45,868 | 115,376 |
| Kentucky | -1,191 | -1,297 | -1,413 | -1,536 | -1,670 | -7,107 | -17,876 |
| Louisiana | -4,284 | -4,663 | -5,080 | -5,523 | -6,005 | -25,555 | -64,282 |
| Maine | -1,699 | -1,849 | -2,015 | -2,190 | -2,381 | -10,134 | -25,492 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | 31,167 | 33,928 | 36,962 | 40,179 | 43,690 | 185,926 | 467,677 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi | -766 | -834 | -908 | -987 | -1,073 | -4,568 | -11,490 |
| Missouri | 32,931 | 35,848 | 39,054 | 42,453 | 46,162 | 196,447 | 494,142 |
| Montana | -1,320 | -1,437 | -1,566 | -1,702 | -1,851 | -7,876 | -19,812 |
| Nebraska | 6,883 | 7,492 | 8,162 | 8,873 | 9,648 | 41,059 | 103,278 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | -6,865 | -7,474 | -8,142 | -8,851 | -9,624 | -40,955 | -103,018 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina | -10,194 | -11,097 | -12,089 | -13,142 | -14,290 | -60,811 | -152,964 |
| North Dakota | 1,996 | 2,173 | 2,367 | 2,573 | 2,798 | 11,908 | 29,952 |
| Ohio | 48,999 | 53,340 | 58,110 | 63,168 | 68,687 | 292,304 | 735,259 |
| Oklahoma | -3,010 | -3,276 | -3,569 | -3,880 | -4,219 | -17,955 | -45,164 |
| Oregon | -2,095 | -2,280 | -2,484 | -2,700 | -2,936 | -12,495 | -31,431 |
| Pennsylvania | 41,897 | 45,609 | 49,687 | 54,012 | 58,731 | 249,936 | 628,685 |
| Rhode Island | 4,591 | 4,998 | 5,445 | 5,919 | 6,436 | 27,390 | 68,896 |
| South Carolina | -566 | -617 | -672 | -730 | -794 | -3,379 | -8,499 |
| South Dakota | 1,888 | 2,055 | 2,239 | 2,433 | 2,646 | 11,260 | 28,324 |
| Tennessee | -2,443 | -2,659 | -2,897 | -3,149 | -3,424 | -14,573 | -36,656 |
| Texas | -62,320 | -67,841 | -73,908 | -80,341 | -87,360 | -371,770 | -935,148 |
| Utah | -1,044 | -1,137 | -1,239 | -1,346 | -1,464 | -6,231 | -15,672 |
| Vermont | -1,671 | -1,819 | -1,982 | -2,155 | -2,343 | -9,970 | -25,078 |
| Virginia | -5,382 | -5,858 | -6,382 | -6,938 | -7,544 | -32,105 | -80,755 |
| Washington | -11,693 | -12,729 | -13,867 | -15,075 | -16,391 | -69,756 | -175,463 |
| West Virginia | -135 | -147 | -160 | -174 | -189 | -806 | -2,027 |
| Wisconsin | 15,463 | 16,833 | 18,339 | 19,935 | 21,676 | 92,246 | 232,035 |
| Wyoming | -742 | -808 | -880 | -957 | -1,041 | -4,429 | -11,140 |
| | | | | | | | |
| **Total, United States** | **-39,652** | **-33,368** | **-36,352** | **-39,516** | **-42,968** | **-182,855** | **-459,953** |
| Funding Gains | 218,243 | 237,577 | 258,823 | 281,352 | 305,931 | 1,301,925 | 3,274,850 |
| Funding Losses | -248,896 | -270,945 | -295,175 | -320,868 | -348,899 | -1,484,781 | -3,734,802 |

Source: PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $500. A negative asterisk (-*) denotes a negative shift of less than $500.

States with zeros would have identical reimbursement rates using unadjusted or adjusted population counts. See footnote 12 in main report.

**Appendix D-5**

**Table D-6.  Estimated Funding Effect of Census 2000 Undercount by State: Rehabilitation Services, FY 2002-2012 [Fiscal years; thousands of dollars]**

| State | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 | 2002-2011 |
|---|---|---|---|---|---|---|---|
| Alabama | -7 | -7 | -8 | -8 | -8 | -38 | -80 |
| Alaska | -139 | -142 | -146 | -150 | -153 | -730 | -1,556 |
| Arizona | -187 | -191 | -196 | -201 | -206 | -982 | -2,095 |
| Arkansas | -41 | -42 | -43 | -44 | -45 | -216 | -460 |
| California | -1,667 | -1,707 | -1,752 | -1,798 | -1,843 | -8,767 | -18,693 |
| Colorado | -48 | -49 | -50 | -51 | -53 | -251 | -535 |
| Connecticut | 82 | 84 | 87 | 89 | 91 | 433 | 923 |
| Delaware | -35 | -36 | -37 | -38 | -39 | -185 | -395 |
| District of Columbia | -56 | -58 | -59 | -61 | -62 | -297 | -632 |
| Florida | -139 | -143 | -146 | -150 | -154 | -732 | -1,560 |
| Georgia | -357 | -365 | -375 | -385 | -394 | -1,876 | -4,000 |
| Hawaii | -176 | -181 | -185 | -190 | -195 | -927 | -1,977 |
| Idaho | -92 | -95 | -97 | -100 | -102 | -485 | -1,035 |
| Illinois | 549 | 562 | 577 | 592 | 607 | 2,887 | 6,156 |
| Indiana | 371 | 380 | 390 | 400 | 410 | 1,953 | 4,163 |
| Iowa | 306 | 314 | 322 | 330 | 339 | 1,611 | 3,436 |
| Kansas | 209 | 214 | 219 | 225 | 231 | 1,097 | 2,339 |
| Kentucky | -32 | -32 | -33 | -34 | -35 | -167 | -355 |
| Louisiana | -112 | -114 | -117 | -120 | -123 | -587 | -1,251 |
| Maine | -30 | -30 | -31 | -32 | -33 | -156 | -332 |
| Maryland | -162 | -166 | -170 | -175 | -179 | -852 | -1,816 |
| Massachusetts | 343 | 351 | 361 | 370 | 379 | 1,804 | 3,847 |
| Michigan | 688 | 705 | 723 | 742 | 761 | 3,619 | 7,717 |
| Minnesota | 606 | 620 | 636 | 653 | 669 | 3,184 | 6,789 |
| Mississippi | -27 | -28 | -28 | -29 | -30 | -142 | -302 |
| Missouri | 596 | 610 | 626 | 642 | 658 | 3,132 | 6,678 |
| Montana | -56 | -57 | -58 | -60 | -61 | -292 | -623 |
| Nebraska | 155 | 159 | 163 | 168 | 172 | 817 | 1,742 |
| Nevada | -131 | -134 | -138 | -141 | -145 | -689 | -1,469 |
| New Hampshire | 8 | 8 | 9 | 9 | 9 | 44 | 93 |
| New Jersey | 29 | 30 | 31 | 31 | 32 | 153 | 327 |
| New Mexico | -214 | -220 | -225 | -231 | -237 | -1,127 | -2,404 |
| New York | 218 | 223 | 229 | 235 | 241 | 1,145 | 2,442 |
| North Carolina | -212 | -217 | -223 | -229 | -235 | -1,116 | -2,379 |
| North Dakota | 71 | 72 | 74 | 76 | 78 | 372 | 794 |
| Ohio | 1,029 | 1,054 | 1,082 | 1,110 | 1,138 | 5,413 | 11,541 |
| Oklahoma | -118 | -121 | -124 | -127 | -130 | -620 | -1,322 |
| Oregon | -46 | -47 | -48 | -50 | -51 | -242 | -515 |
| Pennsylvania | 636 | 652 | 668 | 686 | 703 | 3,345 | 7,132 |
| Rhode Island | 48 | 49 | 50 | 51 | 53 | 251 | 535 |
| South Carolina | -13 | -13 | -13 | -14 | -14 | -66 | -141 |
| South Dakota | 70 | 72 | 74 | 76 | 78 | 370 | 789 |
| Tennessee | -43 | -44 | -45 | -47 | -48 | -227 | -484 |
| Texas | -1,787 | -1,829 | -1,877 | -1,926 | -1,974 | -9,393 | -20,028 |
| Utah | -58 | -59 | -61 | -62 | -64 | -303 | -647 |
| Vermont | -30 | -31 | -32 | -33 | -34 | -160 | -341 |
| Virginia | -153 | -157 | -161 | -165 | -169 | -805 | -1,717 |
| Washington | -195 | -200 | -205 | -210 | -216 | -1,027 | -2,189 |
| West Virginia | -3 | -3 | -3 | -3 | -3 | -15 | -32 |
| Wisconsin | 378 | 387 | 397 | 408 | 418 | 1,988 | 4,238 |
| Wyoming | -28 | -29 | -30 | -30 | -31 | -148 | -316 |
| **Total, United States** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Funding Gains | 6,394 | 6,548 | 6,718 | 6,893 | 7,066 | 33,618 | 71,680 |
| Funding Losses | -6,394 | -6,548 | -6,718 | -6,893 | -7,066 | -33,618 | -71,680 |

Source: PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $500.  A negative asterisk (-*) denotes a negative shift of less than $500.

Appendix D-6

Table D-7. Estimated Funding Effect of Census 2000 Undercount by State: Social Services Block Grant, FY 2002-2012 [Fiscal years; thousands of dollars]

| State | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 | 2002-2011 |
|---|---|---|---|---|---|---|---|
| Alabama | -4 | -4 | -4 | -4 | -4 | -19 | -39 |
| Alaska | -59 | -59 | -59 | -59 | -59 | -295 | -590 |
| Arizona | -76 | -76 | -76 | -76 | -76 | -382 | -764 |
| Arkansas | -17 | -17 | -17 | -17 | -17 | -83 | -167 |
| California | -718 | -718 | -718 | -718 | -718 | -3,589 | -7,179 |
| Colorado | -21 | -21 | -21 | -21 | -21 | -107 | -214 |
| Connecticut | 42 | 42 | 42 | 42 | 42 | 212 | 423 |
| Delaware | -15 | -15 | -15 | -15 | -15 | -77 | -154 |
| District of Columbia | -32 | -32 | -32 | -32 | -32 | -160 | -320 |
| Florida | -61 | -61 | -61 | -61 | -61 | -304 | -608 |
| Georgia | -149 | -149 | -149 | -149 | -149 | -745 | -1,490 |
| Hawaii | -74 | -74 | -74 | -74 | -74 | -370 | -739 |
| Idaho | -37 | -37 | -37 | -37 | -37 | -183 | -366 |
| Illinois | 240 | 240 | 240 | 240 | 240 | 1,198 | 2,396 |
| Indiana | 151 | 151 | 151 | 151 | 151 | 754 | 1,507 |
| Iowa | 124 | 124 | 124 | 124 | 124 | 622 | 1,244 |
| Kansas | 85 | 85 | 85 | 85 | 85 | 427 | 855 |
| Kentucky | -13 | -13 | -13 | -13 | -13 | -67 | -134 |
| Louisiana | -45 | -45 | -45 | -45 | -45 | -225 | -451 |
| Maine | -12 | -12 | -12 | -12 | -12 | -61 | -121 |
| Maryland | -73 | -73 | -73 | -73 | -73 | -364 | -729 |
| Massachusetts | 160 | 160 | 160 | 160 | 160 | 802 | 1,604 |
| Michigan | 287 | 287 | 287 | 287 | 287 | 1,435 | 2,870 |
| Minnesota | 263 | 263 | 263 | 263 | 263 | 1,315 | 2,630 |
| Mississippi | -11 | -11 | -11 | -11 | -11 | -56 | -111 |
| Missouri | 244 | 244 | 244 | 244 | 244 | 1,219 | 2,438 |
| Montana | -22 | -22 | -22 | -22 | -22 | -110 | -219 |
| Nebraska | 64 | 64 | 64 | 64 | 64 | 320 | 640 |
| Nevada | -58 | -58 | -58 | -58 | -58 | -288 | -575 |
| New Hampshire | 3 | 3 | 3 | 3 | 3 | 17 | 35 |
| New Jersey | 13 | 13 | 13 | 13 | 13 | 66 | 132 |
| New Mexico | -84 | -84 | -84 | -84 | -84 | -420 | -840 |
| New York | 98 | 98 | 98 | 98 | 98 | 490 | 980 |
| North Carolina | -89 | -89 | -89 | -89 | -89 | -443 | -885 |
| North Dakota | 28 | 28 | 28 | 28 | 28 | 139 | 279 |
| Ohio | 425 | 425 | 425 | 425 | 425 | 2,126 | 4,253 |
| Oklahoma | -47 | -47 | -47 | -47 | -47 | -237 | -473 |
| Oregon | -20 | -20 | -20 | -20 | -20 | -98 | -196 |
| Pennsylvania | 267 | 267 | 267 | 267 | 267 | 1,334 | 2,668 |
| Rhode Island | 20 | 20 | 20 | 20 | 20 | 101 | 202 |
| South Carolina | -6 | -6 | -6 | -6 | -6 | -29 | -59 |
| South Dakota | 28 | 28 | 28 | 28 | 28 | 141 | 282 |
| Tennessee | -19 | -19 | -19 | -19 | -19 | -93 | -186 |
| Texas | -739 | -739 | -739 | -739 | -739 | -3,694 | -7,388 |
| Utah | -23 | -23 | -23 | -23 | -23 | -116 | -233 |
| Vermont | -12 | -12 | -12 | -12 | -12 | -62 | -125 |
| Virginia | -67 | -67 | -67 | -67 | -67 | -333 | -665 |
| Washington | -85 | -85 | -85 | -85 | -85 | -424 | -847 |
| West Virginia | -2 | -2 | -2 | -2 | -2 | -8 | -16 |
| Wisconsin | 156 | 156 | 156 | 156 | 156 | 780 | 1,560 |
| Wyoming | -12 | -12 | -12 | -12 | -12 | -58 | -116 |
| Total, United States | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Funding Gains | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 13,499 | 26,998 |
| Funding Losses | -2,700 | -2,700 | -2,700 | -2,700 | -2,700 | -13,499 | -26,998 |

Source: PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $500. A negative asterisk (-*) denotes a negative shift of less than $500.

Appendix D-7

**Table D-8. Estimated Funding Effect of Census 2000 Undercount by State: Substance Abuse Prevention and Treatment Block Grant, FY 2002-2012** [Fiscal years; thousands of dollars]

| State | 2003 | 2004 | 2005 | 2006 | 2007 | 2003-2007 | 2003-2012 |
|---|---|---|---|---|---|---|---|
| Alabama | 56 | 57 | 59 | 60 | 61 | 293 | 621 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | -109 | -112 | -114 | -117 | -119 | -571 | -1,208 |
| Arkansas | 3 | 3 | 4 | 4 | 4 | 18 | 38 |
| California | -1,591 | -1,626 | -1,663 | -1,700 | -1,738 | -8,317 | -17,604 |
| Colorado | -30 | -31 | -32 | -32 | -33 | -158 | -335 |
| Connecticut | 58 | 59 | 60 | 61 | 63 | 301 | 636 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | 17 | 18 | 18 | 18 | 19 | 90 | 190 |
| Georgia | -149 | -152 | -156 | -159 | -163 | -779 | -1,649 |
| Hawaii | -95 | -97 | -99 | -101 | -104 | -496 | -1,049 |
| Idaho | -46 | -47 | -48 | -49 | -50 | -242 | -512 |
| Illinois | 330 | 337 | 345 | 352 | 360 | 1,724 | 3,649 |
| Indiana | 228 | 233 | 238 | 244 | 249 | 1,192 | 2,523 |
| Iowa | 151 | 154 | 158 | 161 | 165 | 790 | 1,672 |
| Kansas | 113 | 115 | 118 | 120 | 123 | 589 | 1,248 |
| Kentucky | 19 | 20 | 20 | 21 | 21 | 100 | 213 |
| Louisiana | 12 | 13 | 13 | 13 | 13 | 64 | 136 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | -100 | -102 | -105 | -107 | -109 | -524 | -1,108 |
| Massachusetts | 195 | 199 | 204 | 208 | 213 | 1,020 | 2,158 |
| Michigan | 411 | 420 | 430 | 439 | 449 | 2,149 | 4,548 |
| Minnesota | 356 | 363 | 372 | 380 | 388 | 1,859 | 3,934 |
| Mississippi | 27 | 28 | 28 | 29 | 30 | 142 | 301 |
| Missouri | 338 | 345 | 353 | 361 | 369 | 1,766 | 3,737 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 84 | 86 | 88 | 89 | 91 | 438 | 927 |
| Nevada | -101 | -103 | -106 | -108 | -111 | -529 | -1,120 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | -29 | -30 | -31 | -31 | -32 | -153 | -324 |
| New Mexico | -118 | -121 | -124 | -127 | -129 | -619 | -1,310 |
| New York | 171 | 174 | 178 | 182 | 186 | 892 | 1,887 |
| North Carolina | -47 | -48 | -49 | -50 | -51 | -246 | -520 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio | 685 | 701 | 716 | 732 | 749 | 3,583 | 7,584 |
| Oklahoma | -3 | -3 | -3 | -3 | -3 | -17 | -35 |
| Oregon | -4 | -4 | -4 | -4 | -4 | -21 | -45 |
| Pennsylvania | 452 | 462 | 473 | 483 | 494 | 2,365 | 5,006 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 38 | 38 | 39 | 40 | 41 | 196 | 415 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee | 42 | 43 | 44 | 45 | 46 | 219 | 464 |
| Texas | -1,368 | -1,398 | -1,429 | -1,461 | -1,494 | -7,150 | -15,134 |
| Utah | -31 | -32 | -33 | -33 | -34 | -164 | -346 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia | -82 | -84 | -86 | -88 | -90 | -431 | -912 |
| Washington | -100 | -103 | -105 | -107 | -110 | -525 | -1,111 |
| West Virginia | * | * | * | * | * | 2 | 4 |
| Wisconsin | 220 | 225 | 230 | 235 | 240 | 1,148 | 2,430 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total, United States** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Funding Gains | 4,005 | 4,095 | 4,186 | 4,279 | 4,375 | 20,940 | 44,321 |
| Funding Losses | -4,005 | -4,095 | -4,186 | -4,279 | -4,375 | -20,940 | -44,321 |

Source: PricewaterhouseCoopers calculations.

Note: An asterisk (*) denotes a positive shift of less than $500. A negative asterisk (-*) denotes a negative shift of less than $500.
States with zeros would have identical reimbursement rates using unadjusted or adjusted population counts.

Appendix D-8

CSMPDF - www.fastio.com

**Table D-9.  Estimated Funding Effect of Census 2000 Undercount by State: Vocational Education, FY 2002-2012 [Fiscal years; thousands of dollars]**

| State | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 | 2002-2011 |
|---|---|---|---|---|---|---|---|
| Alabama | -38 | -39 | -40 | -40 | -41 | -198 | -419 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | -80 | -81 | -83 | -85 | -87 | -417 | -882 |
| Arkansas | -26 | -26 | -27 | -27 | -28 | -134 | -283 |
| California | -672 | -687 | -702 | -718 | -734 | -3,514 | -7,438 |
| Colorado | -19 | -20 | -20 | -20 | -21 | -100 | -211 |
| Connecticut | 24 | 25 | 25 | 26 | 27 | 127 | 270 |
| Delaware | -14 | -14 | -14 | -15 | -15 | -71 | -151 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | -113 | -115 | -118 | -120 | -123 | -589 | -1,247 |
| Georgia | -205 | -209 | -214 | -219 | -223 | -1,069 | -2,263 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | -46 | -47 | -48 | -49 | -50 | -238 | -504 |
| Illinois | 328 | 335 | 343 | 351 | 358 | 1,716 | 3,631 |
| Indiana | 189 | 193 | 197 | 202 | 206 | 987 | 2,089 |
| Iowa | 171 | 175 | 179 | 183 | 187 | 896 | 1,897 |
| Kansas | 120 | 123 | 126 | 129 | 131 | 629 | 1,331 |
| Kentucky | -37 | -37 | -38 | -39 | -40 | -191 | -405 |
| Louisiana | -98 | -100 | -103 | -105 | -107 | -514 | -1,087 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | -81 | -83 | -85 | -87 | -89 | -424 | -898 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan | 364 | 372 | 380 | 389 | 397 | 1,901 | 4,024 |
| Minnesota | 259 | 265 | 271 | 277 | 283 | 1,356 | 2,869 |
| Mississippi | -31 | -31 | -32 | -33 | -34 | -161 | -340 |
| Missouri | 302 | 309 | 316 | 323 | 330 | 1,579 | 3,341 |
| Montana | -22 | -22 | -23 | -23 | -24 | -113 | -238 |
| Nebraska | 89 | 91 | 93 | 95 | 97 | 466 | 987 |
| Nevada | -59 | -60 | -62 | -63 | -64 | -308 | -653 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 33 | 34 | 35 | 35 | 36 | 174 | 367 |
| New Mexico | -56 | -57 | -59 | -60 | -61 | -293 | -621 |
| New York | 132 | 135 | 138 | 141 | 144 | 691 | 1,462 |
| North Carolina | -134 | -137 | -141 | -144 | -147 | -703 | -1,488 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio | 485 | 495 | 507 | 518 | 529 | 2,534 | 5,363 |
| Oklahoma | -98 | -100 | -102 | -105 | -107 | -512 | -1,083 |
| Oregon | -33 | -33 | -34 | -35 | -36 | -170 | -360 |
| Pennsylvania | 256 | 262 | 268 | 274 | 280 | 1,340 | 2,835 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | -31 | -32 | -32 | -33 | -34 | -161 | -341 |
| South Dakota | 13 | 13 | 13 | 13 | 14 | 66 | 139 |
| Tennessee | -56 | -57 | -58 | -60 | -61 | -292 | -618 |
| Texas | -806 | -824 | -842 | -861 | -880 | -4,213 | -8,916 |
| Utah | -27 | -27 | -28 | -29 | -29 | -140 | -297 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia | -80 | -82 | -84 | -86 | -88 | -419 | -887 |
| Washington | -109 | -111 | -114 | -116 | -119 | -568 | -1,203 |
| West Virginia | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin | 201 | 206 | 210 | 215 | 220 | 1,052 | 2,227 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total, United States** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Funding Gains | 2,967 | 3,033 | 3,101 | 3,170 | 3,241 | 15,513 | 32,835 |
| Funding Losses | -2,967 | -3,033 | -3,101 | -3,170 | -3,241 | -15,513 | -32,835 |

Source: PricewaterhouseCoopers calculations.
Note: An asterisk (*) denotes a positive shift of less than $500.  A negative asterisk (-*) denotes a negative shift of less than $500.
States with zeros would have identical reimbursement rates using unadjusted or adjusted population counts.

Appendix D-9

# Appendix E:  Estimated Funding Effect by Selected County

CutePDF – www.fasiso.com

**Appendix E.  Estimated Funding Effect of Census 2000 Undercount by County: Eight Federal Grant Programs, FY 2002-2012**

| State, County | Between-State Effects (Thousands) | Within-State Effects (Thousands) | Net Effect Amount (Thousands) | Net Effect Percent[1] |
|---|---|---|---|---|
| **Alabama** | | | | |
| Jefferson County | -722 | -19,846 | -20,568 | -0.4% |
| **Arizona** | | | | |
| Maricopa County | -46,227 | 48,614 | 2,387 | * |
| Pima County | -12,696 | 11,000 | -1,696 | * |
| **California** | | | | |
| Alameda County | -64,200 | 20,600 | -43,599 | -0.4% |
| Contra Costa County | -42,192 | 45,820 | 3,628 | 0.1% |
| Fresno County | -35,548 | -4,494 | -40,042 | -0.7% |
| Kern County | -29,422 | 7,574 | -21,848 | -0.4% |
| Los Angeles County | -423,302 | -212,558 | -635,860 | -0.9% |
| Orange County | -126,568 | 64,807 | -61,761 | -0.3% |
| Riverside County | -68,720 | 43,634 | -25,086 | -0.2% |
| Sacramento County | -54,406 | 41,399 | -13,008 | -0.1% |
| San Bernardino County | -76,014 | 25,725 | -50,289 | -0.4% |
| San Diego County | -125,124 | 53,499 | -71,626 | -0.3% |
| San Francisco County | -34,539 | 3,962 | -30,578 | -0.5% |
| San Joaquin County | -25,062 | 7,310 | -17,752 | -0.4% |
| San Mateo County | -31,446 | 25,268 | -6,177 | -0.1% |
| Santa Clara County | -74,821 | 48,889 | -25,932 | -0.2% |
| Ventura County | -33,493 | 25,711 | -7,782 | -0.1% |
| **Colorado** | | | | |
| Denver County | -184 | -9,072 | -9,257 | -0.3% |
| El Paso County | -172 | 8,539 | 8,368 | 0.3% |
| Jefferson County | -175 | 18,354 | 18,179 | 0.7% |
| **Connecticut** | | | | |
| Fairfield County | 683 | 1,591 | 2,274 | * |
| Hartford County | 663 | -4,412 | -3,749 | * |
| New Haven County | 638 | 3,651 | 4,288 | 0.1% |
| **Delaware** | | | | |
| New Castle County | -615 | 2,237 | 1,622 | * |
| **Florida** | | | | |
| Broward County | -9,306 | 3,303 | -6,003 | -0.1% |
| Miami-Dade County | -12,921 | -92,026 | -104,947 | -0.8% |
| Duval County | -4,466 | 4,183 | -283 | * |
| Hillsborough County | -5,728 | 6,585 | 857 | * |
| Orange County | -5,140 | -1,665 | -6,804 | -0.1% |
| Palm Beach County | -6,486 | 14,506 | 8,020 | 0.1% |
| Pinellas County | -5,284 | 24,111 | 18,827 | 0.3% |
| **Georgia** | | | | |
| Cobb County | -15,498 | -436 | -15,934 | -0.4% |
| DeKalb County | -16,980 | -28,267 | -45,246 | -1.1% |
| Fulton County | -20,808 | -29,435 | -50,243 | -1.0% |
| Gwinnett County | -15,005 | 2,965 | -12,040 | -0.3% |

Footnotes appear at end of table.

Appendix E-1

**Appendix E.  Estimated Funding Effect of Census 2000 Undercount by County, continued**

| State, County | Between-State Effects (Thousands) | Within-State Effects (Thousands) | Net Effect Amount (Thousands) | Net Effect Percent[1] |
|---|---|---|---|---|
| **Hawaii** | | | | |
| Honolulu County | **-76,307** | 5,911 | **-70,396** | **-1.3%** |
| **Illinois** | | | | |
| Cook County | 9,125 | **-201,695** | **-192,570** | **-0.5%** |
| DuPage County | 1,535 | 32,506 | 34,041 | 0.6% |
| Lake County | 1,094 | 13,728 | 14,821 | 0.3% |
| Will County | 852 | 17,852 | 18,705 | 0.6% |
| **Indiana** | | | | |
| Marion County | 32,204 | **-13,328** | 18,875 | 0.3% |
| **Kentucky** | | | | |
| Jefferson County | **-3,304** | 2,792 | **-512** | * |
| **Maryland** | | | | |
| Baltimore City[2] | **-682** | **-28,288** | **-28,970** | **-0.7%** |
| Baltimore County | **-790** | 8,194 | 7,404 | 0.2% |
| Montgomery County | **-914** | 1,773 | 859 | * |
| Prince George's County | **-839** | **-25,851** | **-26,690** | **-0.5%** |
| **Massachusetts** | | | | |
| Bristol County | 864 | 10,465 | 11,329 | 0.2% |
| Essex County | 1,169 | 969 | 2,138 | * |
| Middlesex County | 2,368 | 17,610 | 19,978 | 0.1% |
| Norfolk County | 1,051 | 21,335 | 22,386 | 0.4% |
| Suffolk County | 1,114 | **-58,776** | **-57,661** | **-0.9%** |
| Worcester County | 1,213 | 7,767 | 8,980 | 0.2% |
| **Michigan** | | | | |
| Kent County | 29,546 | 5,806 | 35,352 | 0.8% |
| Macomb County | 40,546 | 23,228 | 63,774 | 1.1% |
| Oakland County | 61,433 | 12,756 | 74,189 | 0.8% |
| Wayne County | 106,036 | **-115,309** | **-9,273** | **-0.1%** |
| **Minnesota** | | | | |
| Hennepin County | 4,659 | **-36,992** | **-32,333** | **-0.4%** |
| Ramsey County | 2,133 | **-11,410** | **-9,277** | **-0.2%** |
| **Missouri** | | | | |
| Jackson County | 61,036 | **-34,949** | 26,087 | 0.4% |
| St. Louis County | 94,723 | **-12,962** | 81,761 | 0.8% |
| **Nevada** | | | | |
| Clark County | **-3,161** | 10,907 | 7,746 | 0.2% |
| **New Jersey** | | | | |
| Bergen County | 153 | 15,674 | 15,826 | 0.2% |
| Camden County | 88 | 6,913 | 7,001 | 0.2% |
| Essex County | 137 | **-44,037** | **-43,900** | **-0.7%** |
| Hudson County | 105 | **-49,981** | **-49,876** | **-1.0%** |
| Middlesex County | 130 | 3,964 | 4,094 | 0.1% |
| Monmouth County | 106 | 18,700 | 18,807 | 0.4% |
| Ocean County | 88 | 21,788 | 21,876 | 0.6% |
| Union County | 90 | **-7,586** | **-7,496** | **-0.2%** |

Footnotes appear at end of table.

Appendix E-2

**Appendix E.  Estimated Funding Effect of Census 2000 Undercount by County, continued**

| State, County | Between-State Effects (Thousands) | Within-State Effects (Thousands) | Net Effect Amount (Thousands) | Net Effect Percent[1] |
|---|---|---|---|---|
| **New Mexico** | | | | |
| Bernalillo County | -33,641 | 35,946 | 2,305 | * |
| **New York** | | | | |
| Bronx County | 644 | -362,643 | -361,999 | -1.6% |
| Erie County | 459 | 94,212 | 94,671 | 0.6% |
| Kings County | 1,192 | -269,695 | -268,503 | -0.6% |
| Monroe County | 355 | 68,026 | 68,381 | 0.6% |
| Nassau County | 645 | 268,842 | 269,487 | 1.2% |
| New York County | 743 | -212,837 | -212,094 | -0.8% |
| Queens County | 1,078 | -61,842 | -60,764 | -0.2% |
| Richmond County[3] | 214 | 56,239 | 56,454 | 0.8% |
| Suffolk County | 686 | 309,855 | 310,542 | 1.3% |
| Westchester County | 446 | 80,046 | 80,493 | 0.5% |
| **North Carolina** | | | | |
| Mecklenburg County | -14,072 | -20,426 | -34,498 | -0.6% |
| Wake County | -12,704 | -5,006 | -17,711 | -0.3% |
| **Ohio** | | | | |
| Cuyahoga County | 97,745 | -43,725 | 54,020 | 0.5% |
| Franklin County | 74,956 | -24,186 | 50,770 | 0.6% |
| Hamilton County | 59,272 | -21,898 | 37,374 | 0.5% |
| Montgomery County | 39,201 | -6,952 | 32,249 | 0.7% |
| Summit County | 38,068 | 4,354 | 42,422 | 0.9% |
| **Oklahoma** | | | | |
| Oklahoma County | -9,568 | -14,869 | -24,437 | -0.5% |
| Tulsa County | -8,161 | -5,506 | -13,667 | -0.3% |
| **Oregon** | | | | |
| Multnomah County | -6,491 | 18,207 | 11,717 | 0.2% |
| **Pennsylvania** | | | | |
| Allegheny County | 69,897 | 46,631 | 116,528 | 0.9% |
| Bucks County | 32,593 | 21,247 | 53,839 | 0.9% |
| Delaware County | 30,042 | 10,219 | 40,261 | 0.8% |
| Montgomery County | 40,907 | 22,067 | 62,974 | 0.9% |
| Philadelphia County | 82,761 | -65,610 | 17,151 | 0.1% |
| **Rhode Island** | | | | |
| Providence County | 42,106 | 15,920 | 58,026 | 0.8% |
| **Tennessee** | | | | |
| Davidson County | -3,884 | -18,895 | -22,779 | -0.4% |
| Shelby County | -6,117 | -43,818 | -49,935 | -0.5% |
| **Texas** | | | | |
| Bexar County | -67,777 | -13,601 | -81,378 | -0.9% |
| Dallas County | -107,966 | -48,311 | -156,278 | -1.1% |
| El Paso County | -33,069 | -13,728 | -46,797 | -1.0% |
| Harris County | -165,464 | -68,936 | -234,400 | -1.0% |
| Hidalgo County | -27,709 | -23,907 | -51,615 | -1.4% |
| Tarrant County | -70,369 | 8,068 | -62,301 | -0.7% |
| Travis County | -39,524 | -7,625 | -47,148 | -0.9% |

Footnotes appear at end of table.

Appendix E-3

**Appendix E.  Estimated Funding Effect of Census 2000 Undercount by County, continue**

| State, County | Between-State Effects (Thousands) | Within-State Effects (Thousands) | Net Effect | |
|---|---|---|---|---|
| | | | Amount (Thousands) | Percent[1] |
| **Utah** | | | | |
| Salt Lake County | -7,009 | 14,914 | 7,904 | 0.2% |
| **Virginia** | | | | |
| Fairfax County | -11,993 | 4,135 | -7,858 | -0.2% |
| **Washington** | | | | |
| King County | -54,418 | 35,842 | -18,575 | -0.1% |
| Pierce County | -21,955 | 13,550 | -8,405 | -0.2% |
| Snohomish County | -18,986 | 22,409 | 3,423 | 0.1% |
| **Wisconsin** | | | | |
| Milwaukee County | 44,147 | -33,665 | 10,481 | 0.2% |

Source:  PricewaterhouseCoopers calculations.

* Denotes less than 0.05%.

[1] Net effect as a percent of the adjusted funding level under the eight programs over 2002-2012.

[2] Baltimore City is an independent city (i.e., it is independent of any county organization).

[3] Richmond County is included in order to comprise the 5 counties of New York City.

Appendix E-4

CHMPDF - www.texiss.com

# Appendix F:  Contact Information

ChilPDF – www.fastio.com

# Contact Information

### U.S. Census Monitoring Board

Margarita Roque
Executive Director, Presidential Members
4700 Silver Hill Rd., Suite 1250
Suitland, MD 20746
Voice:  301-457-9900
Fax:  301-457-9901
Website:  www.cmbp.gov

### PricewaterhouseCoopers

Dr. Peter Merrill
1301 K Street NW, 800W
Washington, DC 20005
Voice:  202-414-1000
Fax:  202-414-1301
Website:  www.pwcglobal.com

## *Media Contacts*

John Chambers
U.S. Census Monitoring Board,
    Presidential Members
4700 Silver Hill Rd., Suite 1250
Suitland, MD 20746
Voice:  301-457-9900
Fax:  301-457-9901

Marc Eiger
PricewaterhouseCoopers
1301 Avenue of the Americas
New York, NY 10019
Voice:  212-596-8000
Fax:  212-259-5324



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC  20233-0001
OFFICE OF THE DIRECTOR

JUL 1 6 2001

Mr. Rolando L. Rios, Esquire
Law Offices of Rolando L. Rios
Milam Building
115 E. Travis, Suite 1024
San Antonio, TX  78205

Dear Mr. Rios:

This is in response to your Freedom of Information Act (FOIA) request of June 27, 2001, for
". . . the statistically adjusted population figures (data adjusted for undercount) for the
2000 Census for . . ." specified Texas jurisdictions.  We received your facsimile in this office on
June 27, 2001.

The data you are requesting are related to an intradepartmental recommendation concurred with
by the Secretary that unadjusted data be released as the U.S. Census Bureau's official
redistricting data.  The Census Bureau reached its recommendation because it was unable, based
on the data and other information it had at the time, to conclude that the adjusted data were more
accurate for use in redistricting.  As such, the data you request are predecisional and deliberative
in nature.  Thus, the data are protected from disclosure by the deliberative process privilege of
Exemption 5 of the FOIA, Title 5, United States Code, Section 552(b) (5).  Accordingly, we
must deny your request for these data.

You have the right to appeal within thirty days of the date of this letter.  If you wish to appeal,
address your appeal to the Assistant General Counsel for Administration, U.S. Department of
Commerce, Room 5883, Attn:  Freedom of Information Appeal, Washington, DC 20230.  The
appeal should include a copy of the original request, this initial determination, and a statement of
the reason(s) why this determination was in error.

Sincerely,

Gerald W. Gates
Chief, Policy Office

Case 1:01-cv-00082  Document 8  Filed in TXSD on 09/10/2001  Page 90 of 122

As noted in the prior section, beginning in the 1960s state courts began scrutinizing exclusionary zoning and, in some instances, invalidating such techniques. In the following case the United States Supreme Court addressed the issue.

### (a) The Equal Protection Clause

## VILLAGE OF ARLINGTON HEIGHTS v. METROPOLITAN HOUSING DEVELOPMENT CORPORATION

Supreme Court of the United States, 1977.
429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450.

Mr. Justice Powell delivered the opinion of the Court.

* * *

Arlington Heights is a suburb of Chicago, located about 26 miles northwest of the downtown Loop area. Most of the land in Arlington Heights is zoned for detached single-family homes, and this is in fact the prevailing land use. The Village experienced substantial growth during the 1960's, but, like other communities in northwest Cook County, its population of racial minority groups remained quite low. According to the 1970 census, only 27 of the Village's 64,000 residents were black.

The Clerics of St. Viator, a religious order (Order), own an 80–acre parcel just east of the center of Arlington Heights. Part of the site is occupied by the Viatorian high school, and part by the Order's three-story novitiate building, which houses dormitories and a Montessori school. Much of the site, however, remains vacant. Since 1959, when the Village first adopted a zoning ordinance, all the land surrounding the Viatorian property has been zoned R–3, a single-family specification with relatively small minimum lot-size requirements. On three sides of the Viatorian land there are single-family homes just across a street; to the east the Viatorian property directly adjoins the backyards of other single-family homes.

The Order decided in 1970 to devote some of its land to low-and moderate-income housing. Investigation revealed that the most expeditious way to build such housing was to work through a nonprofit developer experienced in the use of federal housing subsidies under § 236 of the National Housing Act, 48 Stat. 1246, as added and amended, 12 U.S.C. § 1715z–1.

MHDC is such a developer. It was organized in 1968 by several prominent Chicago citizens for the purpose of building low-and moderate-income housing throughout the Chicago area. In 1970 MHDC was in the process of building one § 236 development near Arlington Heights and already had provided some federally assisted housing on a smaller scale in other parts of the Chicago area.

After some negotiation, MHDC and the Order entered into a 99–year lease and an accompanying agreement of sale covering a 15–acre site in the southeast corner of the Viatorian property. MHDC became the lessee immediately, but the sale agreement was contingent upon MHDC's securing zoning clearances from the Village and § 236 housing assistance from the Federal Government. If MHDC proved unsuccessful in securing either, both the lease

CHAPDF - www.fastio.com

and the contract of sale would lapse. The agreement established a bargain purchase price of $300,000, low enough to comply with federal limitations governing land-acquisition costs for § 236 housing.

MHDC engaged an architect and proceeded with the project, to be known as Lincoln Green. The plans called for 20 two-story buildings with a total of 190 units, each unit having its own private entrance from outside. One hundred of the units would have a single bedroom, thought likely to attract elderly citizens. The remainder would have two, three, or four bedrooms. A large portion of the site would remain open, with shrubs and trees to screen the homes abutting the property to the east.

The planned development did not conform to the Village's zoning ordinance and could not be built unless Arlington Heights rezoned the parcel to R–5, its multiple-family housing classification. Accordingly, MHDC filed with the Village Plan Commission a petition for rezoning, accompanied by supporting materials describing the development and specifying that it would be subsidized under § 236. The materials made clear that one requirement under § 236 is an affirmative marketing plan designed to assure that a subsidized development is racially integrated. MHDC also submitted studies demonstrating the need for housing of this type and analyzing the probable impact of the development. To prepare for the hearings before the Plan Commission and to assure compliance with the Village building code, fire regulations, and related requirements, MHDC consulted with the Village staff for preliminary review of the development. The parties have stipulated that every change recommended during such consultations was incorporated into the plans.

During the spring of 1971, the Plan Commission considered the proposal at a series of three public meetings, which drew large crowds. Although many of those attending were quite vocal and demonstrative in opposition to Lincoln Green, a number of individuals and representatives of community groups spoke in support of rezoning. Some of the comments, both from opponents and supporters, addressed what was referred to as the "social issue"—the desirability or undesirability of introducing at this location in Arlington Heights low-and moderate-income housing, housing that would probably be racially integrated.

Many of the opponents, however, focused on the zoning aspects of the petition, stressing two arguments. First, the area always had been zoned single-family, and the neighboring citizens had built or purchased there in reliance on that classification. Rezoning threatened to cause a measurable drop in property value for neighboring sites. Second, the Village's apartment policy, adopted by the Village Board in 1962 and amended in 1970, called for R–5 zoning primarily to serve as a buffer between single-family development and land uses thought incompatible, such as commercial or manufacturing districts. Lincoln Green did not meet this requirement, as it adjoined no commercial or manufacturing district.

At the close of the third meeting, the Plan Commission adopted a motion to recommend to the Village's Board of Trustees that it deny the request. The motion stated: "While the need for low and moderate income housing may exist in Arlington Heights or its environs, the Plan Commission would be derelict in recommending it at the proposed location." Two members voted

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 92 of 122

against the motion and submitted a minority report, stressing that in their view the change to accommodate Lincoln Green represented "good zoning." The Village Board met on September 28, 1971, to consider MHDC's request and the recommendation of the Plan Commission. After a public hearing, the Board denied the rezoning by a 6–1 vote.

The following June MHDC and three Negro individuals filed this lawsuit against the Village, seeking declaratory and injunctive relief. A second non-profit corporation and an individual of Mexican–American descent intervened as plaintiffs. The trial resulted in a judgment for petitioners. Assuming that MHDC had standing to bring the suit, the District Court held that the petitioners were not motivated by racial discrimination or intent to discriminate against low-income groups when they denied rezoning, but rather by a desire "to protect property values and the integrity of the Village's zoning plan." 373 F.Supp. at 211. The District Court concluded also that the denial would not have a racially discriminatory effect.

A divided Court of Appeals reversed.

* * *

[T]he Court of Appeals ruled that the denial of the Lincoln Green proposal had racially discriminatory effects and could be tolerated only if it served compelling interests. Neither the buffer policy nor the desire to protect property values met this exacting standard. The court therefore concluded that the denial violated the Equal Protection Clause of the Fourteenth Amendment. * * *

II

[Editors' note: The Court then considered, and rejected, petitioners challenge to respondents' standing. Under Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), discussed in note 4 following this opinion, the Court enacted stringent standing rules in exclusionary zoning cases. The Court found, however, that MHDC met the *Warth* standards since the "challenged action of the petitioners stands as an absolute barrier to constructing the housing MHDC had contracted to place on the Viatorian site. If MHDC secures the injunctive relief it seeks, that barrier will be removed. * * * When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy."]

Clearly MHDC has met the constitutional requirements, and it therefore has standing to assert its own rights. Foremost among them is MHDC's right to be free of arbitrary or irrational zoning actions. See Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Nectow v. City of Cambridge, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928); Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). But the heart of this litigation has never been the claim that the Village's decision fails the generous Euclid test, recently reaffirmed in Belle Terre. Instead it has been the claim that the Village's refusal to rezone discriminates against racial minorities in violation of the Fourteenth Amendment. As a corporation, MHDC has no racial identity and cannot be the direct target of the petitioners' alleged discrimination. In the ordinary case, a party is denied standing to assert the rights of third persons. Warth v. Seldin, 422 U.S., at 499, 95 S.Ct.,

at 2205. But we need not decide whether the circumstances of this case would justify departure from that prudential limitation and permit MHDC to assert the constitutional rights of its prospective minority tenants. For we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own.

Respondent Ransom, a Negro, works at the Honeywell factory in Arlington Heights and lives approximately 20 miles away in Evanston in a 5–room house with his mother and his son. The complaint alleged that he seeks and would qualify for the housing MHDC wants to build in Arlington Heights. Ransom testified at trial that if Lincoln Green were built he would probably move there, since it is closer to his job.

The injury Ransom asserts is that his quest for housing nearer his employment has been thwarted by official action that is racially discriminatory. If a court grants the relief he seeks, there is at least a "substantial probability," that the Lincoln Green project will materialize, affording Ransom the housing opportunity he desires in Arlington Heights. His is not a generalized grievance. Instead, as we suggested in *Warth*, supra, at 507, 508 n. 18, 95 S.Ct., at 2210, it focuses on a particular project and is not dependent on speculation about the possible actions of third parties not before the court. Unlike the individual plaintiffs in *Warth*, Ransom has adequately averred an "actionable causal relationship" between Arlington Heights' zoning practices and his asserted injury. We therefore proceed to the merits.

### III

Our decision last Term in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." Id., at 242, 96 S.Ct., at 2049. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Although some contrary indications may be drawn from some of our cases, the holding in *Davis* reaffirmed a principle well established in a variety of contexts. (Citations omitted).

*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," Washington v. Davis, supra, 426 U.S., at 242, 96 S.Ct., at 2049—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race,

emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes. Reitman v. Mulkey, 387 U.S. 369, 373–376, 87 S.Ct. 1627, 1629–1631, 18 L.Ed.2d 830 (1967); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). For example, if the property involved here always had been zoned R–5 but suddenly was changed to R–3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. See Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); United States v. Nixon, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974); 8 J. Wigmore, Evidence § 2371 (McNaughton rev. ed. 1961).

The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed. * * *

* * *

We also have reviewed the evidence. The impact of the Village's decision does arguably bear more heavily on racial minorities. Minorities constitute 18% of the Chicago area population, and 40% of the income groups said to be eligible for Lincoln Green. But there is little about the sequence of events leading up to the decision that would spark suspicion. The area around the Viatorian property has been zoned R–3 since 1959, the year when Arlington Heights first adopted a zoning map. Single-family homes surround the 80–acre site, and the Village is undeniably committed to single-family homes as its dominant residential land use. The rezoning request progressed according to the usual procedures. The Plan Commission even scheduled two additional hearings, at least in part to accommodate MHDC and permit it to supplement its presentation with answers to questions generated at the first hearing.

The statements by the Plan Commission and Village Board members, as reflected in the official minutes, focused almost exclusively on the zoning aspects of the MHDC petition, and the zoning factors on which they relied are not novel criteria in the Village's rezoning decisions. There is no reason to doubt that there has been reliance by some neighboring property owners on

the maintenance of single-family zoning in the vicinity. The Village originally adopted its buffer policy long before MHDC entered the picture and has applied the policy too consistently for us to infer discriminatory purpose from its application in this case. Finally, MHDC called one member of the Village Board to the stand at trial. Nothing in her testimony supports an inference of invidious purpose.

In sum, the evidence does not warrant overturning the concurrent findings of both courts below. Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision.[21] This conclusion ends the constitutional inquiry. The Court of Appeals' further finding that the Village's decision carried a discriminatory "ultimate effect" is without independent constitutional significance.

V

Respondents' complaint also alleged that the refusal to rezone violated the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. They continue to urge here that a zoning decision made by a public body may, and that petitioners' action did, violate § 3604 or § 3617. The Court of Appeals, however, proceeding in a somewhat unorthodox fashion, did not decide the statutory question. We remand the case for further consideration of respondents' statutory claims.

Reversed and remanded.

### Notes

1. Since poverty is not a suspect classification, San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), and housing is not a fundamental right, Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), *Arlington Heights* 'implicit endorsement of economic exclusionary zoning is not surprising. Regarding *Arlington Heights*, see Callies and Weaver, The Arlington Heights Case: The Exclusion of Exclusionary Zoning Challenges, 2 Real Estate Issues 37 (1978) and Mandelker, Racial Discrimination and Exclusionary Zoning: A Perspective on Arlington Heights, 55 Tex.L.Rev. 1217 (1977).

2. Is it right to put the burden on the challenger to show racial motivation? Consider Professor Perry's comment:

> In such a case, who ought to get the benefit of the doubt—the challenging or the defending party? Principally, because racism is still a pervasive feature of American life, infecting more official decisionmaking than we like to admit, the doubt should be resolved in the challenging party's favor; the presumption should be that the decision *is* race-dependent.

See Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Colum.L.Rev. 1023, 1039 (1979). What happens if racial motivation is shown? See footnote 21 in the Court's opinion.

**21.** Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision. But in this case respondents failed to make the required threshold showing. See Mt. Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471.

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 96 of 122



National **Law** Library

*The law library you need, at the lowest possible price .*

**918 F.2d 763**

**59 USLW 2317**

Yolanda GARZA; Salvador Ledezma; Raymond Palacios; Monica
Tovar, Guadalupe De La Garza, Plaintiffs-Appellees,

v.

COUNTY OF LOS ANGELES, Board of Supervisors, Los Angeles
County; Deane Dana; Peter F. Schabarum; Kenneth
F. Hahn, Defendants-Appellants.
UNITED STATES Of America, Plaintiff-Appellee,
and
Lawrence K. Irvin; Sarah Flores, Intervenors-Appellees,

v.

COUNTY OF LOS ANGELES, Board of Supervisors, Los Angeles
County; Deane Dana; Peter F. Schabarum; Kenneth
F. Hahn, et al., Defendants-Appellants.

**Nos. 90-55944, 90-55945 and 90-56024.**

**United States Court of Appeals,
Ninth Circuit.**

**Argued and Submitted Oct. 10, 1990.
Decided Nov. 2, 1990.
Certiorari Denied Jan. 7, 1991.
See 111 S.Ct. 681.**

Page 765

    John E. McDermott, Los Angeles, Cal., for defendants-appellants Los Angeles County.

    Thomas K. Bourke, Los Angeles, Cal , for appellant Flores.

    Mark D. Rosenbaum, Richard P. Fajardo, Antonia Hernandez, Los Angeles, Cal., for plaintiffs-appellees Garza.

Case 1:01-cv-00082  Document 8  Filed in TXSD on 09/10/2001  Page 97 of 122

Irving Gornstein and Jessica Dunsay Silver, Steven H. Rosenbaum, Mark L. Gross and Miriam R. Eisenstein, Dept. of Justice, Washington, D.C., for plaintiff-appellee U.S.

Theodore Shaw, Los Angeles, Cal., for intervenor-appellee.

Appeal from the United States District Court for the Central District of California.

Before SCHROEDER, NELSON, and KOZINSKI, Circuit Judges.

SCHROEDER, Circuit Judge:

## INTRODUCTION

Hispanics in Los Angeles County, joined by the United States of America, filed this voting rights action in 1988 seeking a redrawing of the districts for the Los Angeles County Board of Supervisors. They alleged that the existing boundaries, which had been drawn after the 1980 census, were gerrymandered boundaries that diluted Hispanic voting strength. They sought redistricting in order to create a district with a Hispanic majority for the 1990 Board of Supervisors election in which two board members were to be elected.

The Voting Rights Act, 42 U.S.C. Sec. 1973, forbids the imposition or application of any practice that would deny or abridge, on grounds of race or color, the right of any citizen to vote. In 1980, a plurality of the Supreme Court held that this provision prohibited only intentional discrimination, and would not allow minorities

Page 766

to challenge practices that, although not instituted with invidious intent, diluted minority votes in practice. City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). In response to this decision, Congress amended the Voting Rights Act in 1982 to add language indicating that the Act forbids not only intentional discrimination, but also any practice shown to have a disparate impact on minority voting strength. See 42 U.S.C. Sec. 1973(b). Thus, after the 1982 amendment, the Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes.

To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment. See Bolden, 446 U.S. at 66-67, 100 S.Ct. at 1499. The plaintiffs in this case claimed that because the County had engaged in intentional discrimination in the drawing of district lines in 1981, the resulting boundaries violated both the Voting Rights Act and the Equal Protection Clause. They further claimed that, whether or not the vote dilution was intentional, the effect of the County's districting plan was the reduction of Hispanic electoral power in violation of the newly amended Voting Rights Act.

The district court held a three-month bench trial. At its conclusion the district court found that the County had engaged in intentional discrimination in the 1981 reapportionment, as it had in prior reapportionments, deliberately diluting the strength of the Hispanic vote. It also found that, regardless of intentional discrimination, the County's reapportionment plan violated the Voting Rights Act because it had the effect of diluting Hispanic voting strength. Finally, it found that, based on post-census data, it was possible to grant the remedy that the plaintiffs sought, which was a redistricting in which one of the five districts would have a Hispanic voting majority. It ordered the County to propose such a redistricting

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 98 of 122

In its findings, the district court detailed the recent history of the Los Angeles County Board of Supervisors and the voting procedures by which it has been elected. At least since the beginning of this century, the Board has always consisted of five members, elected in even-numbered years to serve four-year terms. These elections are staggered so that two supervisors are elected one year, and three are elected two years later. Supervisors are elected in non-partisan elections, and a candidate must receive a majority of the votes cast in order to win. If no candidate receives such a majority, the two candidates who receive the highest number of votes must engage in a runoff contest.

The district court found persuasive the evidence showing that the Board had engaged in intentional discrimination in redistrictings that it undertook in 1959, 1965 and 1971. The district court further found that the 1981 redistricting was calculated at least in part to keep the effects of those prior discriminatory reapportionments in place, as well as to prevent Hispanics from attaining a majority in any district in the future. The findings of the district court on the question of intentional discrimination are set forth in the margin. [1] After

Page 768

entering these findings and conclusions of law, the district court gave the County the opportunity to propose a new plan, as required by Wise v. Lipscomb, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978).

Under the Los Angeles County Charter, any redistricting must be approved by four of the five members of the Board. In response to the court's order directing the County to propose a plan, three Board members submitted a proposal. The district court rejected that proposal with findings to support its conclusion that the proposal was less than a good faith effort to remedy the violations found in the existing districting. The court considered other proposals. On August 6 it accepted and imposed a plan which creates a district in which the majority of the voting age citizen population is Hispanic. The County then appealed and this court ordered the matter handled on an expedited basis.

There is a second appeal before us. It is from the district court's denial of a motion

Page 769

to intervene in the main case. During the course of the proceedings, there was a primary election under the existing districting plan. The incumbent supervisor, Edmund Edelman, received a majority of the votes in District 3, and thereby won that seat. In the District 1 contest, the incumbent did not seek reelection. No candidate received the required majority of the votes; therefore, the two front runners, Sarah Flores and Gregory O'Brien, were scheduled to compete in a runoff election on November 6, 1990.

During the remedial phase of these proceedings, one of those candidates, Sarah Flores, sought to intervene in this action in order to oppose any redistricting plan which would result in the need for a new primary election in which additional candidates could run for the seat she was seeking in District 1. The district court denied her petition to intervene and she appeals from that denial. We have jurisdiction of her appeal pursuant to 28 U.S.C. Sec. 1291. See California v. Block, 690 F.2d 753, 776 (9th Cir.1982) (denial of motion to intervene is an appealable order).

I. The County Appeal--Liability

Plaintiffs filed this action in order to require the imposition of new district lines for the 1990 election of supervisors. The record shows without serious dispute that at the time of the decennial redistricting in 1981, it was not possible to draw a district map, with roughly equal population in each district, that

Case 1:01-cv-00082  Document 8  Filed in TXSD on 09/10/2001  Page 99 of 122

contained a district with a majority of Hispanic voters. The district court found, however, that the County in 1981, as part of a course of conduct that began decades earlier, intentionally fragmented the Hispanic population among the various districts in order to dilute the effect of the Hispanic vote in future elections and preserve incumbencies of the Anglo members of the Board of Supervisors. The evidence in the record also shows that at the time that this action was filed it was possible to draw lines for five districts of roughly equal population size, as required by state law, with one single-member district having a majority of Hispanic voters.

The district court found the County liable for vote dilution on two separate theories. It found that the County had adopted and applied a redistricting plan that resulted in dilution of Hispanic voting power in violation of Section 2. It also found that the County, by establishing and maintaining the plan, had intentionally discriminated against Hispanics in violation of Section 2 and the Equal Protection clause of the fourteenth amendment.

In this appeal, the County's threshold argument is that districts drawn in 1981 are lawful, regardless of any intentional or unintentional dilution of minority voting strength, because at the time they were drawn there could be no single-member district with a majority of minority voters. The County asks us to extract from the Supreme Court's leading decision in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L Ed.2d 25 (1986), and subsequent cases in this and other circuits, the principle that there can be no successful challenge to a districting system unless the minority challenging that system can show that it could, at the time of districting, constitute a voter majority in a single-member district.

In response to this position, the appellees argue that no majority requirement should be imposed where, as here, there has been intentional dilution of minority voting strength. The County thus also challenges the sufficiency of the district court's findings with regard to intent.

We hold that, to the extent that Gingles does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength. We affirm the district court on the basis of its holding that the County engaged in intentional discrimination at the time the challenged districts were drawn.

A. The Background and Effect of Gingles

In 1982, Congress amended Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973, to provide minority groups a remedy for vote dilution without requiring a showing that the majority engaged in intentional

Page 770

discrimination. Congress set forth a non-exhaustive list of factors to guide courts in determining whether there had been a Section 2 violation. S.Rep. No. 417, 97th Cong., 2d Sess., pt. I at 28-29, U.S.Code Cong. & Admin.News 1982, pp. 206-207. Congress indicated that in applying these factors, courts should engage in a "searching practical evaluation of the 'past and present reality' " of the political system in question. Id. at 30, U.S.Code Cong. & Admin.News 1982, p. 208. Creation of this "results" test for discrimination under Section 2 did not affect the remedies under Section 2 for intentional discrimination. Id. at 27.

In Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court discussed the meaning of the new amendment. While noting the factors the Senate had set out as indicators of impermissible vote dilution, it stated that a court must look to the totality of the circumstances in considering a vote dilution claim. It also established three preconditions for liability under the amendment to Section 2 for claims based only on discriminatory effects: (1) geographical compactness of

the minority group; (2) minority political cohesion; and (3) majority block voting. 478 U.S. at 50-51, 106 S.Ct. at 2766-67.

The Gingles requirements were articulated in a much different context than this case presents. Although the Gingles Court was aware of the history of discrimination against blacks, which was the minority there in question, the Court did not consider any claim that the disputed districting plan had been enacted deliberately to dilute the black vote. See 478 U.S. at 80, 106 S.Ct. at 2760-61. The claim at issue was that the multi-member districts that were being used, regardless of the intent with which they were created, had the effect of diluting the black vote. 478 U.S. at 39-41, 106 S.Ct. at 2781-82. Thus, the court instituted the "possibility of majority" requirement in a case in which it was asked to invalidate a political entity's choice of a multi-member district system, and impose a system of single-member districts, and was not asked to find that the multi-member scheme had been set up with a discriminatory purpose in mind. [2] An emphasis on showing a statistically significant disparate impact is typical of claims based on discriminatory effect as opposed to discriminatory intent

In contrast, the district court in this case found that the County had adopted its current reapportionment plan at least in part with the intent to fragment the Hispanic population. See Findings at 44 No. 81. The court noted that continued fragmentation of the Hispanic population had been at least one goal of each redistricting since 1959. Thus, the plaintiffs' claim is not, as in Gingles, merely one alleging disparate impact of a seemingly neutral electoral scheme. Rather, it is one in which the plaintiffs have made out a claim of intentional dilution of their voting strength.

Page 771

The County cites a number of cases in support of its argument that Gingles requires these plaintiffs to demonstrate that they could have constituted a majority in a single-member district as of 1981. None dealt with evidence of intentional discrimination. See, e.g., Romero v. City of Pomona, 883 F.2d 1418, 1422 (9th Cir.1989); McNeil v. Springfield Park, 851 F.2d 937 (7th Cir.1988), cert. denied, 490 U.S 1031, 109 S.Ct. 1769, 104 L Ed.2d 204 (1989); Skorepa v. City of Chula Vista, 723 F.Supp. 1384 (S.D.Cal.1989).

To impose the requirement the County urges would prevent any redress for districting which was deliberately designed to prevent minorities from electing representatives in future elections governed by that districting. This appears to us to be a result wholly contrary to Congress' intent in enacting Section 2 of the Voting Rights Act and contrary to the equal protection principles embodied in the fourteenth amendment.

B  The Findings of Intent

We therefore turn to the appellants' challenge to the district court's rulings with respect to the intent of the supervisors in 1981. The County contends that the district court did not make sufficient findings on intentional discrimination. Focusing on language in Finding 177, quoted supra in note 1, the County claims that the district court found only that the supervisors in 1981 intended to perpetuate their own incumbencies. This is a mistaken reading of what the district court found. Although the court noted that "the Supervisors appear to have acted primarily on the political instinct of self-preservation," the court also found that they chose fragmentation of the Hispanic voting population as the avenue by which to achieve this self-preservation. Finding No. 181. The supervisors intended to create the very discriminatory result ✓ that occurred. That intent was coupled with the intent to preserve incumbencies, but the discrimination need not be the sole goal in order to be unlawful. See Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 97 S Ct. 555, 50 L.Ed.2d 450 (1977). Accordingly, the findings of the district court are adequate to support its conclusion of intentional discrimination, and the detailed factual findings are more than amply supported by evidence in the record.

Even where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result. Although the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases, some showing of injury must be made to assure that the district court can impose a meaningful remedy.

That intent must result, according to the Voting Rights Act, in the

political processes leading to nomination or election ... [not being] equally open to participation by members of a [protected] class ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. Sec. 1973(b). This language is echoed in the intentional discrimination case of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). There, in addition to intent, the Supreme Court required proof that "the political processes leading to nomination and election were not equally open to participation by the group in question--that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." Id. at 766, 93 S.Ct. at 2339. See also Whitcomb v. Chavis, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971).

Applying that standard to this case of intentional discrimination, we agree with the district court that the supervisors' intentional splitting of the Hispanic core resulted in a situation in which Hispanics had less opportunity than did other county residents to participate in the political process and to elect legislators of their choice. We conclude, therefore, that this intentional discrimination violated both the Voting Rights Act and the Equal Protection Clause.

Page 772

C. Laches

The County claims that, because four rounds of elections have occurred since the 1981 reapportionment plan was instituted, and because a regular reapportionment is scheduled to occur in 1991, the plaintiffs' claim for redistricting relief is barred on the ground of laches. It argues that substantial hardship will result from a redistricting now, when another regularly scheduled one is set to occur so closely on its heels. Furthermore, the County contends that the plaintiffs had no excuse for their delay in bringing suit. Therefore, it concludes, the suit should have been dismissed.

Although plaintiffs could have filed an action as early as 1981 in order to enhance their ability to influence the result in a district in which they were then still a minority, their failure to do so does not constitute laches. The record here shows that the injury they suffered at that time has been getting progressively worse, because each election has deprived Hispanics of more and more of the power accumulated through increased population. Because of the ongoing nature of the violation, plaintiffs' present claim ought not be barred by laches.

II. The County Appeal--Remedy

A. Redistricting Between Decennial Redistrictings

The County contends that the district court erred in requiring it to redistrict now, at a point between regularly scheduled decennial reapportionments. Citing Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, reh'g denied, 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964), the County claims that

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 102 of 122

decennial redistricting based upon census data is a "rule," and that that case "was intended to avoid" the confusion that might be associated with more frequent reapportionments.

The County misreads Reynolds. The Court in Reynolds instituted a requirement of periodic reapportionment based upon current population data. It stated that decennial reapportionment "would clearly meet the minimal requirements," and less frequent reapportionment would "assuredly be constitutionally suspect." 377 U.S. at 583-84, 84 S.Ct. at 1393. The Court further noted, however, that while more frequent apportionment was not constitutionally required, it would be "constitutionally permissible," and even "practicably desirable." Id. Thus, Reynolds did not institute a constitutional maximum frequency for reapportionment; rather, it set a floor below which such frequency may not constitutionally fall.

B. Use of Post-1980 Population Data

The County further claims that the district court erred in considering any data other than data from the 1980 census. Since the 1980 census data does not suggest the possibility of creating a Hispanic majority district, the County claims that the plaintiffs must lose in their 1988 claim to redistrict to provide for such a district. This claim, too, misinterprets the case law on which it purports to rest.

Since Reynolds would permit redistricting between censuses, it appears to assume that post-census data may be used as a basis for such redistricting. Furthermore, in a subsequent opinion the Court noted with approval the possibility of using predictive data in addition to census data in designing decennial reapportionment plans. The court stated that "[s]ituations may arise where substantial population shifts over such a period [the ten years between redistricting] can be anticipated. Where these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them." Kirkpatrick v. Preisler, 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519, reh'g denied, 395 U.S. 917, 89 S.Ct. 1737, 23 L.Ed.2d 231 (1969) See also Burns v Richardson, 384 U.S. 73, 91, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966) ("the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which ... substantial population equivalency is to be measured."). The Court has never hinted that plaintiffs claiming present Voting Rights Act violations

Page 773

should be required to wait until the next census before they can receive any remedy.

The Fifth Circuit has held that non-census data may be considered in reapportionments between censuses if the relevant information cannot be obtained through census data. Westwego Citizens for Better Government v. Westwego, 906 F.2d 1042, 1045-46 (5th Cir.1990). Such a practice makes sense not only where, as in Westwego itself, census data on the population in question was unavailable because of the limited nature of the compilations and manipulations performed by the census; it is also logical where, as here, the census data is almost a decade old and therefore no longer accurate. [3]

The County contests the validity of the population statistics that the court employed. The district court's findings, however, present an extensive review of the data itself and of the methodology that produced it, coupled with an inquiry into its validity. The County has not offered any reason why the district court should have rejected this data, other than the fact that it does not come from the census. Since it was permissible for the district court to rely on non-census data, we find that the district court did not err in its assessment of the size and geographic distribution of the Hispanic population in Los Angeles.

The district court's findings concerning vote dilution may be set aside only if they are clearly

Case 1:01-cv-00082    Document 8    Filed in TXSD on 09/10/2001    Page 103 of 122

erroneous. Gingles, 478 U.S. at 79, 106 S.Ct. at 2781. The findings at issue here were amply supported by the evidence that was before the district court.

C. Apportionment Based on Population Rather than Voting Age

Citizen Data

The County contends that because the district court's reapportionment plan employs statistics based upon the total population of the County, rather than the voting population, it is erroneous as a matter of law  The County points out that many Hispanics in the County are noncitizens, and suggests that therefore a redistricting plan based upon population alone, in which Hispanics are concentrated in one district, unconstitutionally weights the votes of citizens in that district more heavily than those of citizens in other districts.

The district court adopted a plan with nearly equal numbers of persons in each district. [4] The districts deviated in population by sixty-eight hundredths of one percent. (Findings and Order Regarding Remedial Redistricting Plan and Election Schedule, 4). The variance is larger when the number of voting age citizens in each district is considered. [5]

The County is correct in pointing out that Burns v. Richardson, 384 U.S. 73, 91-92,

Page 774

86 S.Ct. 1286, 1296-97, 16 L.Ed.2d 376 (1966), seems to permit states to consider the distribution of the voting population as well as that of the total population in constructing electoral districts. It does not, however, require states to do so. In fact, the Richardson Court expressly stated that "[t]he decision to include or exclude [aliens or other nonvoters from the apportionment base] involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere." 384 U.S. at 92, 86 S.Ct. at 1296-97. Richardson does not overrule the portion of Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964), that held that apportionment for state legislatures must be made upon the basis of population.

In Reynolds, 377 U.S. at 560-61, 84 S.Ct. at 1381, the Supreme Court applied to the apportionment of state legislative seats the standard enunciated in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), that "the fundamental principle of representative government is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a state." This standard derives from the constitutional requirement that members of the House of Representatives are elected "by the people," Reynolds, 377 U.S. at 560, 84 S.Ct. at 1381, from districts "founded on the aggregate number of inhabitants of each state" (James Madison, The Federalist, No. 54 at 369 (J. Cooke ed. 1961)); U.S. Const. art. I, Sec. 2. The framers were aware that this apportionment and representation base would include categories of persons who were ineligible to vote-- women, children, bound servants, convicts, the insane, and, at a later time, aliens. Fair v. Klutznick, 486 F.Supp. 564, 576 (D.D.C.1980). Nevertheless, they declared that government should represent all the people. In applying this principle, the Reynolds Court recognized that the people, including those who are ineligible to vote, form the basis for representative government. Thus population is an appropriate basis for state legislative apportionment.

Furthermore, California state law requires districting to be accomplished on the basis of total population. California Elections Code Sec. 35000. No part of the holding in Richardson, or in any other case cited by the appellants, suggests that the requirements imposed by such state laws may be unconstitutional. In fact, in Gaffney v. Cummings, 412 U.S. 735, 747, 93 S.Ct. 2321, 2328, 37 L.Ed.2d 298 (1973), the Court approved a redistricting based on total population, but with some deviations based

upon consideration of political factors. In approving that plan, the Court expressly noted that districting based upon total population would lead to some disparities in the size of the eligible voting population among districts. These differences arise from the number of people ineligible to vote because of age, alienage, or non-residence, and because many people choose not to register or vote. Id. at 746-47, 93 S.Ct. at 2328. The Court made no intimation that such disparities would render those apportionment schemes constitutionally infirm.

Even the limited latitude Gaffney affords state and local governments to depart from strict total population equality is unavailable here. The Supreme Court has held that unless a court ordering a redistricting plan can show that population variances are required by "significant state policies", that court must devise a plan that provides for districts of equal population. Chapman v. Meier, 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975). Since California law requires equality of total population across districts, there are no locally relevant contrary policies.

There is an even more important consideration. Basing districts on voters rather than total population results in serious population inequalities across districts. Residents of the more populous districts thus have less access to their elected representative. Those adversely affected are those who live in the districts with a greater percentage of non-voting populations, including aliens and children. Because there are more young people in the predominantly Hispanic District 1 (34.5% of the L.A. County Hispanic population (Findings of

Page 775

Fact and Conclusions of Law re: County's Remedial Plan, 5-6)), citizens of voting age, minors and others residing in the district will suffer diminishing access to government in a voter-based apportionment scheme.

The purpose of redistricting is not only to protect the voting power of citizens; a coequal goal is to ensure "equal representation for equal numbers of people." Kirkpatrick, 394 U.S. at 531, 89 S.Ct. at 1229. Interference with individuals' free access to elected representatives impermissibly burdens their right to petition the government. Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137, 81 S.Ct. 523, 539, 5 L.Ed.2d 464, reh'g denied, 365 U.S. 875, 81 S.Ct. 899, 5 L.Ed.2d 864 (1961). Since "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives", this right to petition is an important corollary to the right to be represented. Id. Non-citizens are entitled to various federal and local benefits, such as emergency medical care and pregnancy-related care provided by Los Angeles County. California Welfare and Institutions Code Secs. 14007.5, 17000. As such, they have a right to petition their government for services and to influence how their tax dollars are spent.

In this case, basing districts on voting population rather than total population would disproportionately affect these rights for people living in the Hispanic district. Such a plan would dilute the access of voting age citizens in that district to their representative, and would similarly abridge the right of aliens and minors to petition that representative. For over a century, the Supreme Court has recognized that aliens are "persons" within the meaning of the fourteenth amendment to the Constitution, entitled to equal protection. See Yick Wo v. Hopkins, 118 U.S. 356, 368, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). This equal protection right serves to allow political participation short of voting or holding a sensitive public office. See Bernal v. Fainter, 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984) (law that would have denied alien the right to become a notary public and thereby assist in litigation for the benefit of migrant workers struck down under strict scrutiny equal protection analysis); Nyquist v. Mauclet, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (state's interest in educating its electorate does not justify excluding aliens from state scholarship program, since aliens may participate in their communities in ways short of voting). Minors, too, have the right to political expression. Tinker v. Des Moines Community School Dist., 393 U.S. 503, 511-13, 89 S.Ct. 733, 739-40, 21 L.Ed.2d 731 (1969). To refuse to count people in

constructing a districting plan ignores these rights in addition to burdening the political rights of voting age citizens in affected districts.

The principles were well expressed by the California Supreme Court in its opinion in Calderon v. City of Los Angeles, 4 Cal.3d 251, 258-59, 93 Cal.Rptr. 361, 365-66, 481 P.2d 489 (1971), in holding that the United States Constitution requires apportionment by total population, not by voting population.

Although we are, of course, constrained by the supremacy clause (U S. Const., art VI, cl. 2) to follow decisions of the Supreme Court on matters of constitutional interpretation, we emphasize that we do so here not only from constitutional compulsion but also as a matter of conviction. Adherence to a population standard, rather than one based on registered voters, is more likely to guarantee that those who cannot or do not cast a ballot may still have some voice in government.

Thus a 17-year-old, who by state law is prohibited from voting, may still have strong views on the Vietnam War which he wishes to communicate to the elected representative from his area. Furthermore, much of a legislator's time is devoted to providing services and information to his constituents, both voters and nonvoters. A district which, although large in population, has a low percentage of registered voters would, under a voter-based apportionment, have fewer representatives to provide such assistance

Page 776

and to listen to concerned citizens. (footnote omitted)

Judge Kozinski's dissent would require districting on the basis of voting capability. Adoption of Judge Kozinski's position would constitute a denial of equal protection to these Hispanic plaintiffs and rejection of a valued heritage.

D. Rejection of the Supervisors' Proposal

After it found that the County's districting plan was statutorily and constitutionally invalid, the district court gave the County 20 days to develop and propose a remedial plan of its own. The County submitted a plan, but the district court rejected it because, although it did create a district that had a Hispanic majority, it unnecessarily fragmented other Hispanic populations in the County. The district court found that such fragmentation posed an impediment to Hispanic political cohesiveness. Furthermore, the district court objected to the placement of the Hispanic majority district in a section controlled by a powerful incumbent, rather than in the one section that had a naturally occurring open seat, an open seat that was "in the heart of the Hispanic core." For these reasons, the district court found that the County's plan did not represent a good faith effort to remedy the violation.

The County objects to the district court's rejection of its proposal. It argues that the district court may not substitute "even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan," citing Wright v. City of Houston, 806 F.2d 634 (5th Cir.1986); Seastrunk v. Burns, 772 F.2d 143, 151 (5th Cir.1985).

However, there appear to be at least two fundamental reasons why the district court was not required to defer to the plan put forward by the supervisors in this case. First, as two of the supervisors themselves point out in their separate brief on the issue, the plan that the Board submitted to the district court could not, under the County's charter, have been considered a Board Redistricting plan, because only three members voted in favor of it, not the four required for such matters. Los Angeles County Charter, Art. II, Sec 7 (1985). Thus, the proposal was not an act of legislation; rather, it was a suggestion by some members of the Board, entitled to consideration along with the other suggestions that had been received  Second, the district court found that it did not constitute a good faith attempt to remedy the

Case 1:01-cv-00082 Document 8 Filed in TXSD on 09/10/2001 Page 106 of 122

violation because, inter alia, it used unnatural configurations in order to place an Anglo incumbent in the new Hispanic district, and it fragmented some Hispanic communities in other districts in the same manner in which the Board had deliberately diluted Hispanic influence in the past.

E. The County's Claim of Reverse Discrimination

The County argues that, by deliberately creating a district with a Hispanic majority, the district court engaged in discrimination in favor of a minority group of the type forbidden by City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). It claims to have had a valid defense based upon the district court's "creation of an equal protection violation in order to establish a Section 2 claim." The district court erred, it contends, in refusing to address this constitutional defense.

The County makes no suggestion, however, that the redistricting plan somehow dilutes the voting strength of the Anglo community. The deliberate construction of minority controlled voting districts is exactly what the Voting Rights Act authorizes. Such districting, whether worked by a court or by a political entity in the first instance, does not violate the constitution. United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). For that reason, the district court properly refused to consider the appellants' constitutional defense.

III. The Flores Appeal

Sarah Flores appeals from the district court's denial of her petition to intervene. Her petition was based upon her

Page 777

interest in the outcome of the suit as a candidate in the election that stood to be invalidated. Under the plan adopted by the district court, she would be eligible to run for election in the new Hispanic district. Under the status quo, she was scheduled to participate in a runoff election against one other candidate. The district court dismissed her petition to intervene because it was untimely and because, in any event, the interests that she claimed to advocate either were already represented in the case or had not been proven to exist.

A party is entitled to intervene as of right under Fed.R.Civ.Pro. 24(a)(2) if that party moves to do so in a timely fashion and asserts an interest in the subject of the litigation, shows that the asserted interest stands to be impeded or impaired if the litigation goes forth without intervention, and demonstrates that the interest is not adequately represented by the parties to the litigation. Sagebrush Rebellion, Inc. v Watt, 713 F.2d 525, 527 (9th Cir.1983). In determining whether a motion to intervene is timely, a court must consider whether intervention will cause delay that will prejudice the existing parties. United States v. Oregon, 745 F.2d 550, 552 (9th Cir.1984).

Where a would-be intervenor does not demonstrate interests sufficiently weighty to warrant intervention as of right, the court may nevertheless consider eligibility for permissive intervention under Fed.R.Civ.Pro. 24(b)(2). Courts will allow such intervention where the intervenor raises a claim that has questions of law or fact in common with the main case, shows independent grounds for jurisdiction, and moves to intervene in a timely fashion. Venegas v. Skaggs, 867 F.2d 527, 529 (9th Cir.1989), aff'd, --- U.S. ----, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990). The decision to grant or deny this type of intervention is discretionary, subject to considerations of equity and judicial economy. Id. at 530-31. Sarah Flores sought both intervention as of right and, in the alternative, permissive intervention in the proceedings below. The district court denied intervention on either ground.

This ruling was correct. Flores knew that this lawsuit was pending at the time when she decided to

CMPDF - www.fenix.com

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 107 of 122

run in the election, and knew that part of the relief sought was a redistricting plan that could affect the outcome of that election. She did not petition to intervene until four months after she declared her candidacy, which was almost two years after the proceedings had been instituted. While Flores points out that the entry of a trial into a "new stage" may be the appropriate point for intervention, this is only the case where the new phase develops as a result of a change in the law or the factual circumstances. See United States v. Oregon, 745 F.2d 550 (9th Cir.1984). Here, the new phase came about in the general progression of the case to a close. It was a foreseeable part of a chain of events. Therefore, Flores' delay cannot be excused on this ground. Introduction of a new party at that late stage could have resulted in irreversible prejudicial delay in a case where time was of the essence.

IV. The Election

A motions panel of this court entered an order which had the effect of staying the County's election procedures pending our decision. Because the time schedule originally contemplated by the district court's order can no longer be followed, we REMAND for the district court to impose a new schedule pursuant to which the primary, and if necessary, a general election can be conducted. Because it is imperative that such election procedures go forward as soon as practicable, the opinion of this panel shall constitute the mandate.

The judgment of the district court on liability and its decision as to remedy are AFFIRMED. The scheduling provisions of the district court's order of August 6, 1989 are VACATED and the matter is REMANDED for the purpose of determining the schedule for elections under the district court's redistricting plan. We issue the mandate now because 42 U.S.C. Sec. 1971(g) requires that voting rights cases "be in every way expedited."

Page 778

AFFIRMED IN PART; VACATED IN PART AND REMANDED. THE MANDATE SHALL ISSUE FORTHWITH.

KOZINSKI, Circuit Judge, concurring and dissenting in part.

I. Liability

A determination by a federal court that elected officials have intentionally discriminated against some of their constituents is a matter of no little moment. While I join the liability portion of Judge Schroeder's opinion without reservation, I write briefly for the benefit of those not conversant with the esoterica of federal discrimination law, what today's ruling means--and what it does not.

First the good news. Nothing in the majority opinion, or in the district court's findings which we review and approve today, suggests that the County supervisors who adopted the 1981 reapportionment--all of whom are still in office--harbored any ethnic or racial animus toward the Los Angeles Hispanic community. In other words, there is no indication that what the district court found to be intentional discrimination was based on any dislike, mistrust, hatred or bigotry against Hispanics or any other minority group. Indeed, the district court seems to have found to the contrary. See Garza v. County of Los Angeles, Nos. 88-5143 & 88-5435, at 7 (C.D.Cal. June 4, 1990) ("The Court believes that had the Board found it possible to protect their incumbencies while increasing Hispanic voting strength, they would have acted to satisfy both objectives."). [1]

Which brings us to what this case does stand for. When the dust has settled and local passions have cooled, this case will be remembered for its lucid demonstration that elected officials engaged in the single-minded pursuit of incumbency can run roughshod over the rights of protected minorities. The

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 108 of 122

careful findings of the district court graphically document the pattern--a continuing practice of splitting the Hispanic core into two or more districts to prevent the emergence of a strong Hispanic challenger who might provide meaningful competition to the incumbent supervisors. The record is littered with telltale signs that reapportionments going back at least as far as 1959 were motivated, to no small degree, by the desire to assure that no supervisorial district would include too much of the burgeoning Hispanic population.

But the record here illustrates a more general proposition: Protecting incumbency and safeguarding the voting rights of minorities are purposes often at war with each other. Ethnic and racial communities are natural breeding grounds for political challengers; incumbents greet the emergence of such power bases in their districts with all the hospitality corporate managers show hostile takeover bids. What happened here--the systematic splitting of the ethnic community into different districts--is the obvious, time-honored and most effective way of averting a potential challenge. Incumbency carries with it many other subtle and not-so-subtle advantages, see Chemerinsky, Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency, 49 Ohio St.L.J. 773, 774-81 (1988), and incumbents who take advantage of their status so as to assure themselves a secure seat at the expense of emerging minority candidates may well be violating the Voting Rights Act. Today's case barely opens the door to our understanding of the potential relationship between the preservation of incumbency and invidious discrimination, but it surely

Page 779

gives weight to the Seventh Circuit's observation that "many devices employed to preserve incumbencies are necessarily racially discriminatory." Ketchum v. Byrne, 740 F.2d 1398, 1408 (7th Cir.1984), cert. denied, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985).

The Supreme Court in Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), left open whether and under what circumstances political gerrymandering may amount to a violation of the Voting Rights Act. Id. at 118 n. 8, 106 S.Ct. at 2803 n. 8. The record before us strongly suggests that political gerrymandering tends to strengthen the grip of incumbents at the expense of emerging minority communities. Where, as here, the record shows that ethnic or racial communities were split to assure a safe seat for an incumbent, there is a strong inference--indeed a presumption--that this was a result of intentional discrimination, even absent the type of smoking gun evidence uncovered by these plaintiffs. State and local officials nationwide might well take this lesson to heart as they go about the task of decennial redistricting.

II. The Remedy

While I enthusiastically join the majority as to liability, I have two points of disagreement as to the remedy. The first is really just a quibble: I agree with the majority that the County's proposed plan was not entitled to any deference. The Los Angeles County Charter requires at least four supervisors to pass a reapportionment plan. Los Angeles County Charter Art. 2, Sec. 7. Since two of the five supervisors opposed the plan proposed by the County, see maj. op. at 776, it is obvious that the "proposal was not an act of legislation; rather, it was a suggestion by some members of the Board," id., not entitled to the special deference afforded apportionment plans that are the legislative act of the apportioning body.

The majority's alternative reason for upholding the district court's rejection of the plan, contained in the last sentence of part II.D of the opinion, is therefore dicta, and dicta about which I harbor some doubt. It is not at all clear to me that, had the Board of Supervisors adopted the apportionment plan proposed by the County, the reasons relied on by the district court for rejecting the plan would be sufficient. Certainly the issue is far more difficult than the majority's casual reference acknowledges. I would prefer to see a more detailed discussion of the issue before adopting the majority's conclusion as the law of the circuit, but a more extensive discussion is inappropriate, as it's all dicta anyhow. The more prudent course would

be to reserve the issue for a day when it is squarely presented to us.

My second disagreement is more substantive; I cannot agree with the majority's conclusion, contained in part II.C of the opinion, that the district court's reapportionment plan complies with the one person one vote principle announced by the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). While the majority may ultimately be vindicated, its conclusion is hard to square with what the Supreme Court has said on this issue up to now.

A. Before plumbing the doctrinal waters in this murky area of constitutional law, it is worth stating exactly what the County is complaining about. In drawing the remedial plan in this case, the district court adhered closely to state law which calls for supervisorial districts that are equal in population. In doing so, the court wound up with two districts where the numbers of voting age citizens are markedly lower than those in the three other districts. [2] The disparity is particularly

Page 780

great between Districts 1 and 3. District 1 has 707,651 eligible voters while District 3 has 1,098,663, a difference of 391,012, about 55% of the eligible voters in District 1. Since it takes a majority in each district to elect a supervisor, this means that the supervisor from District 1 can be elected on the basis of 353,826 votes (less than the difference between the two districts), while the supervisor from District 3 requires at least 549,332 votes. Put another way, a vote cast in District 1 counts for almost twice as much as a vote cast in District 3.

B. Does a districting plan that gives different voting power to voters in different parts of the county impair the one person one vote principle even though raw population figures are roughly equal? It certainly seems to conflict with what the Supreme Court has said repeatedly. For example, in Reynolds, the Court stated: "Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable." 377 U.S. at 563, 84 S.Ct. at 1382. The Court also stated: "With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live," id. at 565, 84 S.Ct. at 1383; and "Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State," id. at 568, 84 S.Ct. at 1385; [3] and "the basic principle of representative government remains, and must remain, unchanged--the weight of a citizen's vote cannot be made to depend on where he lives," id. at 567, 84 S Ct. at 1384.

Almost identical language appears in numerous cases both before Reynolds, see, e.g., Wesberry v. Sanders, 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) ("To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected 'by the People.' "); Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963) ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote--whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit." [4] ); and after, see, e.g., Hadley v. Junior College Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1970) ("[W]hen members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."); Chapman v. Meier, 420 U.S. 1, 24, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975) ("All citizens are affected when an apportionment plan provides disproportionate voting strength, and citizens in districts that are underrepresented lose something even if they do not belong to a specific minority group."); Lockport v. Citizens for Community Action, 430 U.S. 259, 265, 97 S.Ct. 1047, 1052, 51 L.Ed.2d 313 (1977) ("[I]n voting for their legislators, all citizens have an equal interest in representative democracy, and . the concept of equal protection therefore requires that their votes be given equal weight.").

Case 1:01-cv-00062   Document 8   Filed in TXSD on 09/10/2001   Page 110 of 122

The Court adhered to the same formulation as recently as two Terms ago: "In calculating the deviation among districts, the relevant inquiry is whether 'the vote of any citizen is approximately equal in

Page 781

weight to that of any other citizen.' " Board of Estimate v. Morris, 489 U.S. 688, 109 S.Ct. 1433, 1441, 103 L.Ed.2d 717 (1989) (quoting Reynolds, 377 U.S. at 579, 84 S.Ct. at 1390).

Despite these seemingly clear and repeated pronouncements by the Supreme Court, the majority's position is not without support, as the Court has also said things suggesting that equality of population is the guiding principle. See, e.g., Reynolds, 377 U.S. at 568, 84 S.Ct. at 1385 ("We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."); Mahan v. Howell, 410 U.S. 315, 321, 93 S Ct. 979, 983, 35 L.Ed.2d 320 (1973) ("[T]he basic constitutional principle [is] equality of population among the districts."), Kirkpatrick v. Preisler, 394 U.S. 526, 530, 89 S.Ct. 1225, 1228, 22 L.Ed.2d 519 (1969) (" '[E]qual representation for equal numbers of people [is] the fundamental goal for the House of Representatives.' " (quoting Wesberry, 376 U.S. at 18, 84 S.Ct. at 535)).

In most cases, of course, the distinction between the two formulations makes no substantive difference: Absent significant demographic variations in the proportion of voting age citizens to total population, apportionment by population will assure equality of voting strength and vice versa. Here, however, we do have a demographic abnormality, and the selection of an apportionment base does make a material difference: Apportionment by population can result in unequally weighted votes, while assuring equality in voting power might well call for districts of unequal population.

How does one choose between these two apparently conflicting principles? It seems to me that reliance on verbal formulations is not enough; we must try to distill the theory underlying the principle of one person one vote and, on the basis of that theory, select the philosophy embodied in the fourteenth amendment. Coming up with the correct theory is made no easier by the fact that the Court has been less than consistent in its choice of language and that, as Justice Harlan pointed out in his Reynolds dissent, "both the language and history of the controlling provisions of the Constitution [have been] wholly ignored" by the Court, 377 U.S. at 591, 84 S.Ct. at 1397 (Harlan, J., dissenting), making it impossible to rely on the Constitution for any meaningful guidance. Still we must try.

C. While apportionment by population and apportionment by number of eligible electors normally yield precisely the same result, they are based on radically different premises and serve materially different purposes. Apportionment by raw population embodies the principle of equal representation; it assures that all persons living within a district--whether eligible to vote or not--have roughly equal representation in the governing body. [5] A principle of equal representation serves important purposes: It assures that constituents have more or less equal access to their elected officials, by assuring that no official has a disproportionately large number of constituents to satisfy. Also, assuming that elected officials are able to obtain benefits for their districts in proportion to their share of the total membership of the governing body, it assures that constituents are not afforded unequal government services depending on the size of the population in their districts.

Apportionment by proportion of eligible voters serves the principle of electoral equality. This principle recognizes that electors--persons eligible to vote--are the ones who hold the ultimate political power in our democracy. This is an important power reserved only to certain members of society; states are not required to bestow it upon aliens, transients, short-term residents, persons convicted of crime, or those considered too young. See J Nowak, R.

Page 782

Rotunda & J.N. Young, Constitutional Law Sec. 14.31, at 722-23 (3d ed. 1986).

The principle of electoral equality assures that, regardless of the size of the whole body of constituents, political power, as defined by the number of those eligible to vote, is equalized as between districts holding the same number of representatives. It also assures that those eligible to vote do not suffer dilution of that important right by having their vote given less weight than that of electors in another location. Under this paradigm, the fourteenth amendment protects a right belonging to the individual elector and the key question is whether the votes of some electors are materially undercounted because of the manner in which districts are apportioned.

It is very difficult, in my view, to read the Supreme Court's pronouncements in this area without concluding that what lies at the core of one person one vote is the principle of electoral equality, not that of equality of representation. To begin with, the name by which the Court has consistently identified this constitutional right--one person one vote--is an important clue that the Court's primary concern is with equalizing the voting power of electors, making sure that each voter gets one vote--not two, five or ten, Reynolds, 377 U.S. at 562, 84 S.Ct. at 1381; or one-half.

But we need not rely on inferences from what is essentially an aphorism, for the Court has told us exactly and repeatedly what interest this principle serves. In its most recent pronouncement in the area, the Court stated: "The personal right to vote is a value in itself, and a citizen is, without more and without mathematically calculating his power to determine the outcome of an election, shortchanged if he may vote for only one representative when citizens in a neighboring district, of equal population, vote for two; or to put it another way, if he may vote for one representative and the voters in another district half the size also elect one representative." Morris, 109 S.Ct. at 1440 (emphasis added).

References to the personal nature of the right to vote as the bedrock on which the one person one vote principle is founded appear in the case law with monotonous regularity. Thus, in Hadley v. Junior College District, the Court stated: "[T]he Fourteenth Amendment requires that the trustees of this junior college district be apportioned in a manner that does not deprive any voter of his right to have his own vote given as much weight, as far as is practicable, as that of any other voter in the junior college district." 397 U.S. at 52, 90 S.Ct. at 792. The Court further explained: "[A] qualified voter has a constitutional right to vote in elections without having his vote wrongfully denied, debased, or diluted," id. (footnote omitted); and "This Court has consistently held in a long series of cases, that in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's," id. at 54, 90 S.Ct. at 794 (footnote omitted); and "once a State has decided to use the process of popular election and 'once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded,' " id. at 59, 90 S.Ct. at 797 (quoting Gray v Sanders, 372 U.S. at 381, 83 S.Ct. at 809).

Reynolds itself brims over with concern about the rights of citizens to cast equally weighted votes: "[T]he judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote." 377 U.S. at 561, 84 S.Ct. at 1381. Again: "Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature." Id. at 565, 84 S.Ct. at 1383. [6] And yet again: "And the right of suffrage can be denied by a debasement or

Page 783

Case 1:01-cv-00082  Document 8  Filed in TXSD on 09/10/2001  Page 111 of 122

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 112 of 122

dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Id. at 555, 84 S.Ct. at 1378. Reynolds went so far as to suggest that "[t]o the extent that a citizen's right to vote is debased, he is that much less a citizen." Id. at 567, 84 S.Ct. at 1384.

While the Court has repeatedly expressed its concern with equalizing the voting power of citizens as an ultimate constitutional imperative--akin to protecting freedom of speech or freedom of religion--its various statements in support of the principle of equal representation have been far more conditional. Indeed, a careful reading of the Court's opinions suggests that equalizing total population is viewed not as an end in itself, but as a means of achieving electoral equality. Thus, the Court stated in Reynolds: "[T]he overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." Id. at 579, 84 S.Ct. at 1390 (emphasis added). This language has been quoted in numerous subsequent cases. See Gaffney, 412 U.S. at 744, 93 S.Ct. at 2327; Mahan v. Howell, 410 U.S. 315, 322, 93 S.Ct. 979, 984, 35 L.Ed.2d 320 (1973); Burns, 384 U.S. at 91 n. 20, 86 S.Ct. at 1296 n. 20. In Connor v. Finch, 431 U.S. 407, 416, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977), the Court stated the proposition as follows: "The Equal Protection Clause requires that legislative districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives." (emphasis added). [7]

Particularly indicative of the subservience of the representational principle to the principle of electoral equality is Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), on which the majority mistakenly relies. Gaffney deals with the question of how much variation in population is permissible in effectuating the one person one vote principle of Reynolds. The Supreme Court held that absolute mathematical precision is not necessary. Total population, the Court pointed out, is only a proxy for equalizing the voting strength of eligible voters. But, the Court noted, it is not a perfect proxy; voters might not be distributed homogeneously throughout the population, for example. Therefore, "it makes little sense to conclude from relatively minor 'census population' variations among legislative districts that any person's vote is being substantially diluted." Gaffney, 412 U.S. at 745-46, 93 S.Ct. at 2327-28. The Court continued:

What is more, it must be recognized that total population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote under a later adopted reapportionment plan. The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rates are striking and well-known phenomena. So, too, if it is the weight of a person's vote that matters, total population--even if stable and accurately taken--may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because "census persons" are not voters.

Id. at 746, 93 S.Ct at 2328 (emphasis added, footnotes omitted).

Finally, there is the teaching of Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), which the majority dismisses far too lightly. Because it is the only Supreme Court case applying the one person one vote principle in a situation

Page 784

where there were large numbers of residents not eligible to vote--it being the only case where there was a divergence between the representational principle and the principle of electoral equality--the case deserves a more careful examination. While Burns does not, by its terms, purport to require that apportionments equalize the number of qualified electors in each district, the logic of the case strongly

Case 1:01-cv-00082    Document 8    Filed in TXSD on 09/10/2001    Page 113 of 122

suggests that this must be so. As noted earlier, in a situation such as ours--as that in Burns--one or the other of the principles must give way. If the ultimate objective were to serve the representational principle, that is to equalize populations, Burns would be inexplicable, as it approved deviations from strict population equality that were wildly in excess of what a strict application of that principle would permit. [8]

Burns can only be explained as an application of the principle of electoral equality; the Court approved the departure from strict population figures because raw population did not provide an accurate measure of whether the voting strength of each citizen was equal. Thus, while Burns spoke in permissive terms, its logic is far more categorical.

The only other way to explain the result in Burns is to assume that there is no principle at all at play here, that one person one vote is really nothing more than a judicial squinting of the eye, a rough-and-ready determination whether the apportionment scheme complies with some standard of proportionality the reviewing court happens to find acceptable. I am reluctant to ascribe such fluidity to a constitutional principle that the Supreme Court has told us embodies "fundamental ideas of democratic government," Wesberry, 376 U.S. at 8, 84 S.Ct. at 530. [9]

When considered against the Supreme Court's repeated pronouncements that the right being protected by the one person one vote principle is personal and limited to citizens, the various arguments raised by the majority do not carry the day. Thus, the Court's passing reference in Kirkpatrick v. Preisler, 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969), to "prevent[ing] debasement of voting power and diminution of access to elected representatives" suggests only that the Court did not consider the possibility that the twin goals might diverge in some cases. As Kirkpatrick contains no discussion of the issue, it provides no clue as to which principle has primacy where there is a conflict between the two.

Similarly unpersuasive is the majority's citation of cases that hold that aliens and the young enjoy many constitutional rights on the same basis as citizens. Maj. op. at 775. One right aliens and children do not enjoy is the right to vote. Insofar as the Court views its one person one vote jurisprudence as protecting the right to vote enjoyed only by citizens, see pp. 780-781 supra, it's entirely beside the point what other rights noncitizens may enjoy. If, as I suggest, one person one vote protects a right uniquely held by citizens, it would be a dilution of that right to allow noncitizens to share therein. [10]

Page 785

Finally, I understand my colleagues to be suggesting that, as a matter of policy, the principle of equal representation is far wiser than the principle of electoral equality. Were I free to disregard the explicit and repeated statements of the Supreme Court, I might well find this argument persuasive. But I am not free to ignore what I regard as binding direction from the Supreme Court, so my own policy views on this matter make no difference.

All that having been said, I must acknowledge that my colleagues may ultimately have the better of the argument. We are each attempting to divine from language used by the Supreme Court in the past what the Court would say about an issue it has not explicitly addressed. While much of the language and some of the rationale of the Supreme Court's decisions clearly support my view, other language, as well as tradition, supports my colleagues. Were the Supreme Court to take up the issue, I would not be surprised to see it limit or abandon the principle of electoral equality in favor of a principle of representational equality. But the implications of that decision must be considered by those who have the power to make such choices, not by us. My colleagues may well be looking into the future, but controlling guidance comes from the past.

D  Having concluded that it is the principle of electoral equality that lies at the heart of one person one vote, we must address whether the district court's plan nevertheless falls within acceptable limits

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 114 of 122

While the Supreme Court has not been completely consistent in its methodology, usually it creates hypothetical ideal districts (i.e., districts that contain precisely the same number of people) and then determines, in percentage terms, the degree of deviation between each of the actual districts and the ideal one. The maximum deviation is calculated by adding the percentage points that the largest district is above the ideal, to the percentage points that the smallest is below. See, e.g., Brown v. Thomson, 462 U.S. at 839, 103 S.Ct. at 2694, Mahan, 410 U.S. at 319, 93 S.Ct. at 982. While the Court has always used raw population figures, not electors, there seems to be no reason to apply a different methodology when comparing numbers of electors.

Here, a hypothetical ideal district would contain 979,594 electors. See note 2 supra. Compared to this ideal district, the districts under the plan adopted below deviate as set forth in the following table:

| District | # Electors | Raw Deviation | % Deviation |
|----------|-----------|---------------|-------------|
| 1 | 707,651 | -271,943 | -28% |
| 2 | 922,180 | -57,414 | -6% |
| 3 | 1,098,663 | k119,069 | k12% |
| 4 | 1,081,089 | k101,495 | k10% |
| 5 | 1,088,388 | k108,794 | k11% |

----------

As this table demonstrates, the districts in the court-ordered plan contain very significant deviations from the ideal district. As expected, the greatest spread is between Districts 1 and 3, and it amounts to 40%. Equally significant are the individual deviations. Only one district, number 2, has a number of electors close to the norm, i.e., a deviation within single digits. Three of the districts have deviations between 10% and 20% and one district has a deviation nearly three times that amount--28%.

If I am right that it is qualified electors, not raw population figures, that count, these deviations fall far outside the acceptable range. The Supreme Court's cases in this area have defined three ranges of deviation that bear on the constitutionality of the plan. A maximum deviation of less than 10% is considered de minimis and will

Page 786

be acceptable without further inquiry. White v. Regester, 412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973). Deviations somewhat above 10% may be acceptable if justified by compelling and legitimate interests. See, e.g., Abate v. Mundt, 403 U.S. 182, 184-85, 91 S.Ct. 1904, 1905-06, 29 L.Ed.2d 399 (1971). And, the Court has stated quite clearly that deviations above this buffer range will not be acceptable at all, even if justified by the most compelling and legitimate interests. The Court has not precisely identified the upper range for this buffer category, but does not appear to have approved any plans having a maximum deviation over 20%. [11]

It should be noted that, in discussing the range of possible deviations, the Court in all of these cases was comparing total population figures. Gaffney, however, tells us that deviation in total population figures is permissible, to some extent at least, because raw population is only an approximation of the number of electors. 412 U.S. at 746, 93 S.Ct. at 2328. It may well be that where, as here, the comparison is between the number of electors, the permissible range of deviation is much narrower.

Even if we apply to this case the ranges established by the Court in cases involving raw population figures, it is clear that the district court's plan falls far outside the permissible range. As far as I am aware, no plan has ever been approved with a maximum deviation of as much as 40%. If I read the Court's

cases correctly, a deviation that large could not be justified even by the most compelling reasons. Nor, do I believe, has the district court even advanced reasons that would permit it to go beyond the 10% de minimis range. Such reasons may exist, but they are not articulated in the record. Four out of the five districts therefore fall outside the acceptable range for purposes of one person one vote.

E. Having concluded that the district court's plan runs afoul of the one person one vote principle, we arrive at the single most difficult issue in this case: To what extent, if any, this principle may have to give way when it collides with a remedial plan designed to cure the effects of discrimination.

There is, as far as I am aware, little or no guidance on this issue. All prior cases alleging violations of one person one vote involved a conflict between that constitutional principle and various interests advanced under state law. See, e.g., pp. 785-786 supra. Under such circumstances, even if the state is found to have a rational and compelling interest in deviating from substantial district equality, this interest may not justify more than a small range of deviations; beyond that, the state's interest gives way to the constitutional imperative.

The balance may well be different where, as here, the competing interest is itself grounded in the fourteenth amendment or its derivative, the Voting Rights Act. What seems absolutely clear to me, however, is that the district court cannot simply ignore one person one vote in seeking to create a remedy. The Supreme Court has cautioned that district courts have "considerably narrower" discretion than state legislatures to depart from the ideal of one person one vote, and that "the burden of articulating special reasons for following [policies that would result in a departure are] correspondingly higher." Connor v. Finch, 431 U.S. 407, 419-20, 97 S.Ct. 1828, 1836, 52 L.Ed.2d 465 (1977). Moreover, "it is the reapportioning court's responsibility to articulate precisely why a

Page 787

plan of single-member districts with minimal population variance cannot be adopted." Chapman v. Meier, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975).

At the very least, it seems to me, the district court must make a determined effort to eliminate or minimize the electoral disparities within the districts, consistent with achieving the remedial purposes of the plan. In so doing, I should think the district court would have latitude of up to 20% maximum deviation from the ideal district, providing, of course, that it supplies an adequate explanation of why its purposes cannot be achieved within a narrower range.

What if the district court determines that it cannot construct an adequate remedial plan without going beyond the 20% maximum deviation range? Under one view of the matter, one person one vote would not provide an absolute constraint on the court's remedial powers, as the competing interest here is not state law--which necessarily takes a back seat to a constitutional imperative--but an interest of equivalent dignity, itself growing out of the same constitutional roots as one person one vote. Under this paradigm, the district court would be allowed, under certain circumstances, to go beyond the 20% buffer allowed by the earlier cases  The district court would have to make very specific findings on how it has sought to achieve substantial equality among the districts and if it has been unable to do so without sacrificing the remedial purpose of the plan. If supported by the record (i.e., if no one comes forward with a plan that can do what the district court says can't be done), I should think that a much greater deviation from the ideal plan would be permissible, quite possibly as much as the 40% maximum deviation here.

There is, however, another paradigm: A plausible case could be made that the district court gets no greater latitude when it acts pursuant to the Voting Rights Act because its remedial powers are absolutely constrained by the principle of one person one vote. The argument in support of this position grows not out of some hierarchy of values, but out of the nature of the remedial process. A reapportionment plan designed to remedy unlawful discrimination can have one purpose and one purpose only: To put the

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 116 of 122

victims of discrimination in the position they would have enjoyed had there been no discrimination. Here, for example, the object would be to create the type of district that would have existed had the supervisors not continually split the Hispanic core.

Even if we make the most favorable assumptions about what might have been, we cannot conclude that the supervisors would have come up with a district that violated the constitutional constraint of one person one vote. Since we know that, in the normal course of events and in the absence of discrimination, no such district could have been created, no legitimate remedial purpose would be served by creating such a district now. Under this view of the matter, there would be no tension between the court's remedial power and the principle of one person one vote, and therefore no justification for going beyond the 20% buffer. Even departures beyond the 10% de minimis buffer could, under this paradigm, be justified only upon a showing that compelling circumstances in the county would, in the absence of discrimination, have resulted in districts of greater than de minimis disparity. [12]

It is unnecessary to explore this conundrum, however, as it seems absolutely clear that we must remand to the district court on this issue. To begin with, the district court constructed the remedial plan under the mistaken impression that it was constrained by the state law requirement that supervisorial districts be equal in population. It is clear, however, that where state law runs up against a constitutional constraint such as one person one vote, state law must yield. It is most emphatically

Page 788

not the case, as the majority suggests, that a district court, in drafting a remedial plan, is constrained by state apportionment law where that law would violate the Constitution.

Remand is also appropriate because the district court was apparently not aware that it was, required to try--if at all possible--to construct a remedial plan that avoided the conflict between the two interests. Since the district court did not try, we do not know whether it is possible to reconcile both interests. A remand is necessary in order to find out. Only if it turns out that an effective remedial plan that also satisfies one person one vote cannot be constructed would I venture an opinion on the difficult question whether, to what extent and under what circumstances the principle of one person one vote must yield when the district court exercises its equitable powers to remedy the effects of past discrimination.

III. Expedited Issuance of the Mandate

Reluctantly, I must also part company with my colleagues in their decision to issue the mandate forthwith. As it is clear from this action that this panel will not grant a stay, we place an unnecessary burden upon the parties, the district judge, our own colleagues and the Justices above us.

I well understand the reason for haste; delaying an election any longer than absolutely necessary should not be done lightly. Consistent with that imperative, we have issued a significant opinion in an important and difficult case about three weeks after submission. No one can justly accuse us of sitting on our thumbs. Were the opinion unanimous, or were I convinced that our differences are relatively trivial, I would go along with expediting the mandate.

But we do not all agree. Moreover, our disagreement goes to the heart of the district court's remedial plan. Should there be further review, any steps taken by the district court and the parties in implementing the majority opinion would be wasted. The more prudent course, is seems to me, would be to let the parties consider their options in a sober, unhurried fashion, as contemplated by the Federal Rules of Appellate Procedure.

My able colleagues have advanced very compelling arguments as to why the one person one vote

CMPDF - www.fenix.com

rule should be construed as embodying the principle of equal representation. I have suggested that much of the Court's language and rationale supports the opposite view, that it is the principle of electoral equality that lies at the heart of one person one vote. We are not in a position to resolve this issue, which grows out of a lack of meaningful guidance in a long series of Supreme Court opinions. Yet this issue will have immediate and growing significance as large populations of aliens are taking up residence in several of our largest states. [13] The Supreme Court may deem it prudent to take up the issue before large-scale redistricting gets underway in 1991.

Given these considerations, I would preserve the opportunity to have the matter considered in a deliberative fashion, unhurried by the pendency of an election. For better or worse, the election was stayed, which allowed us to consider the case without the sword of Damocles hanging over our heads. I would offer the same opportunity for unhurried deliberation to our colleagues and to any of the Justices who might wish to consider the matter.

IV. Conclusion

This is a fascinating case. It poses many new questions which required the district court to sail into uncharted waters. For the most part, the district court--and the majority--got it right. But close is not close enough when important constitutional rights are at stake. I would order a limited remand for the district court to apply the teachings of Reynolds v. Sims and its progeny.

---------------

1 The relevant findings with regard to the 1959 Redistricting are as follows:

64. Prior to 1959, District 3 included Western Rosemead and did not include any portion of the San Fernando Valley, Beverly Hills, West Hollywood, West Los Angeles, or Eagle Rock.

65. The 1959 redistricting occurred less than six months after the November 1958 general election for the open position of District 3 Supervisor. Ernest Debs, a non-Hispanic, defeated Hispanic candidate Edward Roybal, by a margin of 52.2 percent to 47.8 percent.

66. Debs received 141,011 votes. Roybal received 128,974 votes. There were four recounts before Debs was finally determined to be the winner.

67. In 1959, Debs reported in a Supervisorial hearing that he and District 4 Supervisor Burton Chace agreed to shift Beverly Hills, West Hollywood, and West Los Angeles from District 4 to District 3.

68. The Board's action transferred between 50,000 to 100,000 voters from District 4 into District 3 and had the effect of substantially decreasing the proportion of Hispanic voters in District 3.

69. Dr. Kousser testified it was his opinion that Debs and Chace agreed to the transfer for two reasons. First, Chace was receptive to the agreement because it enabled him to eliminate Los Angeles City Councilwoman Rosaline Wyman as a possible opponent in his upcoming 1960 bid for reelection. Debs welcomed the change because the move west allowed him to make District 3 more easily winnable against Roybal or another candidate who might appeal to Hispanic voters in the next election.

The findings with regard to the 1965 Redistricting are as follows:

88. The Boundary Committee rejected a proposal to move Alhambra and San Gabriel, areas adjacent to growing Hispanic population, from District 1 to District 3. Instead, the committee recommended a complicated two-stage change which moved Alhambra and San Gabriel from Supervisor Bonnelli's District 1 to Supervisor Dorn's District 5, moved a section of the San Fernando Valley from District 5 to Supervisor Debs' District 3, and moved Monterey

Case 1:01-cv-00082    Document 8    Filed in TXSD on 09/10/2001    Page 118 of 122

Park and unincorporated South San Gabriel from District 1 to District 3.

89. Dr. Kousser testified that, in his opinion, the Board avoided transferring Alhambra and San Gabriel directly to District 3 because those areas were adjacent to areas of Hispanic population concentration

Page 788

and were becoming more Hispanic. The more complicated two-stage adjustments permitted the addition of heavily Anglo areas from the San Fernando Valley and offset the much more limited addition of Hispanic population gained by moving Monterey Park and the unincorporated area of South San Gabriel to District 3.

The court's findings with regard to the 1971 Redistricting are as follows:

109. In 1971, District 3 lost some areas with substantial Hispanic population on its eastern border. Western Rosemead was transferred from District 3 to District 1. A census tract in the City of San Gabriel was also transferred from District 3 to District 5.

110. George Marr, head of the Population Research Section of the Department of Regional Planning testified that he was surprised by the proposal to move a substantial portion of the San Fernando Valley from District 5 to District 3. Marr described the portion of the San Fernando Valley ultimately added to District 3 from District 5 as looking like "one of those Easter Island heads." Marr developed the general feeling that Debs' representative on the Boundary Committee had requested the additional area in the San Fernando Valley because the residents of the area were regarded as "our kind of people."

The court's findings on the Overall Intent of Past Redistrictings are as follows:

112. The Court finds that the Board has redrawn the supervisorial boundaries over the period 1959-1971, at least in part, to avoid enhancing Hispanic voting strength in District 3, the district that has historically had the highest proportion of Hispanics and to make it less likely that a viable, well financed Hispanic opponent would seek office in that district. This finding is based on both direct and circumstantial evidence, including the finding that, since the defeat of Edward Roybal in 1959, no well-financed Hispanic or Spanish-surname candidate has run for election in District 3.

113. While Hispanic population was added to District 3 during the 1959-1971 redistrictings, the Court finds that the proportion of Spanish-surname persons added to District 3 has been lower than the Hispanic population proportion in the County as a whole. No individual area added was greater than 15.1 percent Spanish-surname.

114. Dating from the adoption of the County's Charter in 1912 through the 1971 redistricting process, no Los Angeles County redistricting plan has created a supervisorial district in which Hispanic persons constituted a majority or a plurality of the total population.

The court's findings with regard to the 1981 Redistricting are as follows:

125. The individuals involved in the 1981 redistricting had demographic information available of population changes and trends in Los Angeles County from 1950 to 1980. It was readily apparent in 1980 that the Hispanic population was on the rise and growing rapidly and that the white non-Hispanic population was declining.

127. From a political perspective, since Hispanic population growth was most significant in Districts 1 and 3, if the 1971 boundaries were changed in any measurable way to eliminate the existing fragmentation, the incumbency of either Supervisor Schabarum or Supervisor Edelman would be most affected by a potential Hispanic candidate.

136. An analysis of the 1978 Supervisor election in District 3 was conducted after the Boundary Committee recommended a plan with an Hispanic population majority in District 3. The actual results of the analysis were never produced. Mr. Seymour did not rule out the possibility that he requested such an analysis and Supervisor Edelman testified that he "most probably" discussed the results of the 1978 election analysis with Mr. Seymour.

137. Peter Bonardi, a programmer with the Urban Research Section of the Data Processing Department in 1981 and a participant in the data analysis requested by Supervisor Edelman, stated that he was directed not to talk about the analysis of voting patterns and that an "atmosphere of 'keep it quiet' " pervaded.

138. Supervisors Hahn and Edelman sought to maintain the existing lines. To this end, the Democratic minority agreed to a transfer of population from District 3 to District 2. Supervisor Edelman acknowledged that he and Supervisor Hahn had worked out a transfer of population from the heavily Hispanic Pico-Union area on the southern border of District 3 to the northern end of District 2.

139. Supervisor Edelman knew that if the 1971 boundary lines were kept intact, the Hispanic community was going to remain essentially the same in terms of its division among the districts.

140. The Board departed from its past redistricting practice in 1981 and approved a contract with The Rose Institute for State and Local Government, a private entity, to perform specialized services and produce redistricting data at a cost of $30,000.

157. [Boundary Committee Members] Smith and Hoffenblum opposed the CFR [Chicanos for Fair Representation] plan because the plan proposed increasing the Hispanic proportion in District 1 from 36 to 42 percent. Both Boundary Committee members perceived the CFR effort as intended to jeopardize the status of Supervisor Schabarum as well as that of the conservative majority.

158. Hoffenblum testified that one of the objectives of the Republican majority was to create an Hispanic seat without altering the ideological makeup of the Board. According to Hoffenblum, it was "self-evident" that if an Hispanic district was created in Supervisor Schabarum's district it would impact on the Republican majority.

159. The proponents of the Smith and Hoffenblum plans sought to gain areas of Republican strength such as La Mirada, Arcadia, Bradbury in Districts 4 and 5, while losing increasing Hispanic areas such as Alhambra or the predominantly black Compton and other liberal areas of Santa Monica and Venice.

162. Supervisor Edelman would not rule out the possibility that ethnic considerations played at least some part in the rejection by the Board majority of the CFR Plan. Moreover, the fact that CFR proposed a plan in which District 1 had a 42 percent Hispanic population was a possible basis for the rejection of the plan by the majority. Supervisor Schabarum would not accept a 45 or 50 percent Hispanic proportion in his district in 1981.

165. On September 24, 1981, prior to the Board's adoption of the challenged plan, Board members met, two at a time in a series of private meetings in the anteroom adjacent to the board room, where they tried to reach agreement on a plan.

175. The plan adopted in 1981 retained the boundary between the First and the Third Supervisorial Districts, the districts that contain the largest proportions of Hispanics. In doing so, the 1981 Plan continued to split the Hispanic Core almost in half.

176. The Board appeared to ignore the three proposed plans which provided for a bare Hispanic population majority.

177. The Court finds that the Board of Supervisors, in adopting the 1981 redistricting plan, acted primarily with the objective of protecting and preserving the incumbencies of the five Supervisors or their political allies.

178. The Court finds that in 1981 the five members of the Board of Supervisors were aware that the plan which they eventually adopted would continue to fragment the Hispanic population and further impair the ability of Hispanics to gain representation on the Board.

179. The continued fragmentation of the Hispanic vote was a reasonably foreseeable consequence of the adoption of the 1981 Plan.

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 120 of 122

180. The Court finds that during the 1981 redistricting process, the Supervisors knew that the protection of their five Anglo incumbencies was inextricably linked to the continued fragmentation of the Hispanic Core.

181. The Supervisors appear to have acted primarily on the political instinct of self-preservation. The Court finds, however, that the Supervisors also intended what they knew to be the likely result of their actions and a prerequisite to self-preservation--the continued fragmentation of the Hispanic Core and the dilution of Hispanic voting strength.

2 Gingles has spawned confusion in the lower courts. The opinion explicitly reserved the question of whether the standards it set forth would apply to a claim in which minority plaintiffs alleged that an electoral practice impaired their ability to influence elections, as opposed to their ability to elect representatives. 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12. Nevertheless, it has been applied to preclude such "ability to influence" claims, based upon plaintiffs' failure to demonstrate such an ability to elect representatives under the Gingles criteria. See, e.g., McNeil v. Springfield Park, 851 F.2d 937 (7th Cir.1988), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). See generally Abrams, "Raising Politics Up": Minority Political Participation and Section 2 of the Voting Rights Act, 63 N.Y.U.L.Rev. 449 (1988). On the other hand, some courts have dealt differently with the criteria articulated in Gingles when facing "ability to influence" claims. They have done so in opinions that "range from virtually ignoring the electoral standard or ignoring it entirely, to considering it a prerequisite to the application of the totality of the circumstances test [specified in the statute itself], to treating it as a, if not the, central element of the test." Abrams, 63 N.Y.U.L.Rev. at 465 (citing United Latin Am. Citizens v. Midland Indep. School Dist., 812 F.2d 1494, 1496-98 (5th Cir.1987), Buckanaga v. Sisseton Indep. School. Dist., 804 F.2d 469, 471-72 (8th Cir.1986); Martin v. Allain, 658 F.Supp. 1183, 1199-1204 (S.D.Miss.1987)) (footnotes omitted). "[T]he language from Gingles that creates the 'ability to elect' standard may prove to be Gingles ' more enduring and problematic legacy." Abrams, 63 N.Y.U.L.Rev. at 468.

3 In McNeil v. Springfield Park District, 851 F.2d 937, 946 (7th Cir.1988), cert. denied, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), the Seventh Circuit found that in order to prove an effects violation from post-census data, the data used must be of a clear and convincing nature, and that "estimates based on past trends are generally not sufficient to override 'hard' decennial census data." We see no reason to impose this high standard in a case where intentional discrimination has been proved, and the data is merely to be used in fashioning a remedy.

4

| District | Total Pop. | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| 1 | 1,779,835 | 12.4 | 2.1 | 71.2 | 14.3 |
| 2 | 1,775,665 | 15.0 | 38.6 | 35.3 | 11.1 |
| 3 | 1,768,124 | 60.9 | 3.9 | 25.5 | 9.7 |
| 4 | 1,776,240 | 53.9 | 4.3 | 26.6 | 15.2 |
| 5 | 1,780,224 | 57.1 | 5.9 | 24.3 | 12.6 |
| Total | 8,880,109 | 39.8 | 11.0 | 36.6 | 12.6 |

5

| District | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| 1 | 707,651 | 25.4 | 3.5 | 59.4 | 11.6 |
| 2 | 922,180 | 23.8 | 50.8 | 17.1 | 8.3 |
| 3 | 1,098,663 | 77.0 | 4.3 | 13.9 | 4.7 |
| 4 | 1,081,089 | 67.5 | 4.4 | 19.7 | 8.4 |
| 5 | 1,088,388 | 69.8 | 6.2 | 18.1 | 5.9 |
| Total | 4,897,971 | 55.8 | 13.4 | 23.3 | 7.5 |

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 121 of 122

1 The lay reader might wonder if there can be intentional discrimination without an invidious motive. Indeed there can. A simple example may help illustrate the point. Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

2 The district court's remedy finding No. 5 sets forth the relevant figures for the districting plan it adopted:

| District | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| 1 | 707,651 | 25.4 | 3.5 | 59.4 | 11.6 |
| 2 | 922,180 | 23.8 | 50.8 | 17.1 | 8.3 |
| 3 | 1,098,663 | 77.0 | 4.3 | 13.9 | 4.7 |
| District | Total | White | Black | Hispanic | Other |
| 4 | 1,081,089 | 67.5 | 4.4 | 19.7 | 8.4 |
| 5 | 1,088,388 | 69.8 | 6.2 | 18.1 | 5.9 |
| TOTAL | 4,897,971 | 55.8 | 13.4 | 23.3 | 7.5 |

Findings and Order Regarding Remedial Redistricting Plan and Election Schedule 4 (filed Aug. 6, 1990).

3 This language is also quoted in Gaffney v. Cummings, 412 U.S. 735, 744, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973).

4 This language is also quoted in Moore v. Ogilvie, 394 U.S. 814, 817, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969), and Reynolds, 377 U.S. at 557-58, 84 S.Ct. at 1379.

5 It is established, of course, that an elected official represents all persons residing within his district, whether or not they are eligible to vote and whether or not they voted for the official in the preceding election. See Davis v. Bandemer, 478 U.S. 109, 132, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986) (plurality).

6 This language is also quoted in Whitcomb v. Chavis, 403 U.S. 124, 141, 91 S.Ct. 1858, 1868, 29 L.Ed.2d 363 (1971).

7 The Court has continued to justify the requirement of equality of populations as a means of assuring that "each citizen's portion [is] equal." Morris, 109 S.Ct. at 1438; see also Lockport v. Citizens for Community Action, 430 U.S. 259, 264, 97 S.Ct. 1047, 1051, 51 L.Ed.2d 313 (1977) ("[I]t has been established that the Equal Protection Clause cannot tolerate the disparity in individual voting strength that results when elected officials represent districts of unequal population....").

8 In Burns, the ninth and tenth districts contained 28% of Oahu's total population, yet were entitled to only 6 representatives. The fifteenth and sixteenth districts, on the other hand, contained only 21% of the population, but were entitled to 10 representatives. Burns, 384 U.S. at 90-91 & n. 18, 86 S.Ct at 1295 & n. 18. Thus, in districts 9 and 10, there was one representative for every 4.67% of Oahu's total population, whereas in districts 15 and 16, there was one representative for every 2.1% of the population. This deviation of well over 100%--122%, in fact--far exceeds the population deviations held permissible by the

Case 1:01-cv-00082   Document 8   Filed in TXSD on 09/10/2001   Page 122 of 122

Supreme Court in the line of cases discussed below. See pp. 785-786 infra.

9 One's resolve in this regard is put to the test by Brown v. Thomson, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). See id. at 850, 103 S.Ct. at 2700 (Brennan, J., dissenting); note 11 infra.

10 My colleagues also rely on the fact that apportionment for the House of Representatives is based on whole population figures. But for reasons explained by the Supreme Court in Reynolds, 377 U.S. at 571-77, 84 S.Ct. at 1386-89, arguments based on the "federal analogy" are "inapposite and irrelevant to state legislative redistricting schemes," id. at 573, 84 S.Ct. at 1387, and therefore are not particularly persuasive in the context of state and local apportionment cases. Congressional apportionments are governed by section 2 of the fourteenth amendment, which makes total population the apportionment base; it says nothing about state apportionments. If this provision were meant to govern state legislative apportionments, the principle of one person one vote, based on a separate part of the fourteenth amendment, would be superfluous.

11 The only contrary authority seems to be Brown v. Thomson, as to which it is not clear at all what the relevant deviation was. The only deviation mentioned by the majority and concurring opinions is 89%, which was the degree of deviation of one particularly small county. But the majority and concurrence go to great lengths to assure us that that is not the relevant figure; the two concurring Justices expressed "the gravest doubts that a statewide legislative plan with an 89% maximum deviation could survive constitutional scrutiny...." 462 U.S. at 850, 103 S.Ct. at 2700 (O'Connor, J., joined by Stevens, J., concurring). Because of the peculiar procedural posture of the case, it is hard to tell just what the court viewed as the relevant deviation; it might have been 23%, see id. at 860 n. 6, 103 S.Ct. at 2705 n. 6 (Brennan, J., dissenting), although, for the reasons explained by the dissent, this figure, like the theory of the majority, seems to make little sense.

12 The Court has been somewhat vague as to what interests justify departure beyond the 10% de minimis buffer, but the only one clearly identified has been a long-standing and genuine desire to maintain the integrity of political subdivisions. Reynolds, 377 U.S. at 578-81, 84 S.Ct. at 1390-91; Abate, 403 U.S. at 183, 187, 91 S.Ct. at 1905, 1908.

13 See, e.g., Suro, Behind the Census Numbers, N.Y. Times, Sept. 16, 1990, Sec. 4, at 4 col. 1.

HOME  |  SEARCH  |  COLLECTIONS  |  PRICING  |  SIGN UP  |  NEWSLETTER  |  SUPPORT  |  ABOUT

© 1999 - 2001, National Law Library, a subsidiary of Internet Law Library, Inc (ticker symbol ELAW) All rights reserved
For technical support contact support@itislaw.com. For Editorial support contact editorial@itislaw.com
View our Privacy Statement.