9

United States District Court
Southern District of Texas
FILED

SEP 1 1 2001

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CAMERON COUNTY, TEXAS, et al.,
                    Plaintiffs,

          v.                              C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
                    Defendants.
_____/

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Rules 12(c) and 56, Fed. R. Civ. P., defendants move for judgment on the pleadings or, in the alternative for summary judgment as to the claims asserted in the First Amended Complaint. In support of this motion, defendants respectfully refer the Court to the attached memorandum.

                    Respectfully submitted,

                    STUART E. SCHIFFER
                    Acting Assistant Attorney General

                    GREGORY A. SERRES
                    United States Attorney

                    THOMAS MILLET
                    Attorney in Charge
                    D.C. Bar No. 294405
                    ANDREA COHEN
                    Attorneys, Civil Division
                    Department of Justice
                    901 E St., NW
                    Washington, D.C. 20530
                    Tel:(202) 514-3313
                    Fax:(202) 616-8202
                    Attorneys for Defendants.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CAMERON COUNTY, TEXAS, et al.,
        Plaintiffs,

      v.                  C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
        Defendants.
_____/

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS, OR,
IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

STUART E. SCHIFFER
Acting Assistant Attorney General

GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
ANDREA COHEN
Attorneys, Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202

Attorneys for Defendants.

# TABLE OF CONTENTS

Page

Table of Authorities                                              ii

Statement of the Nature
and Stage of the Proceedings                                       1

Statement of the Issues to be
Ruled upon by the Court                                            2

Summary of the Argument                                            2

Factual Background                                                 4

Argument                                                           7

I.   The FOIA Claim Should be Dismissed for
     Failure to Exhaust Administrative Remedies                    7

II.  The Adjusted Data Were Properly Withheld
     Under Exemption 5                                             7

     A.  The Requested Population Estimates
         Are Predecisional                                        10

     B.  The Requested Population Estimates
         Are Deliberative                                         14

Conclusion                                                        23

# Table of Authorities

|  | Page(s) |
|---|---|
| **Cases** | |
| Access Reports v. Dep't of Justice, 926 F.2d 1192 (D.C. Cir. 1991) | 13 |
| Assembly of the State of Cal. v. United States Dep't of Commerce, 968 F.2d 916 (9th Cir. 1992) | 12 |
| City of Virginia Beach v. United States Dep't of Commerce, 995 F.2d 1247, 1253 (4th Cir. 1993) | 21 |
| Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854 (D.C. Cir. 1980) | 9 |
| Dept. of Commerce v. United States House of Representatives, 525 U.S. 316 (1999) | 5,16,22 |
| Department of the Interior v. Klammath Water Users Protective Ass'n, 121 S. Ct. 1060 (2001) | 8,9 |
| EPA v. Mink, 410 U.S. 73 (1973) | 8,9,14 |
| Florida House of Representatives v. United States Dept. of Commerce, 961 F.2d 941, 947 (11th Cir.), cert. dismissed, 506 U.S. 969 (1992) | 8,10,11 |
| Hedley v. United States, 594 F.2d 1043 (5th Cir. 1979) | 7,8 |
| Jordan v. United States Dep't of Justice, 591 F.2d 753 (D.C. Cir. 1978) | 8,10 |
| McDonnell v. United States, 4 F.3d 1227 (3d Cir. 1993) | 2 |
| National Wildlife Federation v. United States Forest Service, 861 F.2d 1114 (9th Cir. 1988) | 10,14,17,19 |
| NLRB v. Sears, Roebuck & Co., 421 U.S. 132 (1975) | 8,9,12,13,14 |
| Petroleum Info. Corp. v. United States Dep't of Interior, 976 F.2d 1429 (D.C. Cir. 1992) | 15,19,20 |
| Providence Journal Co. v. United States Dep't of the Army, 981 F.2d 552 (1st Cir. 1992) | 9,21 |

<u>Quarles v. Department of the Navy</u>, 893 F.2d 390
(D.C. Cir. 1990)            14,18,19,
21

<u>Skelton v. United States Postal Service</u>,
678 F.2d 35 (5th Cir. 1982)      8,14

<u>Voinche v. F.B.I.</u>, 999 F.2d 962 (5th Cir. 1993)    7


<u>Statutes and Regulations</u>

Freedom of Information Act, 5 U.S.C. § 552     <u>passim</u>

Rule 701, Fed. R. Evid.     21

Rule 702, Fed. R. Evid.     21

1998 Commerce Appropriations Act, 111 Stat. 2483    22

<u>Statement of the Nature and Stage of the Proceeding</u>

Plaintiffs' original complaint challenged the Secretary of Commerce's decision not to adopt as the official results of Census 2000 data that have been statistically adjusted through sampling.  Defendants moved to dismiss or, in the alternative, for summary judgment in response to the original complaint. Prior to responding to that motion, plaintiffs filed their First Amended Complaint which largely re-alleges their original complaint, but also adds a claim based on the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").  Unlike the claims in the original complaint, the FOIA count seeks to compel the Secretary to release the adjusted data to the public; it does not seek to compel the Secretary to adopt the adjusted data as the official results of Census 2000.  Defendants now move for judgment on the pleadings or for summary judgment as to the amended complaint.  For brevity's sake, we will not repeat here the arguments contained in our Motion to Dismiss or, in the Alternative, for Summary Judgment, July 20, 2001 ("First Mot."), as the Amended Complaint is identical in all material respects regarding Counts I-III. Instead, we incorporate those arguments here by reference.[1]

---

[1] We do note, however, that the Amended Complaint seeks to add a new plaintiff, the City of Hidalgo, and that the administrative FOIA request was only submitted on behalf of the Counties of Cameron and Hidalgo.  <u>See</u> Attachment 1 to Declaration of Brian DiGiacomo.  As the other plaintiffs have never submitted an

CUtePDF - www.tesisco.com

Statement of the Issues to be Ruled upon by the Court

In addition to the issues identified in our prior brief, the amended complaint presents two additional issues:

1. Whether plaintiffs' FOIA claim must be dismissed for failure to exhaust administrative remedies.

2. Whether the adjusted data may be withheld under FOIA exemption 5 as records reflecting defendants' deliberative processes.

Summary of the Argument

In our motion to dismiss plaintiffs' original complaint, we demonstrated that plaintiffs' challenges to the Secretary's decision not to release adjusted census data were neither justiciable nor meritorious. Prior to filing a substantive response to that motion, plaintiffs have filed an amended complaint, adding an additional claim for the release of the adjusted data under the Freedom of Information Act, 5 U.S.C. § 552. That claim must also fail.

As a threshold matter, plaintiffs' FOIA claim must be dismissed for failure to exhaust administrative remedies. Plaintiffs did not appeal the denial of their initial FOIA request, as required by 5 U.S.C. § 552(a).

Even if plaintiffs' FOIA claim was properly before the

_____

administrative request, their FOIA claims must be dismissed. McDonnell v. United States, 4 F.3d 1227, 1236-39 (3d Cir. 1993).

-2-

Court, the adjusted data are exempt from disclosure as deliberative matter. As explained below and in the accompanying declaration of John Thompson, Principal Associate Director of the Census Bureau, the adjusted data are the product of a series of professional judgments and evaluations by Census Bureau personnel. Those data were part of the deliberative process which culminated in the Secretary's decision to release only the unadjusted data and, thus, they are both predecisional and deliberative. They are predecisional because they were compiled prior to completion of the 2000 census, for possible release in connection with the census for redistricting purposes, and because the Department is actively examining continued use of the underlying statistical methodology for other purposes in the future. Moreover, these estimates are deliberative because they are the product of, and can be understood only by reference to, a series of elastic and subjective judgments made by the mathematicians, statisticians, and demographers at the Census Bureau, who developed and implemented the analytical and deliberative framework through which these estimates were generated. The adjusted data are therefore within FOIA's Exemption 5.

-3-

## Factual Background[2]

As the Court knows, the adjusted data were the product of the Accuracy and Coverage Evaluation ("A.C.E.).  The A.C.E. was a multiyear effort by Census Bureau mathematicians, statisticians, demographers, internal and retained experts, and others to estimate the actual population totals across the United States by statistically adjusting the numbers produced by the initial census counts.  See Thompson Decl. ¶ 4.  The premise of the A.C.E. is that an intensive evaluation and study of a fraction of one percent of the population of the United States could produce demographic and sociological insights that might assist in evaluating whether the original census results overcounted or undercounted the populations of hundreds of distinct demographic groups across the country.

The Census Bureau divides the U.S. into approximately seven million "blocks" of citizens or households.  By comparing data from a fraction of one percent of those blocks to the results of the counts for those same blocks, the Census Bureau attempted to create estimates of the putative overcount or undercount for each of hundreds of selected demographic groups.  Id. ¶ 13.

---

[2] While we have already described the processes leading to the Secretary's decision in some detail in our earlier brief, plaintiffs' FOIA claim requires additional focus on the deliberative nature of the adjusted data and the processes by which they were generated.

A critical first step in the A.C.E. was, of course, the
selection of the A.C.E. sample - *i.e.*, the set of blocks and
housing units to survey. See Thompson Decl. ¶ 8.  The Census
Bureau formulated the A.C.E. sample through stratification
criteria designed by the Bureau's expert demographers and
statisticians.  See *id.*  To put this in perspective, America's
280 million plus residents live in widely varied communities
ranging from concentrated urban settings to very rural locations
with different racial and ethnic compositions.  The expert
demographers' and statisticians' challenge was to develop a
method to select a subset of a fraction of one percent of these
communities that could be successfully examined to reach broadly
applicable conclusions about every community in the United
States.

After studying the 1990 sample design, its results, and
options for improvement, these experts made decisions regarding
how many blocks, and which blocks, to select.  See *id.* ¶¶ 8-10.
The Census Bureau initially decided that the sample would consist
of 750,000 housing units across the country.  See *id.* ¶ 9.  When
the Supreme Court issued its decision barring the use of sampling
for purposes of apportionment of Representatives among the
States, see Dept. of Commerce v. United States House of
Representatives, 525 U.S. 316 (1999), the Census Bureau
considered anew the size of the sample it would utilize for

-5-

CIMPDF - www.fastio.com

purposes other than apportionment.  See  Thompson Decl. ¶ 9.  The
Census Bureau concluded that the A.C.E. sample design should
consist of approximately 300,000 housing units, or approximately
1/4th of 1% of the U.S. population.  Id.  Using statistical and
demographic methods, the Bureau's experts attempted to select
blocks that would be as representative as possible of hundreds of
separate demographic categories, such as race, ethnicity, age,
sex, income, tenure (owner or renter), and other variables.  Id.
¶ 10.  As explained by the Associate Director for the Decennial
Census, the selection of blocks and housing units for the sample
required "[e]xpert judgment, discretion, and analyses."  Id.

     After selecting the sample blocks, the Census Bureau
conducted A.C.E. interviews at homes in those blocks to make
individualized judgments about the accuracy of the Census'
initial counts.  Id. ¶ 11.  Those efforts included telephone
interviews, computer matching, computer assisted clerical
matching, defining the people and areas subject to the matching
operation, field verification, ensuring operational independence,
designing follow-up, and quality assurance procedures to reduce
errors in the A.C.E.  Id. ¶ 13.

     As we noted previously, each person in the initial counts
and the A.C.E. was placed into demographic groupings called
"post-strata."  Id. ¶ 12.  Judgments were required to develop
these post-strata.  Id.  ("A tremendous amount of expertise and

-6-

judgment went into the selection of the post-strata for Census
2000.").  The Census Bureau experts who designed the post-strata
deliberated at length to construct categories that would group
individuals who had similar capture probabilities.  Id.  After
lengthy deliberations, the Census Bureau ultimately selected 448
post-strata, far fewer than the 1357 post-strata utilized for the
1990 Census.  Id.

By comparing the results of the A.C.E. with the census
counts, the Census Bureau derived "coverage correction factors"
for each post-stratum.  Id. ¶ 13.  The Census Bureau "adjusted"
the results of Census 2000 by carrying the coverage correction
factor down to the block level for each post-stratum.  Id. ¶¶ 14,
15.  The Census Bureau generated the adjusted block-level data
for all States within the United States and the District of
Columbia by March 1, 2001.  Id. ¶ 15.

### Argument

#### I. The FOIA Claim Should Be Dismissed
#### For Failure to Exhaust Administrative Remedies

The FOIA requires each agency to provide for administrative
appeals of the denial of any request.  § 552(a)(6)(A).  Such
administrative appeals must be exhausted prior to seeking
judicial review.  Hedley v. United States, 594 F.2d 1043 (5th
Cir. 1979); Voinche v. F.B.I., 999 F.2d 962 (5th Cir. 1993).
Plaintiffs have failed to pursue their administrative appeals in
this matter, as shown by the Declaration of Assistant General

Counsel Brian DiGiacomo.  DiGiacomo Declaration, ¶ 4.  Thus, their FOIA claim must be dismissed.  Hedley, 594 F.2d at 1044.

   II.  The Adjusted Data Were Properly withheld Under Exemption 5

      Even if plaintiffs had exhausted administrative remedies, they are not entitled to the data.  Exemption 5 of the FOIA protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. 552(b)(5).  This exemption incorporates privileges enjoyed by the government in civil discovery, including the so-called "deliberative process" privilege.  See, e.g., Department of the Interior v. Klammath Water Users Protective Ass'n, 121 S. Ct. 1060, 1065 (2001); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 148-49 (1975); EPA v. Mink, 410 U.S. 73, 85-89 (1973).  To fall within the deliberative process privilege, an agency record must be both "predecisional" and "deliberative."  See, e.g., Florida House of Representatives v. United States Dept. of Commerce, 961 F.2d 941, 947 (11th Cir.), cert. dismissed, 506 U.S. 969 (1992); Skelton v. United States Postal Service, 678 F.2d 35, 40, n.6 (5th Cir. 1982).  A record is "predecisional" if it was created "antecedent to the adoption of agency policy" and "deliberative" if it is "related to the process by which policies are formulated."  Jordan v. United States Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978).

-8-

The deliberative process privilege serves important objectives.  Its principal goal is to encourage "open, frank discussion between subordinate and chief concerning administrative action," for Congress recognized that the "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to "operate in a fishbowl."  EPA v. Mink, 410 U.S. at 87 (quotations omitted).  As the Supreme Court recently confirmed, the privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news."  Klammath Water Users, 121 S. Ct. at 1066; see also Sears, Roebuck, 421 U.S. at 150 ("'[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process'" (citation omitted) (emphasis omitted)).  Another important goal of the privilege is "'to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.'"  Providence Journal Co. v. United States Dep't of the Army, 981 F.2d 552, 557 (1st Cir. 1992) (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)).

The deliberative process privilege protects the adjusted population estimates sought here by plaintiffs.  In <u>Florida House of Representatives v. United States Department of Commerce</u>, 961 F.2d 941 (11th Cir.), <u>cert. dismissed</u>, 506 U.S. 969 (1992), the Eleventh Circuit held as a matter of law that the deliberative process privilege protected "adjusted" population estimates developed in connection with the 1990 census.  In reversing summary judgment for the plaintiffs, and ordering entry of judgment for the government, that court had "no problem" in characterizing the "adjusted" population estimates at issue as a "proposal or a recommendation that eventually was rejected by the person in charge" and as "nothing more than one rejected recommendation in a process which ultimately led to the Secretary accepting a different recommendation as his final decision."  <u>Id.</u> at 949-50.  The adjusted data sought by plaintiffs here is identical in all relevant respects to the data sought in that case and the same result should obtain here.

    A.   <u>The Requested Population Estimates Are Predecisional</u>

An agency record is "predecisional," consistent with the plain meaning of that word, if it was created "antecedent to the adoption of the agency's policy." <u>National Wildlife Federation v. United States Forest Service</u>, 861 F.2d 1114, 1117 (9th Cir. 1988); <u>Jordan v. United States Dep't of Justice</u>, 591 F.2d at 774. The "adjusted" population estimates at issue satisfy that

-10-

standard, as they were made prior to the Secretary's March 6, 2001 decision to use the initial counts as the official figures for Census 2000.  As explained by Associate Director Thompson, the "adjusted" block-level data for the states and the District of Columbia were generated beginning on February 8, 2001; they were fully compiled as of March 1, 2001; and they were not changed after that date.  Thompson Decl. ¶ 15.  These estimates were created precisely "for the purpose of allowing the relevant decision makers to be able to adopt either the results of the unadjusted or the adjusted census data."  Thompson Decl., ¶ 16. Absent these data, there could be no deliberations at all, for there would be no choice possible regarding which data to release.  While the Secretary did not review the adjusted block level data themselves in reaching his decision, the Secretary did review a recommendation that the underlying methodology for the adjusted block-level data had not proved sufficiently reliable to warrant release of that data as official census figures.

As described above and by Principal Associate Director Thompson, the adjusted data are the results of the professional judgments of the Census Bureau staff who designed, executed, and evaluated the A.C.E.  The adjusted data are thus more properly viewed as a proposed alternate decision for the Secretary's consideration.  As the Eleventh Circuit held in <u>Florida House</u>, the adjusted data are "nothing more than one rejected

-11-

CDcPDF - www.fastio.com

recommendation in a process which led to the Secretary's accepting a different recommendation as to his final decision." 961 F.2d at 950.

In <u>Assembly of State of Cal. v. United States Dep't of Commerce</u>, 968 F.2d 916 (9th Cir. 1991), the Ninth Circuit upheld the district court's finding that the 1990 adjusted data were not predecisional. That decision is wrong in several respects. The <u>Assembly</u> court viewed those adjusted data as existing "solely for the purpose of post-decision dissemination." 968 F.2d at 921. That view is simply too crabbed and ignores the context of the adjusted data as an alternative, and rejected, policy option prepared for the Secretary's consideration.

Moreover, the factual context of the adjusted data for Census 2000 is materially different from 1990. The adjusted 2000 population estimates are predecisional for the independent reason that the underlying statistical and demographic methodology – the A.C.E. – is actively under consideration for future uses other than redistricting. While the Ninth Circuit dismissed as too remote the possibility that adjusted data might be examined in future deliberations concerning the 1990 census, <u>Assembly</u>, 968 F.2d at 921, the adjusted data for Census 2000 have been actively studied since the Secretary's decision to determine whether they can be used for purposes other than redistricting, and a decision

-12-

on that issue is imminent.[3]

In the case of the "adjusted" population estimates for 2000, the record demonstrates that ESCAP, in recommending against use of the adjusted estimates for the 2000 census, specifically noted that "[a]dditional evaluations, research, and analysis may alleviate [its] concerns." Compl. Ex. A at 3. Consistent with that qualification, the record further demonstrates that "the Census Bureau's evaluation of adjusted and unadjusted data is far from complete." Thompson Decl., ¶ 25. Deputy Director Thompson has identified these ongoing deliberations in detail:

> The ESCAP resumed its deliberations in June, 2001 with the goal of making a recommendation prior to October 15, 2001 regarding whether adjusted data should be released for purposes other than redistricting. For example, adjusted data could be used for federal fund allocation. The Bureau is currently devoting substantial resources to further analyze the adjusted

---

[3] Even absent the pending review of the adjusted data, the Ninth Circuit's view in Assembly is simply too narrow. The Supreme Court has specifically admonished courts against restricting the "predecisional" inquiry to an artificially narrow range of decisions:

> Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of the agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

Sears, Roebuck, 421 U.S. at 151 n.18; accord Access Reports v. Dep't of Justice, 926 F.2d 1192, 1196 (D.C. Cir. 1991) (same).

-13-

> data to investigate the issues raised in the first
> ESCAP report, including performing additional field
> work.  In other words, the Census Bureau's deliberative
> process remains <u>ongoing</u>.  Indeed, the adjusted data
> should be considered preliminary at this point, as <u>the
> adjusted data are subject to revision</u>.

<u>Id.</u> (emphasis in original).

Given these ongoing deliberations, and given a further decision regarding "adjusted" population estimates expected on or before October 15, the record amply demonstrates that the estimates are "predecisional," and a contrary conclusion, if based on an exclusive focus on the Secretary's March 6, 2001 decision, would constitute unwarranted judicial interference into the decisionmaking processes and prerogatives of the Census Bureau.  <u>See</u> <u>Sears, Roebuck</u>, 421 U.S. at 151 n.18.

     B.   <u>The Requested Population Estimates Are Deliberative</u>

An agency record is "deliberative" if it is "'related to the process by which policies are formulated.'"  <u>National Wildlife</u>, 861 F.2d at 1117.  This standard suggests a rough distinction between "purely factual" materials, which are generally unprotected, and "advisory opinions," which are protected.  <u>See</u> <u>EPA v. Mink</u>, 410 U.S. at 86-88.  However, consistent with the policies underlying the privilege, even "factual" materials are protected if they are "inextricably intertwined" with agency deliberations.  <u>National Wildlife</u>, 861 F.2d at 1119; <u>see also</u> <u>Assembly</u>, 968 F.2d at 921-22; <u>Quarles v. Department of the Navy</u>, 893 F.2d 390, 392 (D.C. Cir. 1990).  Thus, attempting to

-14-

categorize a document as factual, and thus not exempt, is

insufficient, as "analysis and evaluation of facts are as much a

part of the deliberative process" as any other analysis.

Skelton, 678 F.2d at 38.  As Justice (then-Judge) Ginsburg has

explained, the "'key question'" in making this determination is

"whether disclosure would tend to diminish candor within an

agency."  Petroleum Info. Corp. v. United States Dep't of

Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992).

     The record in this case demonstrates that "adjusted"

population estimates for 2000 are the product of, and can be

assessed only in connection with, the subjective and enormously

complex statistical operations used to generate the estimates.

John Thompson, the Principal Associate Director for Programs at

the Census Bureau, describes this relationship at length.

According to Mr. Thompson, the "adjusted" estimates "are not 'raw

numbers,'" but rather "a statistical construct that embodies a

host of calculations, assumptions, and hypotheses analyzed by

professional employees."  Thompson Decl. ¶ 26.  The estimates

were generated by "mathematicians, statisticians, demographers,

and experts in related professional fields."  Id. ¶ 4. This

"monumental" project (id. ¶4) took "months" of intensive expert

deliberations (id. ¶ 17).

     Mr. Thompson also details the specific expert judgments

underlying the "adjusted" population estimates.  To generate

-15-

aggregate "adjusted" population estimates, Bureau mathematicians, statisticians and demographers selected, from among the 7 million individual census blocks nationwide, what they hoped was a representative sample of blocks comprising less than 12,000 blocks – less than "1/4 of 1% of the population." Thompson Decl. ¶ 9. Both determination of sample size and selection of the sample required "[e]xpert judgment, discretion, and analyses." Id. ¶ 10. Similarly, to determine whether particular groups were disproportionately over- or under-counted, these experts divided the population into "post-strata" (i.e., groups thought to have "similar chances of being counted in the initial data collection," Department of Commerce, 525 U.S. at 325). The selection of these "post-strata" also required a "tremendous amount of expertise and judgment." Thompson Decl. ¶ 12. Based on "extensive" historical and demographic research, Bureau experts identified several "demographic and geographic variables that include race, ethnicity, age, sex, tenure, mail return rate, and metropolitan status/census enumeration method." Id. Bureau experts considered a wide range of plausible alternatives, ultimately selecting "448 post-strata, in contrast to the 1990 Census, which had 1357 post-strata." Id. The experts further developed, among other things, a series of correction factors (id. ¶ 13), quality control processes (id. ¶ 15), and operational approaches (id. ¶ 5). In addition, the experts exercised further

-16-

judgment in classifying individuals into each strata.

Mr. Thompson also explained that consideration of the methodology that resulted in the adjusted block-level data played an integral role in the Secretary's decision to use the unadjusted data for Census 2000.  This involved close scrutiny of the A.C.E.'s conclusion that the initial counts contained an undercount of the actual population, though it did not involve actual review of the adjusted data at the block level.  In particular, ESCAP was concerned with significant inconsistency between the A.C.E. estimates and demographic analysis, which indicated that the initial counts was more accurate than the A.C.E. estimate (id. ¶ 20).  As Mr. Thompson explained, "assessing these numbers is an integral part of the process of assessing the statistical methodologies used to generate them."  Id. ¶28.  Because of that relationship, "[t]he compelled disclosure of such numeric estimates would severely undermine the Census Bureau's candid assessment of different possible methodologies," and thus "hamper" its "efforts to assess competing population estimates and the underlying statistical methodologies."  Id. ¶29.

Where the record establishes this degree of elasticity, courts have found that the deliberative process privilege protects numeric estimates.  For example, in National Wildlife, the Ninth Circuit affirmed a finding extending the deliberative

-17-

CutePDF - www.fsxisa.com

process privilege to "projected levels of various activities

expected from implementation of" certain Forest Plans developed

by the Forest Service and to "cost-benefit analyses of the

proposed Forest Plans." 861 F.2d at 1120. In so doing, the

court stressed both the opinion-like character of these estimates

and their relationship to the selection of appropriate agency

policies: "Projected levels of various activities expected from

implementation of the Forest Plans, the estimated costs and

benefits associated with each activity, and estimates as to the

Forest's maximum capacity for sustaining each activity are

similarly opinions that figure heavily in the formulation of

Forest Service policies." Id. at 1121.

   Similarly, in Quarles, the D.C. Circuit applied the

deliberative process privilege to cost estimates prepared in the

course of the Navy's selection of home ports. That court too

stressed both the "elasticity" of the numeric estimates at issue

and their relationship to the selection of agency policy:

> Numbers have a surface precision that may
> lead the unsophisticated to think of them as
> fixed * * *. But cost estimates such as
> these are far from fixed, as anyone knows who
> has had two contractors bid on a home
> improvement or has compared budget estimates
> with final costs of a government project.
> They derive from a complex set of judgments--
> projecting needs, studying prior endeavors
> and assessing possible suppliers. They
> partake of just that elasticity that has
> persuaded courts to provide shelter for
> opinions generally.

-18-

893 F.2d at 392-93.   The court reasoned that these considerations implicate the core purpose of the deliberative process privilege: if subjective and potentially controversial estimates were subject to disclosure, "high officials might be inclined either not to call for cost estimates, or to call only for fuzzy ones expressed as wide ranges," and "the prospect of such disclosure" would similarly "increase the incentives to lower officials' fudging such estimates" to avoid potential criticism.   Id. at 393.

The D.C. Circuit reiterated this analysis in Petroleum Information Corporation.   There, the court found the deliberative process privilege inapplicable to certain agency files containing information such as the location and acreage of various parcels of land.   976 F.2d at 1431.   The court stressed the "technical, objective tenor" of the files in question (id. at 1436-1438), and, in concluding that disclosure was unlikely to harm agency deliberations, it distinguished Quarles on precisely that ground. Specifically, the court reasoned that assembling the acreage estimates at issue "may be taxing, but it does not appear to involve the breadth of discretion and the wide range of considerations, the many forecasts and 'judgment calls' involved in making the cost projections at issue in Quarles."   Id. at 1438.

These cases underscore the deliberative nature of the

-19-

CUtePDF - www.texto.com

"adjusted" population estimates.  Like the projected usage and cost estimates in <u>National Wildlife</u>, the population estimates are "opinions" that "figure heavily in the formulation" of agency policies (861 F.2d at 1121).  Like the cost estimates in <u>Quarles</u>, the population estimates are highly "elastic," and therefore subject to "fudging" under a regime of compelled disclosure (893 F.2d at 393).  Indeed,  the record in this case specifically confirms that the "compelled disclosure" of subjective and potentially controversial population estimates would produce precisely those kind of "chilling effects."  Thompson Decl. ¶ 29.  Finally, unlike the acreage estimates in <u>Petroleum Information</u>, the population estimates cannot fairly be described as merely "technical" and "objective," but rather involve a "breadth of discretion," a "wide range of considerations," and "many forecasts and 'judgment calls'" (976 F.2d at 1438).[4]

In addition to their elasticity and subjectivity, the "adjusted" population estimates bear several further indicia of records usually held protected by the deliberative process privilege.  First, because they are "draft material . . . presented by a subordinate to a superior for revision," they are

---

[4] A specific example illustrates this point graphically.  One of the serious anomalies with the adjusted data is their inconsistency with Demographic Analysis.  To resolve that problem, the ESCAP entertained the possibility that demographic estimates of illegal immigration were understated by 100%, Thompson Decl. ¶ 20, thus underscoring the elasticity of the judgments underlying the entire process.

-20-

CitiPDF - www.texisi.com

"likely to receive deliberative process protection." <u>City of Virginia Beach v. United States Dep't of Commerce</u>, 995 F.2d 1247, 1253 (4th Cir. 1993); <u>see</u> Thompson Decl. ¶ 25 ("the adjusted data should be considered preliminary at this point, as the adjusted data are subject to revision").  Second, because the "adjusted" population estimates were actually rejected for use in the 2000 Census, their compelled disclosure is "[e]specially" likely to invite "'precisely the caution . . . that the exemption seeks to render unnecessary.'"  <u>Providence Journal</u>, 981 F.2d at 558 (citation omitted); <u>see</u> Thompson Decl. ¶ 24 (describing rejection of the data for redistricting purposes).  Third, because "adjusted" population estimates based on the same foundational methodology are under active consideration for possible future use, the compelled disclosure "<u>before</u>" the expected October 15 deadline "would pose additional risks" of "skew[ing] the decisionmaking process."  <u>See</u> <u>Quarles</u>, 893 F.2d at 393.  Indeed, on this record, Associate Director Thompson has specifically testified that "candid assessments become far more difficult when the data under consideration could be released to the public at large as they are produced" and that, accordingly, the "chilling effects" from the compelled release of such data "would hamper our efforts to assess competing population estimates and the underlying statistical methodologies, or other new and

-21-

potentially innovative processes."  Thompson Decl. ¶ 29.[5]

Congress itself has addressed in some detail the extent of required disclosure of "adjusted" and "unadjusted" population estimates, and courts should not lightly frustrate its judgments in this politically sensitive area.  By statute, Congress has permitted States to request, and has required the Secretary of Commerce to release, population estimates suitable for purposes of redistricting.  See 13 U.S.C. §141(c).  Where (as here) the Secretary releases for redistricting the kind of unadjusted data that are required for apportionment of Representatives among the States, see 13 U.S.C. §195; Department of Commerce v. United States House of Representatives, 525 U.S. at 334-44, Congress has imposed no statutory obligation to release "adjusted" population estimates that the Secretary also might have considered releasing.  In contrast, where the Secretary releases any statistically "adjusted" population estimates for redistricting, Congress also required him to release the corresponding unadjusted enumeration.  See § 209(j) of the 1998 Commerce

_____

[5] Because the adjusted estimates reflect the judgment of Census Bureau professionals, they cannot be "rationally based on the perception" of a lay witness, Rule 701, Fed. R. Evid., and rest instead on "scientific, technical, or other specialized knowledge" of Bureau mathematicians, statisticians, and demographers, they would plainly constitute expert opinion if used in litigation, Rule 702, Fed. R. Evid., the reliability of which could only be assessed with a full disclosure of the processes by which they were derived.  This simply underscores the nature of the adjusted data as expert judgment and the processes by which they were derived as deliberative.

-22-

CVisPDF - www.fineprint.com

Appropriations Act, 111 Stat. 2483.

## Conclusion

For the foregoing reasons, as well as those stated in our original motion to dismiss or for summary judgment, this action should be dismissed or judgment entered in defendants' favor.

Respectfully submitted,

STUART E. SCHIFFER
Acting Assistant Attorney General

GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
ANDREA COHEN
Attorneys, Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202
Attorneys for Defendants.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CAMERON COUNTY, TEXAS, et al.,
        Plaintiffs,

      v.                   C.A. No. B-01-082

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
        Defendants.
_____/

ORDER

    This matter having come before the Court on Defendants'
motion for judgment on the pleadings or for summary judgment, and
the opposition thereto, and the Court having found that this case
is not justiciable because plaintiffs' claim for release of
adjusted census data is not ripe, plaintiffs lack standing for
such a claim, plaintiffs' challenge to the revocation of the
delegation rule is moot, and plaintiffs failed to exhaust
remedies and having further found that plaintiffs' statutory and
constitutional claims lack merit, it is, this ___ day of
_____, 2001, hereby

    ORDERED that plaintiffs' complaint be, and hereby is,
dismissed.


                           _____
                           UNITED STATES DISTRICT JUDGE

CVisPDF – www.fasiso.com

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Cameron County, Texas, et al.,      )
                                    )
          v.                        )      Case No. B-01-082
                                    )      (Judge: Hilda Tagle)
DONALD EVANS, Secretary of          )
Commerce, and the United States     )
Department of Commerce

### Declaration of Brian D. DiGiacomo

I, Brian D. DiGiacomo, hereby declare and state as follows:

1.  I am Chief of the General Law Division in the Office of
the Assistant General Counsel for Administration, Office of the
General Counsel, at the U.S. Department of Commerce, a position I
have occupied for over five years.  I am a member of the state
bars of New York State and the District of Columbia, and have
practiced law for over 18 years.

2.  One of my duties as Chief of the General Law Division is
to direct and oversee the processing of Freedom of Information
Act (FOIA) appeals for the Department of Commerce.  FOIA appeals
are processed in accordance with the Department's FOIA
regulations at 15 C.F.R. Part 4.  I supervise a staff of 11
attorneys and one paralegal, all of whom prepare the FOIA appeals
received by the Department for the final agency decision made by
the Assistant General Counsel for Administration.

3.  Attached to this Declaration as Exhibits "A" and "B"
respectively are copies of a FOIA request received by the Bureau
of the Census on June 27, 2001 from Rolando Rios and the Census

Bureau's denial dated July 16, 2001 that were provided to me in preparation of this declaration. As you will note, the denial notified Mr. Rios of the procedure to file an appeal with the Office of the Assistant General Counsel for Administration.

4. As Chief of the General Law Division, I maintain a log of all FOIA appeals filed with the Department of Commerce. I have checked this log and have no record of an appeal having been filed on behalf of the Law Offices of Rolando Rios.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of September, 2001, in Washington, D.C.


Brian D. DiGiacomo

# LAW OFFICES OF ROLANDO L. RIOS
## ATTORNEYS AT LAW
### MILAM BUILDING
### 115 E. TRAVIS, SUITE 1024
### SAN ANTONIO, TEXAS 78205

ROLANDO L. RIOS, ESQ.
RLRIOS@WORLD-NET.NET

TELEPHONE (210) 222-2102
FACSIMILE (210) 222-2898

June 27, 2001

FOIA Officer
Policy Office
Room 2430-FB3
Bureau of the Census
Washington, D.C. 20233-3700

RE:  FREEDOM OF INFORMATION REQUEST

VIA FAX, CERTIFIED
& FIRST CLASS MAIL

Mr. Gates:

I am the attorney for CAMERON and HIDALGO COUNTIES, TEXAS and on their behalf, request under the Freedom of Information Act, please provide the statistically adjusted population figures (data adjusted for undercount) for the 2000 Census for the following Texas jurisdictions:

Cameron County, Texas;
Hidalgo County, Texas;
City of Brownsville, Texas;
City of McAllen, Texas;
City of Harlingen, Texas;
City of San Benito, Texas;
City of La Feria, Texas;
City of Port Isabel, Texas;
City of Santa Rosa, Texas;
City of South Padre, Texas;
City of Laguna Vista, Texas;
City of Los Fresnos, Texas;
City of Indios, Texas;
City of Primera, Texas;
City of Rancho Viejo, Texas;
City of Rio Hondo, Texas;
City of Combes, Texas;

C_.y of Indian Lake, Texas;
C_y of Alamo, Texas;
C_'y of Hildago, Texas;
C_ly of Alton, Texas;
C_ly of Donna, Texas;
C_ly of Edcouch, Texas;
C_ly of Edinburg, Texas;
C_ly of Elsa, Texas;
Ci_y of Granjeno, Texas;
Ci_y of La Joya, Texas;
Ci_y of La Villa, Texas;
Ci_y of Mercedes, Texas;
Ci_y of Mission, Texas;
Ci_y of Palmview, Texas;
Ci_y of Penitas, Texas;
Ci_y of Pharr, Texas;
Ci_y of Progresso, Texas;
Ci_y of Progresso Lake, Texas;
Ci_y of San Juan, Texas;
Ci_y of Sullivan City, Texas;
and City of Weslaco, Texas.

If t_ere any fees for searching for or copying the records, please let me know before you fill my request.

If y_u deny all, or any part of this request, please cite each specific exemption you think jus_ifies your refusal to release the information and notify me of appeal procedures ava_able under the law.

If y_u have any concerns, or questions about handling this request, you may contact Me_issa Castro, or myself at (210) 222-2102.

Tha_k you in advance for your cooperation in handling this request.

Sin_ rely,

Rol_ndo L. Rios, Esq.
Attc_ney at Law


cc: C_meron County
    H_dalgo County



**UNITED STATE    EPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001
OFFICE OF THE DIRECTOR

JUL 1 6 2001

Mr. Rolando L. Rios, Esquire
Law Offices of Rolando L. Rios
Milam Building
115 E. Travis, Suite 1024
San Antonio, TX 78205

Dear Mr. Rios:

This is in response to your Freedom of Information Act (FOIA) request of June 27, 2001, for
". . . the statistically adjusted population figures (data adjusted for undercount) for the
2000 Census for . . ." specified Texas jurisdictions. We received your facsimile in this office on
June 27, 2001.

The data you are requesting are related to an intradepartmental recommendation concurred with
by the Secretary that unadjusted data be released as the U.S. Census Bureau's official
redistricting data. The Census Bureau reached its recommendation because it was unable, based
on the data and other information it had at the time, to conclude that the adjusted data were more
accurate for use in redistricting. As such, the data you request are predecisional and deliberative
in nature. Thus, the data are protected from disclosure by the deliberative process privilege of
Exemption 5 of the FOIA, Title 5, United States Code, Section 552(b) (5). Accordingly, we
must deny your request for these data.

You have the right to appeal within thirty days of the date of this letter. If you wish to appeal,
address your appeal to the Assistant General Counsel for Administration, U.S. Department of
Commerce, Room 5883, Attn: Freedom of Information Appeal, Washington, DC 20230. The
appeal should include a copy of the original request, this initial determination, and a statement of
the reason(s) why this determination was in error.

Sincerely,

Gerald W. Gates
Chief, Policy Office

U S C E N S U S B U R E A U

www.census.gov

CVISPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Cameron County, Texas, et al.,        )
                                      )
                v.                    )        Case No. B-01-082
                                      )        (Judge: Hilda Tagle)
DONALD EVANS, Secretary of            )
Commerce, and the United States.      )
Department of Commerce

Declaration of John Thompson

I, John Thompson, hereby declare and state as follows:

1.      I am currently the Principal Associate Director for Programs at the Bureau of the

Census, United States Department of Commerce.  In that capacity, I am responsible for all of the

Census Bureau's demographic and economic programs, including all censuses, survey data

collections, and publications.   I received a Bachelors in Mathematics from Virginia Polytechnic

Institute and State University in 1973 and a Masters in Mathematics from same university in 1975.

2.      From July 27, 1997 to June 16, 2001 I was the Associate Director for Decennial

Census and, as such, was primarily responsible for the planning, implementation, and processing

of Census 2000, including the operations that produced both the adjusted and unadjusted data.  I

have been continuously employed by the Census Bureau since 1975

3.      In the course of my work at the Census Bureau, I have obtained first hand

knowledge concerning the details of the Census Bureau's analytical processes in connection with

Census 2000.  I served as the Chairman of the Executive Steering Committee for A.C.E. Policy

(ESCAP).  ESCAP is a committee of twelve senior career Census Bureau professionals with

advanced degrees in relevant technical fields including statistics, mathematics, economics, and

sociology, and decades of experience with the type of statistical methodologies at issue.  The

ESCAP was chartered and charged to "advise the Director [of the Census Bureau] in determining policy for the A.C.E," which is the Accuracy and Coverage Evaluation Survey.

4.     The design and implementation of the A.C.E. for Census 2000 was a monumental task performed by a number of Census Bureau divisions made up of mathematicians, statisticians, demographers, and experts in related professions fields.  The A.C.E. was designed by these experts with the object of improving the accuracy of Census 2000 by systematically "adjusting" the data.  This work builds on over 20 years of research and development.

5.     In designing and implementing the A.C.E., the Census Bureau professionals exercised their collective judgment in determining matters requiring population and demographic research, performing population and demographic research, selecting the operational approaches and statistical methods to be used, designing the resulting data collection process, determining the appropriate methodology for data analysis to ensure technical and analytical accuracy, and ultimately producing the population and demographic results of the decennial census.  For example, these professionals designed and developed specifications for data collection and data processing requirements, operating procedures, training materials, and operational schedules. They also applied advanced statistical analytical tools such as regression analysis and variance estimation techniques to population, socioeconomic and demographic data.  All of this led to the creation of "adjusted data" – i.e. a set of census estimates that were designed to improve upon the results of Census 2000.

6.     The Census Bureau deliberated over a number of key, complex A.C.E. design components, including:

- **Sample Design**

- **Data Collection**

- **Data Capture** (converting data from the collection media to computer readable form)

- **Matching**

- **Missing Data** (using statistical procedures to account for data that is not provided from respondents or is unresolved at the completion of operations)

- **Dual System Estimation** (using a capture-recapture process to determine undercounts and overcounts)

- **Defining Post-Strata** (the grouping together of people who have similar probability of being included in the census)

7.     Throughout the detailed planning of Census 2000 and the A.C.E., the Census Bureau evaluated these and other design components, applying its technical judgment to each, and ultimately finalizing the criteria for each.   In addition, both during the design and decision making process, the Census Bureau consulted with outside experts in mathematics, statistics, and demography with knowledge of A.C.E. issues to gain their insights and further inform the evaluation process.

8.     One of the many steps that required the Census Bureau's expertise and discretion was the selection of the A.C.E. sample.   To formulate the A.C.E. sample, the Census Bureau utilized expert demographers and statisticians to design and select a sample of blocks through stratification criteria.   These experts made decisions regarding how many blocks, and which blocks, to select.   The sampling design was based in part on extensive research begun after the conclusion of the 1990 census.

9.     With regard to the size of the A.C.E. sample, the Census Bureau exercised its expertise and judgment to define the final universe of block clusters. The original design was developed after considering the 1990 sample design, its results, and options for improvement. The original design for the 2000 A.C.E. contained various sample block clusters totaling 750,000 housing units. When the use of sampling for apportionment purposes was removed from the census design to comport with a Supreme Court decision, the Census Bureau reconsidered the sample size for purposes other than apportionment, including redistricting, and determined that the A.C.E. sample design should include an approximately 300,000 housing unit. Any survey that measures detailed data has to be carefully designed. With regard to the A.C.E. survey, the ESCAP determined that a sample basis for the A.C.E. that was smaller than approximately 1/4th of 1% of the population would supply the data necessary to accomplish dual system estimation.

10.     Expert judgment, discretion, and analyses also went into the selection of which blocks and housing units would constitute the sample. The sample was intended to be as representative as possible of numerous demographic characteristics, such as racial and ethnic composition, age, sex, income, tenure (owner or renter), and other variables.

11.     After selecting the sample blocks, the Bureau then conducted initial A.C.E. interviews at homes in the identified blocks to assess the accuracy of information from the census. None of the individually identifiable information gathered from these visits has been publicly disclosed. Important improvements were made to these processes after extensive demographic research conducted during the development of the Census 2000. After data collection, the Census Bureau performed data capture, matching, reconciliation, and dual system estimation.

12.     The individuals in both the traditional census count and the A.C.E. sample were categorized by demographers and mathematical statisticians into groupings called post-strata. Post-strata are groupings based upon demographic and geographic variables that include race, ethnicity, age, sex, tenure, mail return rate, and metropolitan status/census enumeration method. These post-strata were designed after extensive research that took into account historical coverage and properties of various population groups and areas. The experts who designed the post-strata relied on decades of research and experience to construct the categories in an attempt to group individuals who had a similar probability of having been included in the initial census. A tremendous amount of expertise and judgment went into the selection of the post-strata for Census 2000. The experts ultimately selected 448 post-strata, in contrast to the 1990 Census, which had 1357 post-strata.

13.     The Census Bureau created coverage correction factors for each post-stratum by comparing the results of the A.C.E. sample to the results from the corresponding portions of the traditional census count. The Census Bureau devoted considerable resources to the refinement of these operations, such as using computer matching and computer assisted clerical matching, utilizing telephone interviewing, performing field verification, defining the people and areas subject to the matching operation, ensuring operational independence, and designing follow-up, and quality assurance procedures to reduce errors in the A.C.E. The result of these processes was the creation of coverage correction factors, which determined the amount by which the results of the traditional census count for each post-stratum would be adjusted to arrive at the adjusted figures.

14.     The coverage correction factors were intended to estimate, based upon the limited sample, the extent to which the total number of people in each post-stratum was over- or undercounted in the initial census.  These coverage correction factors then allowed the Census Bureau to "adjust" the results of Census 2000 by carrying the coverage correction factors down to the block level for each post-strata. These adjusted block level data were then subsequently tabulated to generate adjusted data at that the national, state and local level.

15.     Beginning on February 8, 2001, the Census Bureau generated adjusted block-level data for various groupings of states.  Adjusted block-level data for all states within the United States and the District of Columbia were compiled as of March 1, 2001.  (Data for Puerto Rico was compiled as of March 8, 2001.)  These groupings of adjusted data were then subjected to various quality control processes by Census Bureau personnel to ensure, among other things, the specified procedures had been correctly applied.  There were no changes to the adjusted block-level figures for any state as a result of the quality control processes after March 1, 2001.

16.     These data, including the adjusted block level data, were created for the purpose of allowing the relevant decision makers to be able to adopt either the unadjusted or the adjusted census data as the redistricting data for Census 2000.

17      The ESCAP was charged with making a recommendation regarding whether the adjusted numbers should be adopted and released as the Census 2000 redistricting data.  The ESCAP spent many months examining voluminous evidence, and debated at great length whether adjustment would improve Census 2000 data for use in redistricting.

18      One of the ESCAP's concerns was the significant inconsistency between the A.C.E. estimates and the Demographic Analysis estimates.  The A.C.E. was an independent

coverage measurement survey, meaning that it collected information in operations separate from the census to evaluate how well the census counted the population and permit possible adjustment of the census results.

19.     Demographic Analysis, or DA, is a methodology traditionally used by the Census Bureau to evaluate census coverage. DA uses records and data regarding births, deaths, legal immigration, and Medicare enrollments, and estimates of emigration and net undocumented immigration to estimate the national population. The Census Bureau has long relied on DA as an important independent benchmark to validate the accuracy of both the census and coverage measurement surveys such as the A.C.E.

20.     Initial DA results revealed a number of major inconsistencies between the A.C.E. results and the DA results. Most notably, DA suggested that Census 2000 overcounted the national population by 1.8 million individuals. Even an alternative DA that aggressively assumed a doubling of net undocumented immigration during the 1990's showed a small net undercount of 0.9 million, substantially below the net undercount of 3.3 million shown by the A.C.E. The inconsistency between DA and the A.C.E. raised the substantial possibility of an as-yet undiscovered problem in the A.C.E. methodology, a possibility that the Census Bureau is currently investigating.

21.     After evaluating a wide variety of evidence relating to the accuracy of Census 2000, and after developing an extensive record of its deliberations, the ESCAP was unable to conclude that the adjusted Census 2000 data were more accurate than the unadjusted data for redistricting. The Census Bureau relied on three pre-specified criteria in arriving at its recommendation that the ESCAP data should not be released as the Census Bureau's official

CMxPDF - www.tesisc.com

redistricting data. These three criteria were: (1) a consideration of operational data to validate the successful conduct of the A.C.E.; (2) whether the A.C.E. measures of undercount were consistent with historical patterns of undercount and independent demographic analysis benchmarks; and (3) a review of quality measures.

22.    The inconsistency with DA was only one of several reasons why the ESCAP recommended against using the adjusted data for redistricting. Other, more technical, concerns are discussed in the ESCAP Report, including the possibility that balancing error or synthetic error had adversely affected the A.C.E. data, the data that plaintiffs are asking for in this lawsuit.

23.    On March 1, 2001, ESCAP issued its "Report of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy: Recommendation Concerning the Methodology to be Used in Producing the Tabulations of Population Reported to States and Localities Pursuant to 13 U.S.C. 141(c)." In this report, ESCAP was unable to conclude that the adjusted Census 2000 data were more accurate for redistricting. Accordingly, ESCAP recommended that the unadjusted census data be released as the Census Bureau's official redistricting data. I was directly involved in the process that resulted in the ESCAP's recommendation and report.

24.    On March 1, 2000, the Acting Director of the Census accepted the ESCAP's recommendation and relayed his recommendation to the Secretary of Commerce that the unadjusted data be used for redistricting. On March 6, 2001, Secretary Evans publicly announced his decision that the Census Bureau should issue the unadjusted data as the Bureau's official redistricting data. I am aware that the Secretary was provided with the ESCAP report, the recommendation of the Acting Census Director, and the advice of both the statistical experts at

CutePDF - www.fenlio.com

the Census Bureau and non-Government experts from academia and the professional community with knowledge of the methodological issues in connection with his decision.

25      Although the Secretary has made his decision regarding whether to release the adjusted data as the official results of Census 2000, the Census Bureau's evaluation of the adjusted and unadjusted data is far from complete. The ESCAP resumed its deliberations in June, 2001 with the goal of making a recommendation prior to October 15, 2001 regarding whether adjusted data should be released for purposes other than redistricting. This ongoing assessment is intended to resolve concerns identified by the ESCAP and other concerns, and to enable the Census Bureau to recommend whether adjusted Census 2000 data should be used in the future. We expect this research and analysis to be completed by the end of summer and a second ESCAP recommendation report to be issued in October, 2001. If the ESCAP concludes that the adjustment would improve the accuracy of the data, the Census Bureau will use adjusted data for one or more of the census long form data products, post-censal population estimates, and Census Bureau demographic survey controls. Census long form data products and post-censal population estimates are used throughout the decade by a myriad of federal and state agencies in the administration of laws in which population or demographic data are required to determine the amount of the benefit received by State, county, or local governmental units. Demographic survey controls refers to the decision on whether subsequent demographic surveys conducted by the Census Bureau should be calibrated to adjusted or unadjusted population counts. The Bureau is currently devoting substantial resources to further analyze the adjusted data to investigate the issues raised in the first ESCAP report, including performing additional field work. In other

words, the Census Bureau's deliberative process remains ongoing. Indeed, the adjusted data should be considered preliminary at this point, as the adjusted data are subject to revision.

26. While the Census Bureau continues to research the adjusted data, the data sought by plaintiffs in this case are population estimates which the Census Bureau has judged not to be sufficiently accurate. Importantly, the adjusted data are not "raw numbers," but rather the Census Bureau's preliminary (and rejected) estimates regarding the adjusted population. The data are a statistical construct that embodies a host of calculations, assumptions, and hypotheses analyzed by professional employees to determine whether the adjusted data were more accurate. These adjusted block-level data at issue in this case are therefore the result of the numerous, detailed analyses and technical judgments embodied in the A.C.E.

27. The Department of Commerce and the Census Bureau, based upon the inaccuracies discussed above, decided not to release to the public the adjusted data at issue in this case. The Department of Commerce and the Census Bureau's experts concluded that the data are not sufficiently reliable to be used for purposes such as congressional redistricting.

28. In estimating population totals, statisticians and demographers employed by the Census Bureau must be able to propose and discuss alternative approaches, many of them novel and creative, to difficult problems. An essential part of that process involves generating the numbers produced by new or alternative methodologies. Those numbers reflect a subjective expert opinion about how best to achieve the objective; they are sometimes imprecise and controversial, and inevitably require modification. Moreover, assessing these numbers is an integral part of the process of assessing the statistical methodologies used to generate them.

29     The compelled disclosure of such numeric estimates would severely undermine the Census Bureau's candid assessment of different possible methodologies.  Obviously, candid assessments become far more difficult when the data under consideration could be released to the public at large as they are produced.  If such disclosures were required, I and my colleagues would be less likely to propose novel solutions to difficult problems, based on the generation of numeric estimates, such as estimating the population.  These chilling effects would hamper our efforts to assess competing population estimates and the underlying statistical methodologies, or other new and potentially innovative processes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7_ day of September, 2001, in Suitland, Maryland.


John Thompson

## Certificate of Service

I hereby certify that Defendants' Motion for Judgment on the Pleadings, or in the alternative, for Summary Judgment, and accompanying memorandum were served this 10th day of September, 2001, by placing it in Federal Express, overnight delivery to:

Rolando L. Rios
115 E. Travis
Suite 1024
San Antonio, TX 78205

THOMAS MILLET