UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 0 1 2001

Michael N. Milby
Clerk of Court

| | |
|---|---|
| CAMERON COUNTY, TEXAS, HIDALGO COUNTY, TEXAS et. al. | |
| Plaintiffs, | Case No: B-01-082 |
| v. | |
| DONALD EVANS, SECRETARY OF THE DEPARTMENT OF COMMERCE, in his official capacity; and UNITED STATES DEPARTMENT OF COMMERCE, | |
| Defendants. | |

<u>Plaintiffs' Response In Opposition to Defendants' Motion for Judgment on the Pleadings , or, in the Alternative, for Summary Judgment</u>

The defendants are not entitled to the summary relief they seek because of the factual issues that have been raised in this proceeding. As previously stated, the legal and factual issues raised by the defendants in, again, failing to accurately count the Latino Community in Cameron and Hidalgo Counties require a full trial on the merits. As a supplement to our previously filed response in opposition, attached as **Exhibit A** is an affidavit executed by one of plaintiffs' experts, Dr. Jorge Chapa. Dr. Chapa is an expert on the census undercount and his affidavit speaks to the issue of the accuracy of the adjusted numbers at the aggregate level. Indeed, as stated by Dr. Chapa "...there are no substantial or credible objections to Census adjustment of the county-level compared to adjustment at the block-level..." Chapa Declaration, Para 2.

This distinction between data at the block level, which is used for redistricting, and the data at the county wide level, which is used for federal funding, is critical in distinguishing this case from the *City of Los Angeles, et. al. v. Evans, et. al.*, CA No. 01-1671 (C.D. Cal.) upon

which the defendants base their arguments. Also, Dr. Chapa's declaration crystallizes the factual issues that can only be resolved by a full trail on the merits of this case.

All the other arguments made in our previously filed response in opposition to the motion for summary judgment are reasserted and incorporated in this document.

**FOIA Claim**:

FOIA requires that government agencies disclose to the public any requested documents. 5 U.S.C. § 552(a). The agency may avoid disclosure only if it proves that the documents fall within one of nine enumerated exemptions. 5 U.S.C. § 552(b)(1)-(9). FOIA's purpose is to encourage disclosure, and to that end, its exemptions are to be interpreted narrowly. *Department of Justice v. Julian*, 486 U.S. 1, 8, 108 S. Ct. 1606, 1611, 100 l. Ed. 2d 1 (1988); *Department of the Air Force v. Rose*, 425 U.S. 352, 360-61, 96 S. Ct. 1592, 1599, 48 l. Ed. 2d 11 (1976). The government has the burden to prove that a requested document falls within one of FOIA's exemptions. 5 U.S.C. § 552 (a)(3).

The gravamen of the defendants request for judgment on the pleadings in their latest motion is that the data requested by the plaintiffs are part of the "predecisional" and "deliberative" process used by the Secretary in deciding whether or not to release the adjusted census data.[1] Therefore, they argue, the data is privileged and fall within Exemption 5 of the Freedom of Information Act (FOIA).

In order to be protected by the deliberative process privilege, such documents must be both "predecisional" and "deliberative". *National Wildlife Fed'n*, 861 F.2d at 1117. A "predecisional" document is one "prepared in order to assist an agency decision maker in arriving at his decision." *[Renegotiation Board v.] Grumman Aircraft Eng'g Corp.*, 421 U.S.

---

[1] The defendant's first argument is that the plaintiffs did not request the adjusted data pursuant to FOIA *on behalf of* all the named plaintiffs, even though the request was for the population figures *of all the named plaintiff* jurisdictions. In order to address this issue, **Exhibit B** is a copy of a new FOIA request made on August 21, 2001 on behalf of all the named plaintiffs. As the defendants know, this is an exercise in futility since the request will be rejected, as has been done with all other similar requests; by the time this court considers these pending motions the rejection letter will be filed with the Court.

2

168, 184 [95 S. Ct. 1491,1500, 44 L. Ed. 2d 57] (1975), and may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency, ", 617 F.2d 854, 866 (D.C. Cir. 1980). As correctly pointed out by the defendant, a predecisional document is a part of the "deliberative process," if "the disclosure of [the] materials would expose an agency's decision making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Communications Corp. v. Department of the Air Force*, 815 F. 2d 1565, 1568 (D.C. Cir. 1987).

However, the information requested in this litigation is neither predecisional nor deliberative as will become evident as we focus on the essence of the governments argument.

### Predecisional

Chronologically, the adjusted data was prepared before the decision was made by Secretary Evans on March 6, 2001 not to release the adjusted data. This lawsuit and the FOIA requests have been made months <u>after</u> the "decision" was made to not release the data for redistricting purposes – hardly "predecisional".

The defendants further argue that the adjusted census tapes are predecisional because they have not decided whether or not to release the adjusted for other purposes. There will always be future decisions to be made. Any document will always be "predecisional" if it is referenced to a decision that may be made in the future. The defendants broad argument would lead to the evisceration of FOIA and violate a long line of cases that have limited the scope of exempted documents, *Department of Justice v. Julian*, 486 U.S. 1, 8, 108 S. Ct 1606, 1611, 100 L. Ed. 2d 1 (1988). *Department of the Air Force v. Rose*, 425 U.S. 352, 360-61, 96 S. Ct. 1592, 1599, 48 L. Ed. 2d 11 (1976).

### Deliberative:

The purpose for the "deliberative' process privilege is to ensure that agencies are not forced "to operate in a "fishbowl". The key question is whether the disclosure of the materials

sought would expose the agency's decision making process in such a way as to discourage candid discussion within the agency and thereby "undermine the agency's ability to perform its functions." *Dudmans Communications*, 815 F. 2d at 1568. We should focus on whether the document in question is a part of the deliberative process." *National Wildlife Fed'n*, 861 F.2d at 1118. Predecisional materials are privileged "to the extent that they reveal the mental processes of decision-makers." *Id.*, at 1119.

The idea behind limiting the deliberative exception is that agencies had no legitimate interest in keeping the public ignorant of the facts the agencies worked from, while they did have a legitimate interest in shielding their preliminary opinions and explorations. The key to the inquiry is whether revealing the information exposes the deliberative process. *National Wildlife Fed'n* 861 F 2d at 1119.

The data request by the plaintiffs in this case are "numerical data" found in census tapes that include a list of numbers of people broken down by race, associated with geographic areas. The material is purely factual and in no way divulges the reasoning process through which the data was derived or in any way explains any recommendation or decision not to adjust the census. *Assembly of the State of California, et al v United States Department of Commerce*, 968 F. 2d 916 at 922. Indeed, the defendants have already released the unadjusted census numbers, which are simply a different method of estimating the population and not significantly different from the method used for estimating population in determining the adjusted numbers. As stated by the court in the above cited case:

> In the court's view, the two processes are not so fundamentally different as to render the product of one 'classic, objective, non-deliberative material that must be disclosed under FOIA' and the product of the other deliberative material that must not be disclosed." ,*Id*. at *922.*

4

Finally, the release of the adjusted numbers requested in this case would in no way enable the public to reconstruct the deliberative process that is protected by the exception. As stated by Dr. Chapa: "... the release of raw adjusted data for Hidalgo and Cameron County and the included cities would no way compromise or influence the integrity of the decision making process used by the Bureau of the Census." Chapa Declaration, Para 6. See also *Id* at 922.

## CONCLUSION

For all of the above reasons and those previously stated, this court should not dismiss this case and allow these plaintiffs to bring before this Court the trial on the merits of their claims.

Dated: October 1, 2001

Respectfully Submitted

ROLANDO L. RIOS
SBN: 16935900 FBN: 14370
GEORGE KORBEL
LAW OFFICE OF ROLANDO L. RIOS
MILAM BUILDING
115 East Travis, Suite 1645
San Antonio, Texas 78205
(210) 222-2102
(210) 222-2898 fax
rios@world-net.net

JOSE GARZA
SBN: 07731950
FBN: 1959
1913 Fordham
McAllen, Texas 78504
(956)928-0088
garzpalm@aol.com

ATTORNEYS IN CHARGE FOR PLAINTIFFS

C. DOUGLAS WRIGHT
SBN: 22024100  FBN: 15516
RICHARD O. BURST
SBN: 00785586  FBN 15515
Legal Division Commissioners Court
Cameron County Courthouse
964 E. Harrison St.
Brownsville, Texas 78520
956-550-1345  956-550-1348 fax
igonzales@co.cameron.tx.us

LOCAL COUNSEL FOR CAMERON COUNTY

GARY GURWITZ
SBN: 08631000 FBN: 1194
ADRIANA H. CARDINAS
SBN: 24001836 FBN: 22193
 ATLAS & HALL L.L.P.
P.O. BOX 3725
McAllen, Texas 78502-3725
956-682-5501
956-686-6109 fax
ahc@atlashall.com

OF COUNSEL FOR HIDALGO COUNTY

JAMES E. DARLING
SBN: 05386000
FBN: 5400
McAllen City Attorney
P.O. Box 220
McAllen, Texas 78505-0220

OF COUNSEL FOR THE CITY OF McALLEN

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the Plaintiffs Response to Defendants Motion to Dismiss has been sent by first class mail on this the 1[th] day of October, 2001 to:

    Mr. Tom Millet, Esq.
    Federal Programs Branch
    United States Department of Justice
    901 E. St. N.W.
    Washington D.C. 20530

_____
ROLANDO L. RIOS

# Affidavit of Jorge Chapa, PhD

I, Jorge Chapa, hereby declare, under penalty of perjury, the following, based on my personal knowledge, is true and correct to the best of my knowledge:

1. I, Jorge Chapa, am an expert on the issue of Census underenumeration and adjustment. I have followed this issue since 1978. I have been appointed and reappointed several times by the U.S. Secretary of Commerce to serve on the Census Bureau's Racial and Ethnic Advisory Committee. In this capacity I have become very familiar with the details of Census procedures and documents that pertain to the particulars of the case of Cameron and Hidalgo Counties vs. Donald Evans. (Case No. B-01-082).

2. I believe that the overwhelming preponderance of evidence, both in terms of credibility and quantity, support the following: a) The validity and accuracy of the adjustments for differential underenumeration and gross coverage error proposed for the 2000 Census; b) The fact there are no substantial or credible objections to Census adjustment at the **county-level** compared to adjustment at the block-level; and, c) That the main reason that the Census Bureau's Executive Steering Committee for Accuracy and Coverage Evaluation Policy (ESCAP) gave for not adjusting the block-level population counts used for redistricting; i.e., the difference between the Census counts as adjusted using the results of the Accuracy and Coverage Evaluation Survey (ACE) and the results of the Demographic Analysis is quite simply that the **Demographic Analysis** was fatally flawed by substantially underestimating the number of undocumented Hispanic immigrants resident in the US on April 1, 2000.

3. On point "2a" above, regarding, "the validity and accuracy of the adjustments for differential under enumeration and gross coverage error proposed for the 2000 Census," I refer to the National Academy of Sciences' publication, MEASURING A CHANGING NATION: MODERN METHODS FOR THE 2000 CENSUS (1999), which thoroughly reviews the arguments against adjustment. The panel concludes that none of the objections raised against adjustment "are sufficiently compelling to shift the panel's position supporting the use of integrated coverage management [the proposed adjustment technique] as a reliable method for improving the quality of census counts for the key purposes for which they are used." (p. 85)  Note that former Census Director Martha Ritchie frequently claimed that these panels were the "Supreme Court" for deciding technical Census issues.

4. On point "2b", regarding "there are no substantial or credible objections to Census adjustment at the county-level compared to adjustment at the block-level," I refer to Census Bureau publications and practices. The 1990 Census analog to the 2000 ACE was the Post-Enumeration Survey (PES). However, the ACE had the following substantial technical advantages over the PES: 1) The ACE sample was almost twice the size of the PES sample; 2) The ACE sample clusters were drawn using better measures of population size; and, 3) The ACE sampling weights were less variable than the PES weights. All of this resulted in much more precise estimates. For example, for one useful measure of reliability, the coefficient of variation (CV), the ACE results at the county-level were 40 to 50 percent better than the PES results. (Starsinic, Sissel and Asiala, "Accuracy and Coverage

Evaluation: Variance Estimates by Size of Geographic Area." US Bureau of the Census, February 28, 2001). Yet, the 1990 PES-adjusted counts were uniformly used throughout the entire Federal Statistical System to calibrate all surveys conducted by the Census Bureau including the CPS. (Obenski, "Analysis of C.A.P.E. Findings of 1990 PES Technical Issues." US Bureau of the Census, June 9, 2000).

5. On point "2c", regarding the fatally flawed Demographic Analysis because it substantially underestimated the number of undocumented Hispanic immigrants resident in the US on April 1, 2000. Following Passel arguments, the results of the demographic analysis and the ACE are, "quite consistent in estimates of undercount for the non-Hispanic Black population and the non-Hispanic, non-Black population." The ACE and the Demographic Analysis disagree on estimates for the Hispanic population because the Demographic Analysis severely underestimated the number of net Hispanic immigrants residing in the US on or about April 1, 2000. (Jeffrey S. Passel; U.S. Census Monitoring Board, Presidential Members; "Comparison of Demographic Analysis, A.C.E., and Census 2000 Results by Race," February 27, 2001). Passel's analysis and many other's including my own show that the current version of DA systematically underestimates immigration by a significant amount. Passel concludes, "The low DA total should NOT be used as a basis for deciding AGAINST adjustment because the current DA estimate underestimates immigration, particularly Hispanic and undocumented immigration. Corrrecting the underestimation could substantially narrow the gap between DA and ACE." In sum, no credible reason exists for failure to adjust the differential underenumeration.

6. Finally, in my work with the Bureau of the Census, I am generally aware of their decision making process. In my opinion, the release of raw adjusted data for Hidlago and Cameron County and the included cities would in no way compromise or influence the integrity of the decision making process used by the Bureau of the Census.

_____
Jorge Chapa, PhD.

SWORN TO AND SUBSCRIBED TO on this the 24th day of September, 2001.

_____
Diana Amaya
Notary Public

ClibPDF - www.fastio.com

**LAW OFFICES OF ROLANDO L. RIOS**
ATTORNEYS AT LAW
MILAM BUILDING
115 E. TRAVIS, SUITE 1024
SAN ANTONIO, TEXAS 78205

ROLANDO L. RIOS, ESQ.　　　　　　　　　　　TELEPHONE (210) 222-2102
RIOS@WORLD-NET.NET　　　　　　　　　　　FACSIMILE (210) 222-2898

September 21, 2001

FOIA Officer
Policy Office
Room 2430-FB3
Bureau of the Census
Washington, D.C. 20233-3700

RE:　FREEDOM OF INFORMATION REQUEST

　　　　　　　　　　　　　　　　VIA FAX, CERTIFIED
　　　　　　　　　　　　　　　　& FIRST CLASS MAIL

Mr. Gates:

I am the attorney for all of the jurisdictions listed below. On their behalf, I request under the Freedom of Information Act, the statistically adjusted population figures (data adjusted for undercount) for the 2000 Census. This request is made on behalf of following Texas jurisdictions:

Cameron County, Texas;
Hidalgo County, Texas;
City of Brownsville, Texas;
City of McAllen, Texas;
City of Harlingen, Texas;
City of San Benito, Texas;
City of La Feria, Texas;
City of Port Isabel, Texas;
City of Santa Rosa, Texas;
City of South Padre, Texas;
City of Laguna Vista, Texas;
City of Los Fresnos, Texas;
City of Indios, Texas;
City of Primera, Texas;
City of Rancho Viejo, Texas;
City of Rio Hondo, Texas;
City of Combes, Texas;

City of Indian Lake, Texas;
City of Alamo, Texas;
City of Hidalgo, Texas;
City of Alton, Texas;
City of Donna, Texas;
City of Edcouch, Texas;
City of Edinburg, Texas;
City of Elsa, Texas;
City of Granjeno, Texas;
City of La Joya, Texas;
City of La Villa, Texas;
City of Mercedes, Texas;
City of Mission, Texas;
City of Palmview, Texas;
City of Penitas, Texas;
City of Pharr, Texas;
City of Progresso, Texas;
City of Progresso Lake, Texas;
City of San Juan, Texas;
City of Sullivan City, Texas;
and City of Weslaco, Texas.

If there any fees for searching for or copying the records, please let me know before you fill my request.

If you deny all, or any part of this request, please cite each specific exemption you think justifies your refusal to release the information and notify me of appeal procedures available under the law.

If you have any concerns, or questions about handling this request, you may contact Melissa Castro, or myself at (210) 222-2102.

Thank you in advance for your cooperation in handling this request.

Sincerely,

Rolando L. Rios, Esq.
Attorney at Law


cc: Clients