

# COPY

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 2 2 2001

Michael N. Milby
Clerk of Court

CAMERON COUNTY, TEXAS, et al.,
            Plaintiffs,

      v.

DONALD EVANS, SECRETARY OF
COMMERCE, in his official
capacity; and UNITED STATES
DEPARTMENT OF COMMERCE,
            Defendants.
_____/

C.A. No. B-01-082

DEFENDANTS' REPLY MEMORANDUM TO
PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS
OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

ROBERT D. McCALLUM, JR.
Assistant Attorney General

GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202

Attorneys for Defendants.

## I. Plaintiffs' FOIA Claim Should Be Dismissed

1. As defendants originally established, plaintiffs have failed to exhaust their administrative remedies for their FOIA claim. While plaintiffs have attempted to cure the defect presented in their prior claim, where the administrative FOIA request was submitted only by one plaintiff, by submitting a new administrative request by all plaintiffs, they have failed to exhaust their administrative remedies for either of their requests. Accordingly, for the reason stated in defendants' prior memorandum, the FOIA claim must be dismissed.

2. While plaintiffs agree that documents which are both predecisional and deliberative may be withheld under Exemption 5, their arguments that the adjusted census figures do not meet those two requirements fail.

a. Plaintiffs argue that the adjusted census results are not predecisional because their FOIA requests followed the Secretary's decision simply makes no sense. A document which was predecisional before an agency decision is reached does not lose that status after the decision is rendered. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975) (communications which follow an agency decision may be disclosed "as long as prior communications and the ingredients of the decisionmaking process are not disclosed); North Dartmouth Properties, Inc. v. H.U.D., 984 F. Supp. 65, 68-9 (D. Mass. 1997) (restatement of deliberations after a decision is made is still protected). Indeed, under plaintiffs' view, deliberative documents would automatically lose their protected status after an agency decision is made, a result which would lead to the exact harms against which the exemption protects. Federal Open Market Comm. v. Merrill, 443 U.S. 340, 359-60 (1979) ("documents shielded by executive privilege remain privileged even after the decision to which they pertain may have been effected, since disclosure

1

at any time could inhibit the free flow of advice....")

b. Defendants have also pointed to the then-impending decision by the Census Bureau concerning whether adjusted census results can be used in future population estimation projects. Defendants have not argued, as plaintiffs infer, that the possibility of some ill-defined future decision makes the adjusted numbers predecisional. Instead, defendants referred to a specific deliberative process then underway within the Census Bureau as to whether the concerns expressed with reference to the initial adjustment decision can be explained such that the adjusted results may be used in upcoming population estimation projects conducted by the Census Bureau. The Bureau renewed those deliberations in June, 2001, and determined that the A.C.E. results were flawed because they failed to account for a substantial number of duplications in Census 2000. As a result of this flaw, the Census Bureau determined that the A.C.E. results substantially overstated the undercount and that they should not be incorporated in the Bureau's future population estimation projects.[1] Thus, the adjusted results were part of two specific deliberative processes.[2] Indeed, this newly-discovered error in the A.C.E. results only serves to highlight their tentative, predecisional nature.

c. Plaintiffs also argue that the adjusted census results are merely factual and therefore not deliberative. In this regard, they assert that the adjusted results are no different than the

---

[1] Report of the Executive Committee for Accuracy and Coverage Evaluation Policy on Adjustment for Non-Redistricting Uses, October 17, 2001, pp. 10-11, Exhibit 1 to this memorandum. The ESCAP estimated that this error may have caused the A.C.E. (which estimated a net national undercount of 3.3 million) to overestimate the net national undercount by as many as 3-4 million persons. Id.

[2] Plaintiffs cite two cases in this portion of their brief, neither of which involves the deliberative process privilege. See Department of Justice v. Julian, 486 U.S. 1 (1988); Department of the Air Force v. Rose, 425 U.S. 352 (1976).

2

unadjusted data already released.  This argument is wrong in fact and law.

As defendants have previously explained, the unadjusted data are the result of the Census Bureau's efforts to conduct a complete headcount of all inhabitants of the United States.  While a massive undertaking, it is qualitatively different than the adjustment process.  As explained in defendants' prior brief, the adjustment process relies on a complex series of professional judgments and assumptions to alter the results of the initial enumeration process, culminating in a proposal to substitute those adjusted results for the data collected during the enumeration phase as the final tallies for Census 2000.  Simply asserting that the adjusted results are "facts" is to cast a blind eye toward the enormous amount of professional judgment and opinion which underlie the creation of the adjusted results.

Moreover, plaintiffs' argument is an oversimplification of the law.  Indeed, even the authority upon which they chiefly rely, Assembly of the State of California v. Dept. of Commerce, 968 F.2d 916, 921 (9th Cir. 1992), rejected a simple distinction between factual and deliberative materials as determinative, in favor of a functional test which examined whether the "information exposes the deliberative process."  In that regard, the Eleventh Circuit correctly characterized the adjusted results as "nothing more than one rejected recommendation in a process which ultimately led to the Secretary accepting a different recommendation as his final decision."  Florida House of Representatives v. Dept. of Commerce, 961 F.2d 941, 950 (11th Cir.), cert. dismissed, 506 U.S. 969 (1992).   Plaintiffs' argument fails  to address this decision at all.

II.  The Chapa Declaration Provides No Basis to Deny Defendants' Motion

Although the brief to which plaintiffs' opposition purportedly responds contains no

3

argument on this issue, plaintiffs nevertheless have inserted a declaration from Dr. Jorge Chapa addressing the merits of the adjustment decision.[3] The principle purpose of this declaration is to argue that the adjusted data, which have never been seen by Dr. Chapa, are nevertheless more accurate at the county level, in apparent attempt to distinguish City of Los Angeles, et al. v. Evans, et al., C.A. No. 01-1671 (C.D. Cal.), which dismissed claims identical to those presented here. As a matter of fact and law, plaintiffs' efforts to establish this distinction between county level data and other levels make no difference.

The decision challenged here is the Secretary's decision to release unadjusted census results under 13 U.S.C. § 141, which requires the Secretary to provide the states with census data in the format requested by the states for their use in redistricting.[4] While states generally request block-level data for this purpose and the Census Bureau customarily provides census results at various levels of aggregation, nothing in Title 13 requires the Secretary to release county-level

---

[3] Dr. Chapa identifies himself as an "expert" on adjustment because of service on a Census Advisory Committee and familiarity with undisclosed "documents and procedures." Chapa Decl., ¶ 1. Rule 56(e), Fed. R. Civ. P. requires that affidavits contain admissible evidence and show the affiant competent to testify to the matters contained in an affidavit. Expert testimony is admissible only where a person possesses special "knowledge, skill, experience , training, or education" to assist the Court and where "the testimony is based on sufficient facts or data" using standards appropriate to the field of knowledge involved. Rule 702, Fed. R. Evid. Inasmuch as the adjusted census results have not been made public, Dr. Chapa's opinions as to their quality do not meet the standard for admissibility and, thus, are inadmissible under Rule 56(e).

In this same vein, Dr. Chapa's views on the harm to a deliberative process to which he is not a part lacks any basis and should be given no weight over those of Principal Associate Director Thompson, who was intimately involved in those deliberations.

[4] That section also requires the Secretary to calculate the apportionment of the House of Representatives following each decennial census. The Supreme Court has held that § 195 precludes the use of sampling for that calculation. Dept. of Commerce v. U.S. House of Representatives, 525 U.S. 316 (1999).

4

data for use in funding programs.[5]  The distinction between block-level accuracy and county-level accuracy upon which plaintiffs rest their claim simply has no relevance to any legal obligation owed to plaintiffs by the Secretary.

Moreover, both plaintiffs and Dr. Chapa fail to understand the basis of the Census Bureau's analysis.  Rather than basing its conclusions on block-level accuracy, the Census Bureau expressly stated that "[b]lock level accuracy is not an important criterion to evaluate either Census 2000 or the A.C.E."  ESCAP Report, Exh. 4 to Def. Mot. to Dismiss at 25.  Rather, the Bureau examined the relative accuracy of the adjusted results at higher levels of aggregation, such as counties, and found that, while the measures of accuracy, called loss functions, showed improved accuracy in the adjusted results at those levels, concerns about the quality of the adjusted results, considered in light of Demographic Analysis and unexplained synthetic and balancing error, made those data too uncertain for use.  Id, 22.

In reality, plaintiffs' submission of this declaration appears to be an effort to alter the nature of their claim and then create a disputed fact as to that new claim so as to preclude summary disposition of their case.  While they originally claimed that the Secretary's decision was flawed because he applied an incorrect legal standard under § 195, plaintiffs now appear to take issue with the factual merits of the underlying decision, apparently conceding that the Secretary has discretion under § 195 to consider the accuracy of the adjusted results before releasing them.  Plaintiffs, however, have failed to plead such a claim and cannot amend their complaint through a brief.  Sanson Committee v. Lynn, 366 F. Supp. 1271, 1278 (E.D. Pa. 1973);

---

[5] While the Secretary is required to produce county-level data between the decennial censuses, 13 U.S.C. § 181, those efforts are separate from the decennial census at issue here.

Chambliss v. Coca-Cola Bottling Corp., 274 F. Supp. 401, 409 (E.D. Tenn. 1967), aff'd, 414 F.2d

256 (6th Cir. 1967), cert. denied, 397 U.S. 916 (1970). Even if such a claim were pled, the only

possible basis for judicial review of the factual merits of the adjustment decision is the

Administrative Procedure Act's provisions for review of final agency action, 5 U.S.C. §§ 702-4.

See City of New York v. Dept. of Commerce, 713 F. Supp. 48, 53-4 (E.D.N.Y. 1989) (compiling

relevant cases and applying the APA to review of the 1990 adjustment decision).[6] Plaintiffs'

affidavit would not affect the resolution of such a claim.

Under those provisions, the Secretary's findings may be overturned only if they are

arbitrary or capricious. "The scope of review under the 'arbitrary and capricious' standard is

narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs.

Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983). It follows that "a

reviewing court may not set aside an agency rule that is rational, based on consideration of the

relevant factors, and within the scope of the authority delegated to the agency by the statute." Id.

at 42. Insofar as factual issues are concerned, the standard generally requires only that the agency

"examine the relevant data and articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made.'" Id. at 43 (quoting Burlington

---

[6] Plaintiffs' initial theory that the Secretary acted contrary to his legal authority under § 195 did not require plaintiffs to plead a waiver of sovereign immunity under the fiction that an action against an official acting ultra vires is not against the sovereign. Larson v. Domestic & Foreign Corp., 337 U.S. 682, 689-90 (1949). To the extent that plaintiffs wish to challenge the Secretary's factual conclusions, only the APA's § 702 contains such a waiver. See H. Rep. 1656, 94th Cong., 2d Sess. at 5, reprinted in 1976 USCCAN 6121, 6125. The complaint, however, fails even to state such a claim or identify a waiver. Even if leave to amend were sought, however, defendants briefly demonstrate above that such an amendment would be futile and should not permitted. Avator Exploration, Inc. v. Chevron, U.S.A., Inc., 933 F.2d 314, 321 (5th Cir. 1991).

Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). In reviewing that explanation, a court must consider whether relevant factors were considered and whether there has been a "'clear error of judgment.'" State Farm, 463 U.S. at 43 (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974). [7]

In making these determinations, "[t]he task of the reviewing court is to apply the appropriate APA standard of review * * * to the agency decision based on the record the agency presents to the reviewing court," and not some new record made before this Court. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). Thus, APA review does not turn on whether plaintiffs can find a witness who disagrees with the Secretary's decision in an effort to create a factual dispute. Rather, even with an administrative record with conflicting facts, the Court would still be bound to uphold that decision, even if the Court would have decided the matter the other way, as long as the Secretary considered all the relevant factors. Motor Vehicle Mfrs Ass'n, 463 U.S. at 43. Thus, the existence of "experts" with conflicting views does not create "disputed" facts or preclude summary judgment.

## Conclusion

For the foregoing reasons, as well as those stated in defendants' prior memoranda,

---

[7] Here, the "arbitrary and capricious" standard is at its most deferential. First, the Secretary's adjustment determination involves an evaluation of the quality of available data and choices among possible alternatives, where the Secretary's discretion is at its height. See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1988) (quoting Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103 (1983) ("'[w]hen examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.'")); Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976) ("[r]esolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies"); Browning-Ferris Ind. of South Jersey v. Muszynski, 899 F.2d 151, 160 (2d Cir. 1990) ("Courts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise").

judgment should be entered for defendants.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

GREGORY A. SERRES
United States Attorney

THOMAS MILLET
Attorney in Charge
D.C. Bar No. 294405
Civil Division
Department of Justice
901 E St., NW
Washington, D.C. 20530
Tel:(202) 514-3313
Fax:(202) 616-8202
Attorneys for Defendants.

## Certificate of Service

I hereby certify that the foregoing was served this 19th day of October, 2001, by Federal Express to:

Rolando L. Rios
115 E. Travis
Suite 1024
San Antonio, TX 78205

THOMAS MILLET

# Report of the Executive Steering Committee
# for Accuracy and Coverage Evaluation Policy
# on Adjustment for Non-Redistricting Uses

**October 17, 2001**

CUTEPDF - www.fastio.com

# Recommendation

The Executive Steering Committee for A.C.E. Policy (ESCAP) recommended on March 1, 2001 that unadjusted census data be used for redistricting. After assessing considerable new evidence, ESCAP now recommends that unadjusted Census 2000 data also be used for non-redistricting purposes. The effect of this new evidence is that the Accuracy and Coverage Evaluation (A.C.E.) overstated the net undercount by at least 3 million persons. The cause of this error was that the A.C.E. failed to measure a significant number of census erroneous enumerations, many of which were duplicates. This level of error in the A.C.E. measurement of net coverage is such that the A.C.E. results cannot be used in their current form. This finding of substantial error, in conjunction with remaining uncertainties, necessitates that revisions, based on additional review and analysis, be made to the A.C.E. estimates before any potential uses of these data can be considered. The Census Bureau will release the remaining Census 2000 data products, post-censal estimates, and survey controls using unadjusted data. It is, however, reasonable to expect that further research and analysis may lead to revised A.C.E. estimates that can be used to improve future post-censal estimates.

The ESCAP review confirmed the finding in the first ESCAP Report that most Census 2000 and A.C.E. operations were of high quality. The evaluations continue to demonstrate that improvements were achieved over both the 1990 census and the 1990 coverage measurement survey. Important new information and methods are now available for assessing the A.C.E. and Census 2000. As will be discussed in more detail below, final analysis of this new information is still in progress. However, the Census Bureau believes that this analysis will confirm that Census 2000 made substantial gains in reducing the total net undercount, as well as reducing net differential undercount. Most of the A.C.E. operations were also seen to be well conducted, producing valuable information that, when combined with the other evaluation findings, provides important new research data. The ESCAP feels confident that its research program will enhance the evaluations of Census 2000, contribute to planning for the 2010 census, and, with further analysis, potentially improve future the post-censal estimates.

The ESCAP's primary concern in its March decision was that fundamental differences between the Demographic Analysis (DA) estimates and the A.C.E. estimates could not be explained. The estimates differed widely, both for the total national population and for important population groups. The Committee investigated this inconsistency extensively but could not adequately explain it in the time available for the March decision. The Committee concluded in March that the inconsistency must have resulted from one or more of three possible scenarios. The first scenario was that all available 1990 census data, including the census results, the coverage measurement survey, and the demographic analysis estimates, significantly understated the Nation's population, but that Census 2000 found this previously un-enumerated population. The second scenario was that demographic analysis underestimated population growth between 1990 and 2000. The third scenario was that the A.C.E. overestimated the Nation's population, raising the possibility of an undiscovered problem in the A.C.E. or census methodology.

The Census Bureau's extensive research over the past eight months has been directed at examining demographic analysis, the A.C.E., and Census 2000. Demographic analysis research examined historic levels of the components of population change to address the possibility that

1

the 1990 demographic analysis estimates understated the national population (the first scenario). This analysis did not reveal any significant problems. The Census Bureau investigated the second scenario by revising the preliminary estimates of international migration, and hence the foreign-born population, using actual Census 2000 long form data. The Census Bureau also consulted with outside experts on this work. These studies resulted in revisions to the "Base DA" that was initially examined as part of the March 2001 decision. The revisions reflected a larger growth in the foreign-born population during the last decade. The current revised demographic analysis estimates are much closer to the Alternative DA considered during the March deliberations. The A.C.E. and demographic analysis evaluations, when analyzed together, explain many of the inconsistencies.

With regard to the third scenario, the ESCAP's review of the accuracy of the A.C.E. and Census 2000 was based on a number of evaluation studies, including reinterview studies, re-processing studies, and computer searches for duplicate enumerations. This research found that the A.C.E. did not account for a large number of Census 2000 duplicates, leading to an overstatement of the Census 2000 net undercount. As described previously, this finding, in conjunction with the revisions to demographic analysis, explains to a large degree the discrepancies between the A.C.E. and demographic analysis. The significance of the error in the A.C.E. treatment of duplicates compels the recommendation that the current A.C.E. estimates cannot be used to adjust the Census 2000 data.

The ESCAP notes that its extensive evaluation program has provided information that was unavailable for previous decennial censuses. This important new information was the result of outstanding and innovative work on the part of many Census Bureau employees. Additionally, the Committee notes that some of the information resulted from new methodologies not available in prior censuses. Census 2000 was the first census to capture name information in a way that permits nationwide computer matching. The evaluation results, including the new tool of name matching, will be extremely valuable for evaluating the accuracy of Census 2000, planning for the 2010 census, and potentially for improving future post-censal estimates. Both census taking and coverage measurement are processes that evolve and improve with each census. The Census 2000 experience will help refine both census and coverage measurement processes for future censuses.

While the ESCAP has recommended against use of the adjusted data, the A.C.E.'s original objective of addressing the differential undercount must still be pursued. The totality of the evidence considered by the Committee leads it to believe that while Census 2000 successfully lowered the historical pattern of the differential undercount, it did not eliminate it. The Census Bureau believes that the net undercount remains disproportionately distributed among renters and minority populations. With further research, it is reasonable to expect that new information can be used to produce revised A.C.E. estimates. These revised estimates may then be employed to improve post-censal population estimates by reducing remaining differential coverage error. It is also expected that planning for the 2010 census will greatly benefit from these findings, with improved operations to identify and remove duplicates and refined methods to improve the accuracy of all census operations. The Census Bureau will continue research to design improved operations, including coverage measurement studies, for future censuses and surveys.

2

CEAPDF - www.fawia.com

# Table of Contents

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
   Areas of Research  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii
   Evaluation Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii
   Next Steps  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

ESCAP II Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   ESCAP II Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   Non-redistricting uses of the data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ESCAP II Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Demographic Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      International Migration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Measurement of Vital Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Results of Revised DA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   Research to Evaluate the A.C.E. and Census 2000 . . . . . . . . . . . . . . . . . . . 8
      Matching Error Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      Evaluation Followup  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      Person Duplication Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Measurement of Erroneous Enumerations, Including Duplicates . . . . . . . . . . 10
   Measurement of Census Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   Correlation Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   A.C.E. Missing Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   Balancing Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   Conditioning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   Reinstated Late Additions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   Census 2000 Imputations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   Total Error Model and Loss Function Analysis . . . . . . . . . . . . . . . . . . . . . . . 16
   Synthetic Estimation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CVAPDF - www.fastio.com

# Executive Summary

After assessing considerable new evidence, the second ESCAP Committee (ESCAP II) has recommended that unadjusted Census 2000 data also be used for non-redistricting purposes. New evidence indicates that the Accuracy and Coverage Evaluation (A.C.E.) overstated the net undercount by at least 3 million persons, and that the cause of this error was the A.C.E.'s failure to measure a significant number of census erroneous enumerations, many of which were duplicates. This level of error in the A.C.E. measurement of net coverage is such that the A.C.E. results cannot be used in their current form. This finding of substantial error, in conjunction with remaining uncertainties, necessitates that revisions, based on additional review and analysis, be made to the A.C.E. estimates before any potential uses of these data can be considered. The Census Bureau will release the remaining Census 2000 data products, post-censal estimates, and survey controls using unadjusted data. It is, however, reasonable to expect that further research and analysis may lead to revised A.C.E. estimates that can be used to improve future post-censal estimates.

ESCAP II has also confirmed the finding in the first ESCAP Report that most Census 2000 and A.C.E. operations were of high quality. More recent evaluations continue to demonstrate that improvements were achieved over both the 1990 census and the 1990 coverage measurement survey. Important new information and methods are now available for assessing the A.C.E. and Census 2000. As will be discussed in more detail below, final analysis of the effects of this new information is still in progress. However, the Census Bureau believes that this analysis will confirm that Census 2000 made substantial gains in reducing the total net undercount, as well as the net differential undercount. Most of the A.C.E. operations were also seen to be well conducted, producing valuable information that, when combined with the other evaluation findings, provides important new research data. The ESCAP feels confident that the Census Bureau's continuing research program will enhance the evaluations of Census 2000, contribute to planning for the 2010 census, and, with further analysis, potentially improve the post-censal estimates.

The ESCAP's primary concern in its March decision was that demographic analysis and the A.C.E. estimates differed widely, both for the total national population and for important population groups. The Committee concluded in March that the inconsistency must have derived from one or more of three possible scenarios. The first scenario was that all available 1990 census data, including the 1990 census, the 1990 coverage measurement survey, and the 1990 demographic analysis estimates significantly understated the Nation's population, while Census 2000 included portions of this previously un-enumerated population. The second scenario was that demographic analysis estimates underestimated population growth between 1990 and 2000. The third scenario was that the A.C.E. overestimated the Nation's population, raising the possibility of an undiscovered problem with the A.C.E. or census methodology. The ESCAP also identified additional technical concerns that are documented in the previous report.

## Areas of Research

In the months since the ESCAP I Report, the Committee embarked on a second round of deliberations to address the concerns identified in the report and to enable the Census Bureau to

recommend whether Census 2000 data should be adjusted for future uses. The future uses in consideration included the post-censal population estimates, demographic survey controls, and the production of Census 2000 long form data products. The ESCAP I Committee did not have current results for certain measures of A.C.E. accuracy, and was forced to use 1990 data on potential A.C.E. errors. The ESCAP therefore directed and documented that a number of evaluations be conducted to inform the deliberations. Some of the evaluations were designed to provide current measures of accuracy for the various components of error. These evaluations involved additional technical research, field work, and data processing, as well as new computer matching and simulation research. The evaluations include:

## Demographic Analysis (DA) Research

The DA research program examined historical levels of the components of population change to address the possibility that the 1990 DA estimates understated the Nation's population and that demographic analysis did not capture the full population growth in the last decade. The Census Bureau consulted with outside demographic experts to plan and conduct its research program, focusing on the methodologies and underlying estimates of the components of population change. The research activities concentrated on two major areas – international migration and the robustness of the DA estimates.

## Measurement of Erroneous Enumerations, Including Duplication

Erroneous enumerations refer to individuals who should not be included in the census counts because they are duplicated, fictitious, or live someplace other than where they were enumerated. While the ESCAP I Report did not identify erroneous enumerations as an area of concern, Census Bureau researchers quickly noted that Census 2000 erroneous enumerations differed substantially from 1990 measures in ways that were not readily understood. Studies included the Measurement Error Reinterview/ Evaluation Followup (hereinafter called the EFU) and the Person Duplication Studies. EFU results were used to determine how well the A.C.E identified erroneous enumerations. The EFU was based on a reinterview of a sample drawn from the A.C.E. clusters. The Person Duplication Studies used computer matching techniques to identify Census 2000 duplicate enumerations throughout the United States, and to determine whether the A.C.E. estimates had correctly accounted for these duplications. These studies used computer matching methods not available in earlier censuses.

## Measurement of Census Omissions

Census omissions refer to individuals who should have been counted in the census but were not. The A.C.E. methodology must accurately account for both erroneous enumerations, as described above, and census omissions. The A.C.E. identifies omissions by matching an independent sample to the census. The accuracy of this measurement of omissions thus depends on the accuracy of the matching, as well as the accuracy of the information collected by the independent sample. Census omissions were evaluated in the Matching Error Study, in which expert matchers re-matched a sample of the A.C.E. to determine the accuracy of the A.C.E. matching process. Omissions were also evaluated in the EFU described above to measure the

CVAPDF - www.fastio.com

accuracy of the A.C.E. information on Census Day residence, including whether persons had moved since Census Day.

## Missing Data Studies

Missing data occurs in the A.C.E. if, after all attempts, there remain persons for whom complete data are not available, including demographic characteristics such as age or race. Missing data also includes the status of whether a person matched, was a resident on Census Day, or was correctly enumerated. The latter types of missing data can seriously affect the accuracy of coverage measurement surveys such as the A.C.E. The A.C.E. used a statistical model to account for the effects of missing data. The ESCAP directed the development of alternative missing data models to assess the effect on the estimates of using different assumptions to predict the effects of missing data.

## Balancing Error

The previous ESCAP report indicated concerns with balancing error. Balancing error occurs when the method used to determine the number of omissions is different from the method used to determine which records are correctly included in the census. The specific concern was that the area for matching to find omissions was different from the area used to determine erroneous enumerations. The ESCAP posited various scenarios that could explain the concerns with balancing error, ranging from small to very serious effects on the A.C.E. estimates. In order to investigate these concerns, additional field operations were conducted.

## Synthetic Error Study

The A.C.E. estimation methodology produced estimated coverage correction factors which were carried down within the post-strata in a process referred to as synthetic estimation. The key assumption underlying synthetic estimation is that net census coverage is relatively uniform within the post-strata. Failure of this assumption leads to synthetic error. The Census Bureau is concerned with synthetic error since it may affect the accuracy of small area estimates and cannot be directly estimated. ESCAP I examined the effects of synthetic error by studying "artificial populations," populations created with surrogate variables that are known for the entire population, and are developed to reflect the distribution of net coverage error. ESCAP II directed the preparation of additional artificial populations.

# Evaluation Results

Demographic analysis research examined historical levels of the components of population change to address the possibility that the 1990 demographic analysis estimates understated the national population (the first scenario). This analysis did not reveal any significant problems. The Census Bureau investigated the second scenario by revising the estimates of international migration using preliminary Census 2000 long form data, and estimates of the numbers of births, using more current assumptions about birth registration. The Census Bureau also consulted with outside experts on this work. This analysis resulted in revisions to the Base DA that was initially examined as part of the ESCAP I decision. The revisions reflected a larger growth in the foreign-

born population during the last decade. The current Revised DA estimates considered by ESCAP II are much closer to the Alternative DA considered during the ESCAP I deliberations. Many of the inconsistencies previously noted are removed when the Revised DA estimates are viewed in light of the A.C.E. evaluations. The Revised DA national estimate of 281.8 million for the U.S. resident population is 2.2 million higher than the Base DA and about 0.6 million lower than the Alternative DA. The Revised DA net undercount rate of 0.12 percent compares to a net overcount of 0.65 percent implied by the Base DA, and a net undercount of 0.32 percent using the Alternative DA.

## Erroneous Enumerations

The studies examining the accuracy of the measurement of erroneous enumerations initially found serious errors that would have resulted in a large overstatement of the population by the A.C.E. The seriousness of these findings prompted the Committee to direct further work to make sure that the findings were correct. This additional review indicated that a significant problem existed with the measurement of erroneous enumerations, but also indicated that the study findings were subject to uncertainties resulting from a large number of cases left unresolved or conflicting. The Person Duplication Studies added additional information underscoring the seriousness of the errors in measuring erroneous enumerations. These duplication studies found that the A.C.E. had seriously understated the level of erroneous enumerations because of incompletely measuring census duplications, and that the EFU had not accounted for a significant part of this understatement. They also helped to explain some of the uncertainty that arose from the rework of the EFU. The net effect of these studies was the conclusion that the A.C.E. overstated the level of undercount by at least 3 million persons. The level of this error is such that the ESCAP determined that the unadjusted data should be used.

## Census Omissions

With regard to studies of census omissions, the Matching Error Study indicated that the A.C.E. overstated the net undercount due to P-sample matching error by about 385,000. The EFU indicated that a substantial number of movers were changed to nonmovers and vice versa. The net effect of these mover status changes suggests an overestimate of the match rate and therefore an understatement in the A.C.E. estimates of about 450,000. At the national level there is therefore a small net effect of about 65,000 on the accuracy of the measurement of census omissions. However, more research must be conducted to further study these effects.

## Missing Data

The Committee examined a variety of alternative models to account for the effects of missing data. These models gave a wide range of results, implying widely varying effects on the A.C.E. estimates. The data examined by the Committee make clear that alternative missing data models both understated and overstated the effects of missing data on the A.C.E. estimates, depending on the choice of model. The Committee ultimately viewed the choice of model as an increase in the uncertainty associated with the A.C.E. results, but did not find evidence of bias resulting from this choice of model. This uncertainty should be considered in further analysis of the A.C.E. estimates.

## Balancing Error

ESCAP I's concern with balancing error has for the most part been resolved, as further research indicated that the previously observed discrepancy did not appreciably influence the A.C.E. estimates.

## Total Error Model

ESCAP I used a total error model to consolidate its research and to produce an overall assessment of A.C.E. accuracy. ESCAP II directed that an updated model be prepared to account for information from the new evaluation studies. The timing of some of the new evaluations, along with the complexities of both the studies and the A.C.E. design, did not allow preparation of an updated model that would incorporate all errors that impact the A.C.E. estimates. As discussed more fully in the body of the report, the ESCAP could not develop or verify a new total error model that would take into account all of the errors discovered in the EFU, Matching Error Study, and Person Duplication Studies. Even without the information from an updated total error model, however, it was clear to the Committee that the magnitude of the discovered errors precluded a recommendation in favor of the adjusted data.

## Synthetic Error

Consideration of the synthetic error studies requires the completion of the total error model and will be included in the continued research.

## Other Concerns

Additional studies allayed other concerns about the A.C.E. and the census. Studies revealed no evidence of significant contamination bias. The Committee concluded that the effect of excluding reinstated census people from the A.C.E. was minimal. The Committee further concluded that the kind, level and pattern of whole person imputation in Census 2000 did not call the A.C.E. results into question.

# Next Steps

While the ESCAP has recommended against use of the adjusted data, the A.C.E.'s original objective of addressing the differential undercount must still be pursued. The totality of the evidence considered by the Committee leads it to believe that while Census 2000 successfully lowered the historical pattern of the differential undercount, it did not eliminate it. The net undercount remains disproportionately distributed among renters and minority populations. With further research, it is reasonable to expect that new information can be used to produce revised A.C.E. estimates. The evaluation results, including the new measurement tool of name matching, will be extremely valuable for evaluating the accuracy of Census 2000, planning for the 2010 census, and potentially for improving the post-censal estimates. Both census taking and coverage measurement are processes that evolve and improve with each census. The Census 2000 experience will help refine both census and coverage measurement processes for future censuses.

# ESCAP II Report

## Introduction

### Background

On March 1, 2001, the Acting Director of the Census Bureau recommended to the Secretary of Commerce that unadjusted census data be used as the Census Bureau's official redistricting data. This recommendation was in accord with the recommendation of the Executive Steering Committee for A.C.E. Policy (ESCAP). The ESCAP[1] was unable to conclude, based on information available at the time, that adjusted Census 2000 data were more accurate for redistricting. The ESCAP I Report is available on the Census Bureau's website, along with a voluminous Administrative Record supporting this recommendation.

The primary issue that precluded ESCAP I from recommending use of the adjusted data was the unexplained difference between the A.C.E. and Demographic Analysis estimates of the population. Demographic analysis (DA) initially estimated the national total population to be below the census count, while the A.C.E. estimated the population to be above the census count. This discrepancy raised the significant possibility of an undetected problem with the A.C.E. or the census. ESCAP I also identified concerns with balancing and synthetic estimation error as potential problems in the adjusted data. The Committee directed the preparation of an extensive evaluation program to inform its deliberations relating to the proposed use of adjusted data for nonredistricting purposes.

### ESCAP II Proceedings

In the months since the ESCAP I Report, the Committee has embarked on a second round of deliberations to address the concerns identified in the report and to enable the Census Bureau to recommend whether the adjusted Census 2000 data should be used for nonredistricting purposes. These evaluations, the ESCAP II report series, set forth the underlying data that support the Committee's findings. The future uses in consideration include post-censal population estimates, demographic survey controls, and the census long form data products. Some of the required evaluations involved additional research, including additional field work and matching work.

ESCAP II considered a wide variety of research and analyses, and heard presentations of the reports on the attached list (Attachment 1). Some of these presentations provided background information to help the Committee interpret the results of other studies, while others bore directly on the adjustment recommendation. While the Committee considered and deliberated on all of the listed reports, this discussion will focus on those most directly relevant to the comparative

---

[1]For clarity, the Committee that produced the March 1, 2001, ESCAP Report is sometimes referred to herein as "ESCAP I" and the March 1 report as the "ESCAP I Report." The Committee that has been meeting since March 1, 2001, is referred to as "ESCAP II."

accuracy of the adjusted and unadjusted data. This research was conducted over many months and represents diligent and thorough statistical and demographic analysis.[2]

The Associate Director for Decennial Census originally chartered the ESCAP on November 26, 1999, and charged the Committee to "advise the Director in determining policy for the A.C.E. and the integration of the A.C.E. results into the census for all purposes except Congressional reapportionment." Although there was a change in the Associate Director for the Decennial Census position in June 2001, ESCAP II continued to be chaired by John Thompson to maintain continuity. The ESCAP resumed meeting on March 7, 2001, and met a total of 32 times, sometimes with more than one meeting per day. The ESCAP represents a body of senior career Census Bureau professionals, with advanced degrees in relevant technical fields and/or decades of experience in the federal statistical system. All are highly competent to evaluate the relative merits of the A.C.E. data versus the census data and are recognized for their extensive contributions to the professional community.

As in the ESCAP I process, the early sessions were primarily educational, designed to inform Committee members of the research operations and to present general information about non-redistricting uses of the data. The second phase involved presentation by knowledgeable employees of the new data and analyses as they became available. The Committee reviewed the data and analyses, sometimes asking staff to provide additional and new information. The third phase was deliberation, where the Committee members met privately. The final and briefest stage was review, where Committee members commented on the draft report. Again, as in the ESCAP I process, minutes were prepared for all sessions, except for the final ones, which were private deliberations.

During the education and evidence presentation phases, the Chair generally arranged presentations on major issues, issues that he identified on his own initiative or on the suggestion of Committee members. During the evidence presentation stage, authors of the analysis reports presented their data and conclusions to the Committee. The deliberation and review phases were less structured with various members raising topics for discussion and asking for evidence. No formal vote was held; this Report reflects a consensus of the ESCAP.

## Non-redistricting uses of the data

The ESCAP's recommendation covers the three non-redistricting uses of census data: post-censal estimates, demographic survey controls, and Census 2000 long form products. Certain Census Bureau data products have already been issued using only the unadjusted data, including

---

[2]The ESCAP II Report Series does not represent the entirety of the Census Bureau's evaluation of Census 2000. The Census Bureau's formal Census 2000 Evaluation Program provides a comprehensive evaluation of all Census operations and programs. The reports in the ESCAP II series are only those necessary to inform the ESCAP's recommendation.

the Census 2000 Redistricting Data Summary File, Demographic Profiles, Congressional District Demographic Profiles, Summary File 1 Data, and reports in the Census 2000 Brief Series.[3]

Post-censal estimates are made by updating the most recent census base with estimates of population change (births, deaths, and net migration). As directed by the Census Act, the Census Bureau prepares post-censal estimates at the national, state, and county level every year, and at the functioning governmental unit level every other year.[4] These estimates have a variety of uses, most notably in funding allocations, as the basis for sample survey controls, and as denominators for many important statistics.

The accuracy of the post-censal estimates for funding allocations is critical, as about $200 billion are allocated based on these data each year. Medicaid (Title XIX) is the largest program to distribute federal funding based on population estimates, distributing over $100 billion each year based on the post-censal estimates. Community Development Block Grants from the Department of Housing and Urban Development, and Title I Basic, Concentration, and Targeted Grants from the Department of Education are two additional federal programs that use post-censal estimates as factors in their funding formulas to distribute federal monies. The individual states also have within-state fund allocation programs, many of which use post-censal estimates to allocate funds to sub-state areas.

Many federal agencies use post-censal estimates as denominators to produce per capita statistics. Examples are per capita income, crime statistics, incidence of certain health conditions, birth rates, and mortality rates. The numerators of these statistics can be obtained at various points in time throughout the decade. In the absence of updated information, calculating these kinds of statistics on a static 2000 denominator would be misleading; therefore, many federal agencies use post-censal estimates of population.

Demographic survey controls are used by many national sample surveys to transform the data they collect into nationally representative estimates. The most notable is the Current Population Survey, or CPS, which is used to calculate the monthly unemployment rate. Sample surveys generally have poorer coverage than a census; therefore, in order to improve the accuracy of estimates from a sample survey, the survey estimates are controlled to independent measures of the number of people in certain age, sex, race, and Hispanic origin groups, such as the post-censal estimates.

The ESCAP Committee also considered whether adjusted or unadjusted Census 2000 data should be used for the controls for estimates based on data from the Census 2000 long form. The long form collects more extensive characteristic data from a sample of about seventeen percent of the population. Long form data are used to provide local communities with data on education, employment, housing, and various other social and demographic characteristics essential to efficient planning. Additionally, the long form provides the detailed local demographic and social characteristics used in some federal formula allocation programs. In order to produce

---

[3]These models can be found at http://factfinder.census.gov.

[4]13 U.S.C. § 181.

estimates for the country as a whole from this sample, Census 2000 data from the short form items are used as controls.

# ESCAP II Research

In the months since the ESCAP I Report, the Committee embarked on a second round of deliberations to address the concerns identified in the report and to enable the Census Bureau to recommend whether adjusted Census 2000 data should be applied for non-redistricting uses. ESCAP II, therefore, directed the preparation of a number of evaluation studies, as described in detail in Attachment 2. Research centered around four areas, demographic analysis, the A.C.E., Census 2000, and synthetic error. The results of this research are set forth below.

## Demographic Analysis

ESCAP I's primary concern was that DA estimates were inconsistent with A.C.E. estimates. The Census Bureau expected, based on past experience, that demographic analysis would posit a higher estimate of the total population than the A.C.E. because of the presence of correlation bias, and that the two estimates would agree generally on the coverage of certain populations. Instead, the Base DA estimates were lower than both the Census 2000 population counts and the A.C.E. estimates. In response, the Census Bureau developed its Alternative DA estimates by doubling the unauthorized immigration assumed to have occurred during the 1990's. Doing so yielded a number of foreign born for 2000 that was roughly consistent with that reported by the March 2000 Current Population Survey.[5] The Alternative DA estimates were, however, still significantly lower than the A.C.E. estimates. The Alternative DA indicated that Census 2000 undercounted the population by 0.32 percent, while the A.C.E. produced a net undercount estimate of 1.15 percent.[6]

ESCAP I concluded that the inconsistency in the estimates of the total national population must have derived from one or more of three possible explanations. The first explanation was that all available 1990 census data, including the census results, the 1990 coverage measurement survey, and the 1990 DA estimates, significantly understated the Nation's population, but that Census 2000 found this previously un-enumerated population. The second explanation was that DA underestimated population growth between 1990 and 2000. The third explanation was that the A.C.E. overestimated the Nation's population. ESCAP II directed that further research on demographic analysis be conducted. It focused on two main topics: international migration and measurement of vital events like births and deaths.

---

[5]The March Current Population Survey was reweighted using the Census 2000 counts by age, race, sex, and Hispanic origin for this comparison.

[6]This figure differs from the 1.18 percent usually quoted for the A.C.E. because the A.C.E. and DA estimate different populations. DA estimates the total population, while the A.C.E. estimates the household population, which excludes group quarters.

## International Migration

Assumptions regarding international migration were the most uncertain component in the demographic analysis estimates completed by March 1, 2001. Although the research agenda for the March through October period focused primarily on those components of international migration that are less well measured (e.g., emigration, temporary migration, and unauthorized migration), the work also included research into legal immigration and the demographic characteristics of migrants used in the March 2001 DA estimates.

Part of the analysis involved discussions with independent experts on demographic analysis and international migration. The purpose of a March 20, 2001, was to explain how the DA estimates differed from the A.C.E. estimates, and to discuss how to prioritize short-term and long-term research activities. Attendees included experts from the statistical community, academia, state agencies, the Census Bureau's advisory committees, professional organizations, and international organizations. A nearly unanimous recommendation from these experts was to focus on assumptions and estimates of the components of international migration, as these numbers were subject to the most uncertainty. Because of scheduling conflicts, two smaller meetings with other migration experts were held at the annual meeting of the Population Association of America on March 29-30, 2001.

Expert advice was sought again, on September 24, 2001, after completion of the original research activities (validation of the 1990 estimates and updated 2000 estimates) that produced the revised DA estimates. Although these experts generally agreed with the methodology used to calculate components of international migration, they had concerns about the assumptions regarding the undercount of international migrants. Specifically, they believed the undercount assumption of 15 percent for unauthorized migrants, which was incorporated in the Revised DA, was probably too high, especially given the A.C.E. undercounts for other hard-to-enumerate groups. In addition, they urged renaming the residual migrant category as the residual foreign-born, or separating the residual foreign born into known components ("quasi-legal" migrants) and the implied unauthorized migrant population. Both of these suggestions were incorporated into a subsequent sensitivity analysis.

The sensitivity analysis of assumptions about coverage of various components of the foreign-born population showed that the total number of foreign born did not vary enough to have much effect on the DA estimate of the total population. For example, the lower bound assumption of 3.3 percent net undercount of the foreign-born equated to a population of 281.3 million, or more than 3 million people lower than the A.C.E. total population. The upper bound assumption of 6.7 percent was consistent with a population of 282.5 million — still more than 2 million lower than the A.C.E. total population. These results led the Census Bureau to conclude that the Revised DA was an appropriate benchmark for assessing Census 2000 and the A.C.E. estimates.

## Measurement of Vital Events

Other research examined the remaining assumptions underlying the DA components of change, including the birth, death, and Medicare components. Although estimates of deaths and the size of the elderly population did not change much, the estimates of historical births changed

because of this research. The principal outcome was a revision in the assumptions about registration completeness of births since 1968. The previous DA estimates assumed that all births in years since 1968 (the last year of testing birth registration completeness) were registered at the same percent (99.2 percent). For the Revised DA estimates, registration completeness gradually reached 100 percent by 1985 (the first year natality statistics were reported electronically from all the States), and remained at 100 percent through 2000. This revision lowered the estimated number of births for 1968-2000 by 715,000 (which lowered the Revised DA estimate of the total population in 2000 by the same amount).[7]

## Results of Revised DA

The research undertaken between March and October allayed two fundamental concerns: first, the possibility that the Alternative DA did not capture the full growth of the population between 1990 and 2000, and second, the possibility that the 1990 DA was lower than the true population. In fact, the cumulative effect of the research on immigration, births, and deaths led to Revised DA estimates that were only slightly different from the Alternative DA. In other words, the inconsistency between the Alternative DA and the A.C.E. estimates was not the result of unexplained problems in DA. These results, in combination with other evidence, led the ESCAP to conclude that the A.C.E. overestimated the Nation's total population.

More specifically, the Revised DA lowered the net undercount rates from 1.85 to 1.65 percent in 1990, and from 0.32 to 0.12 percent in 2000, but did not alter the DA finding that the net undercount rate in 2000 was substantially lower than in 1990.[8] The Revised DA continued to measure a lower net undercount than the A.C.E., and in fact was very close to the Alternative DA estimate used by ESCAP I in March. The Revised DA estimated a net undercount of 0.3 million, or 0.12 percent, compared with the A.C.E. estimate of a net undercount of 3.3 million, or 1.15 percent. Population totals from the Base DA, Alternative DA, and Revised DA, along with the Census 2000 counts and the A.C.E. estimates, are shown in Table A. The corresponding numerical and percentage undercounts are shown in Figure 1.

**Table A. - Resident Population Totals from Census 2000, Demographic Analysis, and the A.C.E.:  April 1, 2000**

| Source | Total Population |
|---|---|
| Base DA (March) | 279,598,121 |
| Census 2000 | 281,421,906 |
| Revised DA (September) | 281,759,858 |
| Alternative DA (March) | 282,335,711 |
| A.C.E. | 284,683,782 |

[7]ESCAP II Report No. 1, "Demographic Analysis Results."

[8]ESCAP II Report No. 1, "Demographic Analysis Results."



Figure 1. - Numerical Difference Between Census 2000 and Census Bureau Estimates Based on Demographic Analysis and the Accuracy and Coverage Evaluation (A.C.E.), and Percent Net Undercount: 2000

As shown in Table B below, the Revised DA implied a greater reduction than the A.C.E. in net undercount in Census 2000 compared with the 1990 census. Under the revised DA, the net undercount rate was reduced by 1.53 percentage points, from 1.65 percent in 1990 to 0.12 percent in 2000. In contrast, the A.C.E. estimate of 1.15 percent net undercount in 2000 was 0.43 percentage points lower than the 1.58 percent in 1990. Additionally, both DA and the A.C.E. measured a reduction in the net undercount rates of Black and nonBlack children compared with 1990. Both methods also measured a reduction in the net undercount rates of adult Black men and women.

The revised DA and A.C.E. estimates continued to disagree in that DA found a reduction in the net undercount rates of nonBlack men and women in Census 2000 compared with the rates of previous censuses. The A.C.E. indicated no change or a slight increase in undercount rates for nonBlack adults as a group.

Demographic analysis also provided evidence that correlation bias was not reduced between 1990 and 2000. Comparisons of the DA and A.C.E. sex ratios (men per 100 women) showed that correlation bias in the survey estimates was not reduced for Black men between 1990 and 2000. The A.C.E. sex ratios for Black adults were much lower than the expected sex ratios based on DA, implying that the A.C.E. did not capture the high undercount rate of Black men relative to Black women. The size of this bias was about the same as in the 1990 coverage measurement survey.

Page 7 of 18

Table B — Estimates of Percent Net Undercount, by Race, Sex, and Age:  1990 and 2000 (a minus sign denotes a net overcount)

| Category | Revised Demographic Analysis | | PES/A.C.E | |
|---|---|---|---|---|
| | | | PES | A.C.E. |
| | 1990 | 2000 | 1990 | 2000 |
| **Total** | 1.65 | 0.12 | 1.58 | 1.15 |
| **Black** | 5.52 | 2.78 | 4.43 | 2.07 |
| 0-17 | 5.27 | 1.30 | 7.05 | 2.92 |
| Male, 18+ | 9.57 | 7.67 | 3.76 | 2.10 |
| Female, 18+ | 2.05 | 0.75 | 2.64 | 1.28 |
| **NonBlack** | 1.08 | -0.29 | 1.18 | 1.01 |
| 0-17 | 1.12 | 0.54 | 2.46 | 1.27 |
| Male, 18+ | 1.74 | 0.29 | 1.19 | 1.43 |
| Female, 18+ | 0.44 | -1.02 | 0.34 | 0.44 |

Source:  U.S. Census Bureau
Note:  Estimates by race shown for 2000 are based on the "average" of Model 1 and Model 2, as described in ESCAP II Report No. 1, "Demographic Analysis Results."

## Research to Evaluate the A.C.E. and Census 2000

A number of the studies described more fully in Attachment 2 evaluate the accuracy of the A.C.E. and Census 2000.  The A.C.E. is composed of two samples, the E-sample, which measures erroneous enumerations, and the P-sample, which measures census omissions.  The E-sample is also used to estimate the number of census persons who do not have sufficient information to be used in A.C.E. matching and followup operations.  The Dual System Estimates (DSEs) are computed by combining E-sample estimates of erroneous enumerations and insufficient information with P-sample estimates of omission.  Therefore it is critical that the E-sample correctly account for erroneous enumerations and that the P-Sample correctly account for omissions.  The evaluations were designed to measure the accuracy of both the P- and E-Samples.

Three studies in particular produced substantial new information for ESCAP II:  the Matching Error Study, the Evaluation Followup (EFU), and the Person Duplication Studies.

Page 8 of 18

## Matching Error Study[9]

The Matching Error Study provided the P-sample matching error rate and the E-sample processing error rate. Expert matchers clerically rematched all of the people in a one-fifth subsample of the A.C.E. clusters to determine the best match code. This information was compared to match codes assigned in production of the actual A.C.E. estimates.

## Evaluation Followup[10]

The EFU consisted of a reinterview of households in the same one-fifth subsample of A.C.E. clusters used in the Matching Error Study, with additional subsampling. EFU results helped determine the accuracy of the production data processed and collected in the P- and E-Samples. The EFU interview results were used to measure the accuracy of the classification of correct and erroneous census enumerations as determined by the E-Sample. The results were also used to measure the accuracy of the P-Sample data regarding mover status and Census Day residence.

## Person Duplication Studies[11]

The Person Duplication Studies took advantage of the fact that Census 2000 was the first census to record name information in the data capture system and collected in a way that permits computer matching. This new methodology permitted the Census Bureau to direct a nationwide computer matching operation to measure the level of duplication in the census. These studies also examined how well the A.C.E. accounted for these duplicates. While the A.C.E. matched respondents in the same block and surrounding blocks, this new tool permitted the Census Bureau to search for duplicates throughout the country. The Person Duplication Studies involved only computer matching, as the Census Bureau lacked the resources and time to match to the entire country using both computer and clerical matching. The computer matching thus understated the actual level of duplication. These studies also compared the results of the EFU with the Person Duplication Studies to determine whether the EFU correctly measured these duplications.

---

[9] ESCAP II Report No. 7, "Accuracy and Coverage Evaluation Matching Error."

[10] ESCAP II Report No. 3, "Evaluation Results for Changes in A.C.E. Enumeration Status," ESCAP II Report No. 4, "A.C.E. Erroneous Enumeration Errors: Analysis of Census Discrepant Persons," ESCAP II Report No. 16, "Evaluation Results for Changes in Mover and Residence Status in the A.C.E.," and ESCAP II Report No. 24, "Results of the Person Followup and Evaluation Follow-up Forms Review."

[11] ESCAP II Report No. 6, "Census Person Duplication and the Corresponding A.C.E. Enumeration Status," ESCAP II Report No. 9, "Evidence of Additional Erroneous Enumerations from the Person Duplication Study," and ESCAP II Report No. 20, "Person Duplication in Census 2000."

Some of the error components produced in these studies suggest that the A.C.E. overestimated the net undercount while others suggest the net undercount was underestimated. The results of these studies are discussed below, and are the basis for the recommendation that the adjusted data not be used due to a significant problem in the measurement of erroneous enumerations resulting in an overstatement of the net undercount by at least 3 million people.

## Measurement of Erroneous Enumerations, Including Duplicates

The evaluations of the accuracy of the A.C.E. indicated that the A.C.E. did not measure a significant portion of the Census 2000 erroneous enumerations. The measurement of erroneous enumerations is critical to both the national net undercount and to sub-national estimates. The effect of this error resulted in the A.C.E. significantly overstating the net Census 2000 undercount by at least 3 million people, with an approximate range of 3 to 4 million. The significance of this error was such that the ESCAP recommended that the unadjusted data be used for Census 2000 non-redistricting purposes.

The EFU and the Person Duplication Studies described above provided the most significant information regarding the measurement of erroneous enumerations. The initial EFU results gave evidence of a significant understatement in the A.C.E. measurement of erroneous enumerations. Because of the significance of the understatement, the EFU was extensively reviewed. The revised EFU again also indicated a significant problem with understating the level of erroneous enumerations, and resulted in a high level of cases left unresolved or conflicting. The Person Duplication Studies found that a significant number of duplicate enumerations were not measured by the A.C.E., and that the EFU did not pick up significant portions of this error. The Person Duplication Studies also resolved a portion of the cases left unresolved or conflicting by the EFU Review.

The EFU initially found a 3.5 percent change in enumeration status from that measured by A.C.E. production. A total of about 2,800,000 production "correct enumerations" (SE 223,000) were re-coded as "erroneous enumerations," while about 900,000 production "erroneous enumerations," (SE 99,000) were re-coded as "correct enumerations."[12] The net difference found by the EFU was 1,900,000. The EFU also included about 4,500,000 cases (SE 353,000) that could not be resolved. This study indicted that, at a minimum, the A.C.E. overstated the level of net undercount by about 2 million people.

Because of the EFU's potentially significant implications for the A.C.E. estimates, ESCAP decided that further EFU analysis was needed. Accordingly, more highly trained matching analysts from the National Processing Center (NPC) directly reviewed a subsample of the EFU and production cases. Matching analysts are employees at NPC with many years of training in matching, some with over 20 years of experience, who supervise and perform quality assurance for all the A.C.E. matching operations.

---

[12]ESCAP II Report No. 3, "Evaluation Results for Changes in A.C.E. Enumeration Status."

This additional review confirmed that there were errors in the A.C.E.'s identification of erroneous enumerations. A total of about 1,800,000 enumerations (SE 189,000) that were coded as correct in production were subsequently coded erroneous in the evaluation, while the number of enumerations coded as erroneous in production that were then coded as correct in the review was about 361,000 (SE 46,000).[13] Consequently, the net difference in the "correct enumeration" to "erroneous enumeration" and "erroneous enumeration" to "correct enumeration" cells was estimated at 1,450,000, rather than the initial level of 1,900,000. However, the review identified over 15 million cases which could not be resolved or for which conflicting results were observed. Depending on assumptions that could be made regarding the enumeration status of these cases, the overstatement of the net undercount could range from about 1.45 million to up to 5.9 million people.[14]

The Person Duplication Studies found that a significant number of duplicate enumerations were not correctly measured by the A.C.E. or by the EFU. Furthermore, when the Person Duplication Studies results are combined with the EFU results, some of the unresolved and conflicting cases can be explained. Based on this work, more refined ranges for the level of the A.C.E. overstatement were developed. Direct estimates were produced from the Person Duplication Studies that indicated that the level of A.C.E. error not measured was about 3 million persons. In addition, it is also expected that further refinements to the treatment of the unresolved and conflicting cases would lead to about an additional 800,000 errors. Thus, the approximate range of the potential overstatement of the net undercount was reduced to between 3 and 4 million persons.

Finally, the EFU provided information regarding whether the A.C.E. accurately measured Census 2000 discrepant enumerations.[15] This study showed that the net effect of erroneously identifying discrepant persons as correct enumerations in production and vice versa is an overstatement of about 6,000 correct enumerations in production, with a standard error of about 30,000.[16] This difference is statistically insignificant.

---

[13]ESCAP II Report No. 24, "Results of the Person Followup and Evaluation Followup Forms Review."

[14]ESCAP II Report No. 24, "Results of the Person Followup and Evaluation Followup Forms Review."

[15]Discrepant results include falsification (the amount is uncertain), but do not include honest mistakes made by the interviewers or respondents. A person is classified as discrepant during the matching operation if three knowledgeable respondents indicate not knowing him or her in either the EFU or production interview.

[16]ESCAP II Report No. 4, "A.C.E. Erroneous Enumerations Errors: Analysis of Census Discrepant Persons."

## Measurement of Census Omissions

Measurement of census omissions is based on the P-Sample. Therefore, accurate matching of the P-sample to the census, and the correct classification of mover status and Census Day residence, are important components of the P-Sample. Information about the accuracy of the matching was produced by the Matching Error Study. Information about the accuracy of the classification of movers and Census Day residence was derived from the EFU.

The Matching Error Study indicated that the level of matching error from the P-Sample would result in about a 385,000 overstatement of the net undercount.[17]

The EFU demonstrated that misclassification of movers in the A.C.E. may have resulted in an understatement of about 450,000 in the net undercount.[18] It should be noted that this final effect was the result of significant changes in mover status. These changes involved a large number of movers becoming nonmovers and vice versa. The EFU indicated that about 4.5 million people classified as "movers" in production became "nonmovers," and that about 2.4 million people classified as "nonmovers" in production became "movers." At the national level there is therefore a small net effect of about 65,000 on the accuracy of the measurement of census omissions. However, more research must be conducted to further study these effects.

The ESCAP was concerned about the EFU measurement of movers who became nonmovers, specifically about whether the EFU measured too few movers, due to its questionnaire design. To be classified a nonmover, the EFU required less detailed information than needed to be classified a mover. An examination of the bias caused by mover status changes indicates that the effect of mover-to-nonmover changes was greater in absolute value then the effect of nonmover-to-mover changes. Therefore, if there was an over reporting of nonmovers in the EFU, the effect would be to lower the measured net bias described above. Additional work must clearly be conducted to clarify this information. Furthermore, even though the net effects of these errors cancel at the national level, assessment of the subnational effects also requires further research.

## Correlation Bias

Correlation bias refers to the tendency for people enumerated in the census to be more likely to be included in the A.C.E. than those missed in the census. Correlation bias usually results in a downward bias in the DSE. This type of bias can result from causal dependence, that is, the tendency of some people to be more likely to be included in the A.C.E. because they had been included in the census, or vice versa, or from heterogeneity. Heterogeneity bias can arise because different people within poststrata both have different chances of being counted in the census and different chances of being included in the A.C.E. To cause a bias, these chances must be correlated, for example, those likely to be missed by the census are also most likely to be missed

---

[17]ESCAP II Report No. 7, "Accuracy and Coverage Evaluation Matching Error."

[18]ESCAP II Report No. 16, "Evaluation Results for changes in Mover and Residence Status in the A.C.E."

by the A.C.E. ESCAP I assessed possible correlation bias in the A.C.E. estimates by comparing the A.C.E. and DA results. Correlation bias estimates available for the March ESCAP recommendation used DA estimates as of February 26, 2001. ESCAP II directed that the correlation bias estimates be recomputed to use the Revised DA estimates and other newly available data. Revised correlation bias estimates were computed and discussed by the Committee.

Like ESCAP I, ESCAP II was faced with the fact that while correlation bias exists, it is difficult to quantify. Correlation bias is an important component of assessing the A.C.E.'s accuracy because assumptions regarding correlation bias have a large effect. ESCAP II considered several models of correlation bias, including whether correlation bias should be assumed only for the Black population, whether the Hispanic population should be assumed to have the same degree of correlation bias as the Black population, and whether correlation bias should be assumed to be the same for owners and renters. Correlation bias would mean that the A.C.E. estimates of total population were too low by about 750,000 to 1.3 million, depending on which model for correlation bias is assumed.[19] Currently the Census Bureau has no means of incorporating these net biases in the production DSEs.

## A.C.E. Missing Data

Missing data occurs in the A.C.E. if, after all followup attempts, there remain households that were not interviewed, or households with some portions of the person data missing, such as age or race. Sometimes the missing item involves the status of whether a person matched, was a resident on Census Day, or was correctly enumerated. Statistical models are used to account for missing data. ESCAP I viewed the rates of occurrence of unresolved A.C.E. cases for match status, correct enumeration status, and mover status as low enough to preclude serious biases in the A.C.E. results. ESCAP II directed development of additional missing data models to assess the effect on the estimates of using alternative models.

The treatment of missing data can have a large effect on the A.C.E. estimates under certain assumptions. ESCAP II examined a variety of models to predict the effects of missing data. Seven basic methods for addressing the components of missing data in the A.C.E. estimates were considered in various combinations. Each resulting alternative model was used to compute new DSE. The alternatives considered indicated that the choice of missing data model can have a significant effect on the resulting estimates of coverage error, causing the DSEs to be over- or under-stated. The Census Bureau chose to represent the effects of these alternative models in the form of increased uncertainty in the A.C.E. estimates.

The DSEs that resulted from the alternative models were used to calculate a measure of variation similar to a sampling error. This research found that non-sampling variability from the use of alternative missing data models was considerable. At the national level, the overall magnitude of the variation resulting from all combinations of the alternative missing data models

---

[19]ESCAP II Report No. 10, "Estimation of Correlation Bias in 2000 A.C.E. Estimates Using Revised Demographic Analysis Results."

(about 530,000) was higher than the DSE sampling error (about 380,000).[20]  When some alternative models were excluded, the standard deviation was of approximately the same magnitude as the DSE sampling error, but there is no evidence to suggest that the measure of variation based on all methods is unreasonable.  In fact, arguments could be made that this measure understates the actual levels of variation due to missing data because it assumes that the alternatives considered were randomly distributed around an average, that is, each alternative was equally likely.

ESCAP II also examined information describing the level and distribution of A.C.E. missing data compared to the 1990 coverage measurement survey.  The purpose of this review was to put the levels of missing data in context with 1990, and to add to the understanding of the alternative missing data model analysis previously described.  The 2000 unresolved rates were slightly higher than those in 1990, but were not initially viewed as high enough to cause major concern.  The alternative model analysis indicated that missing data had a more significant effect than anticipated, possibly due to changes in the methods for incorporating movers into the DSE, or to a more diverse set of alternative models.

## Balancing Error

The ESCAP I Report had identified balancing error as a potential problem, noting that the A.C.E. found 3 million more matches in surrounding blocks than correct enumerations, a result which could have affected the accuracy of the estimates.  The A.C.E. matching is carried out in a defined search area consisting of the A.C.E. sample blocks (clusters) and a targeted area of blocks surrounding or bordering the A.C.E blocks.  Significant differences were discovered between the number of matches and correct enumerations found in the surrounding blocks.  Various scenarios were identified that could explain the difference, and ESCAP II directed that evaluations be conducted to investigate the source of this difference, identify the scale of any error, and assess whether its magnitude could significantly affect the accuracy of the adjusted data.  This analysis necessitated additional field work.

The evaluations indicated that the causes of the discrepancies were for the most part related to a scenario that does not significantly affect the resulting DSEs.  That is, most of the 3 million difference was attributable to the A.C.E. listing housing units in the blocks surrounding the sample blocks, which had little, if any, effect on the DSE.  The evaluations did, however, detect about 246,000 A.C.E people (SE 82,000) located out of the surrounding blocks.[21]  The evaluations also estimated that an additional 195,000 people (SE 56,000) were incorrectly identified as having been correctly enumerated, but although they were found to have been out of the search area.  The effect of these errors is an approximate overstatement of the net undercount by about 450,000 persons.  It appeared that a portion of these errors were also included in the results of the EFU and Matching Error Study.  While some additional work is required to

---

[20]ESCAP II Report No. 12, "Analysis of Missing Data Alternatives."

[21]ESCAP II Report No. 2, "Evaluation of Lack of Balance and Geographic Errors Affecting Person Estimates."

completely resolve the potential effects of balancing error, the ESCAP believes that most of the previous concerns regarding balancing error have been addressed.

## Conditioning

Conditioning, or contamination bias, refers to the situation where the A.C.E. influenced the census. ESCAP I assumed in its deliberations that any effects of conditioning or contamination bias were minimal, and could be ignored. This assumption was based on previous experiences in the 1990 census. Evidence presented to ESCAP II confirmed that contamination bias was not a problem in Census 2000, as research did not identify any evidence of its presence.[22]

## Reinstated Late Additions

While ESCAP I did not identify Census 2000 late additions as a source of error, levels of these additions were significantly higher than in the 1990 census. Late additions refers to persons included in the final census count who were excluded from A.C.E. matching and dual system estimation because of their late inclusion. For Census 2000, the late additions consisted exclusively of housing units that were temporarily removed from the census because they were suspected to duplicate other housing units, but which were later (after the A.C.E. matching process started) reinstated into the final census after further research. ESCAP I determined that if the reinstated people were a small percentage of the correct enumerations in the census, or if their A.C.E. coverage rate was similar to the A.C.E. coverage rate for census people included in A.C.E., then there would be a minimal effect on the DSEs.[23] To validate this assumption, additional research was conducted.

Based on this additional work, ESCAP II concluded that the effect of excluding reinstated census people from the A.C.E. was minimal. The A.C.E. coverage rate may have been overestimated by 0.034 to 0.082 percentage points.[24] This result confirmed the assumption, previously made in the ESCAP I Report, that the effect of the reinstated people on the DSEs would be small.

## Census 2000 Imputations

Census 2000 experienced a higher rate of whole person imputations than in the 1990 census. Whole person imputations were excluded from A.C.E. matching activities, but reflected in the census coverage error as measured by the A.C.E. ESCAP I was concerned that information was

---

[22]ESCAP II Report No. 14, "Conditioning of Census 2000 Data Collected in Accuracy and Coverage Evaluation Block Clusters."

[23]Howard Hogan (March 2001). "Accuracy and Coverage Evaluation Survey: Effect of Excluding 'Late Census Adds,'" DSSD Census 2000 Procedures and Operations Memorandum Series No. Q-43.

[24]ESCAP II Report No. 21, "Analysis of Census Imputations."

not available at the time to validate that the whole person imputations were explainable by Census 2000 design features (and thus should have no discernible impact on the A.C.E.). ESCAP II concluded that the kind, level, and pattern of whole person imputations in Census 2000 raised no additional issues relative to the accuracy of the A.C.E. adjustment.

Approximately 5.77 million persons had all their characteristics (short form data items) imputed in Census 2000, compared to 1.97 million persons in the 1990 census. Approximately 1.2 million of these persons were added to the census count through a count imputation process. The remaining 4.6 million persons were counted directly through the census enumeration process, but had all their person characteristics imputed because information about them was substantially missing from the census records.[25] Research into the sources of the whole person imputations identified that changes in the census design contributed to the level of housing units requiring imputation. Furthermore, the count imputation rate was comparable to the rate experienced in the 1970 and 1980 censuses.

Characteristics of the imputed persons were also examined. The age, race and sex characteristics of the population requiring some form of imputation was similar to the data-defined population with the exception of the age category under 18. The relatively higher percent of the population under age 18 in the imputed population was due to the high proportion of younger people in the "within household" category and reflected the fact that large households (greater than 6) were likely to have children not able to be accommodated by the 6-person mail-return form, and thus require imputation.[26]

## Total Error Model and Loss Function Analysis

The total error model is designed to incorporate the results of the evaluations to produce a composite estimate of the bias and variability (both sampling and non-sampling) in the A.C.E. These measures are used to correct the A.C.E., thus producing measures of the "true" population that can be used to assess the accuracy of the adjusted and unadjusted census data. The total error model produces measures of this "true" population in the form of target populations which are based on various assumptions because the truth is not known.[27] The total error model used by ESCAP I relied in part on 1990 data, as complete Census 2000 evaluations of the A.C.E were not then available. This preliminary model adapted the 1990 total error model to the Census 2000 environment. For the current deliberations, the ESCAP II wanted to base recommendations on current data. Therefore, development of a new total error model was undertaken to incorporate the results of the Census 2000 evaluations. The complexities of the revised EFU study and the A.C.E. design did not allow for the development and validation of a new total error model.

---

[25]ESCAP II Report No. 21, "Analysis of Census Imputations."

[26]ESCAP II Report No. 22, "Characteristics of Census Imputations."

[27]Mulry, Mary H. and Spencer, Bruce D. (March 2001), ESCAP II Report No. B-19*, "Overview of Total Error Modeling and Loss Function Analysis," DSSD Census 2000 Procedures and Memorandum Series No. B-19*.

Therefore, the ESCAP has had to rely on the individual evaluations described above. It is also apparent that a significant amount of additional research and development will be necessary before a complete total error model is available. ESCAP II believes that the information currently available is strong enough to preclude the use of adjusted data for any further Census 2000 purposes, but that future research may lead to improved A.C.E. estimates, that could, in turn, be used to improve the post-censal estimates.

## Synthetic Estimation

The A.C.E. estimation methodology produces estimated coverage correction factors for each post-stratum. These factors were carried down within the post-strata in a process referred to as synthetic estimation. The key assumption underlying synthetic estimation is that net census coverage is relatively uniform within the post-strata. Failure of this assumption leads to synthetic error. Synthetic error affects both the adjusted and unadjusted census results. ESCAP I analyzed the effects of synthetic error by using artificial populations, which are populations created with surrogate variables to reflect the distribution of net coverage error. Additional synthetic estimation analysis for ESCAP II focused on expanding the scope of the earlier artificial population work.

ESCAP II continues to be concerned with synthetic error because it is not included directly in the total error model. However, as the synthetic error analysis must be considered in conjunction with loss function analysis based on the total error model, there is no need to consider the effects of synthetic error at this point.

# Conclusion

ESCAP II recommends that unadjusted Census 2000 data be used for non-redistricting purposes. The Committee was persuaded by new evidence indicating that the A.C.E. overstated the net undercount by at least 3 million individuals as a result of the survey's failure to measure a significant number of census erroneous enumerations. However, the Committee believes that, while Census 2000 successfully lowered the differential undercount, it did not eliminate it. Therefore, the Census Bureau will conduct further research and analyses to attempt to produce revised A.C.E. estimates that can be used to improve future post-censal estimates.

The ESCAP II recommendation, if accepted, means that Census 2000 long form results will be weighted with unadjusted population counts, and that post-censal population estimates and survey controls will also rely on unadjusted data. The Census Bureau will continue research on the issues discovered with the A.C.E., particularly the issue of census duplicates and their estimation or detection. It is quite possible that this research will develop methods to improve future population estimates by combining information from the census, A.C.E., and the A.C.E. evaluations, including the Person Duplication Studies. Post-censal estimates and survey controls are updated annually, offering the opportunity to incorporate improvements. Even if the research does not lead to improved post-censal estimates, it will still further our understanding of the nature of census duplications and other erroneous enumerations, and the problems with their estimation by the A.C.E. This knowledge will be vitally important to the planning of the 2010 census and to the improvement of future coverage surveys.

Both census taking and coverage measurement are processes that evolve and improve with each census. The Census 2000 experience will help refine both census and coverage measurement processes for future censuses.

## Attachments

1. List of ESCAP II Reports

2. Analysis Plan for Further ESCAP Deliberations Regarding the Adjustment of Census 2000 Data for Future Uses