*/5*

# Civil Courtroom Minutes

United States District Court
Southern District of Texas
FILED

NOV 13 2001

Michael N. Milby, Clerk of C:

| | |
|---|---|
| JUDGE | Hilda G. Tagle |
| CASE MANAGER | Stella Cavazos |
| LAW CLERK | ☐ Roberts   ■ Lehrman |

DATE | 11 — 13 — 01

TIME | | a.m. | | a.m. |
| 2:00 | p.m. | 3:00 | p.m. |

CIVIL ACTION | B — 01 — 82

STYLE | Cameron County et al.,
*versus*
Donald Evans, Secretary/Dept. of Commerce, et al

DOCKET ENTRY

(HGT) ■ Status Conference                    (Court Reporter: Breck Record)

Attorney(s) for Plaintiff(s):     Rolando Rios & George Korbel, all Plaintiffs

Gary Gurwitz, Hidalgo County

Attorney(s) for Defendant(s):

Thomas Millet, DOJ Civil Division

**Comments:**

The Court asked where this case is procedurally. Mr. Rios said they have served the other side with interrogatories and they have replied in part. On October 15, the Department of Commerce was going to decide whether to release the adjusted data. The Motions for Summary judgment were filed prior to that decision. On October 15, the Department decided not to release the adjusted numbers. Within 4 months Mr. Rios expects to be ready for trial after deposing experts.

Mr. Korbel & Mr. Gurwitz had nothing to add. Mr. Millet said the next step is the resolution of the dispositive motion. This would be helpful to the parties to know which direction the case is going. If there are remaining issues they will come up with a discovery plan, then status conference etc.

The Court asked Mr. Millet:

1. Give an example as to, when an administrative decision is procedural and when it becomes a substantive issue. Put another way, when does a procedural rule become a substantive rule? Mr. Millet

replied, were the Census Bureau to have enacted a rule, like guidelines, as to when adjusted data would be used, that would be substantive. The rule here just talked about who would make the decision, so it is not substantive. The rule does not address what the decisionmaker had to consider, or anything like that. It is simply a rule of agency procedure identifying person who makes the determination. It is also clear that that particular count is moot because the acting director has twice stated that he opposes adjusted data being used.

2. What is the definition of release? Mr. Millet stated that the Census bureau only releases data. One way it is used is for redistricting. 13 U.S.C. § 141. The Bureau has no statutory obligation to release data for use as a factor in federal funding formulae. Release can be for redistricting, or it could mean, release under FOIA.

3. In the FOIA context, you are not required to release something that is predecisional or deliberative. Please define those terms. Specifically, the Court asked, what is predecisional or deliberative about numbers? Mr. Millet stated that there was no argument that adjusted data are predecisional in the sense that they precede decisions. But how are they deliberative? There is an appearance of fact about them. FOIA caselaw makes a distinction between facts and opinions. But there is an application of expertise in these numbers. Adjusted numbers are an estimate of the population, as is enumeration. Competing estimates, how to design the survey, which statistical model to use, which samples to use, which demographic, etc, these are all professional judgments which they had to make to come up with the data. Both methods are trying to measure the population, so they can't both be facts. Both are estimates. The Secretary found mistakes in the adjusted data. Numbers have an aura of objectivity, but they are really the product of professional judgment, scientific review and skill, and are more like estimates. The data are analogous to a property assessor's assessment of a piece of property-- it is an opinion. The decisionmaker here was presented with 2 competing estimates.

4. The Court asked Mr. Millet to discuss the difference between adjusted and unadjusted data, and to discuss the nonjusticiability of Plaintiffs' claims. Mr. Millet stated that the Department is no longer asserting the ripeness argument. The FOIA claim is being appealed. The Court asked again about the difference between adjusted and unadjusted data, and the role of feasibility and accuracy. Mr. Millet stated that under §195, the first operation is conducting the census. Census takers go to each household and determine the number of people in each household. There are mistakes. There is a well-documented racially differential undercount. There are different levels of undercount based on different groups-- minorities are less well counted than non-minorities. Minorities are historically underrepresented in the census, so they are also in representation, and funding. This undercounting may have happened in March 2000. The Secretary was supposed to release data for redistricting. DOC v. US HOUSE OF REPRESENTATIVES. For redistricting, the Secretary had two sets of data to choose from. The way adjusted data works is this: a sample survey of designated blocks is taken, then matched to the census

counts, then the blocks are ratioed to the census to determine undercount rates for each demographic group. In March, the Secretary was required by statute to release data for redistricting. The evaluations for redistricting revealed that the adjusted data gave a false result when it came to the count. The Census Bureau used a demographic analysis, which is useful to produce an accurate estimate at a national level (only). Demographic analysis is considered very accurate at a national level. The Secretary had decided use a demographic to measure how well the adjusted ACE data were. Where the adjusted ACE data measured an undercount, however, the demographic analysis revealed an over count– which has never happened so it was startling. So, it was clear from this that there was a problem either in the enumeration, the adjusted ACE data or the demographic analysis. The Bureau was simply not sure where the problem lay, so until they knew they decided to use the unadjusted data. The Bureau then ran tests (called loss functions) to measure whether there was a sampling error. There are 2 kinds of errors: 1) sampling error- this usually means a problem due to the margin of error. 2) Non-sampling error: the data are possibly bad. There may be mistakes in the data. The Bureau said if you look at state level data, there was no evidence of sampling error, but at the county level, there is evidence of sampling error. Until the Bureau could determine where error was it chose to use the unadjusted data.

In October the Bureau found the problem to be with adjusted data. If they had used the adjusted data, they would have overestimated the undercount. The Bureau determined that the adjusted data are flawed. Use of the adjusted data would have added persons to the census count. The issue here is: given that adjusted data are known to be flawed, the Plaintiffs must show that Congress requires them to be used anyway. As a matter of common sense, there is no way §195 says this. The *City of Los Angeles v. Evans* opinion rejected this argument. "Feasible" has to mean that the Bureau and the Secretary have some discretion. Further, the history of § 195 shows that long form sampling can be replaced by shorter form sampling. "Feasible" refers to this-- and was not meant to be interpreted to force use of flawed data. Plaintiffs have attempted to distinguish *City of Los Angeles* because that case had to do with block level accuracy. But block level accuracy has nothing to do with anything.

5. The Court asked, what is relative population? Mr. Millet stated that Plaintiffs cannot just claim that they would have had more people counted and therefore more funding if the Bureau had released the data. There is a fixed pie. If everyone else would have gotten a bigger population as well, showing that Plaintiffs were undercounted does not mean anything. Plaintiffs must show that their populations relative to competing jurisdictions is bigger. None of the Plaintiffs has even tried to do that except Hidalgo County, and they used "margin adjusted rates", which the Bureau has determined to be wrong, and done it using studies which use variables other than population. Their study does not measure person per dollar. Plaintiffs must show a larger share of pie and identify a funding program where they will get a larger share. The Court asked whether Mr. Millet was saying also that the Bureau is not responsible for funding, Congress is, or certain agencies. Mr. Millet agreed. The Secretary of Commerce is not the person who

decides how much money anyone gets. The money goes to Texas, not directly to the County. There is an intervening actor– the state. This speaks to the causation element of standing- injury. As to redressibility- even if the court does what Plaintiffs ask, the fact that the data have now been shown to be flawed, it is highly speculative that any agency will ever use them for anything.

6. The Court asked Mr. Millet to explain the *City of LA* case. Mr. Millet stated that it involved an identical claim. There, the Plaintiffs injury was reduced representation in state and local assemblies, as well as loss of funds flowing from the Secretary's decision not to release the adjusted data. This was largely the same argument as the one we see here. *LA* argued that the Secretary used the wrong interpretation of § 195. They pointed to the same parts of the ESCAP report and attempted to argue that adjusted data were better. The judge in *LA* concluded that there is no way that the Secretary would be required to release the adjusted data. The longstanding interpretation of §195 allows discretion to the Secretary. As a matter of common sense, it doesn't make sense that the Secretary is required to use flawed data.

7. The Court asked about the Equal protection claim. Mr. Millet first addressed the standing issue: Plaintiffs are local governments, complaining of discrimination against Hispanics, and they do not have standing to raise issues for third parties. Plaintiffs must have their own injuries. Also, Plaintiffs have failed to allege an essential element of their equal protection complaint-- that the Defendant intended to discriminate against the Plaintiff– there is no allegation of that. Plaintiffs have alleged disparate impact, and from that the Court might infer intent. But Plaintiffs have not alleged it, and that omission is fatal to the claim. There is no evidence that the Secretary discriminated intentionally against Plaintiffs. When a party files a claim, they have to allege each element of the claim.

8. Mr. Rios then came to the podium: As to the Equal Protection claim, Plaintiffs believe that in their brief they make clear that caselaw allows for a Plaintiff to prove intent through circumstantial evidence. For 40 years the census has undercounted minorities. This shows continual neglect, and from this Plaintiffs can prove intent. *Arlington Heights. Rogers v. Lodge.* The *Arlington* court outlined factors that a court may consider in evaluating if an intent to discriminate can be inferred. They are: a disparate impact, a pattern of events which is unexplainable on grounds other than race, departures from ordinary practice. Here, this continued undercounting is hard to explain on grounds other than discrimination. The Bureau has changed its position several times as to whether there has been an undercount. There are 2 sets of numbers, and they are estimates. Congress ordered sampling to catch all the people they missed historically. Plaintiffs are just asking for the data so they can know what the real population is. If the adjusted numbers are used, 450 million dollars will be affected every year. The Court asked about what was involved in *Arlington Heights*. Mr. Rios stated that the government in that case took the position that they didn't discriminate because there was no smoking gun. After *Arlington*, you don't need smoking gun.

9.  Mr. Rios then mentioned a Rule 12b motion, and stated that in ruling on it, the court must view the facts in light most favorable to nonmovant.  The court asked if the Counties have standing to assert the equal protection claim?  Are they asserting the rights of third parties?  Mr. Rios responded that the Plaintiffs are counties which are recipients of less federal funds due to the undercount.  Also, individual taxpayers, the judges, have the right to raise the issues.  Plaintiffs understand that Defendants are abandoning the ripeness issue because a final decision has been made with regard to the data.

10.  As far as feasibility, it is the Plaintiffs view that Congress had already decided the issue of feasibility.  The Secretary does not have a lot of judgment there.  If the data is there, it should be released.  Plaintiff cited the Supreme Court's decision in *DOC v. HOR*.  Adjusted number do not have to be used for apportionment.  In considering Congress' changes, the section now requires the Secretary to use adjusted data.  Even though such data cannot be used for apportionment, it must be used for other purposes.  Congress limited the Secretary's discretion.  *City of LA* was about redistricting.

11.  The court asked about the status of the appeal of the FOIA claim.  The Plaintiff predicted that the appeal will be denied, and it is more expeditious to go forward with the claim.

12.  Mr. Millet then came to the podium.  As to the appeal of the FOIA claim if it is indeed denied, he will inform the court and the claim will be ripe.  In *DOC v. HOR*: the court discussed "myriad data", and this reference is solely to long form sampling, not about which data to use.  As to the individual Plaintiffs having standing to raise the equal protection claim, neither individual claims any benefit from the federal programs.  This case is not at all like *Arlington Heights*.  Plaintiffs are required to plead any facts now, and they have not.

13.  The Court stated that the parties will have her decision on the motion to dismiss by January 4, 2002.  The parties will reconvene for a status conference sometime around that time if need be.  The parties are directed to get date from court clerk, and at that time to give the Court the parties' best estimates as far as the timeline.  The Court told the parties to give their fax numbers to the clerk of the court so they can have orders of the court faxed to them right away.

14.  Mr. Rios stated that as the parties go through discovery, he may seek further discovery, and will file the necessary documents with the Court.  Mr. Millett said he is willing to consider any future discovery requests.