*18*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

JAN 3 0 2002

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| CAMERON COUNTY, TEXAS et al., Plaintiffs, | § § § § | |
| v. | § § | Case No. B-01-082 |
| DONALD EVANS, Secretary of the Department of Commerce, et al., Defendants. | § § § § | |

**ORDER**

BE IT REMEMBERED that on January 28, 2002, the Court **DISMISSED** Plaintiffs' APA claims, **DISMISSED** Plaintiffs' Fourteenth Amendment Equal Protection claim, **DISMISSED** Plaintiffs' Due Process claims under the Fifth and Fourteenth Amendments, **GRANTED** judgment on the pleadings in favor of Defendants on the Census Act claim and **GRANTED** judgment on the pleadings in favor of Plaintiffs on the FOIA claim. It is hereby **ORDERED** that the adjusted data be released to Plaintiffs by the Department pursuant to Plaintiffs' FOIA requests.

1.   Introduction

This case arises out of a decision by Secretary of Commerce Donald Evans not to release certain unadjusted census data figures relating to the 2000 Census. Plaintiffs, who are Texas counties, cities, and presiding officers of County Commissioners' Courts, filed this action on May 10, 2001 challenging the Secretary's decision not to use adjusted data in calculating population for Hidalgo and Cameron Counties and several cities within those counties. Plaintiffs brought this action against the Department of Commerce and Secretary of Commerce Donald Evans under the

1

Administrative Procedure Act, Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Freedom of Information Act.

Prior to February 2001, 15 C.F.R. § 101 delegated authority to the Director of the Census to make the final determination whether statistically adjusted figures should be released to states and localities for redistricting purposes. In February 2001, Secretary Evans promulgated a rule ("Evans rule") which revoked that regulation, redelegating that authority to himself. Plaintiffs argue that the Evans rule violated the Administrative Procedure Act ("APA") 5 U.S.C. § 551 et seq. ("APA") because the rule was not subject to a "notice-and-comment" period. A "notice-and-comment" period is required under the APA before substantive rules may take effect. See 5 U.S.C. § 553. Plaintiffs also maintain that Evans exceeded his authority and discretion under the APA in promulgating the Evans rule.

Plaintiffs next argue that Secretary Evans violated the Census Act (13 U.S.C. §195) which requires, if "feasible," the release of statistically adjusted census data for all purposes other than the apportionment of the House of Representatives.

Plaintiffs further maintain that as political subdivisions containing a large proportion of minority citizens, they were deprived of their fair share of federal funding in violation of the Fourteenth Amendment of the United States Constitution as a result of the Census undercount resulting from the use of unadjusted data.

In their amended complaint, Plaintiffs also contend that the denial of their request for the statistically adjusted population figures violated the Freedom of Information Act ("FOIA").

Plaintiffs seek declarations that the Evans Rule violates the notice-and-comment provisions of the APA, that Evans exceeded his authority to make the final decision whether to release the data, that it is "feasible" within the meaning of the Census Act for the Secretary to release the adjusted data, and that such data must be released and deemed official census data for federal funding purposes. They further ask the Court to enjoin the Defendants from withholding undercount figures from them, as well as for an award of attorneys' fees, costs, and expenses.

Defendants have moved for dismissal under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the alternative for summary judgment, [Dkt. No.4] on all claims except the FOIA claim. Defendants argue first that the claims are not justiciable because the Plaintiffs have no standing, and the claims are both moot and not ripe. Defendants have also moved for judgment on the pleadings, or in the alternative, for summary judgment on the FOIA claim [Dkt. No. 9], asserting that any documents requested under FOIA are not to be disclosed to Plaintiffs under Exception 5 to FOIA, which applies to documents that are "predecisional and deliberative."[1]

2.   Dismissal Standard

A party wishing to raise a defense under Rule 12(b) must do so "before pleading if a further pleading is permitted." See 5A Wright & Miller Federal Practice & Procedure §1361 ("If defendant decides to assert a Rule 12(b) defense by motion, he must do so before filing his answer.") Because Defendant has not filed a responsive pleading to any of Plaintiffs' claims, the Court applies the standard for dismissal.

The strict standard of review under Rule 12(b)(6) has been summarized as follows: "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." See Shipp v. McMahon, 234 F.3d 907 (5th Cir. 2000) superseded on other grounds at 234 F.3d 907 (5th Cir. 2000) cert. denied 121 S. Ct. 293 (May 29, 2001) quoting 5A Wright & Miller § 1357. The standard of review is the same for motions to dismiss under Rule 12(b)(6) and Rule 12(b)(1). See Benton v. United States, 960 F.2d 19, 21 (5th Cir. 1992).

Defendant has also moved for judgment on the pleadings pursuant to Rule 12(c) as to the FOIA claim. Unlike a motion to dismiss under Rule 12(b), however, "defendant may not move under Rule 12(c) until after he has answered." 5A Wright & Miller, Federal Practice & Procedure §1367. Here, Defendants both moved under Rule

---

[1] The Court has been apprised that Defendants are no longer pursuing their original defense of lack of ripeness under FOIA with regard to Plaintiffs Hidalgo and Cameron Counties, since the denial of the FOIA decision has been appealed. [Dkt. No. 15].

3

12(c) and filed their answer on September 11, 2001. In reviewing a motion for judgment on the pleading pursuant to Rule 12(c), the Court bases its decision on the pleadings only. See Youngblood v. Bender, 104 F.Supp. 2d 618, 619 (E.D. La. 2000). The motion will be granted only if the moving party clearly establishes that no issue of material fact remains to be resolved and that it is entitled to judgment as a matter of law. See J.M. Blythe Motor Lines Corp. v. Blalock, 310 F.2d 77, 78 (5th Cir. 1962). The Court views the facts in the light most favorable to the nonmoving party, and draws all reasonable inferences in that party's favor. See 5A Wright & Miller § 1368.

3.  Facts

The uncontested facts are as follows. Donald Evans is the Secretary of Commerce. The Constitution vests Congress with the authority to conduct the Census, and Congress has delegated that authority to the Secretary of Commerce, who conducts the Census through the United States Census Bureau, a suborganization of the Department of Commerce.

The decennial Census has historically undercounted certain racial and ethnic minorities, and they are undercounted at a higher rate than other minorities and non-minorities. One method of assessing population involves the use of "adjusted" data. "Adjusted" data measures population by using a "capture-recapture" methodology: comparing the "capture" count (a complete enumeration of the population) with the "recapture" sample survey, in which designated blocks of population around the country are counted.[2] People who are counted in both the "capture" and "recapture" are deemed correctly enumerated. Those people found using one method but not the other are deemed "undercounted" or "overcounted". Using this material, post-strata demographic groups are then created, which are organized by race, ethnicity, age, sex, housing tenure, mail return rate and metropolitan status/census enumeration method. Overcounts or undercounts are then estimated for each post-stratum by comparing the census count to the survey blocks. These "coverage correction" factors are then applied

---

[2] For a more detailed explanation of "capture-recapture" methodology, see Wisconsin v. City of New York, 517 U.S. 1, 8 (1996).

4

by using mathematical formulae to synthetically "adjust" the results to account for the over- and undercounts. The "adjusted" data therefore produce different results than data which has not been so adjusted ("unadjusted data").

On October 6, 2000, the Department of Commerce published a rule, 15 C.F.R. 101, which shifted authority to decide whether to use adjusted or unadjusted data in tabulating Census 2000 from the Secretary to the Director of Census Bureau. On February 16, 2001, Secretary Evans revoked the rule in part. The revocation redelegated the authority to him, with advice from the Acting Director of the Census Bureau and the Executive Steering Committee for Accuracy and Coverage Evaluation Policy ("ESCAP"), a body created in 2000 for the purpose of advising the Secretary as to this very decision. On March 1, 2001, the Acting Director and ESCAP recommended to the Secretary that he not release the adjusted data figures as the official Census 2000 redistricting data. The recommendation was based on an overall conclusion that accuracy would not be achieved by adjusting the data. Of significant concern were inconsistencies between the adjusted data Demographic Analysis ("DA") estimates. DA estimates provide a measure of population at the national level, through an analysis of data on births, deaths, immigration, emigration, and Medicare enrollments. The DA figures indicated that there had been a net overcount of the population of 1.8 million persons, while the Accuracy and Coverage Evaluation ("ACE"), another sample survey, estimated a net undercount of 3.3 million. ESCAP concluded that it was necessary to further investigate the inconsistencies before recommending that the adjusted figures be used. The Secretary ordered that the unadjusted data be released to the states for their use in redistricting. The Census Bureau continues to study the data from the census and the ACE, considering, among other things, whether adjusted census data are more accurate for other uses, like federal funding.

4.  Standing as to APA claims

Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' APA claims for three reasons: lack of ripeness, mootness,[3] and lack of standing. In order to have standing, Plaintiffs must show that 1) they have suffered a concrete injury in fact, which was 2) caused by Defendants and 3) is capable of judicial redress. Bennett v. Spear, 520 U.S. 154, 162 (1997).

"When considering a 12(b)(1) motion to dismiss with a motion for summary judgment in the alternative, the Court must determine if subject matter jurisdiction is present before considering the substantive arguments of the summary judgment motion." Strait Shooters v. St. Tammany Parish, 2001 WL 1491182 (E.D. La. 2001) (slip op.). Lack of standing is a jurisdictional issue. Id. In a similar vein, the Court recognizes that the redressibility element of standing also necessitates treatment of the standing issue under Rule 12(b)(6), since failure to claim a redressible injury is, for our purposes, dispositive of a claim of failure to state a claim upon which relief may be granted.

Defendants argue that Plaintiffs' claims fail to confer standing in two fatal respects: 1) Plaintiffs have not alleged that their population would increase relative to other population segments (thereby failing to satisfy the injury-in-fact element of standing); and 2) Plaintiffs have failed to allege that ordering the Census Bureau to release the data would result in increased funding, which is allocated by other bodies (failing to satisfy the redressibility element).

---

[3] Defendants also state that Plaintiffs' claims under the APA are moot since, even if the Court were to declare the Evans rule to be in violation of the APA, thereby redelegating the authority to release or not release the data to the Acting Director of the Census Bureau, such redelegation would not address Plaintiff's harm because the Acting Director concurred with and approved the decision not to release the figures. The Court finds it unnecessary to reach either the mootness or the ripeness claims in light of the Court's holding that Plaintiffs lack standing to bring the APA claims.

6

i.   <u>Relative Population</u>

Funding distribution decisions are based on relative population share, not absolute population, and Plaintiffs have only claimed that their absolute population was undercounted. Defendants assert that each Plaintiff must claim that its relative population would increase in order to demonstrate concrete injury. Neither the complaint nor the amended complaint argues that a *relative* undercount has resulted in underfunding, and the Court will not assume that an absolute undercount results in a relative undercount for all the Plaintiffs. In order for a future "injury in fact" to confer standing, the alleged injury must be "actual or imminent, not 'conjectural' or 'hypothetical.'" <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). The Court holds that a claim of relative undercounting is necessary in order for Plaintiffs to defeat a motion for dismissal for failure to state a claim upon which relief can be granted.

ii.   <u>Responsibility for Funding Allocation</u>

Defendants further state that Plaintiffs fail to demonstrate redressibility since the complaint does not allege that Defendants are responsible for any funding allocation decisions which affect Plaintiffs. Rather, Defendants state, funding allocation decisions are made by federal and state officials not before this Court. "Moreover, in light of the serious inconsistencies identified by the Census Bureau with the accuracy of the adjusted data, it is sheer conjecture to assume that such third party officials would nevertheless use the adjusted data in allocating public funds over the next decade." [Dkt. No. 4 at 11]. The Court agrees. "[I]t must be "likely," as opposed to merely "speculative," that the injury will be 'redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 561 (citations omitted). The complaint does not allege that Defendants are responsible for funding allocation; indeed, Defendants claim that they are not responsible for those decisions [Dkt. No. 4 at 11]. Even if the Court were to grant the relief sought by Plaintiffs, Plaintiffs have not alleged that any third parties responsible for funding allocation would "likely" use the adjusted data. The Court will not engage in such speculation. Without a claim that Defendants have some control over funding

allocation, the complaint states no valid claim for relief. See Shipp, 234 F.3d at 907. The APA claims are therefore **DISMISSED** for lack of standing.

5.    Census Act

13 U.S.C. § 195 states, "the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title." Plaintiffs maintain that Defendants employed the incorrect standard (i.e., not the "feasible" standard) in deciding whether to release the adjusted data, and that such action violates the statute. ESCAP, in making its recommendation, concluded that the adjusted data were not reliable enough to authorize their use. The question then becomes whether "feasible" means simply operational feasibility, or whether accuracy, as determined by the Secretary, bears on feasibility.

The Secretary, through the Census Bureau, preliminarily determined that sampling was feasible [Dkt. No. 4 Ex. 10 at 13-14], but would not "release corrected redistricting data until it has brought its technical judgment to bear in assessing the available data to verify that its expectations have been met" (i.e., the expectation that the data would actually improve accuracy of the census). Id. at 51. The Court sees the determination that the sampling was feasible as contingent on a later determination that the data would provide improved accuracy. "The Secretary's decision not to adjust need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." Wisconsin, 517 U.S. at 19-20.

Through the Census Act, Congress has delegated its broad authority over the Census to the Secretary. Wisconsin v. City of New York, 517 U.S. 1, 19 (1996). It is undisputed that the goal of the Census is to achieve an actual enumeration of the population. 13 U.S.C. § 141(a) (the "Count" is the purpose of the Act); 13 U.S.C. § 141 note (stating that it is essential that the enumeration be as accurate as possible); Wisconsin, 517 U.S. 1, 6 (1996). At least one court has held that "feasible" means "capable of being accomplished in a manner consistent with the Act." American Water Works Association v. EPA, 40 F.3d 1266, 1270-71 (D.C. Cir. 1994). Plaintiff's reading

8

of "feasible" is that if the Secretary determines that sampling is operationally feasible, he must adopt it no matter how inaccurate the result. The Court agrees with Defendants that such a reading would lead to absurd consequences. The language "if he considers it feasible" indicates his broad discretion in making that determination. Indeed, in <u>City of Los Angeles v. Evans</u>, C.A. No. 01-1671 (C.D. Cal. April 25, 2001), the court held that a reading that "feasible" means operational feasibility would strip the Secretary of his ability to consider accuracy "even if all evidence indicates that the adjustment process developed flawed data . . . Reading the statute this way defeats the purpose of the Census Act in general and the specific purpose behind Congress's encouragement of the use of statistical sampling methods." <u>Id</u>. at 17. The Court must read a statute consistent with its object and policy. <u>Regions Hospital v. Shalala</u>, 522 U.S. 448, 460 n.5 (1998). Where the Secretary determines that an actual enumeration would be better achieved using one kind of data over another, his decision is consistent with the purposes of the Census, and thus with the Act. <u>Wisconsin</u>, 517 U.S. 1 (1996). The Court therefore finds that, as a matter of law, the Secretary did not exceed his authority under the Census Act by failing to release adjusted data where he determined that it was inaccurate, even though the data's existence made it operationally feasible to release it. Judgment on the pleadings is **GRANTED** in favor of Defendants.

6.  <u>Due Process and Equal Protection</u>

a.  <u>Equal Protection</u>

The Plaintiffs, most of which are cities and counties, are not protected by the Equal Protection clause of the Fourteenth Amendment to the Constitution. The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the Equal Protection of the laws." U.S. Const. Amend. 14 § 1. The Equal Protection clause protects people, not states or its municipalities. See <u>Pennsylvania v. New Jersey</u>, 426 U.S. 660 (1976); <u>Harris County v. Dowlearn</u>, 489 S.W.2d 140 (Tex. Civ. App.14 Dist. 1972) <u>overruled on other grounds by</u> <u>State Dept. of Highways and Pub. Transp. v. Payne</u>, 838 S.W.2d 235 (Tex. 1992). Although the complaint states that two Plaintiffs are the presiding officers of Cameron and Hidalgo Counties, it does

9

not state that they are members of a class alleging discrimination on the basis of a class characteristic. See Parham v. Hughes, 441 U.S. 377 (1979) (purpose of Equal Protection clause is to measure the validity of classifications made on the basis of race). In fact, no class of individuals asserts a claim here, nor do any individuals assert a claim on behalf of any class of persons.

Plaintiffs also fail to state a claim for Equal Protection upon which relief can be granted, as they fail to allege intentional discrimination. Plaintiffs argue only that the alleged undercount of Hispanics resulted in a disparate effect on that group, but do not allege an intent to discriminate. Plaintiffs must, in order to state an Equal Protection claim under the Fourteenth Amendment, allege either a) that the regulation discriminates against Hispanics on its face, (see Wayte v. United States, 470 U.S. 598, 610 (1985); Strauder v. West Virginia, 100 U.S. 303 (1880)); or b) the disparate impact is so great as to be evidence of an underlying intent by Defendants to discriminate. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977). Under the Arlington Heights framework, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." Id. at 265. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Id.; see also Yick Wo v. Hopkins, 118 U.S. 356 (1886). Although intentional discrimination may, as Plaintiffs point out, be inferred from a review of circumstantial evidence, Plaintiffs do not allege in their complaint that Defendants had any improper intent or purpose. Indeed, Plaintiffs allege only that the Secretary misunderstood the provision of the APA (§ 195) which they claim compels him to release the figures [Amended Complaint ¶ 46-50]. For both of the reasons discussed above, the Equal Protection claim is therefore **DISMISSED**.

b.   Due Process

The Due Process clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . ." U.S. Const. Amend 14 § 1. The Fifth Amendment to the Constitution states that "no person . . . . shall be deprived of life, liberty or property without due process of law."

10

In order to establish either a substantive or a procedural due process violation by claiming denial of a property right, a plaintiff must first establish a denial of a constitutionally protected property right. See Ruckleshaus v. Monsanto Co., 467 U.S. 986, 1001-004 (1984); Bryan v. City of Madison, Mississippi, 213 F.3d 267 (5th Cir. 2000); Spuler v. Pickar, 958 F.2d 103, 107 (5th Cir. 1992). Such a showing must be made by reference to state law as the Constitution does not create property interests. Schaper v. City of Huntsville, 813 F.2d 709 (5th Cir. 1987); Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed.2d 548 (1972). Because the Court has determined that Plaintiffs' claim that release of the adjusted data would lead to greater funding for Plaintiffs is merely speculative (see Part 4 supra), Plaintiffs cannot claim deprivation of any property interest. The Due Process claims under the Fifth and Fourteenth Amendments are therefore **DISMISSED**.

7.   FOIA

Plaintiffs further argue that Defendants' denial of their request for the adjusted figures under the Freedom of Information Act is unreasonable.[4] Defendants claim that the materials requested by Plaintiffs are not subject to disclosure under FOIA, because, under Exemption 5 of FOIA, "inter-agency and intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempt from disclosure. 5 U.S.C. § 552(b)(5). This privilege has been interpreted to protect agency records used by the government in a "deliberative process," and that are "predecisional". Skelton v. United States Postal Service, 678 F.2d 35, 40 n.6 (5th Cir. 1982). Privileged documents are those documents, "and only those documents, normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).

---

[4]   The Court notes that Plaintiffs' requests for release of the information under FOIA does not create the standing issues that a request for release of the same information under the APA or other laws creates, because FOIA specifically directs federal agencies to "make available to the public information . . ." 5 U.S.C. 552(a) and allows for requests of information by "any person" 5 U.S.C. 552(a)(6)(c). The denial of such a request and exhaustion of administrative remedies confers standing on Plaintiffs.

11

Agency records are protected as deliberative if they are "relate[d] to the process by which policies are formulated." National Wildlife Federation v. U.S. Forest Svc., 861 F.2d 1114, 1117 (9th Cir. 1998); Jordan v. DC Dept. of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978). Generally, purely factual materials are not protected, while advisory opinions are protected. See Herbert v. Lando, 441 U.S. 153 (1979); EPA v. Mink, 410 U.S. 73, 86-88 (1973) superseded on other grounds by statute and in Zweibon v. Mitchell, 516 F.2d 594 (D.C. Cir. 1975). Plaintiffs argue that the data are nothing more than a list of numbers, and as such cannot be protected as part of a deliberative process. Where intertwined with deliberations, however, "analysis and evaluation of facts are. . . a part of the deliberative process" and thus protected. See Skelton, 678 F.2d at 38. Defendants respond by stating that "the adjusted estimates are not raw numbers, but rather a statistical construct that embodies a host of calculations, assumptions, and hypotheses analyzed by professional employees." [Dkt. No. 9 at 15; Thompson Decl. ¶ 26].

The Court, in deciding whether information is opinion or fact, examines whether the information reflects the give-and-take of a consultive process. See Florida House of Representatives v. U.S. Dept of Commerce, 961 F.2d 941 (11th Cir. 1992). Recently, the United States District Court for the District of Oregon ruled, on facts substantially identical to these, that "[t]he fact that the adjusted data were the *subject* of the Secretary's decision– i.e., one of the alternatives in an either/or choice– does not satisfy the Department's burden of proving that the adjusted data was part of the *process* which led to the final decision on the issue of whether to use the unadjusted or adjusted data." Carter v. United States Department of Commerce, C.A. No. 01-868-RE (D. Ore. 2001). The Carter court distinguished Quarles v. Department of the Navy, 893 F.2d 390, 392-93 (D.C. Cir. 1990), in which a Navy study team evaluated seven proposed harbor sites in the Gulf of Mexico for the purpose of choosing one "homeport" from which to deploy a fleet of ships. At the conclusion of the study, the Secretary decided to deploy the ships from not one but several "homeports" in the Gulf. The Navy, in response to a FOIA request, provided redacted versions of the team's final report. The redacted portions included analysis, conclusions and cost estimates. The Quarles

12

court concluded that the military cost estimates were derived from a "complex set of judgments" and thus protected from disclosure.

The Ninth Circuit evaluated and distinguished <u>Quarles</u> in <u>Assembly of the State of Cal. v. U.S. Dept. of Commerce</u>, 968 F.2d 916, 922 (9th Cir. 1992) ("<u>Assembly II</u>"). The <u>Assembly II</u> court held that adjusted census data was closer to fact material than deliberation material, and would not reveal the agency's protectable thought processes. The court was of the opinion that "[t]he bare numbers reveal nothing about the process informing the judgment [as to which figures best estimated the actual population of the United States]." <u>Id</u>.

The agency has the burden of showing that the materials in issue are exempt. 5 U.S.C. § 552 (a)(4)(B). The <u>Carter</u> court rejected an argument made by the government which is similar to the one made to this Court: that the adjusted data are "the product of the subjective and enormously complex statistical operations used to generate the estimates," and therefore protected by Exemption 5. <u>Carter</u> No. 01-868-RE at 18. The <u>Carter</u> court noted that "the adjusted data were prepared in anticipation of, and intended for, public release if the Secretary had chosen to adjust the initial enumeration." <u>Id</u>. at 20. Therefore, the court concluded that the release of the numbers "would not reveal anything more about the deliberative process than has already been disclosed." <u>Id</u>. at 21.

The Court agrees. "While release of the data may subject the Department to some political controversy over the decision that was made, or generate some additional departmental embarrassment over numerical errors which have already been publicly disclosed, these are the very consequences which the FOIA intends: robust political debate, agency accountability and public disclosure rather than secrecy." <u>Carter</u>, at 21. "The adjusted data at issue in this case are clearly not suggestions, recommendations, or advice; they are not subjective or personal, and they do not reflect "agency give-and-take" by which a decision was made." <u>Carter</u> at 16. FOIA's exemptions are narrowly construed in light of FOIA's dominant objective of disclosure, not secrecy. See <u>Department of the Air Force v. Rose</u>, 425 U.S. 352, 361 (1976).

13

Judgment on the pleadings is therefore **GRANTED** in favor of Plaintiffs on the FOIA claim.

8.  Conclusion

Plaintiffs lack standing as to the APA claims; those claims are accordingly **DISMISSED**. Because the Fourteenth Amendment Equal Protection claim is facially deficient in several respects, it is likewise **DISMISSED**. Further, as Plaintiffs have failed to allege deprivation of a property interest without Due Process of law, the Due Process claims under the Fifth and Fourteenth Amendments are **DISMISSED**. Because the Court holds that as a matter of law the Secretary did not exceed his authority under the Census Act, judgment on the pleadings is **GRANTED** in favor of Defendants. Lastly, in light of the Court's holding that as a matter of law the data are not exempt under FOIA, judgment on the pleadings is **GRANTED** in favor of Plaintiffs and it is hereby **ORDERED** that the data be released to Plaintiffs by the Department pursuant to Plaintiffs' FOIA requests.

DONE this 28th day of January, 2002, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge

14